# EXHIBIT A(1)

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
**TRENWICK** AMERICA LITIGATION TRUST,
Plaintiff,
v.
ERNST & YOUNG, L.L.P.; Pricewaterhousecoopers,
L.L.C.; Baker & McKenzie L.L.P.; Milliman, Inc.;
James F. Billett, Jr.; Stephen H. Binet; Anthony S.
Brown; Richard E. Cole; Robert M. Demichele; Neil
Dunn; Paul Feldsher; Robert A. Giambo; Frank E.
Grzelecki; Alan L. Hunte; P. Anthony Jacobs; James
E. Roerts; Joseph D. Sargent; Frederick D. Watkins;
and Stephen R. Wilcox, Defendants.
**No. CIV.A. 1571-N.**

Date Submitted: June 2, 2006.
Date Decided: Aug. 10, 2006.

Neil B. Glassman, Esquire, and Peter B. Ladig,
Esquire, the Bayard Firm, Wilmington, Delaware;
Paul B. Lackey, Esquire, and Elizabeth K. Stepp,
Esquire, Lackey Hershman, L.L.P., Dallas, Texas,
Attorneys for Plaintiff.
Allen M. Terrell, Jr., Esquire, Richard P. Rollo,
Esquire, Richards, Layton & Finger, P.A.,
Wilmington, Delaware; William B. Dawson, Esquire,
J. Stuart Tonkinson, Esquire, Vinson & Elkins LLP,
Dallas, Texas, Attorneys for Defendant Ernst &
Young LLP.
A. Gilchrist Sparks, III, Esquire, and Alan J. Stone,
Esquire, Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware; Howard M. Shapiro, Esquire,
Jonathan E. Paikin, Esquire, Kyle M. DeYoung, and
Will L. Crossley, Jr., Esquire, Wilmer Cutler
Pickering Hale and Dorr LLP, Washington, District
of Columbia, Attorneys for Defendant
PricewaterhouseCoopers LLP.
Arthur G. Connolly, III, Esquire, Connolly Bove
Lodge & Hutz LLP, Wilmington, Delaware; Howard
W. Gutman, Esquire, George A. Borden, Esquire and
Ryan T. Scarborough, Esquire, Williams & Connolly
LLP, Washington, District of Columbia, Attorneys
for Defendant Baker & McKenzie L.L.P.
Brett D. Fallon, Esquire, and Joseph S. Naylor,
Esquire, Morris, James, Hitchens & Williams, LLP,
Wilmington, Delaware; R. Timothy Muth, Esquire
and Ryan S. Stippich, Esquire, Reinhart Boerner Van
Deuren, Milwaukee, Wisconsin, Attorneys for
Defendant Milliman, Inc.
J. Travis Laster, Esquire, Abrams & Laster, LLP,
Wilmington, Delaware; Richard W. Reinthaler,
Esquire, Michael C. Hefter, Esquire, and Konstantin
Chelney, Esquire, Dewey Ballantine, LLP, Attorneys
for Defendants James F. Billett, Jr., Stephen H. Binet,
Anthony S. Brown, Richard E. Cole, Robert M.
DeMichele, Neil Dunn, Paul Feldsher, Robert A.
Giambo, Frank E. Grzelecki, Alan L. Hunte, Anthony
Jacobs, James E. Roberts, Joseph D. Sargent,
Frederick D. Watkins, and Stephen R. Wilcox.

OPINION

STRINE, Vice Chancellor.

**\*1** This case is unusual. The primary defendants in
this case were directors of a publicly listed insurance
holding company. All but one of the eleven directors
was an independent director. The other director was
the chief executive officer of the holding company.

In 1998, the holding company embarked on a strategy
of growth by acquisition. Within a span of two years,
the holding company acquired three other unaffiliated
insurance companies in arms-length transactions. The
two transactions at issue in this case involved the
acquisition of publicly-traded entities and were
approved by a vote of the holding company's
stockholders. The holding company's stockholder
base was diverse and the company had nothing close
to a controlling stockholder.

In connection with the last acquisition, the holding
company redomiciled to Bermuda, for the disclosed
reason that tax advantages would flow from that
move. Consistent with the objective of reducing its
tax burden, the holding company reorganized its
subsidiaries by national line, creating lines of United
States, United Kingdom, and Bermudan subsidiaries.
As a result of that reorganization, the holding
company's top U.S. subsidiary came to be the
intermediate parent of all of the holding company's
U.S. operations. The top U.S. subsidiary also
continued and deepened its role as a guarantor of the
holding company's overall debt, including becoming
a primary guarantor of $260 million of a $490 million
line of credit, a secondary guarantor of the remainder
of that debt, and assuming the holding company's
responsibility for approximately $190 million worth
of various debt securities. Nonetheless, after that
reorganization, the financial statements of just the top

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

U.S. subsidiary indicated that it had a positive asset value of over $200 million.

In 2003, the holding company had to place its insurance operations in run-off globally. The holding company and its top U.S. subsidiary filed for bankruptcy. The cause of the failure was that the claims made by the insureds against the holding company's operating subsidiaries (including the insureds of the companies it had acquired) exceeded estimates and outstripped the holding company's capacity to service the claims and its debt.

The reorganization plan for the top U.S. subsidiary resulted in the creation of a Litigation Trust. That Trust was assigned all the causes of action that the U.S. subsidiary owned.

The Litigation Trust then brought this case. The essential premise of its claims is that the majority independent board of the holding company engaged in an imprudent business strategy by acquiring other insurers who had underestimated their potential claims exposure. As a result of that imprudent strategy, the holding company and its top U.S. subsidiary were eventually rendered insolvent, to the detriment of their creditors. Not only that, because the top U.S. subsidiary took on obligations to support its parent's debt and actually assumed some of that debt, the top U.S. subsidiary and its creditors suffered even greater injury than the holding company and its creditors.

**\*2** Although the complaint is full of inflammatory adjectival assaults on the motives of the holding company board, they are all of an entirely conclusory and unsupported nature. No pled facts suggest any plausible motive on the part of the holding company's board to cause the company or its top U.S. subsidiary to become insolvent or to dishonor the rights of their creditors. In fact, what the complaint pleads is that the managers and directors of the holding company simply replaced their existing options in the previous public entity, which had been domiciled in Delaware, with identical options in the Bermuda entity resulting from the last acquisition.

Furthermore, although the complaint accuses the board of the holding company of a lack of diligence, it does so by conclusory insult, not by fact pleading. The complaint is entirely devoid of facts indicating that the board did not engage in an appropriate process of diligence before deciding to make its acquisitions and to reorganize its subsidiary structure. Instead, the complaint argues from hindsight, that the

fact that the holding company's strategy ultimately failed must mean that the process that led to its adoption was the product of culpably sloppy efforts. Even less does the complaint confront the reality that the holding company directors are immune from liability for breaches of their duty of care, due to the holding company's exculpatory charter provision.

Had this claim been brought by a stockholder of the holding company, it would be easily stopped at the gate, because the complaint fails to plead a breach of fiduciary duty. This is not surprising given that it is unusual for arms-length transactions approved by majority independent boards and a diverse stockholder base to be subject to attack; after all, they are the quintessential transactions subject to the protection of the business judgment rule.

Here, what the Litigation Trust relies upon to make up for its pleading deficiencies is the later-arising fact of insolvency. But that fact does not aid it.

For one thing, the Litigation Trust has failed to plead facts supporting the inference that either the holding company or its top U.S. subsidiary were insolvent at the time of the transactions challenged in the complaint. For that reason, settled law indicates that the holding company owed no fiduciary duty to the top U.S. subsidiary or that entity's creditors. If the holding company, as controlling stockholder, owed no such duties, it is impossible to fathom how the holding company's directors owed such duties.

Moreover, the mere fact that the holding corporation caused its wholly-owned subsidiary to take on more debt to support the holding corporation's overall business strategy does not buttress a claim. Wholly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations; that is why they are created. Parent corporations do not owe such subsidiaries fiduciary duties. That is established Delaware law.

**\*3** That is not to say that Delaware law leaves the creditors of subsidiaries without rights. That would be inaccurate. Delaware has a potent fraudulent conveyance statute enabling creditors to challenge actions by parent corporations siphoning assets from subsidiaries. And Delaware public policy is strongly supportive of freedom of contract, thereby supporting the primary means by which creditors protect themselves-through the negotiations of toothy contractual provisions securing their right to seize on the assets of the borrowing subsidiary.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

What Delaware law does not do is to impose retroactive fiduciary obligations on directors simply because their chosen business strategy did not pan out. That is what the Litigation Trust seeks here, to emerge from the wreckage wielding the club that the holding company's own failed subsidiary can now accuse the holding company's directors of a breach of fiduciary duty. To sanction such a bizarre scenario would undermine the wealth-creating utility of the business judgment rule.

As untenable is the Litigation Trust's attempt to hold the former directors of the U.S. subsidiary liable for causing the subsidiary to support the holding company's business strategy. Again, the Litigation Trust fails to plead any facts suggesting a disloyal motive on the part of these former directors. In fact, the motive the Litigation Trust points to does not create an inference that these directors would have wished the subsidiary to become insolvent. Each of them owed his livelihood to the subsidiary. Why would they have wished to put their jobs in jeopardy purposely by hazarding insolvency?

Likewise, the complaint fails to plead facts suggesting that the subsidiary directors were less than diligent or misunderstood their roles. A wholly-owned subsidiary is to be operated for the benefit of its parent. A subsidiary board is entitled to support a parent's business strategy unless it believes pursuit of that strategy will cause the subsidiary to violate its legal obligations. Nor does a subsidiary board have to replicate the deliberative process of its parent's board when taking action in aid of its parent's acquisition strategies.

