# EXHIBIT A(2)

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

10-K filed Apr. 2, 2001).

Furthermore, despite all its rhetoric about a three-card monte, the Litigation Trust has never rationally articulated how the reorganization of Trenwick's subsidiaries worked a particular injury on Trenwick itself or Trenwick America. It appears to be the case that Trenwick America emerged out of the reorganization being primarily responsible for the $260 million credit revolver, secondarily responsible for the Lloyd's line of credit (if Trenwick International could not pay it off), and having responsibility for $190 million in Assumed Notes. But Trenwick America also emerged out of the internal restructuring as the subsidiary under which all of Trenwick's U.S. subsidiaries operated. For the year ending December 31, 2002, these consolidated American operations generated approximately 52% of Trenwick's revenues, generating $571 million in annual revenue.[FN77]

> FN77. Stone Aff. Ex. 1 at 11 (Trenwick America Amended Disclosure Statement For Plan Of Reorganization).

One can accept the notion that Trenwick as a whole, and Trenwick America, in general, emerged from the Chartwell and LaSalle transactions as a more leveraged organization. Trenwick also was a much larger overall operation, having absorbed Sorema, Chartwell, and LaSalle in less than four years.

What the complaint fails to plead are facts supporting an inference that Trenwick America was insolvent as of the time of the restructuring, much less that the Trenwick directors believed that to be the case. In this connection, it is important to recognize that the plain terms of documents the complaint draws from and references to the LaSalle merger proxy and the Trenwick/LaSalle Joint Proxy Statement-explain the purpose of the restructuring. Namely, the restructuring was undertaken in order to create chains of American, English, and Bermudan subsidiaries, chains that would enable favorable tax treatment for Trenwick.

*24 The complaint fails to articulate a rational premise for the notion that the restructuring, and the allocation of Trenwick's debt among the various chains, had some other, less obvious, and more nefarious purpose. In particular, there are no facts pled that support a rational inference that Trenwick's board believed it was structuring the chains such that the Bermudan and English chains would thrive, while leaving a debt-ridden and diseased American chain to fall into bankruptcy, leaving its creditors unsatisfied. Indeed, because Trenwick itself remained responsible for the $490 million credit facility, there is not even a pleading-stage plausibility that such a strategy was embarked upon consciously. And the fact that Trenwick remained on the hook for the $490 million debt combines with the reality that it is difficult to conceive how such an unusual strategy could make sense for Trenwick, as a public company, even if Trenwick America's failure could be cabined, without recourse to Trenwick by Trenwick America's creditors. In that scenario, Trenwick would have to come out a financial winner after entirely losing its invested capital in all its U.S. operations and after suffering great injury to its global credibility as an insurance provider and as a borrower by seeing its largest operations fall into the disrepute of bankruptcy.

Finally, it is important to point out that my refusal to conclude that a wholly-owned subsidiary may sue the directors of its parent company on the premise that their improvident business strategies ultimately led to the bankruptcy of the subsidiary does not leave open a gap in the law. There is no chasm.

The laws of all states and the federal bankruptcy laws address precisely the scenario the Litigation Trust contends occurred in the reorganization but fails to plead. They do so through a body of law that might be fairly called the "law of fraudulent transfer." [FN78]

> FN78. While most states have adopted the more expansive Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act is still law in some states while a few remaining states continue to follow the old common law standards based on "badges of fraud." *See generally* Jonathan C. Lipson, *Enron, Asset Securitization and Bankruptcy Reform: Dead or Dormant?*, 11 J. BANK. L. & PRAC. 101, 111 (2002).

Under the relevant Delaware statute,[FN79] creditors of Trenwick America were entitled to attack the reorganization on the grounds that:

> FN79. 6 *Del. C.* § 1301, *et. seq.*

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 23

claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[FN80]

FN80. 6 Del. C. § 1304(a).

Likewise, the Bankruptcy Code permits fraudulent transfer actions to be brought under sections 544(b) or 548.[FN81] Section 544(b) allows a trustee or debtor-in-possession to bring an action to avoid any transfer of an interest in property that a creditor may avoid under applicable state law.[FN82] Similarly, § 548 allows a trustee or debtor-in-possession to commence a federal fraudulent conveyance action to avoid certain transfers made or incurred within two years before the date of the filing of the bankruptcy petition.[FN83] More specifically, § 548 allows the trustee to avoid any transfer made for less than reasonable equivalent value and made at a time when the transferor was insolvent, engaged in a business for which it had unreasonably small capital, or intended to incur debts beyond its ability to pay.

FN81. See 11 U.S.C. § § 544(b), 548.

FN82. 11 U.S.C. § 544(b).

FN83. 11 U.S.C. § 548. At the time Trenwick America filed its bankruptcy petition, the reach-back period for enforcement under § 548 was only one year.

*25 Both state law and federal law provide a panoply of remedies in order to protect creditors injured by a wrongful conveyance, including avoidance, attachment, injunctions, appointment of a receiver, and virtually any other relief the circumstances may require.[FN84] In a fraudulent conveyance suit

challenging the reorganization, Trenwick itself would have been a proper defendant-as the supposed beneficiary of the fraudulent transfers from Trenwick America-and the creditors of Trenwick America would have had direct standing to prosecute an action.

FN84. E.g., 6 Del. C. § 1307; 11 U.S.C. § § 544, 548. Other common remedies available to injured creditors are replevin, sequestration, constructive trust, equitable liens, and garnishment.

The law of fraudulent conveyance is, of course, not the only or primary protection for creditors. The financial creditors of companies like Trenwick and Trenwick America know how to craft contractual protections that restrict their debtors' use of assets. In a situation when creditors cannot state a claim that such contractual protections have been breached and cannot prove a fraudulent conveyance claim, the creditors' frustration does not mean that there is a gap in the remedial fabric of the business law that equity should fill. Rather, it means that we remain a society that recognizes that reward and risk go together, and that there will be situations when business failure results in both equity and debt-holders losing some money. As this court has said:

Having complied with all legal obligations owed to the firm's creditors, the board would ... ordinarily be free to take economic risk for the benefit of the firm's equity owners, so long as the directors comply with their fiduciary duties to the firm by selecting and pursuing with fidelity and prudence a plausible strategy to maximize the firm's value.[FN85]

FN85. Prod. Res. Group, L.L.C. v. NCT Group, Inc, 863 A.2d 772, 790 (Del. Ch.2004).

If the common law is to evolve in a direction where judges invent quasi-fraudulent conveyance actions to be brought by subsidiaries against the independent directors of public companies, it should do so in more compelling circumstances than these. The Litigation Trust's complaint pleads no rational reason why the independent board majority stood to benefit personally from undertaking a foolish business strategy. Nothing in the reorganization helped them enrich themselves. Even assuming the odd notion that the Trenwick board sought to benefit Trenwick by sacrificing its entire U.S. operations to bankruptcy,

Not Reported in A.2d                                                      Page 24
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

the beneficiary of that strategy would have been Trenwick itself and the law of fraudulent conveyance permitted creditors to seek relief against Trenwick.[FN86]

FN86. As to this, see *infra* note 97.

For all these reasons, I conclude, among other things, that: (1) the Litigation Trust has no standing to sue the directors of Trenwick; (2) even assuming the Litigation Trust could sue the directors of its parent, rather than the parent itself, the Litigation Trust has not stated a claim that the Trenwick directors breached any fiduciary duty owed to Trenwick; and (3) the Litigation Trust has failed to plead facts supporting an inference that Trenwick or Trenwick America were insolvent at any of the relevant times, and therefore has not pled fact supporting an inference that Trenwick owed any fiduciary duties to Trenwick America at the time of the challenged transactions.

### C. *The Litigation Trust Also Fails To State A Claim Against Trenwick America's Former Directors*

***26** The Litigation Trust also pleads a breach of fiduciary duty claim against the directors of Trenwick America. This claim stands, in one respect, on firmer ground. That is because as directors of Trenwick America, these defendants would be, in the language of many of our cases,[FN87] described as owing fiduciary duties to Trenwick America as an entity.

FN87. *E.g., Malone v. Brincat,* 722 A.2d 5, 10 (Del.1998) ("The directors of Delaware corporations stand in a fiduciary relationship not only to the stockholders but also to the corporations upon whose boards they serve.") (citing *Guth v. Loft,* 5 A.2d 503, 510 (Del.1939)); *Credit Lyonnais,* 1991 WL 277613 at 34 & 34 n.55; *Arnold v. Society for Sav. Bancorp, Inc.,* 678 A.2d 533, 539 (Del.1996) ("It is well established that the directors of a Delaware corporation have a fiduciary relationship with the corporation they serve ....").

