## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DENNIS J. BUCKLEY, AS TRUSTEE OF THE DVI LIQUIDATING TRUST | : | |
| | : | |
| Plaintiff, | : | Civ. No. 04-955-GMS |
| v. | : | |
| | : | |
| MICHAEL A. O'HANLON, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DEFENDANT GERALD L. COHN'S OPENING BRIEF
## IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Julian W. Friedman (Admitted Pro Hac Vice)
Elizabeth S. Weinstein (Admitted Pro Hac Vice)
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.
425 Park Avenue
New York, NY 10022
(212) 223-0200 (telephone)
(212) 223-1942 (facsimile)

*Counsel for Defendant Gerald L. Cohn*

Steven T. Davis (#2731)
Kellie M. MacCready (#4574)
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
3 Mill Road, Suite 306A
Wilmington, Delaware 19806
(302) 655-9094 (telephone)
(302) 658-8051 (facsimile)

*Counsel for Defendant Gerald L. Cohn*

DATED: July 18, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS ............................................... 1

SUMMARY OF THE ARGUMENT ....................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

ARGUMENT ............................................................................................................ 5

I.  SUMMARY JUDGMENT MOTION STANDARD ....................................... 5

II.  MR. COHN IS ENTITLED TO SUMMARY JUDGMENT ON
    PLAINTIFF'S DIRECT CLAIMS FOR BREACH OF FIDUCIARY
    DUTY BECAUSE SUCH CLAIMS ARE NOT RECOGNIZED
    UNDER DELAWARE LAW ......................................................................... 6

    A.  Delaware Law Pre-*Gheewalla* .......................................................... 7

    B.  *North American Catholic Educational Programming
        Foundation, Inc. v. Gheewalla* ........................................................ 8

III.  MR. COHN IS ENTITLED TO SUMMARY JUDGMENT ON
     PLAINTIFF'S DERIVATIVE BREACH OF FIDUCIARY DUTY
     CLAIMS ....................................................................................................... 9

    A.  Derivative Claims in the "Zone of Insolvency" .............................. 10

    B.  Derivative Claims Against Directors of Insolvent Corporations ..... 10

    C.  The Business Judgment Rule ........................................................... 12

        1.  Reasonably Available Information ....................................... 14

            a.  Management's Deception of Mr. Cohn ..................... 15

            b.  Deloitte Provided No Notice of the Fraud to Mr. Cohn ... 16

        2.  Gross Negligence ................................................................. 17

            a.  Mr. Cohn Diligently Pursued His Fiduciary Duties ..... 17

b.　　Mr. Cohn Acted in Good Faith ....................................................... 18

IV.　MR. COHN IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S "DEEPENING INSOLVENCY" CLAIM ................................................ 19

CONCLUSION ......................................................................................................... 20

## TABLE OF AUTHORITIES

**CASES**                                                                                               **PAGE**

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) ................................................................13

*Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150 (Del Ch. 2005)...................................17

*Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169 (Del. Ch. 2006)..................6

*Blackmore Partners, L.P. v. Link Energy LLC*, 2005 WL 2709639, at *6
    (Del. Ch. Oct. 14, 2005) ..............................................................................7, 11

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) .....................................................13, 17, 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...............................................................5

*El v. Southeastern Pennsylvania Transp. Authority (SEPTA)*,
    479 F.3d 232 (3d Cir. 2007)..........................................................................5

*Geyer v. Ingersoll Publications Co.*, 621 A.2d 784 (Del. Ch. 1992) .............................................7

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003)..................................................14, 17, 19

*Harff v. Kerkorian*, 324 A.2d 215 (Del. Ch. 1974), *rev'd in part on other grounds*,
    347 A.2d 133 (Del. 1975).............................................................................7

*In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996) ...................................17

*In re Citigroup Inc. Shareholder Litig.*, 2003 WL 21384599, at *2
    (Del. Ch. Jun. 5, 2003), *aff'd sub nom Rabinowitz v. Shapiro*,
    839 A.2d 666 (Del. 2003).............................................................................15

*In re Hechinger Inv. Co. of Delaware*, 327 B.R. 537 (D. Del. 2005) .............................................12

*In re NCS Healthcare, Inc.*, 825 A.2d 240 (Del. Ch. 2002) ........................................................7, 13

*In re Teleglobe Communications Corp.*, 493 F.3d 345 (3d Cir. 2007) .............................................19

*LaSalle Nat. Bank v. Perelman*, 82 F. Supp. 2d 279 (D. Del. 2000)..................................5, 7, 11

*Marten v. Godwin*, 499 F.3d 290 (3d Cir. 2007) ...................................................................5

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 575 (1986)............................5, 6

*North American Catholic Educational Programming Foundation, Inc.*
    *v. Gheewalla*, 930 A.2d 92 (Del. 2007) ................................................. 6, 7, 8, 9, 10, 11, 12

*Production Resources Group, LLC v. NCT Group, Inc.*,
    863 A.2d 772 (Del. Ch. 2004) ........................................................... 7, 8, 9, 11, 12

*Rales v. Blasband*, 634 A.2d 927 (Del 1993) ........................................................... 13

*Rattner v. Bidzos*, 2003 WL 22284323, at *13 (Del. Ch. Oct. 7, 2003) ................................. 13, 15

*Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209 (S.D.N.Y. 2004) ............................ 7

*Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120 (3d Cir. 1998) ................................... 6

*Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*,
    906 A.2d 168 (Del Ch. 2006) ........................................................... 12, 14, 19, 20

## OTHER AUTHORITIES

Fed. R. Civ. P. 56 ........................................................................................ 5

Fed. R. Civ. P. 56(e) ..................................................................................... 5

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Dennis J. Buckley[1], the Trustee of the DVI Liquidating Trust, brings this action against Defendant Gerald Cohn, as well as a number of former officers and directors of DVI, Inc. and its subsidiaries. (D.I. 1). The Complaint alleges nine claims against Mr. Cohn:

- Claims Eleven through Nineteen are for breach of fiduciary duty, and allege that Mr. Cohn and others "owed fiduciary duties of care, loyalty and good faith to DVI and its creditors" which were violated by their "intentional ignorance of and/or willful blindness to DVI's improper transactions and system failures". (D.I. 1, ¶¶ 187-239.)