In the complaint, the Litigation Trust also has attempted to state a claim against the former subsidiary directors for "deepening insolvency." As noted, however, the complaint fails to plead facts supporting an inference that the subsidiary was insolvent before or immediately after the challenged transactions. Equally important, however, is that Delaware law does not recognize this catchy term as a cause of action, because catchy though the term may be, it does not express a coherent concept. Even when a firm is insolvent, its directors may, in the appropriate exercise of their business judgment, take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red. The fact that the residual claimants of the firm at that time are creditors does not mean that the directors cannot choose to continue the firm's operations in the hope that they can expand the inadequate pie such that the firm's creditors get a greater recovery. By doing so,

the directors do not become a guarantor of success. Put simply, under Delaware law, "deepening insolvency" is no more of a cause of action when a firm is insolvent than a cause of action for "shallowing profitability" would be when a firm is solvent. Existing equitable causes of action for breach of fiduciary duty, and existing legal causes of action for fraud, fraudulent conveyance, and breach of contract are the appropriate means by which to challenge the actions of boards of insolvent corporations.

*4 Refusal to embrace deepening insolvency as a cause of action is required by settled principles of Delaware law. So, too, is a refusal to extend to creditors a solicitude not given to equityholders. Creditors are better placed than equityholders and other corporate constituencies (think employees) to protect themselves against the risk of firm failure.

The incantation of the word insolvency, or even more amorphously, the words zone of insolvency should not declare open season on corporate fiduciaries. Directors are expected to seek profit for stockholders, even at risk of failure. With the prospect of profit often comes the potential for defeat.

The general rule embraced by Delaware is the sound one. So long as directors are respectful of the corporation's obligation to honor the legal rights of its creditors, they should be free to pursue in good faith profit for the corporation's equityholders. Even when the firm is insolvent, directors are free to pursue value maximizing strategies, while recognizing that the firm's creditors have become its residual claimants and the advancement of their best interests has become the firm's principal objective.

Along with dismissing the Litigation Trust's fiduciary duty claims and its deepening insolvency claim, I dismiss its claims of fraud. The fraud claims are not pled with appropriate particularity and rest on the general assertion that because the holding company and subsidiary became insolvent nearly three years after the last challenged transaction, the books and records of the companies must have contained knowing misrepresentations of material fact. Because such conclusory allegations do not satisfy Rule 9(b) and for other reasons, the fraud claims are not viable.

Finally, the Litigation Trust advances a host of claims against third-party advisors. Rather than detail what the advisors did that was wrongful, the Litigation Trust devoted much of the complaint to setting forth accusations made against these prominent advisors in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

other lawsuits. For a myriad of reasons, the claims against these advisors are deficient and will also be dismissed.

I now turn to the facts underlying this case and then to the merits of the motions to dismiss.

### I. *Factual Background*

#### A. *The Parties*

In 1999, Trenwick Group Inc. operated a specialty insurance and reinsurance organization issuing policies around the world. Trenwick Group Inc., which was a holding company, had five direct subsidiaries at that time and was a publicly-traded corporation. The most important of those subsidiaries for purposes of this case is Trenwick America Corporation ("Trenwick America"), which eventually became a wholly-owned subsidiary of Trenwick Group Inc.'s successor, Trenwick Group Limited. For the sake of clarity, I refer to both Trenwick Group Inc. and Trenwick Group Limited simply as "Trenwick." At all times, Trenwick was the ultimate parent and the company whose shares were publicly listed.

*5 On August 20, 2003, both Trenwick and Trenwick America filed for chapter 11 bankruptcy protection in the U.S. District Court for the District of Delaware.[FN1] As part of Trenwick America's Plan of Reorganization, the plaintiff Litigation Trust was formed and invested with the right to bring claims belonging to Trenwick America. Exercising that right, on September 20, 2005, the Litigation Trust filed this action.

> FN1. *In re Trenwick America Corp.*, United States Bankruptcy Court, District of Delaware, Case No. 03-12635 (2003).

The defendants in this case can be divided into three general groups: 1) the former directors of Trenwick,[FN2] the parent corporation; 2) the former directors of Trenwick America;[FN3] and 3) certain former advisors of Trenwick.[FN4]

> FN2. Defendants serving on the board of directors for Trenwick at various times were: James F. Billett, Jr.; Anthony S.

Brown; Richard E. Cole; Robert M. DeMichele; Frank E. Grzelecki; P. Anthony Jacobs; Joseph D. Sargent; Frederick D. Watkins; and Stephen R. Wilcox.

> FN3. Defendants serving on Trenwick America's board of directors were: James F. Billett, Jr.; Stephen H. Binet; Paul Fedsher; Robert A. Giambo; Alan L. Hunte; and James E. Roberts.

> FN4. The professional advisors named as defendants are Ernst & Young, L.L.P.; PriceWaterhouseCoopers, L.L.C.; Baker & McKenzie, L.L .P.; and Milliman, Inc.

#### B. *The History Of The Trenwick Companies Leading Up To This Litigation*

##### 1. *What Was Trenwick As Of The Beginning Of 1998?*

The amended complaint ("complaint") is a confusing muddle, laden with irrelevancies, and failing to set forth a coherent course of events. From the murk of the complaint, and certain public documents it relies upon, I will attempt to craft a more understandable rendition of Trenwick's relevant history.

Critical to that endeavor is establishing a baseline understanding of what Trenwick was before the transactions that the Litigation Trust attacks occurred. As of the beginning of 1998, Trenwick was a specialty insurance underwriting organization. Its shares were listed on the New York Stock Exchange. Trenwick did not have a controlling stockholder or anything close to one.

At that time, Trenwick's principally operated in the domestic United States as a provider of so-called "treaty reinsurance" to American insurers of property and casualty risks.[FN5] Trenwick conducted this business through an indirect, wholly-owned subsidiary, Trenwick America Re. Trenwick America Re was wholly-owned by a direct, wholly-owned subsidiary of Trenwick called Trenwick America Corporation-that is, "Trenwick America." As of 1997, the business Trenwick conducted through Trenwick America Re was its sole business, and Trenwick reported assets of almost $1.9 billion, stockholders' equity of almost $358 million, and a book value of $29.93 per share.[FN6]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 5

FN5. Trenwick also sold some so-called facultative reinsurance as of that point, but it was a small portion of its business.

FN6. Hefter Decl. Ex. G at 10 (Trenwick Form S-4 filed Aug. 23, 2000).

### 2. The 1998 Transaction: Trenwick Expands Into The International Markets By Acquisition

In 1998, Trenwick entered the international insurance markets for the first time. In February of that year, Trenwick acquired Sorema (UK) Limited. Like the existing domestic operations of Trenwick, Sorema's business consisted primarily of underwriting reinsurance. But Sorema also wrote certain specialty insurance policies. Upon acquisition, Trenwick renamed Sorema "Trenwick International Limited." Trenwick International Limited immediately became a major part of Trenwick's overall business.

As of December 31, 1998, Trenwick had assets of almost $ 1.4 billion, stockholders' equity of almost $348 million, and a book value of $31.49 per share.[FN7]

FN7. Hefter Decl. Ex. G at 10 (Trenwick Form S-4 filed Aug. 23, 2000).

### 3. The 1999 Transaction: Trenwick Expands Again Through The Acquisition Of Chartwell

*6 In October 1999, Trenwick consummated another major acquisition. That acquisition is challenged by the Litigation Trust in the complaint and therefore it is important to understand its precise nature.

The entity that Trenwick acquired by merger was Chartwell Re Corporation. Like Trenwick, Chartwell Re was an NYSE-listed company. The total cost of the acquisition to Trenwick was estimated at $368 million, which included the cost of the eight million new Trenwick shares issued to the former Chartwell Re holders as the merger consideration, the assumption of Chartwell Re's debt, and the costs to Chartwell of purchasing $100 million in reserve protection.

The latter issue is raised by the Litigation Trust prominently in the complaint. What it involved was a requirement, demanded by Trenwick, that Chartwell purchase $100 million in reinsurance to protect Trenwick against unanticipated increases in the reserves of Chartwell attributable to business

Chartwell wrote before the merger. According to the complaint, the $100 million was exhausted quickly after the merger, as Chartwell's claims exceeded even that excess coverage.[FN8]

FN8. Compl. ¶ 71.

By merging with Chartwell Re, Trenwick acquired several new U.S. and U.K. insurance businesses. The Chartwell insurance businesses were all rated by A.M. Best Company for claims-paying ability at an excellent level and by Standard & Poor's at an Afor claims-paying ability.[FN9]

FN9. Hefter Decl. Ex. B Ex. 99.2 at 3-4 (Trenwick 8-K filed June 25, 1999).

In the merger proxy Trenwick issued in connection with the Chartwell merger, it was estimated that after the merger with Chartwell, Trenwick would have assets in excess of $3 billion and that the combined companies' premiums for 1999 would be nearly $900 million, or more than double what Trenwick wrote in 1998 before the merger.[FN10] Thus, the acquisition was a major one.

FN10. Hefter Decl. Ex. B Ex. 99.2 at 2 (Trenwick 8-K filed June 25, 1999).

After the merger, Trenwick reorganized itself into four operating units by rationalizing its holding company structure to take into account both the Chartwell and the prior Sorema transaction. The reorganization appears to have occurred primarily along functional and geographic lines.

The principal operating units and their functions thus became:
• Domestic Reinsurance-This unit comprised the domestic reinsurance operations of the company and included both Trenwick's former domestic reinsurance business and the reinsurance business of Chartwell Reinsurance Company. Trenwick America was in this business line. The financials of Trenwick, the parent, aggregated all the business in this line, including those under the Trenwick America name.[FN11]

FN11. Trenwick's 10-K is clear that the reinsurance business of Chartwell

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 6
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Reinsurance Company was assumed by Trenwick America and that the 1999 financials of Trenwick America include the reinsurance business of Chartwell Re and its subsidiaries. *See* Hefter Decl. Ex. A. at 1-2 (Trenwick 10-K filed Aug. 22, 2000). But what is not clear from Trenwick's 10-K is whether the Chartwell Reinsurance Company formally moved to become a subsidiary of Trenwick America or whether Chartwell's reinsurance business was a separate sister company that merely began operating in the same business line as Trenwick America.