But even the straightforward notion that the Trenwick America directors owed the company fiduciary duties must not be viewed as a simple one. The context is what matters.[FN88] To the extent that Trenwick America was a wholly-owned solvent subsidiary of Trenwick, the fiduciary duties owed by the Trenwick America board ran to Trenwick. Our Supreme Court has made clear that, "in a parent and wholly-owned subsidiary context, directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." [FN89] Likewise, this court, through then Vice-Chancellor, now Chief Justice Steele, has noted that this is not a novel concept, but a long "settled rule[ ] of law." [FN90]

FN88. Professor Bainbridge's thoughts on this subject, touched on at *supra* note 75, have obvious relevance here. As he points out, simply saying that a director owes duties to the firm does little to define what those duties are and the end to which they are directed.

FN89. *E.g., Anadarko Petro. Corp.,* 545 A.2d at 1174 (citing *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971)).

FN90. *Shaev v. Wyly,* 1998 WL 13858, at *2 (Del. Ch. Jan. 6, 1998) (quoting *Anadarko* ); *Goodman v. Futrovsky,* 313 A.2d 899, 902 (Del.1965).

Here, that settled rule of law is of critical importance. The only Trenwick America director on the Trenwick board was defendant James Billett, who was CEO of Trenwick. The remaining members of the Trenwick America board were also employees of Trenwick and Trenwick America. That is, all Trenwick America owed their employment to Trenwick.

The Litigation Trust tries to argue that this mundane fact supports an inference of disloyalty and conflict of interest. In its fiduciary duty count, the Litigation Trust states that the Trenwick America directors "did not exercise their independent, disinterested business judgment as to the [ ] [challenged transactions], as they were all officers of Trenwick America and owed their livelihood to [Trenwick America's] controlling shareholder [ ], [Trenwick]." [FN91] Insofar as this statement is intended to suggest a motive on the part of the Trenwick America directors to injure the long-term health of that entity, it fails entirely of its purpose.

FN91. Compl. ¶ 100.

Indeed, the complaint as a whole suggests that the

Not Reported in A.2d
Page 25
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

directors of Trenwick America had every interest in ensuring that the company would remain profitable. They owed their salaries to the company and had accepted replacement options in the new Trenwick resulting after the LaSalle merger. One cannot conjure up from the absence of facts in the complaint a scenario whereby these directors had a personal motive to undermine the long-term viability of Trenwick's U.S. operations, particularly since each of the Trenwick America directors is alleged to have been domiciled in Connecticut and functioning as an officer of Trenwick America-i.e., they are alleged to have been the key managers of Trenwick's domestic U.S. operations.

Not only that, the complaint is entirely devoid of pled facts regarding what the Trenwick America board did that was either a breach of the duty of care or the duty of loyalty. In the former respect, I take it as no novelty for me to hold that the Trenwick America board had no duty to replicate the deliberative process of its sole stockholder's board of directors. In the absence of any indication that they would be causing Trenwick America to violate legal obligations owed to others, the Trenwick America board was free to take action in aid of its parent's business strategy.[FN92] There is no sound basis to hold that the boards of wholly-owned subsidiaries must engage in their own parallel merger consideration processes, thereby setting in motion an inefficient intergenerational *Van Gorkom*-machine spreading the powerful procedural mandate of *Van Gorkom* and its progeny to every level of the corporate family.[FN93] Delaware law does not embrace the concept that a director of a wholly-owned subsidiary owes a duty to second-guess the business judgment of its parent corporation when following and supporting the parent's strategy would not violate any legal obligation the subsidiary owes to another.

> FN92. *See, e.g., Cochran v. Stifel Financial Corp.,* 2000 WL 286722, at *11 ("A wholly-owned subsidiary is to be managed solely so as to benefit its corporate parent") (citing *Anadarko,* 545 A .2d at 1174).

> FN93. *See generally Smith v. Van Gorkom,* 488 A.2d 858 (Del.1985).

**\*27** Rather, the law is that the Trenwick America directors were obligated to manage Trenwick America with loyalty to Trenwick, the company's sole stockholder. To the extent that the Trenwick America directors acceded to their parent's wishes

and lent support to its business strategy, there is no basis to fault them.

That is even so if the Trenwick America board took actions that made Trenwick America less valuable as an entity. If the Trenwick America board authorized the subsidiary to provide (as it appears to have done) guarantees to Trenwick's creditors that supported Trenwick's overall business, they would have been managing the subsidiary to benefit its parent: a proper goal. Such guarantees may reduce the value of the subsidiary conceived as a stand-alone entity but that in itself is of no moment. The payment of a dividend from a subsidiary to a parent does the same thing. If the dividend remains in the subsidiary, the subsidiary is better able to satisfy the future claims of creditors and to conduct its own operations. In pondering whether to pay a dividend, however, a subsidiary board is permitted to act to benefit its parent, not simply the subsidiary itself, for the obvious reason that wholly-owned subsidiaries are formed by parents to benefit the parents, and not for their own sake . [FN94]

> FN94. "It is by no means a novel concept of corporate law that a wholly-owned subsidiary functions to benefit its parent." *Grace Bros. v. UniHolding Corp.,* 2000 WL 982401, at * 12 (Del. Ch. July 12, 2000); *see also Sternberg v. O'Neil,* 550 A.2d 1105, 1124 (Del.1988) (same).

Again, the implications of the complaint's incantation of the word "insolvency" must be considered. To begin with, I reiterate that the complaint fails to plead facts supporting a rational inference that Trenwick America was insolvent before any of the challenged transactions or that any of the challenged transactions would, when consummated, leave Trenwick America unable to satisfy its creditors. As a result, the Litigation Trust cannot base a claim on the idea that the Trenwick America directors owed fiduciary obligations to Trenwick America's creditors at the time of the challenged transactions. Because the complaint fails to support an inference of insolvency, the Trenwick America directors were free to manage Trenwick America for the best interests of Trenwick, and to follow loyally the direction of Trenwick's board as to what Trenwick's best interests were. The reality that the parent's strategy ultimately turned out poorly for itself and its subsidiaries does not buttress a claim by the subsidiary that the subsidiary's directors acted culpably by implementing the parent's prior wishes.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

In this respect, it is notable that the charter of Trenwick America did not contain an exculpatory charter provision. The reasons why it did not are not clear, but one might be that Trenwick, as sole stockholder and the entity on behalf of whom the subsidiary was to be run, wanted to reserve the right to fault the Trenwick America directors if they breached an obligation of due care they owed as subsidiary directors. In the usual course, Trenwick, as sole owner, could exercise its control over Trenwick America to press any derivative claims. That Trenwick America has become bankrupt and its claims are now controlled by the Litigation Trust cannot act as a basis to retroactively impose procedural duties upon the Trenwick America board it did not bear at the time of the challenged transactions. In other words, because the Trenwick America board, as directors of a wholly-owned subsidiary, was entitled to follow the parent's instructions unless those instructions required the board to violate the legal rights of others, no due care claim may be brought against them.[FN95] Otherwise, a subsidiary board could not follow parental direction without risk that the failure of the parent's business strategy, and thus the subsidiary, would later expose the subsidiary board to negligence-based liability for its loyalty to the parent. A care-based claim premised on an act of fiduciary loyalty!

> FN95. The decision in *McMullin v. Beran*, 765 A.2d 910 (Del.2000), does not aid the Litigation Trust. That decision is controversial for several reasons, one of which is that it imposed *Van Gorkom*-like duties on the board of a non-wholly owned subsidiary board with regard to a merger in which the parent and the minority stockholders received identical consideration. Transactions where the minority receive the same consideration as the majority, particularly a majority entitled to sell its own position for a premium, had long been thought to fall within the ambit of non-conflict transactions subject to business judgment rule protection. *See, e.g., Puma v. Marriott*, 283 A.2d 693 (Del. Ch.1971); DAVID A. DREXLER, LEWIS S. BLACK, JR., & A. GILCHRIST SPARKS, III. DELAWARE CORP. LAW AND PRACTICE § 15.11, at 15-75 (2002). In any event, what is critical here is that *McMullin* does not purport to hold that the board of a wholly-owned subsidiary must

engage in a separate process of deliberation in order to consider whether a parent's acquisition strategy is sound, even if that strategy requires financial support or other aid from the subsidiary.