- Claim Twenty is for "deepening insolvency" and alleges that by "grossly negligent, reckless and at times fraudulent actions while DVI was insolvent or in the zone of insolvency", Mr. Cohn and others "alienated and dissipated assets" and "permitted DVI to issue false and misleading financial statements". (D.I. 1, ¶¶ 240-247.)

In response to Plaintiff's Complaint, Mr. Cohn moved to dismiss for failure to state a claim. (D.I. 32.) That motion was made before any discovery had been conducted, and was denied by this Court on March 28, 2007. (D.I. 81.) Since that time, the parties have conducted extensive discovery, including document production and numerous depositions.   Those depositions have included testimony by Mr. Cohn and other DVI directors, as well as testimony by DVI officers, employees, legal advisors, and outside accountants.  Mr. Cohn now moves for summary judgment based on that discovery, and the application of the relevant law to the facts elicited. This Brief is submitted in support of that Motion.

## SUMMARY OF THE ARGUMENT

1.     Mr. Cohn is entitled to summary judgment because Delaware law bars direct breach of fiduciary duty claims by creditors against corporate directors.

---

[1]     The former Plaintiff, The Official Committee of Unsecured Creditors of DVI ("the Committee"), filed this action in August 2004.  Soon thereafter, the Committee was dissolved.  In November 2004, the United States Bankruptcy Court for the District of Delaware appointed the current Plaintiff, Dennis J. Buckley, as Trustee for the DVI Liquidating Trust ("Buckley").  Thereafter, Mr. Buckley was substituted as Plaintiff in this action.

2.     Mr. Cohn is entitled to summary judgment because Delaware law bars derivative breach of fiduciary duty claims by creditors against corporate directors while a corporation is in the "zone of insolvency".

3.     Mr. Cohn is entitled to summary judgment because while Delaware law permits derivative breach of fiduciary duty claims by creditors against corporate directors based on events occurring after a corporation's insolvency, the business judgment rule protects directors when such claims are made.

4.     In order to overcome the protection of the business judgment rule, a creditor suing a corporate director bears the burden of proving that the director lacked independence, or that the director did not consider all material information reasonably available and acted with gross negligence. The record in this case establishes that Plaintiff can make no such showing.

5.     Mr. Cohn is entitled to summary judgment because Delaware law does not recognize "deepening insolvency" claims.

## STATEMENT OF FACTS

The arguments summarized above -- and discussed in more detail below -- are based upon the undisputed facts which have been established during the discovery in this action. It is respectfully submitted that the evidence shows that Mr. Cohn was the victim of a concerted effort by DVI senior management to conceal the true facts regarding the Company's operations and its non-compliance with its loan agreements, and that as soon as he received an indication of possible fraud by DVI management, he acted properly and in a manner consistent with his fiduciary duty. The relevant facts supporting the aforesaid statements are as follows:

- Although he was a director of DVI during the relevant time period, Mr. Cohn was not on the Audit Committee between 2000 and 2002. (Cohn Affidavit, ¶¶ 27, 29.)

- When Mr. Cohn learned in April 2001 that a DVI employee (Lisa Cruikshank) intended to resign, Mr. Cohn contacted Steven Garfinkel (DVI's Chief Financial Officer) to ask the reason for Ms. Cruikshank's departure. When Mr. Garfinkel responded that Ms. Cruikshank was uncomfortable because DVI was sometimes out of compliance with its agreements with its lending banks, Mr. Cohn demanded to know whether DVI was currently in compliance. Mr. Garfinkel assured Mr. Cohn that DVI was currently in compliance, and Mr. Cohn insisted that DVI stay in compliance. (Cohn Affidavit, ¶ 49.)

- In their discussion about Ms. Cruikshank's resignation, Mr. Garfinkel lied to Mr. Cohn in explaining that DVI's past compliance failures were because of a collateral imbalance due to delays in the sale of DVI securitizations. (Cohn Dep. 813:5 - 815:12, Feb. 14, 2008 [A13, p. 92]; Cohn Affidavit, ¶ 51.)[2]

- After his conversation with Mr. Garfinkel concerning Ms. Cruikshank, Mr. Cohn spoke directly to Michael O'Hanlon (DVI's Chief Executive Officer). Mr. O'Hanlon deceived Mr. Cohn by comparing DVI's compliance issues to overdrawing a checking account. Mr. Cohn insisted that Mr. O'Hanlon take DVI's compliance seriously, called Mr. O'Hanlon every quarter to check on DVI's compliance status, and received constant assurances of continued compliance. (Cohn Dep. 810:15 - 810:22, 909:21 - 910:2, 931:1 - 931:8, Feb. 14, 2008 [A13, pp. 91, 97]; Cohn Affidavit, ¶ 50.)

- At meetings of the DVI Board, both Mr. Garfinkel and Mr. O'Hanlon further deceived Mr. Cohn by assuring the Board that DVI was in compliance with the covenants in its lending agreements. (Cohn Dep. 337:4 - 338:11, 343:12 - 344:13, Feb. 13, 2008 [A12, pp. 64, 65]; Cohn Affidavit, ¶¶ 52-54.)

- At the April 10, 2001 Board meeting, Mr. O'Hanlon further deceived Mr. Cohn by reassuring the Board that he would "fix" any compliance issues that still existed. (Cohn Affidavit, ¶ 52.)

- At a subsequent Board meeting, Mr. Garfinkel explained that while DVI had gone out of compliance due to the Argentinian currency crisis, Fleet Bank would likely grant DVI an exemption. Mr. Cohn asked which specific covenant DVI had broken, and Mr. Garfinkel explained it was the cash flow covenant. Mr. Cohn then asked whether DVI was in full compliance with all other bank covenants. Mr. Garfinkel assured the Board that DVI was in full compliance. (Cohn Affidavit, ¶ 53.)