• International Reinsurance and Specialty Insurance-This unit sold global reinsurance and specialty reinsurance internationally. Trenwick International was in this business line.
• Chartwell Managing Agents (Management of Lloyds Syndicates)-This unit was comprised of the Lloyd's syndicates formerly controlled by Chartwell.
• Domestic Specialty Insurance-Canterbury Financial Group, Inc. was the name given to the U.S. specialty insurance businesses acquired from Chartwell. Those businesses, Insurance Corporation of New York and Dakota, were placed as subsidiaries under Canterbury.

*7 As is typical after major merger transactions, Trenwick restructured its debt. Thus, it entered into a $400 million credit facility in November 1999. A $170 million revolving credit facility for the use of Trenwick as a holding company comprised one major chunk of the debt. The other portion, $230 million, went to finance a five-year letter of credit for use by Chartwell Managing Agents in its Lloyd's syndicate underwriting operations. The assets of several Trenwick subsidiaries, including the Trenwick America operating unit entities, were pledged as security for the $400 million debt, thereby rendering Trenwick America a primary guarantor of that debt.

As with the acquisition of Sorema, Trenwick's merger with Chartwell did not involve a transaction with an affiliate. Chartwell was a listed company in its own right and both its stockholders, and the stockholders of Trenwick, voted to approve the merger. In Trenwick's case, 82.8% of the electorate participated in the vote, with over 90% voting to approve the deal.[FN12] After the closing of the Chartwell acquisition, three members of Chartwell's board joined the Trenwick board increasing the board from one 7/8 comprised of independent directors to

one 10/11 comprised of such directors.[FN13]

> FN12. Hefter Decl. Ex. C at 23 (Trenwick 10-K filed March 30, 2000).

> FN13. Chartwell directors Cole, DeMichele, and Grzelecki joined the Trenwick board. *See* Hefter Decl. Ex. H at 2-5 (Trenwick Proxy Statement filed Apr. 17, 2000); Hefter Decl. Ex. G at 64 (Trenwick Form S-4 filed Aug. 23, 2000).

As of the end of 1999, Trenwick had reported assets in excess of $3.24 billion, stockholders' equity in excess of a $462 million, and a book value of $27.37 per share.[FN14]

> FN14. Hefter Decl. Ex. G at 10 (Trenwick Form S-4 filed Aug. 23, 2000).

*4. The 2000 Transaction: Trenwick Grows Again By Merging With Another Public Company, LaSalle Re Holdings Limited*

Beginning in 1998, and continuing in 1999, Trenwick had explored an interest in acquiring yet another publicly-traded insurance company. That company, LaSalle Re Holdings Limited, was a Bermuda entity whose shares traded on the NYSE. The primary business of LaSalle Re was to operate as an underwriter of property catastrophe reinsurance on a worldwide basis. As a secondary line of business, LaSalle Re also wrote certain types of specialty insurance and provided capital support to certain Lloyd's of London syndicates.

After LaSalle finished exploring its options, which included overtures from entities other than Trenwick, it decided to sign a merger agreement with Trenwick. That agreement contemplated that both the Trenwick and the LaSalle common stockholders would become stockholders in a new NYSE-listed entity, Trenwick Group Ltd., which would be domiciled in Bermuda. For each share of their Trenwick and LaSalle shares, stockholders would receive one share in the new Trenwick Group holding company. As a result, the former LaSalle stockholders received a premium to market and would hold a majority of the shares of the resulting entity. The Trenwick stockholders voted to approve the merger on September 25, 2000. As a result of the LaSalle merger, the Trenwick board was increased to fourteen members when three former LaSalle directors were added to the board.[FN15] The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

board's independent supermajority grew from 10/11 to 13/14.

> FN15. *Id.* at 64. Neither the briefs nor the complaint specify the identity of the former LaSalle directors who joined Trenwick's board.

*8 As the merger proxy issued by Trenwick in connection with the LaSalle deal makes clear, the redomiciliation of the Trenwick public holding company to Bermuda was designed to secure advantageous tax treatment. Moreover, the merger proxy made clear that Trenwick would conduct an internal restructuring of its various subsidiaries before the merger "into three separate groups: a chain of U.S. corporations, a chain of U.K. corporations and a chain of Bermuda corporations." [FN16] Pages 54 and 55 of the merger proxy were largely devoted to explaining how the U.S. and non-U.S. subsidiaries would be taxed after the merger and the benefits of Trenwick Group's new Bermuda status.

> FN16. *Id.* at 92.

In the merger proxy, Trenwick's financial status as of June 30, 2000 was reported. As of that date, Trenwick had assets of nearly $3 .5 billion, stockholders' equity of $439 million, and a book value per common share of $26.98.[FN17] In the same document, it was reported that "All of Trenwick's principal insurance and reinsurance subsidiaries are rated A (Excellent) by A.M. Best Company, an independent insurance rating organization. Standard & Poor's Rating Services rates the financial strength of Trenwick's principal insurance and reinsurance subsidiaries as A+. Standard & Poor's also rates the Trenwick's counterpart credit and senior debt as BBB+ and its preferred stock as BBB-. On December 20, 1999, Moody's Investors Service confirmed its previously issued Baa2 rating for Trenwick's senior debt and revised its rating outlook to 'stable.' " [FN18]

> FN17. *Id.* at 10.

> FN18. *Id.* at 91-92.

As was also the case in the merger with Chartwell, both of the merger partners received fairness opinions. LaSalle's investment banker estimated the resulting Trenwick entity's value under a discounted cash flow analysis at $17.04 to $23.17 per share

without synergies and $19.14 to $25.73 per share with operating synergies from the merger.[FN19]

> FN19. *Id.* at 47.

This is not to say that the financial statements and information were devoid of less rosey information. They were not. In particular, they plainly revealed that Trenwick operations had suffered operating losses in 1999 [FN20] and Trenwick America operations (including the Chartwell U.S. reinsurance business as of their acquisition) had suffered operating losses in 1999 and 2000. [FN21]

> FN20. Hefter Decl. Ex. A. at 48, 53 (Trenwick 10-K filed Aug. 22, 2000).

> FN21. Stone Aff. Ex. 7 at 5 (Trenwick America Form 10-K filed Apr. 2, 2000).

5. *The Restructuring Of Trenwick Subsidiaries*

Beginning April 1, 2000, Trenwick began a reorganization of its subsidiaries that was completed on September 27, 2000. During the first stage of the restructuring of Trenwick's subsidiaries, Chartwell's reinsurance businesses, including all its active U.S. and U.K. reinsurance subsidiaries were transferred to Trenwick America as indirect subsidiaries. That transfer left Chartwell Re, originally the parent entity of all the Chartwell businesses and the direct subsidiary of Trenwick, holding as its only asset one inactive subsidiary. Also at this time, Trenwick America gained as indirect subsidiaries various U.K.-based Chartwell businesses, including Chartwell Managing Agents, which held the Lloyd's syndicates. In sum, with the exception of the Chartwell Re entity itself, all of the former Chartwell businesses were transferred to Trenwick America briefly during the first stage of the restructuring . [FN22]

> FN22. As previously noted, *supra* note 11, the reinsurance business of Chartwell may have been part of or a subsidiary of Trenwick America previous to this stage. At the least, they were operated together as a business line and the financial results were reported together.

*9 In September, the second and third stages of the restructuring occurred. During the second stage, all of the Chartwell U.K. business lines (i.e., reinsurance

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

and Lloyd's) that were transferred into Trenwick America in April were transferred out of Trenwick America to another principal operating subsidiary known as Trenwick Holdings Limited, which held only U.K.-based businesses, including Trenwick International. That is, Trenwick America was left primarily holding the U.S.-based reinsurance and specialty insurance businesses while Trenwick Holdings Limited was left holding all the UK-based businesses, regardless of the type of insurance business. Also, during the second stage, Trenwick contributed all of its assets and liabilities to Chartwell Re except for the $135 million intercompany payable it was owed by Chartwell Re. Trenwick's liabilities that were transferred included approximately $75 million in senior notes, approximately $113.4 million in subordinated deferrable interest debentures, and an additional $1 million in contingent interest notes that came from Chartwell during the 1999 merger (collectively, the "Assumed Notes"). The structural impact of this transfer of all or substantially all of Trenwick's assets was that Chartwell Re remained as the only direct subsidiary of Trenwick while Trenwick America and Trenwick Holdings became subsidiaries of Chartwell Re.

Finally, during the third stage of the restructuring of subsidiaries, which occurred the same day as the second stage, Chartwell Re sold back all the U.K. subsidiaries it had received in the second stage of the restructuring to Trenwick (i.e., the ultimate parent and publicly-listed entity) in exchange for reducing the $135 million intercompany held by Trenwick and owed by Chartwell Re. Thus, all the U.K. and foreign businesses were again wholly-owned subsidiaries of parent Trenwick while the U.S. businesses held in Trenwick America remained the only subsidiaries of Chartwell Re.

### 6. *The LaSalle Combination And The Creation Of Trenwick Group Limited*

The day after Trenwick restructured its subsidiaries, September 27, 2000, LaSalle and Trenwick merged. They merged into a newly-created entity named Trenwick Group Limited. Chartwell Re then merged with and into its subsidiary Trenwick America bringing to Trenwick America Chartwell Re's only other subsidiary, which was inactive. Thus, when Chartwell Re merged into Trenwick America, Trenwick America became responsible for the liabilities Chartwell Re had received from Trenwick (including the approximately $190 million in Assumed Notes) when Trenwick had transferred

substantially all its assets to Chartwell Re in the second stage of the internal restructuring.

To summarize, before the restructuring began, Trenwick America consisted of only the Trenwick America domestic reinsurance business and (at least operationally) the reinsurance business of Chartwell. But by the end of the internal corporate restructuring and the completion of the LaSalle merger, Trenwick America was the branch of Trenwick with all the U.S. businesses and entities, regardless of the specific business line in which they operated and whether the entities were acquired in the Chartwell or LaSalle acquisitions. In addition to gaining all the remaining U.S. businesses, by the end of the restructuring and the LaSalle merger, Trenwick America also held additional debt-the Assumed Notes-that was initially incurred by parent Trenwick. Trenwick America, therefore, gained both new assets and liabilities by the end of September 2000.