*28 If there is conceptual room for equity in this context, that room is quite narrow. At most, one might conceive that the directors of a wholly-owned subsidiary owe a duty to the subsidiary not to take action benefiting a parent corporation that they know will render the subsidiary unable to meet its legal obligations.[FN96] Any lesser standard would undercut the utility of the business judgment rule by permitting creditors to second-guess good faith action simply because the subsidiary ultimately became insolvent. Even the recognition of a cause of action along stringent lines requires careful consideration. Despite the breadth of remedies available under state and federal fraudulent conveyance statutes, those laws have not been interpreted as creating a cause of action for "aiding and abetting." [FN97] Rather, as the both the defendants and the Litigation Trust agree, the only proper defendants in a fraudulent conveyance action under federal bankruptcy law or Delaware law are the transferor and any transferees.[FN98] In any event, there is no need to hold that such a cause of action does or does not exist under our law. The complaint does not plead facts supporting an inference that Trenwick America was rendered insolvent by the challenged transaction, much less that the Trenwick America board knew that was the case.

> FN96. In a recent decision, Judge Walsh of the District of Delaware Bankruptcy Court held that the directors and officers of a wholly-owned insolvent subsidiary owe a fiduciary duty to that subsidiary and its creditors. *See In re Scott Acq. Corp.*, 2006 WL 1731277, at *5. In that case, the defendant directors of an insolvent subsidiary argued that they could not be held liable to the creditors of the subsidiary because they owed their duties solely to the parent corporation. The court rejected that argument and held that the plaintiff trustee had stated a claim for breach of fiduciary duties against the officers and directors. Judge Walsh explained that a director's fiduciary duty to creditors is derivative of the duty owed to the corporation. As Professor Bainbridge notes, see *supra* note 88, the idea that the subsidiary directors

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                     Page 27
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

could be exposed to a claim for breach of fiduciary duty in this context can be rationalized in traditional terms. If the firm is insolvent, its residual claimants are the creditors and it is for their benefit that the directors must now manage the firm. A purposeful fraudulent transfer to stockholders who are "out of the money" is obviously inconsistent with the best interest of the creditors, the firm's new residual claimants.

FN97. *See, e.g., Mack v. Newton,* 737 F.2d 1343, 1357-58 (5th Cir.1984) ("[T]he general rule under the Bankruptcy Act is that one who did not actually receive any of the property fraudulently transferred ... will not be liable for its value, even though he may have participated or conspired in the making of the fraudulent transfer ....") (citing *Elliott v. Glushon,* 390 F.2d 514 (9th Cir.1967); *Ernst & Young LLP v. Baker O'Neal Holdings., Inc.,* 2004 WL 771230, at *14 (So.D.Ind.2004) (surveying several cases holding that there is no accessory liability for fraudulent transfers under the Uniform Fraudulent Transfer Act and noting that the court is not permitted to assign liability where the Act did not); *Freeman v. First Union Nat'l Bank,* 865 So.2d 1272, 1275-77 (Fla.2004) (stating that the UFTA was not intended "to serve as a vehicle by which a creditor may bring a suit against a non-transferee party ... for monetary damages arising from the non-transferee's alleged aiding-abetting of a fraudulent money transfer").

FN98. *See* 11 U.S.C § § 544(b), 550(a); 6 *Del. C.* § 1308(b).

For these reasons, the Litigation Trust has failed to state a claim for breach of fiduciary duty against the former Trenwick America directors.

### D. Delaware Law Does Not Recognize A Cause Of Action For So-Called "Deepening Insolvency"

In Count II of the complaint, the Litigation Trust seeks to state a claim against the former Trenwick America directors for "deepening insolvency." The Count consists of the following cursory allegations: From 2000 until 2003, these [Trenwick America] Defendants fraudulently concealed the true nature

and extent of [Trenwick America's] financial problems by expanding the amount of debt undertaken by [Trenwick America].[FN99]

FN99. Compl. ¶ 104.

The [Trenwick America] Defendants knew that [Trenwick America] would not be able to repay this increased debt, but fraudulently represented to creditors and other outsiders that the debt would be repaid.[FN100]

FN100. *Id.* ¶ 105.

By these actions, [Trenwick America's] officers and directors prolonged the corporate life of [Trenwick America] and increased its insolvency, until [Trenwick America] was forced to file for bankruptcy on August 20, 2003. [FN101]

FN101. *Id.* ¶ 106.

As a result of [those] actions, [Trenwick America] suffered damages to be proven at trail, which [the Litigation Trust] is entitled to recover. [FN102]

FN102. *Id.* ¶ 107.

The concept of deepening insolvency has been discussed at length in federal jurisprudence, perhaps because the term has the kind of stentorious academic ring that tends to dull the mind to the concept's ultimate emptiness.

Delaware law imposes no absolute obligation on the board of a company that is unable to pay its bills to cease operations and to liquidate. Even when the company is insolvent, the board may pursue, in good faith, strategies to maximize the value of the firm. As a thoughtful federal decision recognizes, Chapter 11 of the Bankruptcy Code expresses a societal recognition that an insolvent corporation's creditors (and society as a whole) may benefit if the corporation continues to conduct operations in the hope of turning things around.[FN103]

FN103. *See, e.g., Kittay v. Atlantic Bank of N.Y. (In re Global Servs.),* 316 B.R. 451, 460 (Bankr.S.D.N.Y.2004) ("The fiduciaries

Not Reported in A.2d                                          Page 28
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

of an insolvent business might well conclude that the company should continue to operate in order to maximize its "long-term wealth creating capacity," or more generally, its enterprise value. In fact, chapter 11 is based on the accepted notion that a business is worth more to everyone alive than dead."). *See also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."); *In re RSL Com Primecall, Inc.*, 2003 WL 22989669, at *8 (Bankr.S.D.N.Y. Dec. 11, 2003) ("It has never been the law in the United States that directors are not afforded significant discretion as to whether an insolvent company can 'work out' its problems or should file a bankruptcy petition."); *Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.)*, 225 B.R. 646, 655 (Bankr.N.D.Ill.1998) (noting there is no duty "to liquidate and pay creditors when the corporation is near insolvency, provided that in the directors' informed, good faith judgment there is an alternative"), *aff'd in part & rev'd in other part*, 2000 WL 28266 (N.D.Ill.2000); H.R. REP. NO. 95-595, at 220 (1977), *as reprinted in* 1978 U.S.C.C.A.N.1978, 5963, 6179 ("The premise of a business reorganization is that assets that are used for production in the industry for which they are designed are more valuable than those same assets sold for scrap ... It is more economically efficient to reorganize than to liquidate, because it preserves jobs and assets.").

**\*29** If the board of an insolvent corporation, acting with due diligence and good faith, pursues a business strategy that it believes will increase the corporation's value, but that also involves the incurrence of additional debt, it does not become a guarantor of that strategy's success. That the strategy results in continued insolvency and an even more insolvent entity does not in itself give rise to a cause of action. Rather, in such a scenario the directors are protected by the business judgment rule. To conclude otherwise would fundamentally transform Delaware law.

The rejection of an independent cause of action for deepening insolvency does not absolve directors of insolvent corporations of responsibility. Rather, it remits plaintiffs to the contents of their traditional toolkit, which contains, among other things, causes of action for breach of fiduciary duty and for fraud. The contours of these causes of action have been carefully shaped by generations of experience, in order to balance the societal interests in protecting investors and creditors against exploitation by directors and in providing directors with sufficient insulation so that they can seek to create wealth through the good faith pursuit of business strategies that involve a risk of failure. If a plaintiff cannot state a claim that the directors of an insolvent corporation acted disloyally or without due care in implementing a business strategy, it may not cure that deficiency simply by alleging that the corporation became more insolvent as a result of the failed strategy.