- At none of the Board meetings did Mr. Garfinkel or Mr. O'Hanlon inform the Board about DVI's pledging of ineligible collateral or double-listing collateral. (Cohn Affidavit, ¶¶ 52-54.)

---

[2]    Pursuant to Rule 7.1.3 of the Local Rules of this Court, the deposition excerpts cited in this Brief and in the accompanying Cohn Affidavit are set forth in a separate Appendix that is being filed with this Brief. The citations to the deposition excerpts set forth above and in the Cohn Affidavit contain both the original transcript pages and line numbers, and the pages of the Appendix on which those transcripts are reproduced.

- Mr. Garfinkel has admitted that while he used the words "out of compliance," he does not know what Directors understood those words to mean. Crucially, Mr. Garfinkel acknowledged, "[The board] certainly didn't understand that I was using ineligible collateral." (Cohn Dep. 293:22 - 294:6, Feb. 12, 2008 [A11, p. 56]; Garfinkel Dep. 43:18 - 43:22, 44:19 - 46:11, 51:18 - 51:21, Mar. 27, 2008 [A17, pp. 122-123, 124]; Garfinkel Dep. 97:2 - 97:18, 97:23 - 99:17, 100:2 - 100:8, 121:20 - 123:19, Apr. 1, 2008 [A19, pp. 140-141, 145-146].)   There is no testimony in the record that contradicts these admissions by Mr. Garfinkel.

- Mr. Garfinkel has also confirmed that Mr. O'Hanlon "badly lied to the board." In fact, in April 2003, Mr. Garfinkel wrote a memorandum to Mr. O'Hanlon expressing his concerns that the Board had no awareness of DVI's collateral shortfall. This memo makes clear that management was engaged in a concerted effort to conceal fraudulent activities from Mr. Cohn specifically. (April/May 2003 Memorandum from Steven Garfinkel to Michael O'Hanlon [A1]; Cohn Affidavit, ¶¶ 6-10.) Once again, there is no evidence in the record that contradicts Mr. Garfinkel's admissions.

- Plaintiff himself has admitted that DVI only became insolvent in June 2003. (D.I. 1, ¶ 57.)

- In mid-July 2003, after the DVI insolvency, Mr. Cohn learned that Mr. Garfinkel had just revealed for the first time that there was a $50 million "hole" in DVI's collateral. Mr. Cohn was instrumental in causing the Company to disclose this possibility to its lenders and in commencing an investigation to get at the true facts. (Cohn Dep. 262:4 - 262:6, 270:17 - 271:3, 272:21 - 273:1, 274:9 - 275:4, Feb. 12, 2008 [A11, pp. 50, 52, 52-53, 53]; Cohn Dep. 808:22 - 809:15, 910:15 - 911:8, 930:10 - 930:23, Feb. 14, 2008 [A13, pp. 90-91, 97, 101]; Cohn Affidavit, ¶¶ 68-71.)

- On August 4, when Mr. Cohn first saw a "whistle blower" letter written by a DVI employee, he immediately brought the letter to the attention of the forensic accountants working for DVI. (Cohn Dep. 260:2 - 261:14, 263:13 - 263:19, Feb. 12, 2008 [A11, pp. 49-50]; Cohn Dep. 348:21 - 348:22, Feb. 13, 2008 [A12, p. 66]; Cohn Affidavit, ¶¶ 72-74.)

- Only in August 2003, when Mr. Cohn saw the "whistle blower" letter, did he learn that the DVI compliance failures -- which Mr. O'Hanlon and Mr. Garfinkel had repeatedly assured him were attributable to non-fraudulent causes and had been cured -- were apparently due to the intentional pledging of ineligible collateral. (Cohn Dep. 261:15 - 262:13, Feb. 12, 2008 [A11, p. 50]; Cohn Dep. 344:10 - 344:22, Feb. 13, 2008 [A12, p. 65]; Cohn Dep. 931:15 - 931:20, Feb. 14, 2008 [A13, p. 101]; Cohn Affidavit, ¶ 73.)

- After seeing the "whistle blower" letter, Mr. Cohn did his own investigation and learned that Mr. Garfinkel had apparently paid "hush money" -- in the form of "severance payments" -- to two employees who had not left the Company, and that Mr. Garfinkel had also directed that these payments be kept confidential. (Cohn Dep.

4

261:14 - 264:7, 284:13 - 284:23, Feb. 12, 2008 [A11, pp. 50, 54]; Cohn Affidavit, ¶ 75.)

- Mr. Cohn immediately directed DVI's legal department to inform the entire Board about the severance payments. In addition, he explained the collateral shortfall situation to each member of the Board individually to ensure each director understood the magnitude of the problem. (Cohn Dep. 267:18 - 268:11, 286:17 - 287:4, Feb. 12, 2008 [A11, pp. 51, 55]; Cohn Affidavit, ¶ 79.)

- Once Mr. Cohn had reason to suspect management's fraudulent behavior in August 2003, he immediately ceased relying on management and worked with other directors to create procedures limiting management's authority. (Cohn Dep. 258:16 - 268:11, 273:18 - 275:4, Feb. 12, 2008 [A11, pp. 49-51, 53]; Cohn Dep. 572:2 - 579:6, Feb. 13, 2008 [A12, pp. 80-82]; Cohn Dep. 928:14 - 930:23, Feb. 14, 2008 [A13, pp. 100-101].)

- Faced with evidence that DVI's management had engaged in fraudulent behavior, Mr. Cohn acted quickly and decisively to investigate the problem --he confronted Mr. Garfinkel and Mr. O'Hanlon, brought the problems to the attention of the other Directors, and was instrumental in bringing crisis managers into the Company and then, in having the Company initiate bankruptcy proceedings. (Cohn Dep. 264:8 - 267:10, Feb. 12, 2008 [A11, pp. 50-51]; Cohn Affidavit, ¶¶ 76-81.)