**\*10** As described, the LaSalle and Trenwick merger resulted in Trenwick Group Limited. The Trenwick shareholders approved Trenwick Group Inc.'s dissolution, and accordingly, Trenwick's board of directors filed a certificate of dissolution with the Delaware Secretary of State on September 26, 2000. Shortly after the LaSalle merger, the credit facility originally set up for the Chartwell acquisition was amended and increased to $490 million from the original $400 million.[FN23] The implications of that amended credit facility are discussed in the next section.

> FN23. Compl. ¶ 84. The credit facility retained the $230 million letter of credit, but the revolver increased to $260 million.

### II. *The Complaint And Procedural Background*

Regrettably, I must now take the reader back through this chronology, tracking through it in a manner that identifies the aspects of the preceding course of events that the Litigation Trust challenges. Normally there would be no need for this sequential exercise. In this case, it is unavoidable because the complaint fails to articulate a coherent narrative.

### A. *The Chartwell Transaction*

In chronological order, the complaint first challenges the Chartwell transaction. The allegations involving the Chartwell transaction are cursory. Essentially

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

they involve the notion that it was a dumb business decision for Trenwick to merge with Chartwell. Specifically, the complaint alleges that:

• *Chartwell turned out to be in worse shape than Trenwick estimated and ran through the $100 million adverse development policy purchased in connection with the merger within a year after the merger:* In this connection, the complaint alleges that Trenwick conducted "due diligence" on Chartwell, including receiving an actuarial analysis by defendant Milliman, Inc., a well-known actuarial firm. That due diligence stimulated the requirement that Chartwell buy the $100 million coverage;

• *Trenwick entered into the $400 million credit facility after the Chartwell purchase:* In connection with that, Trenwick caused its Trenwick America subsidiary (which conducted its American reinsurance operations) to pledge its assets as security for the credit facility. The key Chartwell subsidiary's assets were already pledged, but the Litigation Trust complains that its assets were also pledged to cover its own debt and that Trenwick America was therefore the most likely entity to have to make good on a default by parent Trenwick under the credit facility. According to the Litigation Trust, Trenwick America derived no benefit from the pledge or the Chartwell transaction. This allegation, of course, ignores the fact that the stock of Trenwick America was wholly-owned by Trenwick, which had decided that the Chartwell acquisition was good for Trenwick.

• *Touted the Chartwell merger as a success when it was not:* Despite the fact that the losses at Chartwell exceeded the $100 million policy, Trenwick claimed in an amended 10-K in August 2000 that the "acquisition of Chartwell provided Trenwick with additional cost-effective means of augmenting capital, accelerating premium growth and added structural platforms for expansion." [FN24] Trenwick also estimated that it would achieve operating synergies as a result of the Chartwell merger of between $15-25 million in 2000 and 2001, respectively. Because of the problems that Chartwell was already experiencing as of that time, the Litigation Trust says that the Trenwick directors must have known those claims were untrue.

FN24. *Id.* ¶ 72.

**\*11** • *Trenwick America was insolvent before and after the Chartwell merger:* The complaint alleges, without factual support, that Trenwick America was "insolvent" before Chartwell was acquired and after

it was acquired. When I say without factual support, I mean that nothing in the complaint supports the assertion. Nothing.[FN25]

FN25. *Id.* ¶ 98.

### B. *The LaSalle Merger And Corporate Reorganization*

The complaint then challenges the reorganization of Trenwick's business lines in connection with the LaSalle merger and Trenwick's redomiciliation in Bermuda. As explained in the previous section, the internal reorganization and LaSalle merger resulted in a corporate structure in which Trenwick had: (1) a chain of Bermuda subsidiaries; (2) a chain of American subsidiaries; and (3) a chain of U.K. subsidiaries.

On this score, the complaint achieves a level of obscurity and incomprehensibility that is truly remarkable. Describing the reorganization tritely as a "three card monte," [FN26] the complaint then goes on to explain the reorganization in an unfathomable manner. Here is my best attempt to articulate what it is about the reorganization that offends the Litigation Trust.

FN26. *Id.* ¶ 74.

First and foremost, the Litigation Trust contends that the reorganization was undertaken for the benefit of Trenwick, as a public holding company, and "without regard to the best interests of the [Trenwick America] stockholders." [FN27] This, of course, is internally inconsistent. Trenwick owned all of the equity of Trenwick America. Therefore, if the reorganization was in the best interests of Trenwick and its stockholders, it was in the best interests of Trenwick America's equity owners.

FN27. *Id.* ¶ 75.

What is critical therefore is to figure out how some other constituency of Trenwick America was somehow injured by the reorganization. As of the beginning of the restructuring, we know that the Litigation Trust is upset that Trenwick America's assets have been pledged as security for the $400 million credit facility Trenwick procured. In other words, even though Trenwick America did not own, for example, the Chartwell Managing Agents

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

business (to which $230 million of the credit facility was dedicated) or the Trenwick International line of businesses (for which the remaining $170 million revolving facility could be used at Trenwick's discretion), Trenwick America was on the hook for the full $400 million if Trenwick defaulted. That is a given at the get-go, or *ab initio,* as some Latin lovers might prefer.

Before the internal reorganization began in March 2000, Trenwick America is at the top of a chain of subsidiaries comprising only its own U.S. reinsurance businesses, such as Trenwick America Reinsurance Corporation, and Chartwell's U.S. reinsurance businesses .[FN28] By the end of the reorganization on September 27, 2000, Trenwick America's position is only slightly different from what it was at the get-go. Under Trenwick America were the following additional business lines: the U.S. specialty insurance businesses previously held under Canterbury, and an inactive subsidiary called Drayton Company Limited.

> FN28. As previously noted, Trenwick America may have assumed, within its business line, the operational responsibility for the business of Chartwell Reinsurance Company without having formally acquired that Chartwell entity or its subsidiaries. *See supra* note 11.

*12 In other words, Trenwick America went from being the key entity in one business line comprised of domestic reinsurance operations for both Trenwick and Chartwell to being the parent of all the U.S. corporations in that line. The ownership of these entities is not really what the complaint challenges, it is the increase in Trenwick America's debt that resulted from the reorganization. I describe that next.

Concurrently with the merger of Trenwick and LaSalle, a new credit facility was entered for $490 million, a figure $90 million higher than the previous figure. Of the $490 million, $230 million was for a letter of credit dedicated to the Lloyd's syndicates managed by Chartwell Managing Agents. Before the restructuring and LaSalle merger, Trenwick America had been on the hook for this portion of the credit facility in the event parent Trenwick defaulted. After the LaSalle merger, the primary obligor on the $230 million letter of credit became Trenwick Holdings Limited, that is, the top U.K. subsidiary, which was on top of all the Trenwick subsidiaries conducting business out of the U.K. Trenwick America remained a guarantor, however, of that letter of credit. The

remaining $260 million of the credit facility was for a revolver. After the LaSalle merger, Trenwick America went from being the secondary obligor to becoming the primary obligor for that part of the facility. According to the Litigation Trust, the revolver had no benefit for Trenwick America but simply was necessary for Trenwick's other operations. Thus, Trenwick America's liability exposure under the credit facility increased after the restructuring and LaSalle merger. That exposure was in addition to the obligation to service $190 million in Assumed Notes by Trenwick America that previously was owed by parent Trenwick.

Trenwick America's 10-K filed in April 2001 reflected those changes, reporting that at year end Trenwick America had approximately $367 million in indebtedness. That debt was compromised of approximately $181 million in revolving loans outstanding at that time, $75 million in senior notes, $1 million in contingent interest notes, and $110 million in preferred securities. [FN29] According to the 10-K, that was an increase of approximately $46 million from the previous year.[FN30]

> FN29. *See* Stone Aff. Ex. 7 at F-17-F-18 (Trenwick America 10-K filed Apr. 2, 2001).

> FN30. *Id.*

In a conclusory manner unsupported by pled facts, the complaint alleges that Trenwick America was insolvent after the reorganization. For example, the complaint alleges that the reorganization reduced the book value of Trenwick America from $565 million to $204 million because of the debt Trenwick had guaranteed.[FN31] Of course, $204 million in positive value is a long way from insolvency. But the complaint fills this gap through this conclusory paragraph:

> FN31. Compl. ¶ 89.

On the books, [Trenwick America] appeared to be solvent. However, the public records did not give a true picture of the state of [Trenwick America's] affairs. Instead, the [Trenwick America] Defendants and [Trenwick] Defendants and [Trenwick Group Limited] wrongfully hid the fact of [Trenwick America's] insolvency through "creative accounting," assisted by E & Y and PWC. To any objective observer, with access to its true books and records,

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

[Trenwick America's] assets were worth far less than its liabilities. In fact, its adjusted equity value after the reorganization was hundreds of millions of dollars in the red.[FN32]

> FN32. *Id.* ¶ 90.

**\*13** Absent from this paragraph are any real facts. Remarkably, the complaint entirely fails to address the reality that LaSalle was a public company not controlled by Trenwick. LaSalle and Trenwick merged in a stock-for-stock merger. Each side had financial advisors and each side's stockholders approved the merger. The reality that the financial markets believed each company had positive economic value and that the resulting Trenwick has positive value is ignored in the complaint.

### C. The Allegations That Trenwick's Directors And Officers Somehow Enriched Themselves By The Chartwell And LaSalle Transactions

At all relevant times, the Trenwick board was comprised almost entirely of directors who were not officers of Trenwick. Only one of the Trenwick directors was an executive, James F. Billett, Jr. Although the complaint does not bother to identify his title, Billett was the CEO of Trenwick during the period when the challenged transactions occurred.