Moreover, the fact of insolvency does not render the concept of "deepening insolvency" a more logical one than the concept of "shallowing profitability." That is, the mere fact that a business in the red gets redder when a business decision goes wrong and a business in the black gets paler does not explain why the law should recognize an independent cause of action based on the decline in enterprise value in the crimson setting and not in the darker one. If in either setting the directors remain responsible to exercise their business judgment considering the company's business context, then the appropriate tool to examine the conduct of the directors is the traditional fiduciary duty ruler. No doubt the fact of insolvency might weigh heavily in a court's analysis of, for example, whether the board acted with fidelity and care in deciding to undertake more debt to continue the company's operations, but that is the proper role of insolvency, to act as an important contextual fact in the fiduciary duty metric. In that context, our law already requires the directors of an insolvent corporation to consider, as fiduciaries, the interests of the corporation's creditors who, by definition, are owed more than the corporation has the wallet to repay.[FN104]

----

FN104. *See, e.g., Prod. Res. Group*, 863 A.2d at 791 (Del. Ch.2004) ("When a firm has reached the point of insolvency, it is settled that under Delaware law, the firm's directors are said to owe fiduciary duties to the company's creditors. This is an uncontroversial proposition and does not completely turn on its head the equitable obligations of the directors to the firm itself. The directors continue to have the task of attempting to maximize the economic value of the firm. That much of their job does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

change. But the fact of insolvency does necessarily affect the constituency on whose behalf the directors are pursuing that end. By definition, the fact of insolvency places the creditors in the shoes normally occupied by the shareholders-that of residual risk-bearers. Where the assets of the company are insufficient to pay its debts, and the remaining equity is underwater, whatever remains of the company's assets will be used to pay creditors, usually either by seniority of debt or on a pro rata basis among debtors of equal priority.") (internal citations omitted); *Angelo, Gordon & Co. v. Allied Riser Comm. Corp.,* 805 A.2d 221, 229 (Del. Ch.2002) ("Even where the law recognizes that the duties of directors encompass the interests of creditors, there is room for application of the business judgment rule."); *Geyer v. Ingersoll Publ'ns Co.,* 621 A.2d 784, 787 (Del. Ch.1992) ("[W]hen the insolvency exception [arises], it creates fiduciary duties for directors for the benefit of creditors."); *see generally* Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors,* 46 VAND. L. REV. 1485 (1993).

In this case, the Litigation Trust has not stated a viable claim for breach of fiduciary duty. It may not escape that failure by seeking to have this court recognize a loose phrase as a cause of action under our law, when that recognition would be inconsistent with the principles shaping our state's corporate law. In so ruling, I reach a result consistent with a growing body of federal jurisprudence, which has recognized that those federal courts that became infatuated with the concept, did not look closely enough at the object of their ardor.[FN105] Among the earlier federal decisions embracing the notion-by way of a hopeful prediction of state law-that deepening insolvency should be recognized as a cause of action admittedly were three decisions from within the federal Circuit of which Delaware is a part.[FN106] None of those decisions explains the rationale for concluding that deepening insolvency should be recognized as a cause of action or how such recognition would be consistent with traditional concepts of fiduciary responsibility. In a more recent decision, the Third Circuit has taken a more skeptical view of the deepening insolvency concept,[FN107] a view consistent with the outcome reached in this decision. In fact, many of the decisions that seem to embrace the concept of deepening insolvency do not clarify

whether the concept is a stand-alone cause of action or a measurement of damages (the extent of deepening) for other causes of action.[FN108]

FN105. Good examples of this jurisprudence include: *Bondi v. Bank of America Corp. (In re Parmalat),* 383 F.Supp.2d 587 (S.D.N.Y.2005) (explaining that "[i]f officers and directors can be shown to have breached their fiduciary duties by deepening a corporation's insolvency, and the resulting injury to the corporation is cognizable ... that injury is compensable on a claim for breach of fiduciary duty" and declining to recognize a separate tort for deepening insolvency under North Carolina law); *Alberts v. Tuft (In re Greater Southeast. Community Hosp. Corp.),* 333 B.R. 506, 517 (Bankr.D.C.2005) ("Recognizing that a condition is harmful and calling it a tort are two different things. The District of Columbia courts have not yet recognized a cause of action for deepening insolvency, and this court sees no reason why they should .... There is no point in recognizing and adjudicating "new" causes of action when established ones cover the same ground. The Trust's duplicative claims will be dismissed."); *In re Vartec Telecom, Inc.,* 335 B.R. 631, 641, 644 (Bankr.N.D.Tx.2005) (describing recent cases and the trend to decline recognizing deepening insolvency as a separate tort because the injury caused is substantially duplicated by torts already in existence); *In re Global Servs.,* 316 B.R. at 459 ("The distinction between "deepening insolvency" as a tort or damage theory may be one unnecessary to make. Prolonging an insolvent corporation's life, without more, will not result in liability under either approach. Instead, one seeking to recover for 'deepening insolvency' must show that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt.") (citations omitted); Sabin Willet, *The Shallows of Deepening Insolvency,* 60 BUS. LAW. 549 (2005) (providing detailed reasons not to recognize deepening insolvency as a cause of action). *See also In re CitX Corp., Inc.,* 448 F.3d 672, 679 n.11 (3d Cir.2006) (rejecting, as without basis in reason, a request to hold

Not Reported in A.2d                                                    Page 30
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

that a claim of negligence will sustain a cause of action for deepening insolvency under Pennsylvania law).

FN106. *See Official Comm. of Unsec. Creditors v. R.F. Lafferty,* 267 F.3d 340 (3d Cir.2001) (recognizing deepening insolvency as a valid cause of action under Pennsylvania law where defendants used fraudulent financial statements to raise capital in the debtor's name, thereby deepening debtor's insolvency and causing bankruptcy); *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.),* 340 B.R. 510, 2006 WL 864843, at \*16-17 (Bankr.D.Del. Mar. 31, 2006) (holding that Delaware, New York, and North Carolina would recognize the cause of action); *In re Exide Technologies, Inc.,* 299 B.R. 732 (Bankr.D.Del.2003) ("based on the Third Circuit's decision in *Lafferty* and the Delaware courts' policy of providing a remedy for an injury, I conclude that Delaware Supreme Court would recognize a claim for deepening insolvency when there has been damage to corporate property").

FN107. *See In re CitX Corp.,* 448 F.3d at 680 n.11.

FN108. *E.g., Lafferty,* 267 F.3d at 351, *clarified by, CitX,* 448 F.3d at 11 (explaining that in *Lafferty* "we did describe deepening insolvency as a "type of injury," and a "theory of injury" but that "we never held it was a valid theory of damages for an independent cause of action.") (citations omitted).

### E. *The Complaint Fails To State A Claim For Fraud Against The Former Directors Of Trenwick And Trenwick America*

\*30 The final claim made against the directors of both Trenwick and Trenwick America is that they worked together to commit fraud that injured Trenwick America. This is an extremely odd claim to be advanced on behalf of Trenwick America for an obvious reason: the claim depends on the notion that Trenwick America's controlling stockholder, Trenwick, and Trenwick America's board, in particular, Billett, who was on the parent board as well, knew facts about Trenwick America that they concealed from Trenwick America. As I will explain,

that reality is but one of the reasons why the complaint fails to state a cognizable fraud claim.

Before I get to that reason, I get to the plain vanilla reason the fraud claim fails, which is that the complaint does not satisfy the stringent pleading standard governing fraud claims. To state a claim for common law fraud, the Litigation Trust must plead facts supporting an inference that: (1) the defendants falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendants knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendants intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[FN109] Under Court of Chancery Rule 9(b), a heightened pleading standard applies to fraud claims requiring particularized fact pleading. "In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." [FN110] Similarly, a claim of conspiracy to commit fraud must be pleaded with particularity.[FN111] The factual circumstances that must be stated with particularity refer to the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation.[FN112] Although Rule 9(b) provides that "knowledge ... may be averred generally," where pleading a claim of fraud has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pled facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it.[FN113]

FN109. *E.g., Abry Partners V, L.P. v. F & W Acquisition LLC,* 891 A.2d 1032, 1050 (Del. Ch. Feb. 14, 2006) (citing *DCV Holdings, Inc. v. Conagra, Inc.,* 889 A.2d 954, 958 (Del.2005)); *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983).

FN110. Del. Ct. Ch. R. 9(b).

FN111. *E.g., Iotex Commc'ns v. Defries,* 1998 WL 914265, at \*3 (Del. Ch. Dec. 21, 1998); *Atlantis Plastics Corp. v. Sammons,* 558 A.2d 1062, 1066 (Del. Ch.1989).