## ARGUMENT

## I.  SUMMARY JUDGMENT MOTION STANDARD

A moving party is entitled to summary judgment as a matter of law if the party demonstrates that there exists "no genuine issue as to any material fact." Fed. R. Civ. P. 56; *see, e.g., El v. Southeastern Pennsylvania Transp. Authority (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007). However, the party opposing a summary judgment motion must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party cannot assert "mere allegations or denials" of the movant's factual arguments. Fed. R. Civ. P. 56(e); *see, e.g. Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007). Instead, the opposing party must set forth specific and meaningful evidence in support of its position that genuine questions as to material facts exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also LaSalle Nat. Bank v.*

5

*Perelman*, 82 F. Supp. 2d 279, 290 (D. Del. 2000).  Demonstrating the requisite "genuine dispute" requires Plaintiff to present evidence sufficient for a reasonable jury to find in its favor. *See, e.g., Matsushita, supra*, 475 U.S. at 587; *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 131 (3d Cir. 1998).  This Brief demonstrates that Plaintiff cannot meet his burden of coming forward with such evidence.

## II.   MR. COHN IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DIRECT CLAIMS FOR BREACH OF FIDUCIARY DUTY BECAUSE SUCH CLAIMS ARE NOT RECOGNIZED UNDER DELAWARE LAW

Plaintiff's claims that Mr. Cohn breached his fiduciary duties are based on the proposition that while DVI was "either insolvent or in 'the zone of insolvency'", the officers and directors "owed fiduciary duties to both DVI and DVI's creditors to manage and supervise DVI's finances and operations".[3]  (D.I. 1 at ¶ 6.)

With regard to Plaintiff's direct claims, it is now clear that Delaware law does not recognize such claims by creditors.  In fact, two months after this Court denied Mr. Cohn's Motion to Dismiss, the Delaware Supreme Court, in the seminal case *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007), ruled that Delaware law does not impose upon a corporation's directors fiduciary duties owing directly to that corporation's creditors -- even when the corporation is insolvent or in the "zone of

---

[3]       Plaintiff's Complaint does not make clear whether his claims against Mr. Cohn are direct claims or derivative claims.  When suit is brought by a shareholder, Delaware law distinguishes these two types of claims based on the following analysis: "[w]ho suffered the alleged harm--the corporation or the suing stockholder individually--and who would receive the benefit of the recovery or other remedy?"  *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1179 (Del. Ch. 2006) (citation omitted).  When a suing stockholder suffered the alleged harm and would receive the recovery, Delaware law considers the claim to be direct.  When the corporation itself suffered the alleged harm and would receive the recovery, Delaware law considers the claim to be derivative.  *Id.* at 1179.  This Brief assumes that Plaintiff has pleaded both direct and derivative claims based on the following assertion repeated in each Count: "The Director Defendants owed fiduciary duties of care, loyalty and good faith to DVI and its creditors."  (D.I. 1, ¶¶ 188, 193, 199, 205, 211, 217, 223, 229, 235.)  Because Delaware law treats direct and derivative claims differently, Section II addresses Plaintiff's direct claims, and Section III, below, addresses Plaintiff's derivative claims.

insolvency." Thus, Mr. Cohn is entitled to summary judgment on Plaintiff's direct breach of fiduciary duty claims.

A.    **Delaware Law Pre-*Gheewalla***

Delaware law has long-established that creditors of corporations are not generally owed fiduciary duties by directors of the corporation. *See Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 787 (Del. Ch. 1992), *citing Harff v. Kerkorian*, 324 A.2d 215, 222 (Del. Ch. 1974), *rev'd in part on other grounds*, 347 A.2d 133 (Del. 1975); *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 787 (Del. Ch. 2004). Yet, prior to *Gheewalla*, Delaware law left open the question of whether to make an exception from this rule for directors of corporations that were either insolvent or entering a "zone of insolvency". *See, e.g. Blackmore Partners, L.P. v. Link Energy LLC*, 2005 WL 2709639, at *6 (Del. Ch. Oct. 14, 2005); *In re NCS Healthcare, Inc.*, 825 A.2d 240, 256-7 (Del. Ch. 2002); *Geyer*, 621 A.2d at 790. Similarly, federal cases applying Delaware law prior to *Gheewalla* also found that directors owed a fiduciary duty directly to creditors in certain circumstances. *See LaSalle Nat. Bank*, 82 F. Supp. 2d 279 (affirming directors' duties to creditors during period of insolvency); *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209 (S.D.N.Y. 2004) (directors owe fiduciary duties to creditors when a corporation enters a "zone of insolvency").[4]

In 2004, the Delaware Court of Chancery expressed deep concern over such creditor-initiated direct breach of fiduciary duty claims. In *Production Resources,* the Court soundly rejected the proposition that insolvency created new fiduciary duties owing from a corporation's directors to its creditors:

---

[4]    However, in both of the above cases, the Court concluded that despite the existence of the duty, the business judgment rule protected the director defendants. *LaSalle Nat. Bank,* 82 F. Supp. 2d at 290-91; *Roselink Investors,* 386 F. Supp. 2d at 217.

> the fact of insolvency does not change the primary object of the director's duties, which is the firm itself . . . Put simply, when a director of an insolvent corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation.

863 A.2d at 792. Despite this cautionary analysis, however, the Court left open the possibility of direct fiduciary breach claims by creditors. *Id.* at 801.