The complaint's allegations regarding the incentives of the Trenwick directors, frankly, make no economic sense. The complaint alleges that the Trenwick directors entered into the Chartwell and LaSalle mergers in order to enrich themselves but in a way that somehow "had nothing to do with earning a profit for shareholders or timely paying creditors, and everything to do with bonuses, gold parachutes, ego, and greed." [FN33]

> FN33. *Id.* ¶ 35.

This inflammatory, albeit banal, rhetoric is unaccompanied by pled facts supporting the assertion. At most, the complaint alleges that as part of the LaSalle acquisition, the Trenwick directors "received bonuses and stock (and cash in lieu of fractional shares) in the newly-formed" Bermuda holding company for their pre-existing options and equity in the former holding company.[FN34] This exchange somehow is alleged to have "provided a financial benefit" to the Trenwick directors "beyond that enjoyed by the other shareholders of the corporation." [FN35]

> FN34. *Id.* ¶ 85.

> FN35. *Id.*

At most, this allegation suggests that the Trenwick directors received treatment equivalent to that of other equityholders. When the new Bermuda holding corporation was formed it was to become the publicly-listed company. Thus, in order for option holders to retain their pre-existing options, they had to receive options to buy stock in the new listed company. The receipt of such replacement options presents no conflict, in itself.

As important, that the Trenwick directors received options is at odds with the notion that they believed they were taking steps that would lead to the insolvency of Trenwick. If Trenwick became insolvent, the options would have no value.

As to the bonus compensation, the complaint fails to provide any specifics. The Litigation Trust had access to Trenwick's books and records. The public filings it references in the complaint do not indicate that any bonus compensation was to be paid to the independent directors of Trenwick as a result of the LaSalle acquisition or that Billett's severance agreement was triggered in a manner that gave him a right to payments. In connection with the Chartwell acquisition, there is a disclosure that Billett received a bonus for his work on the transaction as CEO, but that the company had cut the bonus pool for the succeeding year from which Billett and other executives could potentially benefit.[FN36] There is no indication that the outside directors of Trenwick received bonuses.

> FN36. Hefter Decl. Ex. H at 14 (Trenwick Proxy Statement filed Apr. 17, 2000); Hefter Decl. Ex. I at 27 (Trenwick Proxy Statement filed Apr. 12, 2002).

**\*14** The complaint is just as obscure when it alleges that the directors of Trenwick America were somehow conflicted. As one would expect, the Litigation Trust is able to allege that most of the directors of Trenwick America were employees of Trenwick and Trenwick America. This would be natural given that Trenwick America was a wholly-owned subsidiary. The directors of Trenwick

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

America are alleged to have received options in the new Bermuda holding company after the LaSalle merger. That is a wholly innocuous fact. Moreover, these directors are alleged to have gotten bonuses. As executives, one would expect that they might get bonuses. Nothing in the complaint alleges that the bonuses were not determined at the Trenwick level-where the board was overwhelmingly independent-and nothing in the complaint alleges that the bonuses were out of order. Furthermore, the complaint makes one assertion that was likely true, which is that the executives who served on the Trenwick America board owed their livelihood to Trenwick. That assertion, however, would (as would the grant of options in the new Bermuda entity) give those executives a strong interest in maintaining Trenwick as a solvent entity capable of employing and paying them. Notably, the public disclosures of Trenwick indicated, as I just mentioned, that the bonus pool for executives for the years 2000 and 2001 had been trimmed in the wake of the Chartwell acquisition.

All in all, the complaint essentially concedes that the Chartwell and LaSalle acquisitions, and the reorganization of Trenwick, were overseen by a parent board with only one management director, Billett. That management director is not alleged to have received excessive compensation, and he and other officers and directors simply received replacement options in the new publicly-listed holding company that replaced the options they held in the former publicly-listed holding company.

### D. Trenwick Falls Into Financial Distress In 2002 And 2003

This case is before the court because something bad happened. The bad here was that Trenwick eventually faltered as an entity. Both the public holding company Trenwick and Trenwick America filed for bankruptcy in August 2003.

The complaint's allegations regarding the circumstances giving rise to the bankruptcy filing are sparse. In a paragraph, the complaint tersely indicates that by the end of 2001, Trenwick America was "substantially under-reserved" despite not having material exposure to losses caused by the September 11, 2001 terrorist attacks.[FN37] In 2002, Milliman is alleged to have conducted an analysis revealing that Trenwick America remained unreserved. Allegedly, Trenwick did not disclose that results of that analysis.[FN38]

FN37. Compl. ¶ 91.

FN38. Id.

During the same year, Trenwick allegedly caused Trenwick America to pay increased fees on the $230 million portion of the credit facility that supported the Lloyd's syndicates, "despite the fact that [Trenwick America] was still neither a party to nor a beneficiary of that letter of credit." [FN39]

FN39. Id. at ¶ 92.

*15 On April 1, 2003, Trenwick America allegedly announced that it could not file its 10-K in a timely fashion, because "management's time and attention during the past several months has been principally devoted to issues arising as a result of the significant deterioration in the financial condition of Trenwick Group Limited ("Trenwick"), the Company's parent, including efforts to restructure Trenwick's outstanding indebtedness." [FN40]

FN40. Id. at ¶ 93 (Trenwick America Notification of Inability to Timely File Form 10-K filed Apr. 1, 2003).

Eventually, the complaint alleges, Trenwick America failed because of the liabilities it assumed in 2000 at the end of the LaSalle merger and the corporate reorganization. The complaint is not more specific than that. I take it that means that because Trenwick could not service the $490 million credit facility itself, the lenders under that facility were entitled to look to the assets of Trenwick America to make good on that obligation, and that Trenwick America could not do that and service the Assumed Notes. Relatedly, I infer that the insurance operations that Trenwick acquired from Chartwell turned out to be more problematic than profitable, because Chartwell had to pay out more in claims than was estimated and was unable to overcome that through growth in profitable new sales.

### E. The Alleged Fraud

At the tail end of its complaint, the Litigation Trust alleges that the Trenwick and Trenwick America directors committed fraud, in concert with each other and with outside advisors to Trenwick. The fraud alleged consists of non-disclosures and material

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 13
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

misstatements of fact.

The allegedly material facts that were wrongly concealed were:
• Trenwick America's financial condition from 2000 through 2003;[FN41]

FN41. *Id.* ¶¶ 125, 131.

• The financial condition and reserve-level problems at Chartwell before its acquisition by Trenwick in 1999;[FN42]

FN42. *Id.*

• The "true nature of the intercompany payable supposedly due to [Trenwick] by [Chartwell];"[FN43]

FN43. *Id.*

• The "actual value of the LaSalle transaction;"[FN44] and

FN44. *Id.*

• The "true value of the various [Trenwick] subsidiaries transferred between companies in the 2000 transaction."[FN45]

FN45. *Id.*

The complaint alleges that the Trenwick and Trenwick America officers and directors had a duty to disclose these facts to "Plaintiff."[FN46] By that, I suppose the Litigation Trust means the entity whose claims it now possesses, Trenwick America. Supposedly, Trenwick America relied to its detriment on the omission of information regarding these matters.[FN47]

FN46. *Id.* ¶ 126.

FN47. *Id.* at 127.

The complaint then alleges material misstatements of fact that were made in August 2000 by the Trenwick directors in the LaSalle merger proxy:
• A supposed statement that the Chartwell merger had

been "beneficial and was expected to result in cost savings;"[FN48]

FN48. *Id.*

• An overstatement of the "amount of intercompany loans given by" Trenwick;[FN49]

FN49. *Id.*

• A claim that the "LaSalle acquisition would make Trenwick more competitive in all of its major markets;"[FN50]

FN50. *Id.*

Allegedly, the Trenwick directors knew "these statements were false when made." Again, "Plaintiff"-i.e., Trenwick America-supposedly relied detrimentally on the statement.[FN51]

FN51. *Id.*

F. *The Causes Of Action In The Complaint*

**\*16** The complaint sets forth eight counts. All center on one idea: Trenwick's strategy of growing by acquiring Chartwell and LaSalle was "irrational" and resulted from "gross negligence."[FN52] As a result of stupidity, the Trenwick directors, whose bidding was followed by the Trenwick America directors, put together a large insurance holding company with inadequate reserves and assets to cover the claims that were ultimately made against it. By pledging the assets of Trenwick America to cover the debt resulting from this expansion strategy, the Trenwick and Trenwick America directors injured Trenwick America by rendering it insolvent and leaving it with too few assets to satisfy its creditors. To carry out this feckless plan, Trenwick employed the defendant advisors, who provided intentionally erroneous or at least negligent advice that facilitated the implementation of a foolish business strategy, which ultimately worked harm to Trenwick America as an entity and its creditors.

FN52. *Id.* ¶ 100.

As a matter of characterization of claims, the

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Litigation Trust alleges that the Trenwick directors breached their fiduciary duties of care and loyalty by this conduct-duties that the Litigation Trust alleges were owed to the creditors of Trenwick and its subsidiaries because Trenwick and its subsidiaries were insolvent. As a component of this breach, the Trenwick directors supposedly engaged in fraud by concealing and misstating the facts regarding the nature and effects of the expansion strategy.

The Trenwick America directors are accused of identical conduct and conspiring with the Trenwick directors. As to them, however, the Litigation Trust makes the argument that they faced a conflict the Trenwick directors did not-a conflict among the constituencies of Trenwick America. That is, the Trenwick America directors are alleged to have injured the creditors of Trenwick America by causing its assets to be pledged to support other subsidiaries owned by Trenwick, at a time when Trenwick America was insolvent. For that reason, the Trenwick America directors are alleged to have violated their fiduciary duties, because the focus of the Trenwick America board had to be solely upon making sure Trenwick America could satisfy as many of the legal claims of its creditors as possible, with the equity owner and parent, Trenwick, being out of the picture as a result of its corporate child's insolvency. In addition, the Trenwick America directors are accused in a separate count of the supposed tort of "deepening insolvency" by coloring the entity and its subsidiaries an even deeper shade of red by increasing their debt in connection with the LaSalle acquisition.