FN112. *See Albert v. Alex. Brown*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 31
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

*Management Services, Inc.*, 2005 WL
2130607, at *7 (Del. Ch. Aug. 26, 2005)
(citing *York Linings v. Roach*, 1999 WL
608850, at *2 (Del. Ch. July 28, 1999)
(internal quotations and citations omitted)).
Similar to the strict pleading standards of the
Private Securities Litigation Reform Act
("PSLRA") and federal Rule 9(b), Delaware
law also does not permit the conclusion that
a defendant knew of certain facts involving
an organization merely because the
defendant had a position of responsibility
within that organization. *E.g.*, *Metro
Commc'n Corp. BVI v. Adv. Mobilecomm
Techs. Inc.*, 854 A.2d 121, 147 n.50 (Del.
Ch.2004) (citing *Iotex Commc'ns, Inc.*, 1998
WL 914265, at *4-5).

FN113. *See Iotex Commc'ns*, 1998 WL
914265, at *4.

Here, the Litigation Trust does not come close to
pleading particularized facts supporting its fraud
claim. The complaint just cursorily states that the
directors of both parent and subsidiary acted together
to:

fraudulently conceal (a) [Trenwick America's]
financial condition from 2000 to 2003; (b) the
financial condition and reserve level problems at
Chartwell prior to the 1999 merger; (c) the true
nature of the intercompany payable supposedly due
to Trenwick by Chartwell; (d) the actual value of the
LaSalle transaction; and (e) the true value of the
various TGI subsidiaries transferred between
companies during the restructuring done in
preparation for the LaSalle merger.[FN114] As directors
and/or officers of [Trenwick] and [Trenwick
America], these defendants had a duty to disclose this
information to Plaintiff. Plaintiff relied on these
omissions to its detriment.[FN115]

FN114. Compl. ¶ 125.

FN115. *Id.* at ¶ 126.

**\*31** In addition, the Litigation Trust complains that
the Trenwick directors also committed fraud when
they made material misstatements of facts, which
Trenwick America relied on, in August 2000:
(a) stating that the "Chartwell acquisition had been
beneficial and was expected to result in cost savings;
(b) overstating the amount of intercompany loans
given by [Trenwick]; and (c) claiming that the

LaSalle acquisition would make Trenwick more
competitive in all three of its major markets.[FN116]

FN116. *Id.* ¶ 127.

These allegations are precisely the sort of unspecific,
broad-brush generalities that Rule 9(b) is intended to
preclude from serving as a basis for a fraud claim.
Notably absent from the complaint are particularized
allegations identifying what aspects of Trenwick's
and Trenwick America's financial statements were
tainted by improper accounting practices, when those
financial statements were made public, and the
circumstances that suggest that any inaccuracies were
intentional, rather than good faith mistakes in
estimation. Perhaps of paramount importance is the
insinuation that Trenwick and Trenwick America
made knowingly false estimates of the potential
insurance claims their operating companies faced.
The very public disclosures the complaint refers to
expressly indicate that estimates regarding potential
claims and the reserves necessary to address them are
imprecise and cannot be guaranteed.[FN117] That such
estimates later turned out to be too low does not
buttress a fraud claim. What is necessary is the
pleading of facts suggesting that the original
estimates were fraudulently conceived, from the get-
go. This does not require a plaintiff to probe the
mindset of the defendants, what it does require is that
the plaintiff set forth particularized facts regarding
the precise estimates in question, the circumstances
suggesting they were unsound from the inception,
and why the defendants had an incentive to
intentionally low-ball them. The Litigation Trust has
not even made a good faith effort to plead its claim.
Instead of attempting to meet a Rule 9(b) standard,
the Litigation Trust simply argues backwards from
the fact of the Trenwick family's eventual bankruptcy
that all of its financial statements during the period of
the challenged transactions must have contained
knowing falsehoods.

FN117. *E.g.*, Hefter Decl. Ex. A at 12
(Trenwick 10-K filed Aug. 22, 2000); Stone
Aff. Ex. 6 at 11 (Trenwick 10-K filed Apr.
2, 2001).

Yet, the Litigation Trust does not point to one
specific asset of Trenwick or Trenwick America that
was overstated in their financial statements. It does
not contend that the revenue figures in their financial
statements were phony. In the end, it simply argues

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

that Trenwick must have intentionally understated the claims it faced because those claims eventually rose to a level beyond Trenwick's ability to pay them and remain solvent. In other words, there must have been fraud because the estimates eventually turned out wrong. Indeed, the fraud is a subtle one, because the complaint concedes that when Trenwick purchased Chartwell, it required Chartwell to buy $100 million in coverage to cover what Trenwick and its advisors perceived to be a lack of adequate reserves.

**\*32** To this point, it is notable that the Litigation Trust is trying to ground its fraud claims on the softest of turf. For example, it claims that statements by Trenwick that the company believed the Chartwell acquisition would generate good results were fraudulent. But these sorts of statements are the softest of information, and very difficult to base a fraud claim on for good reason. They are simply statements of expectation or opinion about the future of the company and the hoped for results of business strategies.[FN118] Such opinions and predictions are generally not actionable under Delaware law.[FN119] The Litigation Trust fails to plead particularized facts regarding these soft statements, precisely what was said, and why what was said was likely, given known facts, to have been a consciously false estimate of the future. To that point, the Litigation Trust does indicate that Trenwick estimated that operational synergies of a certain level could be achieved as a result of the Chartwell merger. It nowhere explains why those estimates were not responsible ones and the mere fact that Chartwell's reserves turned out to be too low does not give rise to an inference that the estimates of operational synergies that could be achieved by combining the insurance operations of Trenwick and Chartwell were irresponsibly prepared. The same deficiency afflicts its allegations regarding the disclosed estimates of the possible claims faced by Trenwick's operating insurance businesses. There are no pled facts, aside from an indication that those estimates turned out to be too low, that suggest that the estimates were irresponsibly prepared, much less that they were intentionally understated by Trenwick or Trenwick America insiders.[FN120]

FN118. *See In re Oracle Corp.*, 867 A.2d 904, 938 (Del. Ch.2004) ( "The more tentative and soft the information, the more reluctant our courts have been to deem it material.")

FN119. *See, e.g., id.* at 935 ("Because, by their very nature, predictions of the future

are less certain than statements about past events, courts have been less apt to find forward-looking statements material and have been more dubious of claims that it was reasonable for investors to rely upon such statements in making trading decisions."); *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at \*3, (Del. Ch. Oct. 19, 2004) ("to the extent that plaintiff is arguing that any statements of opinion rise to the level of a fraudulent representation, [such] statements... are mere puffery and cannot form the basis for a fraud claim"); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch.2001) (explaining that predictions about the future and mere opinions cannot give rise to actionable common law fraud); *see also Consol. Fisheries Co. v. Consolid. Solubles Co.*, 112 A.2d 30, 37 (Del.1955) (stating that it is a general rule that mere expressions of opinion as to probable future events, when clearly made as such, cannot be deemed fraud or misrepresentations) (citations omitted); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos. Inc.*, 75 F.3d 801, 811 (2d. Cir.1996) (explaining that optimistic forward-looking statements that a company would perform well are the type of puffery that bespeak caution and are generally not actionable).

FN120. *See Iotex Commc'ns*, 1998 WL 914265, at \*4-\*5.

Even as to harder information, the complaint is entirely conclusory. No facts are included that indicate when or how specific information was fraudulently concealed by the directors nor is any specific information pled supporting the Litigation Trust's contention that Trenwick and Trenwick America's financial records were misstated. The allegations of fraud merely state that the "actual" or "true value" of certain assets and transactions were fraudulently concealed or misstated.[FN121] The complaint fails to provide any particulars, such as the specific financial items that were allegedly fraudulent and the extent of their inaccuracy. Speculative conclusions unsupported by fact do not allege fraudulent conduct.[FN122] The complaint's allegations are entirely vague and general, and do not satisfy Rule 9(b).

FN121. *E.g.,* Compl. ¶ ¶ 125, 131.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 33

FN122. *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d at 326 (explaining that conclusions "will not be accepted as true without specific allegations of fact to support them."); *see also Dann v. Chrysler Corp.*, 174 A.2d 696, 700 (Del. Ch.1961) ("Using the word 'fraud' or its equivalent in any form is just not a substitute for the statement of sufficient facts to make the basis of the charge reasonably apparent.").