### B. *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*

In *Gheewalla*, the Delaware Supreme Court closed the door left slightly ajar by *Production Resources*, and made clear that creditors had no direct fiduciary duty claims against directors. *Gheewalla*, 930 A.2d at 103. In *Gheewalla*, the defendants served on a corporation's board at the pleasure of their employer, a bank. *Id.* at 95. Plaintiff was a creditor of the corporation, and alleged that the directors breached their fiduciary duties by cancelling a transaction without compensating the creditor for its losses. *Id.* at 95. The Supreme Court ruled that directors do not owe fiduciary duties to creditors, even after a corporation enters the so-called "zone of insolvency":

> [N]o direct claim for breach of fiduciary duties may be asserted by the creditors of a solvent corporation that is operating in the zone of insolvency. When a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interest of the corporation for the benefit of its shareholder owners.

*Id.* at 101.

The Court next turned to the question of whether the directors of a corporation that has already become insolvent owe fiduciary duties to the corporation's creditors. The Court noted that:

> [i]t is well settled that directors owe fiduciary duties to the corporation. When a corporation is *solvent*, those duties may be enforced by its

8

> shareholders, who have standing to bring *derivative* actions . . . when a corporation is *insolvent*, however, its creditors take the place of the shareholders.

*Id.* at 101 (emphasis in original). However, the Court made it clear that even in the insolvency situation, the creditors do not have direct claims against the directors:

> [t]he fact that the corporation has become insolvent does not turn [derivative] claims into direct creditor claims, it simply provides creditors with standing to assert those claims. At all times, claims of this kind belong to the corporation itself.

*Id.* at 102 (*citing Production Resources,* 863 A.2d at 776). After acknowledging that *Production Resources* had not ruled out the possibility of direct breach of fiduciary duty claims by creditors against directors, the *Gheewalla* Court made clear that it was now doing exactly that -- holding that "creditors of a Delaware corporation that is either insolvent or in the zone of insolvency have no right, as a matter of law, to assert direct claims for breach of fiduciary duty against its directors." *Id.* at 103.

In the case at bar, the ruling in *Gheewalla* precludes Plaintiff's direct claims against Mr. Cohn for breach of fiduciary duty. These claims must fail -- even if limited to the time DVI was in the "zone of insolvency" or actually insolvent -- because Plaintiff, an "individual *creditor* of an *insolvent* corporation [has] *no right to assert direct* claims for breach of fiduciary duty against corporate directors". *Id.* (emphasis in original). Thus, Mr. Cohn is entitled to summary judgment on Plaintiff's direct claims against him for breach of fiduciary duty.

## III.    MR. COHN IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DERIVATIVE BREACH OF FIDUCIARY DUTY CLAIMS

Turning from direct to derivative claims for breach of fiduciary duty, the Delaware Supreme Court in *Gheewalla* precluded such claims by creditors against directors of corporations in a "zone of insolvency". By contrast, the Court in *Gheewalla* permitted derivative claims by creditors against directors of corporations that were already insolvent because in that situation,

9

"the creditors take the place of shareholders" to whom the fiduciary duties are owing.  930 A.2d

at 101-102.  However, even on such a claim, a plaintiff seeking to resist summary judgment still

has the burden, under the general standards discussed in Section I above, of presenting specific

and meaningful evidence supporting his derivative post-insolvency fiduciary duty claim.  The

extensive discovery record in this case establishes that Plaintiff cannot satisfy that burden, and

cannot raise a genuine issue of material fact as to Mr. Cohn's alleged breach of his fiduciary

duties to DVI during its insolvency.  For this reason, Mr. Cohn is entitled to summary judgment

on Plaintiff's derivative claims for breach of fiduciary duty during DVI's insolvency.

### A.    Derivative Claims in the "Zone of Insolvency"

The Court made clear in *Gheewalla* that directors' fiduciary duties are owed solely to the

corporate entity (and not to stockholders or creditors) throughout the life of the corporation, and

that

> [w]hen a solvent corporation is navigating in the zone of insolvency, the
> focus for Delaware directors does not change: directors must continue to
> discharge their fiduciary duties to the corporation and its shareholders by
> exercising their business judgment in the best interests of the corporation
> for the benefit of its shareholder owners.

*Id.*  Therefore, Plaintiff's derivative claims based on the premise that DVI entered a "zone of

insolvency" must thus be rejected.

### B.    Derivative Claims Against Directors of Insolvent Corporations

*Gheewalla* left a single legal recourse for creditors asserting breach of fiduciary duties

claims against directors -- derivative claims against directors of insolvent corporations.[5]

---

[5]      *Gheewalla* barred: (1) direct claims for breach of fiduciary duty by creditors against directors of
corporations in a zone of insolvency; (2) direct claims for breach of fiduciary duty by creditors against directors of
insolvent corporations; and (3) derivative claims for breach of fiduciary duty by creditors against directors of
corporations in the "zone of insolvency".  (930 A.2d at 101-02.)

Defining "insolvency" is normally a fact-intensive inquiry.[6]   However, this is not a genuine issue of material fact here because for purposes of this motion, we accept Plaintiff's allegation that DVI became insolvent in June 2003.  (D.I. 1, ¶ 57.)  If Plaintiff can show no breach of fiduciary duty by Mr. Cohn after that date, when the point of insolvency was reached, *Gheewalla* requires summary judgment in his favor.

While the Delaware Court of Chancery in *Production Resources* indicated that creditors might be able to rely on pre-insolvency conduct in asserting derivative claims against directors, 863 A.2d at 790 n. 56, it is respectfully submitted that this perspective is untenable after *Gheewalla*.  To hold otherwise and to allow creditors to base claims on pre-insolvency conduct would be to recreate a *de facto* "zone of insolvency" claim identical to that precluded by *Gheewalla* itself.  For what is a "zone of insolvency," after all, but a period prior to a corporation's insolvency?  In *Gheewalla*, the Supreme Court articulated the importance of protecting directors from claims by creditors during such a pre-insolvency period because:

> any benefit to be derived by the recognition of such additional direct claims appears minimal, at best, and significantly outweighed by the costs to economic efficacy . . . an otherwise solvent corporation operating in the zone of insolvency is one in most need of effective and proactive leadership -- as well as the ability to negotiate in good faith with its creditors -- goals which would likely be significantly undermined by the prospect of individual liability arising from the pursuit of direct claims by creditors.[7]

---

[6]   Delaware law recognizes at least two methods for determining whether a corporation is insolvent. *LaSalle Nat. Bank*, 82 F. Supp. 2d at 290-1. The "balance sheet test" examines the relative value of a corporation's equity -- if liabilities outweigh assets, the corporation is deemed insolvent. *Production Resources*, 863 A.2d at 782. The "cash flow test," examines whether a corporation can "reasonably meet its fixed (on-balance sheet and contingent) obligations as they become due" -- if a corporation cannot pay its debts as they become due in the usual course of business, the corporation is deemed insolvent. *Blackmore Partners*, 2005 WL 2709639, at *3 (citation omitted).