Finally, the defendant professional advisors (the "defendant advisors") are charged with conspiring with the Trenwick and Trenwick America directors and, redundantly, of aiding and abetting their breaches of fiduciary duty and fraud. These advisors also are accused of professional malpractice for failing to protect Trenwick America, the corporate child, from harm in the advisors' capacity as advisors for Trenwick, the parent.

### G. *The Current Motions Before The Court*

**\*17** All of the defendants have moved to dismiss the complaint, primarily for failure to state a claim. The standard of review that applies on a motion to dismiss under Rule 12(b)(6) is familiar. All inferences from well-pled allegations of fact in the complaint must be construed in favor of the plaintiff,[FN53] but the court should not give weight to conclusory allegations not grounded in allegations of fact.[FN54] In evaluating the

complaint, the court may also consider the unambiguous terms of those documents incorporated by reference in the complaint, especially when evaluating a claim that those documents make material misstatements of fact.[FN55] Here, although the complaint cites specifically Trenwick's 1999 annual report, it also liberally refers to the "public records,"[FN56] and the "books" of Trenwick and Trenwick America.[FN57]

FN53. *E.g.,* *Rabkin v. Philip A. Hunt Chemical Corp.,* 498 A.2d 1099, 1104 (Del.1985).

FN54. *E.g.,* *In re Tri-Star Pictures, Inc. Litig.,* 634 A.2d 319, 326 (Del.1991).

FN55. *E.g.,* *In re General Motors S'holder Litig.,* 897 A.2d 162, 169 (Del.2006) (explaining that in limited circumstances courts may consider the plain terms of documents incorporated in the complaint without thereby converting the motion into one for summary judgment); *In re Santa Fe,* 669 A.2d 59, 69 (Del.1995); *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 727 (Del. Ch.1999); *Sanders v. Devine,* 1997 WL 599539, at \*4 (Del. Ch. Sept. 24, 1997); *see also* *H-M Wexford, LLC v. Encorp, Inc.,* 832 A.2d 129, 139 (Del. Ch.2003) ("a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations.").

FN56. *E.g.,* Comp. ¶ 90.

FN57. *Id.*

In this case, it was critical for me to review those documents simply to be able to have any understanding of the Litigation Trust's claims in the complaint. To state a claim, a plaintiff ought to have to articulate a story that is comprehensible. Here, that was not done. In order to ensure fairness to the Litigation Trust, as well as the defendants, I reviewed the disclosures incorporated in the complaint so that I could establish a coherent framework for the evaluation of the complaint.[FN58] That review does not involve the consideration of a competing version of events, but simply of context that enabled me to understand the Litigation Trust's assertions. To that point, it also is evident that the Litigation Trust relied

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

heavily on these referenced documents in crafting the complaint, and has drawn its own, less than clear, recitation of the facts from them. In the end, I do not draw any facts from them that contradict the facts pled in the complaint, but the documents admittedly make the cursory nature of the complaint and its failure to plead facts, rather than conclusory allegations, more patent.

> FN58. *See, e.g.,* *Solomon v. Armstrong,* 747 A.2d 1098, 1121 n.72 (Del. Ch.1999) ("[I]t is well settled that where certain facts are not specifically alleged (or in dispute) a Court may take judicial notice of facts publicly available in filings with the SEC.") (citations omitted).

### III. *Legal Analysis*

With the factual background and procedural framework in mind, I now turn to an evaluation of the viability of the complaint. That evaluation will proceed in this order.

Initially, I will consider exactly whose claims the Litigation Trust may press in this litigation. Once I do that, I will consider whether the Litigation Trust has stated a claim for breach of fiduciary duty against the Trenwick and Trenwick America directors. Then, I will determine whether Delaware law recognizes as an independent cause of action an assertion that fiduciaries "deepened" the insolvency of an entity. After that, I will address the viability of the fraud claims brought against the Trenwick and Trenwick America directors. Finally, I will address the claims brought against the defendants who were Trenwick advisors.

### A. *The Litigation Trust Lacks Standing To Pursue Claims On Behalf Of Trenwick America's Creditors*

As a creature of statute and Trenwick America's chapter 11 plan of reorganization, the Litigation Trust is entrusted with standing to pursue only certain defined "Causes of Action." [FN59] But the Litigation Trust conceives its standing to be more expansive than the defendants interpret it to be under federal bankruptcy law and Trenwick America's governing reorganization plan. The Litigation Trust contends that, under the terms of Trenwick America's plan of reorganization, the Trust has standing to pursue claims on behalf of Trenwick America's creditors in addition to any claims Trenwick America had before

the filing of its bankruptcy petition. The defendants agree that the Trust has standing to bring any claims Trenwick America holds, but the defendants disagree that the Trust has standing to pursue claims on behalf of Trenwick America's creditors. I find that the defendants are correct that the Litigation Trust does not have standing to pursue the claims of Trenwick America's creditors under either the governing bankruptcy documents or under federal bankruptcy law.

052 No cent-Y cent-R found.

> FN59. TAC Second Amended Plan of Reorganization § 6.03; Litigation Trust Agreement § 1.1.

**\*18** Trenwick America's chapter 11 reorganization plan states specifically that the vested "Causes of Action" are:
*any and all claims,* suits, rights, *actions, causes of action,* recoveries, and *judgments that could have been brought by or on behalf of the Estate or Debtor in Possession arising before,* on or after the Petition date, known or unknown, suspected or unsuspected, in contract or in tort, at law or in equity or any theory of law liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, whether filed or initiated prior to the Confirmation Date ... or afterward, *including,* but not limited to ... (ii) *those that belonged to the Debtor prior to the Petition Date,* (iii) those on behalf of the Estate's creditors, (iv) those of the Estate or Debtor in Possession may have against any Person arising under chapter 5 of the Bankruptcy Code, or any similar provision of state law or any other law, rule regulation, decree, order, statute or otherwise, *(v) those claims, rights, suits, judgments, causes of action, and/or judgments, recoveries or proceeds therefrom that may be assigned by the holders thereof to the Estate, Debtor in Possession or the Litigation Trust,* (vi) *derivative creditor and shareholder claims* and (vii) right of setoff or recoupment, and claims on contracts or breaches of duty imposed by law .... [FN60]

052 No cent-Y cent-R found.

> FN60. TAC Second Amended Plan of Reorganization § 1.16 (emphasis added).

Under this definition and the Litigation Trust Agreement, the Litigation Trust contends that it has the authority to bring the claims of Trenwick America's creditors. But the relevant provisions of those governing documents do not support the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Litigation Trust's position.

First, although the definition of "Causes of Action" contemplates the possibility of assignment of creditors' claims to the Litigation Trust, no automatic assignment of such claims arises from this definition or elsewhere in the plan of reorganization. At most, the definition of "Causes of Action," included in the court-approved plan of reorganization, merely contemplates the possibility that creditors may assign their direct claims to the Trust. The only creditor claims that are automatically vested in the Litigation Trust are in fact not creditor claims at all. They are "derivative creditor and shareholder claims" brought on behalf of Trenwick America. That the Litigation Trust's reading is incorrect also is evidenced by certain provisions of the Litigation Trust Agreement, which include an express assignment of Trenwick America's pre-petition claims to the Litigation Trust, but not the claims of Trenwick America's creditors.

Section 3.2.3 of the Litigation Trust Agreement also provides that the Managing Trustee for the Trust is authorized to "accept the assignment or transfer of claims, rights, suits, judgments, causes of action ... from the holders thereof ...."[FN61] That is, the Litigation Trust Agreement putatively gives the Trust the ability to pursue claims not belonging to Trenwick America where there was an express assignment of claims. In this case, the only express assignment of claims in section 1.4 of the Litigation Trust Agreement. That section reads:

FN61. Litigation Trust Agreement § 3.2.3.

*19 Assignment and Assumption of Liabilities: In accordance with Sections 1.2 and 1.3 hereof, [Trenwick America and Trenwick America's successor] hereby transfers and assigns, and the Managing Trustee on behalf of the Litigation Trust, hereby assumes and agrees that all Litigation Trust Claims *will be and hereby are transferred* to the Litigation Trust subject to any liabilities provided for in the Plan.[FN62]

FN62. *Id.* at § 1.4 (emphasis added).

Thus, under section 1.4, only the pre-petition claims of Trenwick America (i.e., Trenwick America's derivative claims) were expressly assigned to the Litigation Trust. No other express assignment of claims is made in that section or any other section of the Litigation Trust Agreement.

In addition, even if the Litigation Trust Agreement or plan of reorganization did expressly assign the direct claims of Trenwick America's creditors to the Litigation Trust, federal bankruptcy law is clear that litigation trusts do not have standing to pursue the direct claims of creditors. In *Caplin v. Marine Midland Grace Trust Co.,*[FN63] the U.S. Supreme Court established that bankruptcy trustees and litigation trusts formed as part of reorganization plans do not have standing to bring direct claims belonging to creditors under the federal bankruptcy statute.[FN64] The U.S. Supreme Court explained that the bankruptcy statute authorized bankruptcy trustees or litigation trusts to bring only those claims belonging to the *debtor* at the time of the debtor's bankruptcy filing, but that it did not vest with trustees or litigation trusts standing to pursue separate claims belonging to others, such as the direct claims of individual creditors. The rule articulated in *Caplin* holds true even in cases where a creditor has assigned her claims to a trustee or Trust,[FN65] which is not the situation here.

FN63. 406 U.S. 416 (1972).