In all respects, it is relevant that the complaint does not even attempt to describe the level of involvement of either the Trenwick or Trenwick America directors in the preparation of the financial statements and the other disclosures that are challenged. No effort is made to identify deficiencies in the directors' process for considering the financial statements and disclosures. Given that the Litigation Trust's central theory is that the Trenwick board was foolish-i.e., pursued a stupid series of acquisitions-and given that the Trenwick America directors who were employees presumably wished to remain employed by a solvent entity-it is well-nigh impossible to draw an inference that these defendants knew they were being stupid and putting the company (and for some of them, their livelihoods) at stake. Although there is not a duty to plead state of mind with particularity, the requirement to plead the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation [FN123] exists in large measure so that defendants are not subjected to fraud claims simply because business plans did not work out as hoped. [FN124] The requirement of particularized pleading ensures that a plaintiff must plead circumstances suggesting that the defendants were positioned to know that they were making erroneous statements of material facts and had an interest in doing so. [FN125] That has not been done here.

FN123. *See Albert*, 2005 WL 2130607, at *7.

FN124. *York Linings*, 1999 WL 608850, at *3 (noting that one of Rule 9(b)'s purposes is to protect defendants from unfounded charges of wrongdoing that could injure their reputation and goodwill, and refusing to sustain a fraud claim based on general allegations by one joint venture partner that

the other breached promises made going into the joint venture).

FN125. *See id.* at 11; *Metro Commc'ns Corp.*, 854 A.2d at 147 (citing *Iotex Commc'ns*, 1998 WL 914265, at *4).

**\*33** Recognizing the deficiencies in its complaint, the Litigation Trust devoted much of its briefing on its fraud claims to seeking an exemption from Rule 9(b) for itself. The Litigation Trust argues that Rule 9(b) should be less stringently applied in the context where a plaintiff is a third-party, such as a trustee, because third-parties generally have less information on which to base their allegations. Accordingly, the Litigation Trust maintains that as long as the defendants have notice that is "not vague[ ] or general [ ]," the complaint will meet the requirements of Rule 9(b). [FN126] That is not a correct statement of law and its logical premise is flawed. Most fraud plaintiffs possess less information than the defendants who made the statements at issue. Protecting those who occupy that vulnerable posture is the essential purpose of the law of fraud-to act as a safeguard when there is reasonable, detrimental reliance on another's statement of fact by someone with less knowledge. More specifically, this would be one of the last scenarios when a court's equitable heartstrings would lead it to do what it should not-that is, undercut a court rule requiring a certain level of pleading. The Litigation Trust has had far more access to information than the typical plaintiff, having access to voluminous documents during the bankruptcy proceedings, for more than a year before it filed its complaint. [FN127] Thus, it was better positioned than most fraud plaintiffs to meet the standards of Rule 9(b).

FN126. Trust Br. 43-44.

FN127. In addition, there apparently was an investigation in which the trustee, creditors, and Trenwick America's bankruptcy counsel participated to determine what claims could be brought. *See* Trial Tr. at 99, 101, 114.

Finally, the Litigation Trust fails to plead a fraud claim for another important reason that I adverted to earlier. The Litigation Trust is only entitled to bring claims possessed by Trenwick America. By the Litigation Trust's own admission, Trenwick America's board of directors knew the true facts about all the issues said to have been misrepresented. As a result, Trenwick America-as an entity-did not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 34

rely to its detriment on any of the misstatements, despite the cursory statement in the complaint that the "plaintiff" relied on the false statements to its detriment.[FN128] To the extent that the Litigation Trust is referring to itself, it could not have relied on the statements at issue as it did not exist when those statements were made. To the extent that the Litigation Trust is referring to Trenwick America, its statement makes no sense because the complaint alleges that those who controlled Trenwick America knew the statements were inaccurate.

> FN128. *See Albert,* 2005 WL 1594085, at *11 ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal.").

Of course, this is not to say that a company like Trenwick America might not possess claims against insiders who injure the company and then cause the company to make false representations that cover up the wrongdoing. But the claim that the disclosing company made misrepresentations is not a fraud claim, it is a claim related to the original wrongdoing. The misdisclosure might have relevance for the vitality of the underlying claim-such as by defeating an argument that a stockholder vote cleansed any breach of fiduciary duty or by tolling a statute of limitations [FN129]-but it would not give rise to a separate claim for fraud.[FN130] The reason is simple, the entity would not have been relying to its detriment on the fraudulent statement because its controllers were aware of the actual state of affairs. For this reason, our law has treated claims by stockholders that corporate disclosures in connection with a stockholder vote or tender were materially misleading as direct claims belonging to the stockholders who were asked to vote or tender.[FN131]

> FN129. *See In re J.P. Morgan Chase & Co. S'holder Litig.,*___ A.2d ___, 2006 WL 585606, at *6-*7 (Del. Mar. 8, 2006) (reiterating the reality that in a context when a transaction's economic unfairness would cause injury to the corporation itself, disclosure claims have relevance primarily to the standard of review; if the entire fairness standard applies, the ultimate question remains whether the terms of the transaction were substantively fair to the corporation).

> FN130. One can also imagine a scenario when a corporation's directors commit fraud, giving rise to liability on the part of the company to third parties. Depending on whether the positive law precludes such a claim, one can conceive of the corporation having a claim for indemnity against the directors to make the company whole for the payments it had to make to the third parties as a result of the directors' wrongdoing.

> FN131. *See, e.g., Dieterich v. Harrer,* 857 A.2d 1017, 1029 (Del. Ch.2004).

**\*34** Therefore, for all these reasons, I conclude that the complaint fails to state a claim of fraud against the Trenwick or Trenwick America directors.[FN132]

> FN132. The defendants advance another defense I do not rely upon. That defense is premised on the notion that Trenwick America cannot bring a claim against them because the knowledge of Trenwick America's insiders are imputed to it and if the insiders are guilty of fraud, so is Trenwick America. That is, the defense is based on the *in pari delicto* doctrine.
> As a judge in Delaware, the federal case law on *in pari delicto* does not strike me as reflecting a nuanced approach to business law. There are certainly situations when an entity could be injured by an insider's misconduct and when the entity, as to third parties, would be charged with knowledge of that misconduct. Suppose, for example, that a board of directors conspired with the company's auditors to embezzle $100 million, giving the auditor a 10% cut if it characterized the stolen funds improperly in the company's financial statements. In that circumstance, the directors' knowledge of the wrongdoing would not bar a derivative suit against the directors and the auditors on behalf of the company, even though a third party relying reasonably on the company's false financial statements might have a basis to sue the company and charge it with its insiders' knowledge. Many of the great corporate scandals have involved concerted activity by company advisors and insiders, activity that sometimes harmed not only outsiders but also, derivatively, the company's innocent stockholders. The doctrine of *in pari delicto* has never

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

operated in Delaware as a bar to providing relief to the innocent by way of a derivative suit. *See also Scholes v. Lehmann*, 56 F.3d 750 (7th Cir.1995) (explaining that the defense of *in pari delicto* functions to prevent a wrongdoer from profiting from the recovery awarded by a court for the wrong but that when the wrongdoer will not be able to share in the corporation's recovery the defense of *in pari delicto* "loses its sting").

### F. *The Challenges To The Chartwell Transaction Are Time-Barred*

As a more general matter, the defendants are correct that all of the Litigation Trust's challenges to the Chartwell transaction and Trenwick America's guarantee of the $400 million credit facility after that transaction are untimely. More than three years had passed from the date of those transactions before Trenwick America filed for bankruptcy. The facts that Trenwick America had guaranteed that credit facility and that Chartwell's reserves were deemed sufficiently inadequate in the due diligence process to have led Trenwick to demand that Chartwell purchase $100 million in excess coverage before the merger were both publicly disclosed by Trenwick well within the limitations period. So too were numerous facts about Chartwell.

The complaint and the Litigation Trust's briefs do not provide any factual basis for excusing the untimely filing. As with its overall fraud allegations, the Litigation Trust fails to plead that the defendants fraudulently concealed their wrongdoing.[FN133] Moreover, as noted, within the limitations period, there were abundant facts in the public record about the Chartwell transaction, the effect that had on Trenwick America's debt and Trenwick's operating losses, putting potential plaintiffs on inquiry notice of their claims.[FN134] Therefore, the portions of the complaint challenging the Chartwell transaction and the financing arrangements entered into in the immediate wake of that transaction are dismissed for the alternative reason that they are time-barred.

FN133. Fraudulent concealment requires an affirmative act of concealment or some misrepresentation by a defendant that prevents a plaintiff from gaining knowledge of the facts. *See Albert*, 2005 WL 1594085, at *19 (citing *In re Dean Witter P'ship Litig.*, 1998 Del. Ch. LEXIS 133, at *21 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441

(Del.1999));

FN134. *E.g.*, Hefter Decl. Ex. A, Ex. 13.1, at 11-12, 42 (Amended Excerpts from Trenwick 10-K, Amd. No 1, filed Aug. 22, 2000); Hefter Decl. Ex. C, at 13-14 (Trenwick 10-K filed Mar. 30, 2000).