[7]   While the language from *Gheewalla* quoted above concerned direct claims, the Court relied on it in abolishing standing for creditors to bring both direct and derivative claims in the "zone of insolvency". (930 A.2d at 101-103.)

930 A.2d at 100-101 (*citing North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 2006 WL 2588971, at *13 (Del. Ch. Sept. 1, 2006)). To allow creditors to base claims on conduct of directors prior to insolvency would undercut the policies which are the very foundation of the *Gheewalla* decision.

For the above reasons, we respectfully submit that only Mr. Cohn's actions in and after June 2003 -- conceded by Plaintiff as the time of insolvency (D.I. 1, ¶ 57) -- are relevant to the inquiry of whether he can be sued derivatively by the DVI creditors on whose behalf Plaintiff is acting. The remainder of this Brief sets forth the authorities supporting our argument that Mr. Cohn's post-insolvency conduct was proper. Moreover, should the Court disagree with our position and consider that Mr. Cohn's pre-insolvency conduct also has some relevance here, the authorities below also demonstrate that even with respect to this earlier period, there are no material facts in dispute and Mr. Cohn is entitled to judgment as a matter of law.

## C.    The Business Judgment Rule

It is well-established Delaware law that both prior to insolvency and even after that stage has been reached, the business judgment rule protects directors in evaluating the performance of their fiduciary duties. *Production Resources*, 863 A.2d at 788; *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 205 (Del. Ch. 2006) ("[i]f the board of an insolvent corporation, acting with due diligence and good faith, pursues a business strategy that it believes will increase the corporation's value . . . it does not become a guarantor of that strategy's success"); *In re Hechinger Inv. Co. of Delaware*, 327 B.R. 537, 549 (D. Del. 2005) ("the fact of insolvency does not change the primary object of the directors' duties, which is the firm itself"; therefore, "the business judgment rule remains important and provides directors with

the ability to make a range of good faith, prudent judgments about the risks they should undertake on behalf of troubled firms.").

The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). "Under the business judgment rule, '[c]ourts do not measure, weigh or quantify directors' judgments,' rather they merely look to see if the process employed by the board was reasonable." *In re NCS Healthcare, Inc.*, 825 A.2d at 257 (citing *Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000)).

In order to negate the deference to a director's business judgment which the rule requires, a plaintiff pursuing a derivative claim has the burden of rebutting "the powerful presumption" that the director acted reasonably by showing the director's abuse of discretion. *Aronson*, 473 A.2d at 812; *Rattner v. Bidzos*, 2003 WL 22284323, at *13 (Del. Ch. Oct. 7, 2003) (citing *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993)). Beginning with *Aronson*, the Delaware Courts have held that there are only two limitations on the business judgment rule's protections. The first limitation -- that directors must be independent and disinterested -- is inapplicable here, since Plaintiff has not alleged that Mr. Cohn was an interested director who lacked independence.

Instead, Plaintiff relies on the second limitation -- that in order for the business judgment rule to apply, "in making business decisions, directors must consider all material information reasonably available, and the director's process is actionable only if grossly negligent." *Brehm*, 746 A.2d at 259 (finding that the business judgment rule protected directors from liability for breach of fiduciary duty, and holding that directors are "responsible for considering only

13

*material* facts that are *reasonably available*, not those that are immaterial or out of the Board's reasonable reach") (emphasis in original). Moreover, proving gross negligence -- so as to deprive a director of the protection of the business judgment rule -- "requires the articulation of facts that suggest a *wide* disparity between the process the directors used to ensure the integrity of the company's financial statements and that which would have been rational." *Guttman v. Huang*, 823 A.2d 492, 507 n. 39 (Del. Ch. 2003) (emphasis in original); *see also Trenwick*, 906 A.2d at 168, 192.

Thus, Delaware law imposes upon Plaintiff the burden of demonstrating that based on the "material information reasonably available to him", Mr. Cohn acted with "gross negligence". To sustain this burden, Plaintiff must prove that there was a "wide disparity" between Mr. Cohn's actions and those of a reasonable director. Only by satisfying these burdens can Plaintiff overcome the business judgment rule's presumptions. However, Plaintiff can come forward with no such proof here, and thus cannot raise a genuine issue of material fact supporting his derivative claims for breach of fiduciary duty against Mr. Cohn.[8]

### 1.    Reasonably Available Information

Plaintiff has alleged that the DVI Directors' "intentional ignorance and/or willful blindness to DVI's improper transactions and system failures constitutes a breach of the Director Defendants' fiduciary duties" (D.I. 1, ¶¶ 189, 194, 200, 206, 212, 218, 224, 230, 236) because they knew or should have known about the alleged fraud by management. (D.I. 1, ¶¶ 40-42, 7, 83, 119-123.) However, a so-called "red flag" can only be deemed to put a defendant on notice

---

[8]    Plaintiff will argue, of course, that gross negligence is a factual inquiry which cannot be resolved on a motion for summary judgment. But as noted in Section I above, it is not that easy. Plaintiff must come forward with real evidence sufficient -- if credited -- to meet the burden of overcoming the presumption of the business judgment rule. In order to do that, Plaintiff must not only claim that Mr. Cohn's actions were improper -- he must offer enough competent evidence to raise a genuine issue on that score.

if he either was actually aware of it, or would have discovered it if he acted diligently. *In re Citigroup Inc. Shareholder Litig.*, 2003 WL 21384599, at *2 (Del. Ch. Jun. 5, 2003), *aff'd sub nom Rabinowitz v. Shapiro*, 839 A.2d 666 (Del. 2003) ("'[r]ed flags' are only useful when they are either waived in one's face or displayed so that they are visible to the careful observer").