FN64. Although the U.S. Supreme Court decided *Caplin* under the Bankruptcy Act, the adoption of the U.S. Bankruptcy Code, 11 U.S.C. § 101 et. seq., did not alter the rule articulated in *Caplin. See Williams v. Cal. 1st Bank,* 859 F.2d 664, 666 (9th Cir.1988) ("*Caplin* remains the law under the revised bankruptcy code."); *Ozark Rest. Equip. Co., Inc. v. Anderson (In re Ozark Rest. Equip. Co.),* 816 F.2d 1222, 1227-28 (8th Cir.1987) ("No trustee, whether a reorganization trustee as in *Caplin* or a liquidation trustee ... has power ... under the Code to assert general causes of action ... on behalf of the bankrupt estate's creditors."). The federal courts continue to rely on *Caplin. E.g., Fla. Dep't of Ins. v. Chase Bank of Texas Nat'l Assoc.,* 274 F.3d 924, 929 (5th Cir.2001), *cert. denied,* 535 U.S. 1097 (2002) (citing *Caplin* ); *Steinberg v. Buczynski,* 40 F.3d 890, 892 (7th Cir.1994); *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 120 (2d Cir.1991).

FN65. *See In re Bennett Funding Group, Inc.,* 336 F.3d 94 (2d Cir.2003) (explaining that the assignment of creditors' claims did not confer standing on the trustee);

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

*Williams*, 859 F.2d at 666-67 (holding that the trustee could not bring claims of creditors although the creditors had assigned the claims); *In re Gaudette*, 241 B.R. 491, 499-502 (Bankr.D.N.H.1999).

For all the reasons described, the Litigation Trust therefore lacks standing to pursue direct claims on behalf of Trenwick America's creditors. Therefore, the Litigation Trust's complaint must be analyzed solely from the perspective of whether it pleads viable claims belonging to Trenwick America itself as an entity.

### B. *The Litigation Trust Fails To State A Claim Against The Former Directors Of Trenwick*

Analytical clarity is served by first examining the Litigation Trust's claim that the Trenwick board of directors breached its fiduciary duties by approving the Chartwell and LaSalle mergers and the reorganization of Trenwick. That claim is a quite unusual one.

Remember that the Litigation Trust only has the ability to assert a claim that Trenwick America possesses. Therefore, this claim depends on the notion that the directors of a corporate parent-Trenwick-breached fiduciary duties owed to the parent's wholly-owned subsidiary-Trenwick America. But that notion is at odds with our state's law. Under settled principles of Delaware law, a parent corporation does not owe fiduciary duties to its wholly-owned subsidiaries or their creditors.[FN66]

> FN66. *E.g.,* *Anadarko Petro. Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del.1988). Although it is said in general terms that a parent corporation owes a fiduciary obligation to its subsidiaries, this obligation does not arise as such unless the subsidiary has minority stockholders. *See* DAVID A. DREXLER, LEWIS S. BLACK, JR., & A. GILCHRIST SPARKS, III, DELAWARE CORP. LAW AND PRACTICE § 15.11, at 15-72 (2002).

**\*20** Assume for a moment that Trenwick itself never went bankrupt. Imagine further that it had bought another insurer and pledged a key asset of Trenwick America as security for the purchase price. The purchase goes wrong and causes Trenwick to become less profitable, but not insolvent. To satisfy its

creditors, Trenwick causes Trenwick America to sell the key pledged asset and uses the proceeds to pay off the acquisition debt. As a result, Trenwick America is less profitable and less valuable. In this scenario, even though the course of events posed no prospect of benefit for Trenwick America when it is conceived solely as an entity, there would be nothing troubling about it from a fiduciary perspective. Rather, the scenario would involve a garden-variety situation when a parent corporation used the asset value of one of its wholly-owned subsidiaries to help it finance and absorb the down-side of the parent's larger business strategy.

The case before me now does not present a materially different situation, and is complicated only by the reality that the corporate parent and the corporate child went into bankruptcy, leaving their creditors with less than 100 cents on the dollar. The question is whether, on the facts as pled, this distinction supports recognition of a cause of action on the subsidiary's part against the directors of the parent. For the following reasons, I conclude not.

I begin with the reality that if the complaint was filed on behalf of Trenwick itself, it would fail to state a claim for breach of fiduciary duty. Trenwick's Delaware charter contained an exculpatory charter provision under § 102(b)(7) before the LaSalle merger, and a similar provision carried forward in the charter of the resulting Bermudan public holding company. As a result, neither Trenwick nor its stockholders could bring an action against its directors for damages resulting from a breach of duty of care.

Here, I do not believe that the complaint even pleads facts supporting a gross negligence claim. It is undisputed that the Trenwick board was dominated by independent directors. The complaint pleads no facts indicating that they had a motive to injure Trenwick. Even as to the one management director, defendant James Billett, the complaint alleges no facts suggesting a motive on his part to injure Trenwick's long-term value. Indeed, the complaint indicates that Billett rolled his existing options into options in the entity resulting after the LaSalle merger.

Moreover, both the Chartwell and LaSalle mergers involved stock-for-stock mergers between Trenwick and independent public entities. These were not self-dealing mergers and they received support from Trenwick's diverse base of shareholders. Whether or not the mergers turned out well, there is nothing in

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

the complaint that supports the notion that the idea of putting these businesses together in order to achieve economies of scale and a larger market share was irrational. Under our law, a complaint does not state a claim simply by alleging in a cursory manner that independent directors pursued "an all consuming and foolhardy acquisition strategy." [FN67] As Chancellor Allen noted in *Gagliardi*:

FN67. Compl. ¶ 35.

**\*21** [T]o allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in good faith pursuit of corporate purposes, does not state a claim for relief ... no matter how foolish the investment may appear in retrospect.[FN68]

FN68. *Gagliardi v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1052 (Del. Ch.1996).

Nor does the complaint even attempt to plead deficiencies in the deliberative process that the Trenwick board used to evaluate these mergers. At most, the complaint points out that Trenwick's due diligence identified that Chartwell's reserves might not be adequate and that a $100 million insurance policy was procured to address that risk. Although the complaint alleges that the $100 million turned out to not be enough, the reality is that this part of the complaint indicates that Trenwick in fact conducted due diligence and obtained $100 million worth of coverage to address a material risk. That coverage turned out to be inadequate does nothing to suggest that the Trenwick board acted outside its exculpatory immunity. This sort of quibble does not, in my view, even raise a due care claim without the pleading of facts suggesting that the original estimate resulted from gross negligence by the Trenwick directors. Because the complaint suggests that the amount was set based on advice from professional advisors,[FN69] that inference is even less sustainable.

FN69. *See* 8 *Del. C.* § 141(e).

In that same vein, it is notable that public documents that the complaint quotes from and relies upon refer to the fact that the Trenwick board received advice from investment bankers in connection with the Chartwell and LaSalle mergers, and that these mergers were approved by the Trenwick

stockholders, as well as the stockholders of Chartwell and LaSalle. Notably, the stockholders of Chartwell and LaSalle received stock in the Trenwick entity resulting after each merger, not cash.

At bottom, the complaint attempts to challenge the wisdom of an independent board's strategy to grow by acquiring, for stock, third-parties in the same industry, with the approval of its public stockholders. Other than identifying that the $100 million in excess coverage was not enough, the complaint rests solely on the reality that the larger entity that resulted ultimately filed for bankruptcy nearly three years after the final acquisition and reorganization were completed.

But business failure is an ever-present risk. The business judgment rule exists precisely to ensure that directors and managers acting in good faith may pursue risky strategies that seem to promise great profit. If the mere fact that a strategy turned out poorly is in itself sufficient to create an inference that the directors who approved it breached their fiduciary duties, the business judgment rule will have been denuded of much of its utility .[FN70]

FN70. *See, e.g., Litt v. Wycoff,* 2003 WL 1794724, at \*10 (Del. Ch. Mar. 28, 2003) ("The exercise of business judgment cannot be evaluated, as the Plaintiff seems to suggest, merely by looking at the results of that business judgment. While challenges are seldom, if ever, made to business judgments that turn out well, the simple fact that the business decision caused significant loss does not dictate how that decision should be classified or evaluated."); *Gagliardi,* 683 A.2d at 1052 ("The business outcome of an investment project that is unaffected by director self-interest or bad faith, cannot itself be an occasion for director liability. That is the hard core of the business judgment doctrine."); *Rabkin,* 547 A.2d at 972 (noting that without factual allegations that support that a board's decision was uninformed or grossly negligent, mere dissatisfaction about how directors exercised their business judgment does not state a claim).

Precisely because the business judgment rule serves an important purpose, our law requires that a plaintiff plead facts supporting an inference that directors committed a cognizable breach of duty. To state a

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

claim for gross negligence, a complaint might allege, by way of example, that a board undertook a major acquisition without conducting due diligence, without retaining experienced advisors, and after holding a single meeting at which management made a cursory presentation. To state a claim of disloyalty, a complaint might allege that a board undertook an acquisition of a company controlled by one of its directors because that director was having financial problems and the board, in bad faith, decided to prefer his interests to that of the company. What a plaintiff may not do, however, is simply allege that a majority independent board undertook a business strategy that was "all consuming and foolhardy" [FN71] and that turned out badly and thereby seek to have the court infer that the later failure resulted from a grossly deficient level of effort or from disloyal motives.

FN71. Compl. ¶ 35.

**\*22** That is all that the Litigation Trust has done here. Therefore, the Litigation Trust has not stated a claim that the directors of Trenwick breached their duty of care or loyalty to Trenwick itself in approving the Chartwell and LaSalle mergers, and the reorganization of Trenwick.

I emphasize Trenwick itself for a reason. As I understand Delaware law, the Litigation Trust may not assert claims on behalf of Trenwick America against the Trenwick board of directors without piercing Trenwick's veil in some manner. That is, if there was a breach of fiduciary duty by conduct at the Trenwick-level toward Trenwick America, the proper defendant is Trenwick itself, as the parent corporation, not the directors of Trenwick. Delaware law does not blithely ignore corporate formalities and the Litigation Trust has not explained how the Trenwick directors, as opposed to Trenwick, can be deemed to be a "controlling stockholder" group that owes fiduciary duties to a subsidiary.