### G. *The Ad Hominem Advisor Allegations*

In the complaint, the Litigation Trust named certain high-profile advisors to Trenwick as defendants. Most of the allegations of the complaint involving these advisors can be fairly said to be irrelevant and impertinent material that would justify that rarest of judicial orders, an order striking portions of a pleading.[FN135] Pages 13 to 19 of the complaint are taken up almost entirely by references to other lawsuits and proceedings in which these advisors have been accused of wrongful or negligent behavior. The magical word "Enron" is bandied about by the Litigation Trust as a substitute for relevant factual pleading.[FN136] Given the freedom with which the Litigation Trust and its counsel accuse others of intentionally wrongful behavior, their skins should be thick enough to realize that these portions of the complaint wasted the court's time and the defendants' resources. They are frivolous and reflect professionally unacceptable pleading practice.

FN135. *See* Del. Ch. Ct. R. 12(f).

FN136. Comp. ¶ ¶ 1, 47.

Once these improper references are put to the side, little remains. The sued defendant advisors consist of Ernst & Young, PriceWaterhouseCoopers, Baker & MacKenzie, and Milliman.

Defendant PriceWaterhouseCoopers is alleged to have acted as the auditor for Trenwick in connection with the LaSalle merger and the creation of a new public holding company in 2000. Ernst & Young is alleged to have given accounting advice in connection with the reorganization of Trenwick's subsidiaries, allegedly to the effect that certain companies transferred to a Chartwell subsidiary in September 2000, had enough value to offset liabilities transferred to the same subsidiary.[FN137] In connection with the same reorganization, defendant Baker & MacKenzie allegedly advised Trenwick that the transfers involved complied with certain indentures requiring Trenwick to transfer substantially all of its assets to any company that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                   Page 36
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

would assume the obligations under the indentures.[FN138] Finally, defendant Milliman is alleged to have provided actuarial estimates to Trenwick in connection with the LaSalle transaction and the reorganization, as well in connection with the prior Chartwell merger.[FN139]

FN137. *Id.* ¶ 80.

FN138. *Id.*

FN139. *Id.*

**\*35** There is little in the complaint that addresses exactly what these advisors did that was professionally deficient. Rather, the complaint alleges in a conclusory way that the advisors "knowingly participated" in breaches of duty by the Trenwick and Trenwick America directors by "helping to conceal the true financial condition of the Trenwick Companies, manipulating the valuation and reserves of various of these companies, and/or signing off on the legitimacy of these transactions." [FN140] Milliman is further alleged to have acted wrongly "by certifying the reserve levels at Chartwell and concealing the true levels of those reserves" before the 1999 merger. [FN141] According to the complaint, all these advisors were "aware of the Trenwick Companies' insolvency" at the time they were advising on the LaSalle merger and the reorganization .[FN142]

FN140. *Id.* ¶ 121.

FN141. *Id.*

FN142. *Id.* at ¶ 122.

Notably, the complaint never specifically alleges that any of the advisors was employed by Trenwick America itself. Other than the bare reality that Trenwick went into bankruptcy nearly three years after the LaSalle merger, the complaint does not contain facts indicating that the advisors had been professionally deficient in working for Trenwick. The most specific allegation is that Baker & MacKenzie gave an erroneous opinion to Trenwick regarding certain indentures. In that respect, the complaint does not, as it could not for reasons I later explain, seek to bring a claim for breach of those indentures, as the Litigation Trust does not possess the right to bring claims under those indentures.

At the tail end of the complaint, the Litigation Trust purports to state a professional malpractice claim against the advisors, the entire sum and substance of which states:

136. The Trenwick Companies had an attorney-client relationship with Baker and accountant-client relationships with [Ernst & Young] and [PriceWaterhouseCoopers] and an actuary-client relationship with Milliman. As such, these entities are held to the standard of care that would be exercised by reasonably prudent professionals in their fields.[FN143]

FN143. *Id.* ¶ 136.

137. The Professional Defendants breached their duties of care by failing to act with the diligence required and/or providing representation that lacked the minimum degree of skill, prudence[,] and knowledge. Specifically, the Professional Defendants breached their duties of care by helping to conceal the true financial condition of the Trenwick Companies, manipulating the valuation and reserve levels of various of these companies, and/or signing off on the legitimacy of the transactions in question. Milliman further breached its duty of care by certifying the reserve levels at Chartwell in 1999.[FN144]

FN144. *Id.* ¶ 137.

138. As a result of the Professional Defendants' negligence, [Trenwick America] suffered injury for which Plaintiff seeks recovery.[FN145]

FN145. *Id.* ¶ 138.

At bottom, the complaint simply alleges that big-dog advisors were on the scene when Trenwick acquired Chartwell and LaSalle, that Trenwick ultimately failed, and that in the post-Enron era, big-dog advisors should pay when things go wrong with their clients, even when a plaintiff cannot articulate what it is that the advisors did that was intentionally wrongful or even negligent.

**\*36** Each of the defendant advisors has moved to dismiss the complaint against it on various grounds. I grant those motions for reasons that will be stated tersely.

First, because the complaint fails to state a claim for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

breach of fiduciary duty against the Trenwick or Trenwick America directors, the claims that the defendant advisors aided and abetted any underlying breach of fiduciary duty fails.[FN146] As important, a claim for aiding and abetting involves the element that the aider and abettor have "knowingly participated" in the underlying breach of fiduciary duty.[FN147] The complaint is devoid of facts suggesting that any of the defendant advisors had any reason to believe they were assisting in a breach of fiduciary duty against Trenwick America, a wholly-owned subsidiary of Trenwick, by acting in the capacities they did for Trenwick, in particular in connection with non-self dealing mergers involving Trenwick's acquisition of other public companies.

> FN146. *See, e.g., Malpiede v. Townson,* 780 A.2d 1075, 1096-97 (Del.2001) (explaining the existence of a viable underlying claim for breach of fiduciary duty is a necessary element of an aiding and abetting claim).

> FN147. *See id.* ("A third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party 'knowingly participates' in the breach.") (citing *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del. Ch.1984)); *Weinberger v. Rio Grande Indus., Inc.,* 519 A.2d 116, 131 (Del. Ch.1986) (dismissing aiding and abetting and conspiracy to breach fiduciary duty claim because the plaintiff did not establish the defendants knowingly participated in the breach).

Second, for identical reasons, the count in the complaint purporting to state a claim for "conspiracy to breach fiduciary duties" is equally defective.

Third, the fraud count in the complaint fails against the defendant advisors for the same reasons it fails against the Trenwick and Trenwick America directors. The allegations in the complaint do not satisfy Rule 9(b) and Trenwick America as an entity could not have reasonably relied to its detriment on statements of fact its board and sole owner allegedly knew to be false. Thus, without an underlying claim of fraud, the claim that the defendant advisors conspired with the boards of directors also fails.

Fourth, the so-called "malpractice" count is defective for several reasons. As an initial matter, Trenwick America has no right to bring a malpractice claim

against advisors who worked solely for Trenwick. Any right to bring such a claim belongs to Trenwick as the client and not to its wholly-owned subsidiary. Thus, as to Baker & McKenzie, Ernst & Young, and Milliman, the claim fails because Trenwick was their client. I do not base my dismissal decision on this ground as to defendant PriceWaterhouseCoopers, which was engaged to audit not only Trenwick, but Trenwick America.

Next, the malpractice claims fail to plead facts supporting an inference that the defendant advisors breached the standard of professional care owed by them. For example, as to defendant Milliman, an actuarial firm, the complaint simply states that Milliman's estimate that Chartwell's reserves at the time of its acquisition would be sufficient, when supplemented with $100 million in additional coverage, was wrong. The inflammatory allegations that Milliman must have known they were wrong or manipulated its certification are entirely conclusory and are not accompanied by factual context giving rise to the odor of purposeful wrongdoing or professional slack.[FN148] Notably, the Litigation Trust has not pled that Milliman warranted that if its estimates were wrong, it would be strictly liable. Indeed, to the contrary, the public documents the complaint draws upon contain heavy caveats regarding these estimates.[FN149] In addition, as the Second Circuit recognized, regardless of the actuarial method used, calculations of net worth for casualty risk reinsurers are not as firmly determinable as other financial line items.[FN150]

> FN148. *See* Compl. ¶¶ 80, 86, 121, 137.