In *Rattner*, a case factually similar to this one, shareholders brought derivative breach of fiduciary duty claims against directors. 2003 WL 22284323, at *6. In that case, the Court of Chancery dismissed shareholders' claims against directors, deferring to the directors' business judgment. The Court found that failing to take action on the basis of a particular set of facts cannot be the basis for a claim of gross negligence by a director if the existence or significance of those facts only became apparent in hindsight. *Id.* at *13. The factual record here regarding what information was "reasonably available" to Mr. Cohn likewise demonstrates as a matter of law that Plaintiff cannot avoid the business judgment because of Mr. Cohn's failure to discover wrongdoing by others which Plaintiff himself admits was **concealed from Mr. Cohn.**

### a.    Management's Deception of Mr. Cohn

The relevant deposition testimony, and Plaintiff's Complaint itself, all describe the massive deception that DVI's senior management committed in order to conceal its fraudulent activities from the Directors and subvert the controls put in place by the Board. That uncontradicted evidence is summarized at pages 2-5 above, and discussed in detail in the accompanying Affidavit of Mr. Cohn. The business judgment rule issue of what information was "reasonably available" to Mr. Cohn must be determined in light of the fact that he was a target of management's deception and subversion.

Plaintiff seeks to minimize management's concealment of the fraud, and improperly shift blame to the Directors, by claiming that they failed to enforce reliable internal controls and a

reporting system.  However, the factual record makes clear (and Plaintiff himself admits) that Mr. Garfinkel and Mr. O'Hanlon purposefully circumvented DVI's Credit Committee procedures and withheld information from the non-management Directors.  (D.I. 1, ¶¶ 42, 72, 83, 119-123.)  Plaintiff's own allegations and the deposition testimony show that this is a case about **directors who were deceived**, rather than directors who abdicated their responsibilities.  And because of the investments in DVI securities made by Mr. Cohn and his family (Cohn Affidavit, ¶¶ 17-22), he was doubly victimized by management's fraud -- not only in his status as a director, but also in the most direct financial way possible.

### b.    Deloitte Provided No Notice of the Fraud to Mr. Cohn

Plaintiff bases his allegation that Mr. Cohn consciously disregarded "red flags" of management's fraudulent behavior on the false premise that Mr. Cohn was on DVI's Audit Committee during the relevant time period, and thus was responsible for addressing Deloitte's management letters.  (D.I. 1, ¶¶ 76-77.)  Plaintiff, however, has misrepresented Mr. Cohn's service on the Audit Committee, blithely ignoring the fact that Mr. Cohn was not on that Committee between December 1999 and 2003.  (Cohn Dep. 135:13 - 136:17, Feb. 12, 2008 [A11, p. 41]; Cohn Affidavit, ¶ 29.)

The only audit information to which Mr. Cohn had access during this period was: (1) Deloitte's continued certifications of DVI's financial statements; and  (2) Deloitte's presentations at Board meetings.  However, numerous Board members and others have testified that Deloitte never once raised compliance Board meetings issues or concerns about the accuracy of DVI's financial statements.[9]  That is not surprising since Deloitte believed the Company's

---

[9]      Cohn Dep. 305:11 - 306:1, Feb. 12, 2008 [A11, p. 58]; Miller Dep. 140:10 - 141:14, Jan. 15, 2008 [A3, p. 10]; Miller Dep. 454:4 - 455:18, Jan. 16, 2008 [A4, p. 12]; Turek Dep. 144:8 - 145:7, Jan. 24, 2008 [A5, pp. 36-37]; Shapiro Dep. 105:12 - 105:16, 140:13 - 141:18, 160:12 - 162:2, Feb. 6, 2008 [A10, pp. 25-27, 28-31]; Goldberg Dep. 153:21-154:4, Feb. 20, 2008 [A14, pp. 103-105]; Goldberg Dep. 456:11 - 456:17, Feb. 21, 2008 [A15, pp. 113-

financial statements to be accurate -- in the words of the Deloitte annual certifications, to "fairly present" the Company's financial condition.    Otherwise, Deloitte would not have given unqualified opinions on those financials.

### 2.    Gross Negligence

In addition to the requirement of proving that a director failed to consider "all material information reasonably available", a plaintiff can overcome the business judgment rule's presumption of good faith only by showing that a director acted with "gross negligence". *Brehm*, 746 A.2d at 259.    To satisfy this standard, the plaintiff must show that the director either deliberately ignored, and/or acted with reckless indifference to, fraudulent activity based on the information reasonably available to him. *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005).    Furthermore, where a director is deceived -- as Mr. Cohn was here -- Delaware law protects the directors' reliance on management: "absent grounds to suspect deception, neither the corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 969 (Del. Ch. 1996).    The factual record here attests to Mr. Cohn's extreme diligence in performing his fiduciary duties as a director -- conclusively negating the existence of the required "*wide disparity*" between Mr. Cohn's behavior and "rational" behavior. *See Guttman*, 823 A.2d at 507 n. 39 (emphasis in original).