To this point, I also do not believe that Trenwick America is permitted to do an end-run around Trenwick's exculpatory charter provision. A judicial acknowledgement that, as a matter of the common law of equity, directors of a public company protected by an exculpatory charter provision may be exposed to negligence-based liability claims made by the public company's wholly-owned subsidiaries would undercut the important public policy reflected in *8 Del. C. § 102(b)(7)*. Out of nowhere independent directors of parent corporations would

face, in a litigation context in which firm failure is a given, due care claims by entities to which our law has said the parent itself does not owe any fiduciary duties. To sanction such bizarre claims would discourage board service and create uncertainty about the extent to which parent corporations could deploy their organization's assets in a good faith effort to undertake risky strategies that promise future profit. Put simply, even if one were to conclude (as I do not) that Trenwick America can proceed against the Trenwick directors directly, at the very least Trenwick America would have to plead a claim not exculpated by the Trenwick charter. It has failed to do so.

Of course, I must deal with the Litigation Trust's assertion that Trenwick America may complain about the conduct of the Trenwick directors because Trenwick and Trenwick America were "insolvent" at all relevant times. The most immediate response is the easiest: the mere incantation of the word insolvency does not open the key to discovery.

If a plaintiff seeks to state a claim premised on the notion that a corporation was insolvent and that the directors of the corporation were therefore obligated to consider the corporation's creditors, as an object of their fiduciary beneficence, the plaintiff must plead facts supporting an inference that the corporation was in fact insolvent at the relevant time. [FN72] Here, the Litigation Trust cursorily alleges that Trenwick and Trenwick America were insolvent, not just after, but even before the Chartwell and LaSalle mergers, and irrespective of the fact that Trenwick did not file for bankruptcy until August 2003. The most specific allegation of the complaint alleges that the U.S. subsidiaries that ended up under Trenwick America after the post-LaSalle reorganization (e.g., Insurance Company of New York, Chartwell Reinsurance, and Trenwick America Reinsurance Corporation) had a fair market value of $565 million before the reorganization but that once these entities became subsidiaries of Trenwick America through the merger, their net book value was reduced to only $204 million [FN73] because Trenwick America had increased the debt it was responsible for after the merger by becoming the primary obligor of the $260 million revolver, remaining as a secondary guarantor of $230 million letter of credit, and taking on liability for the $190 million in Assumed Notes. That was a sizable reduction, no doubt, but one that left Trenwick America well north of insolvency, having a net book value of over $200 million. [FN74] Because the complaint fails to plead facts supporting a rational inference that Trenwick or Trenwick America were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 20
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

insolvent at the time of any of the challenged transactions, the premise for the Litigation Trust's fiduciary duty claim does not exist.[FN75]

FN72. *E.g., U.S. Bank Nat'l Assoc. v. U.S. Timberlands Klamath Falls, L.L.C.,* 864 A.2d 930, 947 (Del. Ch.2004), *rev'd on other grounds,* 875 A.3d 632 (Del.2005).

FN73. Compl. ¶ 89.

FN74. Insolvency in fact occurs at the moment when the entity "has liabilities in excess of a reasonable market value of assets held." *See Blackmore Partners, L.P. v. Link Energy LLC,* 2005 WL 2709639, at *6 (Del. Ch. Oct. 14, 2005) (quoting *Geyer v. Ingersoll Publ'ns,* 621 A.2d 784, 789 (Del. Ch.1992)).

FN75. In an incisive article and a thoughtful blog comment, Professor Bainbridge is critical of jurisprudence that expresses the view that directors owe fiduciary duties to the corporation itself, rather than a particular constituency of the corporation. *See* Stephen M. Bainbridge, *Much Ado About Little? Directors' Fiduciary Duties in the Vicinity of Insolvency* (forthcoming 2006), *available at* http:// ssrn.com/abstract=832504; Duties of Directors of Insolvent Corporations, http://www.professorbainbridge.com/2006/0 7/duties_of_direc.html (July 26, 2006). When a corporation is solvent, Professor Bainbridge believes that fiduciary duties are owed by the directors to the stockholders. Bainbridge, *Much Ado,* at 5-6. When a corporation is insolvent, he accepts the notion that the directors owe their fiduciary duties to the creditors, because the creditors are now the residual claimants. *Id.* at 15. That does not mean, however, that Professor Bainbridge believes that all claims against directors of insolvent corporations are direct claims belonging to the creditors individually. To the contrary, he recognizes that if the directors of an insolvent firm commit a breach of fiduciary duty reducing the value of the firm, any claim belongs to the entity and that creditors would benefit from the recovery derivatively, based on their claim on the firm's assets. *Id.* at 38; Duties of Directors of Insolvent Corporations. Supporting his view that

owing fiduciary duties to a firm is an unhelpful concept, Professor Bainbridge relies heavily on the idea of the corporation as a nexus of contracts to which it is silly to think duties can be owed. *See* Bainbridge, *Much Ado,* at 21 n.94, n.96 (citing to HENRY HANSMANN, THE OWNERSHIP OF ENTERPRISE 18 (1996) and Stephen M. Bainbridge, *The Board of Directors as a Nexus of Contracts,* 88 IOWA L. REV. 1 (2002)). His concern is that telling directors that they owe fiduciary duties to a "nexus of contracts" provides no concrete objective against which to measure their conduct; thus, he favors clarity that the directors' obligation is to maximize returns for the corporation's residual claimants, who in the case of insolvency, are its creditors.

Although Professor Bainbridge's views regarding the substantive effect the question of insolvency should have on directors' ability to rely upon the business judgment rule and on the application of the derivative/direct claim distinction is identical to mine-short answer: none-I am not as critical as he of references to the directors owing duties to the insolvent corporation itself. *See, e.g., In re Scott Acq. Corp.,* 2006 WL 1731277, *5-*7 (Bankr.D. Del. June 23, 2006) ("[T]he fact of insolvency does not change the primary object of the directors' duties, which is the firm itself."). That expression might be short-hand that elides the rich academic debates about what corporations are but the expression seems to be used to advance an end that Bainbridge supports. Even when a corporation is solvent, the notion that the directors should pursue the best interests of the equityholders does not prevent them from making a myriad of judgments about how generous or stingy to be to other corporate constituencies in areas where there is no precise legal obligation to those constituencies. I do not understand this complexity to diminish when a firm is insolvent simply because the residual claimants are now creditors. Indeed, it is not immediately apparent to me why, if the common law were to begin to dole out in insolvency special, non-contractual "ward" rights to certain constituencies that transformed in a material way the obligations of directors, creditors would be the primary object of that (difficult to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

legitimize) act of judicial invention. Better for society that those who manage them see them as something more importantly human, as societal institutions freighted with the goal of responsible wealth creation. In the insolvency context, directors have, in my view, no less discretion, for example, to decide to accord respectful and considerate treatment to the company's workers (who as Bainbridge admits, may have made more of a non-diversifiable risk with less opportunity to use the tool of contract as a shield) if they believe that will improve the firm's value and the return to its creditors.

In other words, insolvency does not suddenly turn directors into mere collection agents. Rather, the creditors become the enforcement agents of fiduciary duties because the corporation's wallet cannot handle the legal obligations owed. Theft from the firm remains theft from the firm, even if the firm as seen by academics is a legal fiction. In other words, the fiduciary duty tool is transferred to the creditors when the firm is insolvent in aid of the creditor's contract rights. Because, by contract, the creditors have the right to benefit from the firm's operations until they are fully repaid, it is they who have an interest in ensuring that the directors comply with their traditional fiduciary duties of loyalty and care. Any wrongful self-dealing, for example, injures creditors as a class by reducing the assets of the firm available to satisfy creditors.

To ensure that the directors manage the enterprise to maximize its value so that the firm can meet as many of its obligations to creditors as possible-the new goal of the firm-the jurisprudence refers to the directors as owing fiduciary duties to the firm and its creditors. E.g., In re Scott Acq. Corp., 2006 WL 1731277, at *5; Credit Lyonnais, Bank Nederland, N.V. v. Pathe Commc'ns Corp., 1991 WL 277613, at *34 & 34 n.55 (Del. Ch. Dec. 30, 2001) ("At least where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise."). The judicial decisions indicating that directors owe fiduciary duties to the firm when it is insolvent are not, in my view, at odds with Bainbridge's fundamental perspective; indeed, they seem to me more a judicial method of attempting to reinforce the idea that the business judgment rule protects the directors of solvent, barely solvent, and insolvent corporations, and that the creditors of an insolvent firm have no greater right to challenge a disinterested, good faith business decision than the stockholders of a solvent firm. To this point, many firm life cycles have involved an emergence from bankruptcy with the firms' former creditors emerging in the form of the firms' new equityholders.

**\*23** For the sake of completeness, it is useful to consider the last-gasp theory that the Litigation Trust most stressed at oral argument. This last-gasp theory concedes that certain aspects of the complaint are just silly. Namely, it concedes that Trenwick's board could, as an ordinary matter, use the assets of Trenwick America to help procure financing for an acquisition strategy that Trenwick, as Trenwick America's sole stockholder, believed would be profitable for the overall Trenwick empire. What Trenwick could not do, however, is to defraud the creditors of Trenwick America in order to benefit itself.

Supposedly, the reorganization of Trenwick's subsidiaries in connection with the LaSalle transaction was such a maneuver. As was discussed in colloquy at argument, the Litigation Trust now contends that by the time of the LaSalle merger, Trenwick's board knew the entity could not prosper as a whole. Therefore, it allegedly concentrated its largest liabilities and worst-performing assets in the line of subsidiaries under Trenwick America, on the theory that it would allow that line to fail, leaving the rest of Trenwick to thrive.

There is a fatal problem for this theory, however, which is that there are not pled facts to support it. Nothing in the complaint suggests that Trenwick was able to off-load its own ultimate responsibility for the $490 million in debt to Trenwick America alone. Trenwick America's assets were used by Trenwick to support debt procured by Trenwick.[FN76] Trenwick itself went into bankruptcy at the same time as Trenwick America.

FN76. See Hefter Decl. Ex. C Ex. 10.1 at §§ 5.08, 6.14, 10 (Credit Agreement dated Nov. 24, 1999 between Trenwick and lenders); Stone Aff. Ex. 7 at F-17 (Trenwick America

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.