> FN149. *E.g.,* Hefter Decl. Ex. A, at 12-13 (Trenwick 10-K, Amd. No. 1, filed Aug. 22, 2000); Hefter Decl. Ex. C, at 10-12 (Trenwick 10-K filed Mar. 30, 2000).

> FN150. *See, e.g., Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.,* 945 F.2d 1226, 1231 (2d Cir.1991) ("Consequently, regardless of the actuarial method used, the preparation of, and reliance upon a net worth calculation in a balance sheet for a casualty risk reinsurer is based in large part upon informed guesswork. One cannot, therefore, expect equivalent certainty in a balance sheet's statement of loss reserves and its statement of more determinable items, such as outstanding principal and interest on debt instruments."); *see also Nat'l Distillers &*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

_Chem. Corp. v. Don W. Stephens_, 912 S.W.2d 30, 32 (Ky.1995) ("The law turns a blind eye towards attempts to restate the financial condition of a corporation once that condition has already been lawfully determined .").

*37    Likewise,    as    to    defendants PriceWaterhouseCoopers and Ernst & Young, the complaint fails to plead any specifics regarding the deficiency in the accounting and valuation work that they performed. The Litigation Trust does not identify a single violation of generally accepting accounting principles or any other specific material misstatement of financial fact in the relevant financial statements. All that the complaint alleges is that the financial statements were false in some unspecified way and that these defendants participated with Trenwick in manipulating them and in facilitating Trenwick's acquisition strategy. The reason this must be so, the complaint infers, is that in August 2003, Trenwick and Trenwick America became insolvent.

As to Baker & McKenzie, the complaint is, admittedly, more specific. The complaint alleges that the law firm gave an erroneous opinion that a transfer of assets from Trenwick to Chartwell complied with the requirement that Trenwick transfer substantially all of its assets to an entity that would assume the obligations of those indentures. The reason that advice was given was to protect Trenwick against a claim under an indenture governing particular notes, not to protect Trenwick America. What the Litigation Trust fails to explain is that if this opinion was wrong, a matter that it does not try to prove at this stage, any claim would belong to Trenwick. Moreover, the proper party to sue Trenwick for any violation of the indenture would be the noteholders or the trustee under that particular indenture (as the case may be, in compliance with the indenture's terms) and not Trenwick America. Furthermore, even if a court might conclude that its view of the legal matter addressed in the Baker & McKenzie opinion was, on balance, different, that conclusion would not dictate that the law firm committed malpractice. In that regard, the complaint does not even attempt to plead facts supporting an inference that the opinion in question had no reasonable basis in law or fact. Given that the only asset not transferred in the transaction was an intercompany payable,[FN151] given that all of the remaining assets of Trenwick were transferred to Chartwell Re, and given that the assets transferred comprised approximately 81.6% of those assets backing the indentures (according to the Litigation Trust itself),[FN152] that inference would be

hard to draw, if one assumes that the term in the indenture is to be interpreted consistently with its use in Delaware's jurisprudence under _8 Del. C. § 271_.[FN153]

FN151. In addition, the complaint never makes it clear how it would have helped Trenwick America if it had received an intercompany payable owed by another wholly-owned    Trenwick    subsidiary, Chartwell Re, to Trenwick. Trenwick became insolvent itself, in large measure according to the Litigation Trust because the relevant subsidiary, Chartwell Re, had inadequate reserves stemming from the period before it was acquired by Trenwick.

FN152. Compl. ¶ 80.

FN153. _See Hollinger Inc. v. Hollinger Intern., Inc._, 858 A.2d 342, 377-78 (Del. Ch.2004) ("It would be less than candid to fail to acknowledge that the § 271 case law provides less than ideal certainty about the application of the statute to particular circumstances. This may result from certain decisions that appear to deviate from the statutory language in a marked way and from others that have dilated perhaps longer than they should in evaluating asset sales that do not seem to come at all close to meeting the statutory trigger for a required stockholder vote.") (citations omitted); _In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig._, 810 A.2d 351, 370, 371 n.42 (Del. Ch.2002) (stating that determining what "substantially all" means in the context of _8 Del. C. § 271_ can be an "amorphous inquiry" and that some cases have read it to mean about "half"); _In re Gen. Motors Class H S'holders Litig._, 734 A.2d 611, 623 (Del. Ch.1999) (same).

Instead of using the lengthy passages of the complaint it devoted to tarring the defendant advisors with allegations made against them in other contexts and with being somehow responsible for the permeation of an Enron-like culture throughout the American business community, the Litigation Trust should have done what it was supposed to do to plead a malpractice action. That would have involved factual allegations that each of the defendant advisors was engaged by Trenwick America to provide professional advice of a particular kind, specifying

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)
(Cite as: Not Reported in A.2d)

what the advisors did in those capacities, and identifying how what the advisors did fell short of applicable standards of care. Even under a notice pleading standard, a plaintiff must articulate facts supporting an inference that a professional acted without due care.[FN154]

> FN154. *See, e.g., In re Parmalat Sec. Litig.,* 377 F.Supp.2d 390, 410 (S.D.N.Y.2005) ("Professional malpractice is governed by Rule 8, and plaintiff need only make a short and plain statement of the claim. The short and plain statement, however, must give the defendant notice of the nature of the claim. Simply asserting that [the accountant's] actions constituted malpractice is not sufficient for even this minimal standard. As the Second Circuit has explained, 'a simple declaration that defendant's conduct violated the ultimate legal standard at issue ... does not suffice. But it is enough to assert facts from which, construing the complaint liberally and in the plaintiff's favor, one could infer such a violation." ') (quoting *Gregory v. Daly,* 243 F.3d 687, 692 (2d Cir.2001)).

**\*38** Lastly, as to defendant Ernst & Young, the Litigation Trust is barred from proceeding in this court. The retention agreement Ernst & Young signed with Trenwick contained a broad arbitration clause. Trenwick America, in the guise of the Litigation Trust, cannot seek to hold Ernst & Young responsible for malpractice it committed under a contract signed by Trenwick and then refuse to press its claim in the forum clearly agreed upon in that contract. [FN155]

> FN155. *See, e.g., Ishimaru v. Fung,* 2005 WL 2899680, at \*18 (Del. Ch. Oct. 26, 2005) ("One of the primary justifications for estopping a signatory from denying a non-signatory a right to arbitrate is that it is unfair for the signatory to have it both ways by attributing to a non-signatory the duties of a contract signatory for purposes of pressing claims but denying the non-signatory the right to invoke the arbitration clause."); *In re Kaiser Group Int'l, Inc.,* 307 B.R. 449, 457 (Bankr.D. Del.2004 ("courts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never

signed the agreement ... The policy driving this theory is that a non-signatory should be prevented from embracing a contract and then turning its back on those portions of the contract which it finds distasteful.") (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 200 (3d Cir.2001); *see also Town of Smyrna v. Kent County Levy Court,* 2004 WL 2671745, at \*4 (Del. Ch. Nov. 9, 2004) ("equity will not allow a party to sue to enforce the provisions of a contract that it likes, while simultaneously disclaiming provisions that it does not") (citing approvingly *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen Gmbh,* 206 F.3d 411, 418 (4th Cir.2000)).

For all these reasons, the counts against the professional advisors are all dismissed.

### III. *Conclusion*

It is no doubt regrettable that Trenwick and Trenwick America became insolvent. That insolvency no doubt injured their stockholders, creditors, customers, and employees. But the mere fact of a business failure does not mean that a plaintiff can state claims against the directors, officers, and advisors on the scene just by pointing out that their business strategy did not pan out. If simple failure gave rise to claims, the deterrent to healthy risk taking by businesses would undermine the wealth-creating potential of capitalist endeavors. For that reason, our law defines causes of action that may be pled against business fiduciaries and advisors with care, in order to balance society's interest in promoting good-faith risk-taking and in preventing fiduciary misconduct. The Litigation Trust has failed to meet its burden to plead facts stating claims of that kind against the defendants in this case.

The defendants shall prepare an implementing order, with notice as to form to the Litigation Trust. The parties shall bear their respective costs.

Del.Ch.,2006.
Trenwick America Litigation Trust v. Ernst & Young, L.L.P.
Not Reported in A.2d, 2006 WL 2333201 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.