### a.    Mr. Cohn Diligently Pursued His Fiduciary Duties

Mr. Cohn acted properly in relying on DVI's senior managers because he had no knowledge of their fraudulent behavior.    Since he no access to information showing

---

114]; Goldberg Dep. 606:14 - 607:6, 608:5 - 608:16, Feb. 22, 2009 [A16, pp. 117-118]; Garfinkel Dep. 23:13 - 24:12, 32:2 - 34:1, 117:17 - 117:21]; 131:12 - 134:10, Apr. 1, 2008 [A19, pp. 132, 133-134, 144, 147-148].

management's deceit, there is no basis for Plaintiff's claims that Mr. Cohn acted with conscious or intentional disregard of his duties. On the contrary, prior to learning of management's fraudulent activity in August 2003, Mr. Cohn repeatedly questioned management about DVI's financial condition and properly relied on management's assurances. (Cohn Affidavit, ¶¶ 45-54.) And upon learning of the fraud, Mr. Cohn took immediate action by informing appropriate parties and assisting in the hiring of outside counsel, auditors, and crisis managers. (Cohn Affidavit, ¶¶ 68-81.) In fact, the record includes numerous examples of Mr. Cohn's diligent behavior. The argument by Plaintiff that it was unreasonable for Mr. Cohn to rely on statements made to him by DVI's management is an attempt to apply 20/20 hindsight to conduct that was appropriate and reasonable at the time it was undertaken.

### b.    Mr. Cohn Acted in Good Faith

Mr. Cohn's good faith, as demonstrated by the record, further supports his diligence in acting in the best interests of DVI at all relevant times. One such demonstration of Mr. Cohn's good faith was his personal investment in DVI. First, Mr. Cohn spent over $1 million in purchasing DVI common stock -- stock he did not sell, but rather held until it became worthless on DVI's bankruptcy. (Cohn Affidavit, ¶¶ 17, 19, 21.) Second, Mr. Cohn and his family foundation purchased $1 million in convertible notes that were due in 2002. (Cohn Affidavit, ¶ 20.) When Mr. Garfinkel asked Mr. Cohn to roll over those notes to extend the maturity to 2004, Mr. Cohn did so because he had no knowledge of any wrongdoing at DVI. (Cohn Affidavit, ¶ 20.) Similarly, Mr. Cohn's daughter lost $150,000 when she exercised stock options, purchasing DVI stock at his recommendation,[10] and holding that stock until DVI's demise. (Cohn Affidavit, ¶ 18.) It defies common sense to believe that Mr. Cohn would have

---

[10]    Mr. Cohn made that recommendation to his daughter in March of 2002, more than a year after the departure from DVI of Lisa Cruikshank -- an event which Plaintiff claims should have put Mr. Cohn on notice of management's fraud. (Cohn Affidavit, ¶ 18.)

given such advice to his daughter, held his own stock, and rolled over the convertible notes if he had any reason to doubt the veracity of DVI's financial reporting or believed DVI management was engaged in fraud. (Cohn Dep. 27:14 - 30:3, Feb. 12, 2008 [A11, pp. 33-34]; Cohn Dep. 651:9 - 652:19; 915:7 - 917:16, Feb. 14, 2008 [A13, pp. 88, 98-99].)

In sum, it is respectfully submitted that the factual record compels the conclusion, as a matter of law, that Mr. Cohn was not "grossly negligent" because no information about the fraud was "reasonably available" to him -- the applicable standard under the business judgment rule. *Brehm,* 746 A.2d at 259. Mr. Cohn had no reason to suspect management's fraudulent behavior, so Plaintiff cannot argue that he was "conscious of the fact that [he was] not doing [his] job." *See Guttman,* 823 A.2d at 506. The facts in this case demonstrate that the directors were actively deceived by management, and that this deception included the deliberate bypassing of the procedures and systems in place to prevent fraud. Far from breaching his duty of care, Mr. Cohn was **victimized by management's concealment** of its fraudulent behavior. (Cohn Dep. 344:8 - 344:22, Feb. 13, 2008 [A12, p. 65].) The business judgment rule was intended to protect directors in the very situation in which Mr. Cohn found himself at DVI.

## IV.    MR. COHN IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S "DEEPENING INSOLVENCY" CLAIM

Plaintiff has alleged that Mr. Cohn and the other Director Defendants deepened the insolvency of DVI. (D.I. 1, ¶¶ 240-247.) Since this Court's denial of Mr. Cohn's Motion to Dismiss, the Third Circuit has made clear that Delaware law does not recognize "deepening insolvency" claims as independent causes of action. *In re Teleglobe Communications Corp.,* 493 F.3d 345, 385 (3d Cir. 2007). The Third Circuit's holding in *Teleglobe* was in turn based on the Delaware Court of Chancery case *Trenwick America Litigation Trust v. Ernst & Young LLP,* in which the Court ruled that the business judgment rule precludes an independent cause of action

19

for deepening insolvency. *Trenwick*, 906 A.2d at 205. The Court of Chancery explained that when directors of an insolvent corporation undertake a strategy in good faith that

> results in continued insolvency and an even more insolvent entity [this] does not give rise to a cause of action. Rather, in such a scenario the directors are protected by the business judgment rule. To conclude otherwise would fundamentally transform Delaware law.

*Id.* Thus, Mr. Cohn is entitled to summary judgment on Plaintiff's Twentieth Claim for Relief.

## CONCLUSION

For all of the foregoing reasons, Defendant Gerald Cohn respectfully requests that this Court enter summary judgment in his favor and against Plaintiff on all claims against Mr. Cohn.

OF COUNSEL:

Julian W. Friedman (Admitted Pro Hac Vice)
Elizabeth S. Weinstein (Admitted Pro Hac Vice)
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.
425 Park Avenue
New York, NY 10022
(212) 223-0200 (telephone)
(212) 223-1942 (facsimile)

*Counsel for Defendant Gerald L. Cohn*

/s/ Steven T. Davis

Steven T. Davis (#2731)
Kellie M. MacCready (#4574)
OBERMAYER REBMANN MAXWELL
& HIPPEL LLP
3 Mill Road, Suite 306A
Wilmington, Delaware 19806
(302) 655-9094 (telephone)
(302) 658-8051 (facsimile)

*Counsel for Defendant Gerald L. Cohn*

DATED: July 18, 2008