IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DENNIS J. BUCKLEY, AS TRUSTEE OF THE DVI LIQUIDATING TRUST | : : : | |
| Plaintiff, | : : | Civ. No. 04-955-GMS |
| MICHAEL A. O'HANLON, *et al.*, | : : : | |
| Defendants. | : : | |

**APPENDIX A TO DEFENDANT GERALD L. COHN'S OPENING BRIEF
IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Julian W. Friedman (Admitted Pro Hac Vice)
Elizabeth S. Weinstein (Admitted Pro Hac Vice)
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.
425 Park Avenue
New York, NY 10022
(212) 223-0200 (telephone)
(212) 223-1942 (facsimile)

*Counsel for Defendant Gerald L. Cohn*

Steven T. Davis (#2731)
Kellie M. MacCready (#4574)
OBERMAYER REBMANN MAXWELL &
HIPPEL LLP
3 Mill Road, Suite 306A
Wilmington, Delaware 19806
(302) 655-9094 (telephone)
(302) 658-8051 (facsimile)

*Counsel for Defendant Gerald L. Cohn*

DATED: July 18, 2008

# TABLE OF CONTENTS

**Page**

A1  March/April 2003 Memorandum from Steven Garfinkel to Michael O'Hanlon ............. 1

A2  Lisa Cruikshank Deposition, 8/21/07 .................................................................. 6

A3  Richard Miller Deposition, 1/15/08 ..................................................................... 8

A4  Richard Miller Deposition, 1/16/08 ..................................................................... 11

A5  Anthony Turek Deposition, 1/24/08 .................................................................... 13

A6  Anthony Turek Deposition, 1/25/08 .................................................................... 16

A7  Michael O'Hanlon Deposition, 1/28/08 ............................................................... 18

A8  Michael O'Hanlon Deposition, 1/29/08 ............................................................... 20

A9  Michael O'Hanlon Deposition, 1/31/08 ............................................................... 22

A10  Nathan Shapiro Deposition, 2/6/08 ................................................................... 24

A11  Gerald Cohn Deposition, 2/12/08 ...................................................................... 32

A12  Gerald Cohn Deposition, 2/13/08 ...................................................................... 59

A13  Gerald Cohn Deposition, 2/14/08 ...................................................................... 84

A14  William Goldberg Deposition, 2/20/08 ............................................................... 102

A15  William Goldberg Deposition, 2/21/08 ............................................................... 112

A16  William Goldberg Deposition, 2/22/08 ............................................................... 115

A17  Steven Garfinkel Deposition, 3/27/08 ................................................................ 119

A18  Steven Garfinkel Deposition, 3/31/08 ................................................................ 127

A19  Steven Garfinkel Deposition, 4/1/08 .................................................................. 129

**A1**

At our last dinner I tried to convey a growing sense of concern that we had reached an untenable cross roads for the company. We are no longer talking at out a small problem. The size of the hole has taken on unimagined size and consequences. We are at a point where the viability of the company can be legitimately questioned. The personal exposure to our Board, you and me is real, serious and large.

Last week I had to meet with John Healy on the senior note exchange and Sox issues. Conversations with John are protected by client – attorney privilege. In the past, John had been generally familiar with our smaller compliance issues. It was through conversations with him that I got some comfort in being able to sign the previous SOX certifications. John knows that one of your strengths is being able to see a positive end game to everything. In this case, as a friend, I know that he wants to talk with you to convey the seriousness of the consequences to you personally of pressing ahead on several of our planned initiatives without fixing the current problems. He already made clear to me my personal risks and expected consequences.

It had been frustrating sitting in on Board decisions and conversation about raising capital or selling businesses and assets that I know would have had a different answer with a fuller disclosure of the company's liquidity situation. Unfortunately, these same kind of misguided conversations continue today only reinforcing what should be a great deal of discomfort for you, Rich and myself. You and I both have to cringe when Jerry talks about using the cash from the overseas operations to retire the senior notes and dismisses having to raise capital. Even you responded back that with the Jeffries deal we could delay raising equity as though the hole never needs to be addressed. I even fear that you will pass on any offer from Walgreens for Valley.

You enjoy the personal friendship and trust of Tom Pritzker who has asked a long time and trusted friend to join our board, as a personal favor to Mr. Pritzker. Hopefully he will decline and you will not have to deal with any of the questions of what we knew and when. This again is a personal risk factor that only you can evaluate.

Since August 1999 when the MedCaps drained our cash, we have all been committed to operating the company normally without any outward indications of our problems while trying to fix the problems. In fact, we have always had sufficient collateral and near term plans to provide a fix. We

have had great success in keeping the problem manageable and having near term solutions on hand.

We reached at apparent brink in October 2002 with a near catastrophic BofA call on $11 million in cash and the need to come up with $15 million for USDL. Given Jerry's awareness of our problems, the use of the words "insolvent and bankrupt" by him, as well as his apparent support from the Pritzkers, we all assumed that a cash infusion of some type would have been facilitated to relieve the pressure and problem.

Unfortunately, nothing substantive has happened and our cash position has gotten significantly worse because of Business Credit, Latin America and USDL. Just about everyone in Jamison is aware that we have a serious liquidity crisis. Fundings are delayed on deals, strange draw patterns exist for Merrill, and the Fleet usage begs some obvious questions from Fleet. The reported $130 million increase in non-accruals for the December, 2002 period in our 10Q by itself begs the question as to how we have been able to finance that.

The Merrill audit has blown up as they have become intimately aware of over $88 million in rewrites in their warehouse as well as extensive unreported obligor concentrations. Nasty words have already been exchanged, a series of unpleasant meetings will have to be scheduled shortly, and the prospects of their renewal are in question. As we understand it, they will be setting up a review process for all of the credits we pledge in the future. They have already asked for additional collateral in the form of delinquent loans. Merrill knows they can declare us in default and that they probably have a responsibly to the rating agencies for a change in our disclosures.

On top of this we have $13 million in cash loan repayments that cannot be postponed in early May for DEG and the IFC/FMO B loans. The US Bank and Centro situations may be manageable but at some point US Bank has to press Fleet as the lead agent to get on top of our liquidity situation. Potential delinquency repurchase continue. The payables for Siemens and Philips continue to hang around our neck and delinquency repurchases continue to drain cash.

Over the same time period, we continue to operate as a company that has cash available to fund St John acquisitions and the Opco Company's

acquisition and cash needs. Most troublesome though is the further erosion in the ethics of the company as to what constitutes eligible collateral and what we are being asked to finance. With a strong cash position we could deal with this. In our current position my choices are to declare Chapter 11 or look the other way. Nothing I say makes an impact.

The Business Credit Servicer reports are a bomb waiting to go off if they do not get fixed over the next thirty days. Unfortunately, these reports are 45 days delayed and we still need to deal with February and March actual numbers. We are now only able to deal with the servicer report requirements for April, which is due on June 15.

I could go on but it serves little purpose. Desperate people do desperate things when their backs are to the wall. I understand that – but we do not have to create situations that put our people and us in harms way. We have moved close to both cash and moral bankruptcy.

Matthew Goldenberg resigned on Friday after getting blasted by Merrill. Once he saw the audit report and realized that the damage was already out in the open he reconsidered on Wednesday. It did not help for Matthew to have Rich Miller distance himself from any decisions as to what goes into the securitization in the joint phone call to S&P. It was made clear that the company relies on Matthew and me to do the right thing. Both Matthew and I took that as a sign of things to expect.

John Boyle has had to beat down insurrections from his accounting staff just last week on how we were handling the portfolio litigation account. The staff is under management letter instruction to fight back on several things they see. The SEC letters and Healthsouth this week only reinforce everyone's discomfort and the realty that good people do go to jail.

Michael, I do not intend for this to be an ultimatum or a letter of resignation. It is instead a personal plea to you to do what we have to get the cash problem out in the open with the Pritzkers, an investment bank that will help and be rewarded for helping, and in a delicate way with the Board. There are clear issues of potential duplicity by the Board that only John Healy can advise you and the Board on. The Prtizkers may not be able to help but I think the actions taken would be very different with how we are running the company today. Examples would include, sale of the Opco companies and warrants – starting with Pell. Business Credit needs to be spun off or face a

serious downsizing. Any activity outside of Rich Millers area that uses cash should be curtailed. This would include International until it is sold or disposed of.

John Healy's perspective on the pending exchange offer and capital raise were surprising, alarming and very bothersome. John will tell you that the plans to go ahead with the exchange offer and raise capital without solving the cash problem will represent serious securities fraud. Our issues now are defrauding an FDIC insured bank, which has federal law implications as well as serious civil liability issues. The board will become enormously exposed to the securities fraud implications. In John's own words – "We all go to jail" – in my words, "This is serious shit"

I know you well enough to think that you will look at much of this letter as a betrayal of loyalty to you and unfounded overreaction. You will also look to all of the ways that we can fix these problems without disclosure. Unfortunately, after a long time we are in a worse state of affairs then ever before. Time has not been a friend. The potential for this to show up through a whistle blower or through obvious questions from outsiders is enormous.

As CEO you are entitled to run the company as you best see and to have the type of staff that you think you can rely on to "go to war". After reading this you may legitimately feel that does not include me. For all I know the Board may have already reached that decision based on what you said at the Porterhouse dinner. Unfortunately, I also have to make decisions and one of them is whether to sign the March 31st certification. This quarter's certification is the first one to put both of us on the spot. Not to sign it kills the company. If nothing changes in how you view our options or in how we are disclosing or addressing this problem then the ball simply comes back to my court. I know that whatever decisions I make need to be done in a time frame that gives you sufficient time to have a planned response and announcement.

Hopefully, you are at the same point as I am. This is something that we had never intended or planned to happen. Every decision we have made was made in the best interest of the shareholders and the company. There has never been a real option to disclose a small problem that brings all of the banks down on us. Unfortunately, the cash drains from the sharp rise in delinquencies, Latin America and Business Credit have dramatically changed the outlook over the last four months and the expected solutions of

cramming rewrites of large obligor concentrations has taken its toll on good employees and valued lenders.

I know that neither one of us joined DVI to get ensnared in possible criminal activates or to come under the microscope of the Sarbenes Oxly act. We are the only two that have this problem (actually, Tony and Rich do have a problem which I am sure they would prefer to ignore). We should not be putting ourselves, our homes and personal assets at this kind of risk as well as face the very real prospects of going to jail simply for fear of selectively disclosing the problems and forcing painful but necessary changes to solve the liquidity issues.

I cannot even think through the prospects of letting the Board members proceed with the exchange and capital raising issues with no awareness whatsoever of the risks they are exposed to. I should add that the Board exposure is compounded by not having a Whistleblower policy already in effect, not having started an internal audit function and having a dysfunctional and incomplete audit committee. If anything bad came about these are all extremely incriminating issues for our Board in the context of what processes they had put in place to make them aware of these problems.

As I said in the beginning, we are at a crossroads. I want to continue the journey but neither one of us should want to continue with this kind of baggage. Again, John Healy is familiar with enough of the facts to understand the issues. He does not think it is his role to call you but does think that as a friend he needs to talk to you.

5

**A2**

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

CASE NO. 2:03-CV-5336
IN RE DVI, INC. SECURITIES LITIGATION
CASE NO. 04-CV-1277
FLEET NATIONAL BANK, et al.,
     Plaintiffs,
vs.
O'HANLON, et al.
     Defendants
CASE NO. 04-CV-3423
(Coordinated With 04-CV-1277)
WM HIGH YIELD, et al.,
     Plaintiffs,
vs.
O'HANLON, et al.,
     Defendants.
CASE NO. 2:06-CV-1003
DENNIS J. BUCKLEY, as trustee
of the DVI Liquidating Trust,
     Plaintiff,
vs.
CLIFFORD CHANCE LLP and
CLIFFORD CHANCE U.S. LLP
     Defendants.

## LISA CRUIKSHANK
## August 21, 2007



TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
——————— www.TylerEaton.com ———————

6

FLEET NATIONAL BANK, ET AL.
O'HANLON, ET AL.

LISA CRUIKSHANK
August 21, 2007

(Pages 237 to 240)

Page 237

1  ineligible collateral on the Fleet line?
2        MS. BUTLER: Object to the
3  form.
4     A.   Not to my recollection.
5     Q.   Did Mr. Garfinkel after this
6  board of directors meeting tell you
7  whether or not DVI would continue to
8  pledge ineligible collateral on the Fleet
9  line?
10    A.   No.
11    Q.   Did he tell you whether or not
12  DVI would begin double pledging collateral
13  after this board of directors meeting?
14        MS. BUTLER: Object to the
15  form of the question.
16    A.   No.
17    Q.   After the board of directors
18  meeting, you spoke with Mr. Garfinkel
19  about that meeting, correct?
20    A.   That's correct.
21    Q.   Did you have any discussions
22  with any member of DVI's board after this
23  board of directors meeting about the issue

Page 238

1  of pledging ineligible collateral?
2     A.   No.
3     Q.   Have you ever had a discussion
4  with any member of DVI's board about the
5  pledging of ineligible collateral?
6     A.   No.
7     Q.   Besides Mr. O'Hanlon?
8     A.   Oh --
9        MR. FELDMAN: Objection.
10    A.   Sure. Besides Mr. O'Hanlon,
11  no.
12    Q.   Did you have any discussions
13  with any member of DVI management about
14  the issue of pledging ineligible
15  collateral subsequent to this board of
16  directors meeting?
17    A.   Yes.
18    Q.   Who was that?
19    A.   Actually I think it was -- I
20  think it was before. Sara Lee Keller.
21    Q.   Before we get to Ms. Keller,
22  after this board of directors meeting when
23  you spoke with Mr. Garfinkel, was there a

Page 239

1  discussion as to what was going to happen
2  with your resignation?
3     A.   Yes, that I was going.
4     Q.   Did Mr. Garfinkel tell you
5  what discussion, if any, occurred before
6  the board regarding your resignation?
7     A.   All I know is that he said
8  that Mr. Cohn asked him about it. I don't
9  know if it was actually in the board
10  meeting or not, but that Mr. Cohn asked
11  him why I was leaving.
12    Q.   Did Mr. Garfinkel tell you
13  what he told to Mr. Cohn?
14    A.   I don't remember. You know,
15  it does discuss it in the Examiner's
16  Report, so I don't know if it was -- I
17  remember from that or from Mr. Garfinkel
18  telling me.
19    Q.   We want to know your memory.
20    A.   Right, right. And I think
21  that's just from here. I just remember
22  Mr. Garfinkel saying that Mr. Cohn asked
23  why I was leaving, that he did want to

Page 240

1  talk to me, and Mr. Garfinkel asked me not
2  to speak to him.
3        MR. FRIEDMAN: I'm sorry,
4  could you read back the answer?
5        (Record read.)
6        MR. FRIEDMAN: Okay. And
7  because I'm on the same side of the table
8  as the witness, when the witness said
9  "here," was she referring to some document
10  like the Examiner's Report?
11    A.   Yes, I was. I was.
12        MR. FRIEDMAN: Okay, okay.
13    A.   I'm sorry.
14        MR. FRIEDMAN: That's what I
15  wasn't sure.
16    Q.   (BY MR. SCHWARTZ:) Now, Mr.
17  Garfinkel issued an instruction to you
18  that you should not speak to Mr. Cohn?
19    A.   Not that I should not speak to
20  him, but asked that I not.
21    Q.   If Mr. Cohn had come to speak
22  with you, would you have spoken to him?
23    A.   Absolutely.

60

**A3**

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

CASE NO. 2:03-CV-5336
IN RE DVI, INC. SECURITIES LITIGATION
CASE NO. 04-CV-1277
FLEET NATIONAL BANK, et al.,
     Plaintiffs,

vs.
O'HANLON, et al.
     Defendants
CASE NO. 04-CV-3423
(Coordinated With 04-CV-1277)
WM HIGH YIELD, et al.,
     Plaintiffs,

vs.
O'HANLON, et al.,
     Defendants.
CASE NO. 2:06-CV-1003
DENNIS J. BUCKLEY, as trustee
of the DVI Liquidating Trust,
     Plaintiff,

vs.
CLIFFORD CHANCE LLP and
CLIFFORD CHANCE U.S. LLP
     Defendants.

## RICHARD E. MILLER
### January 15, 2008



TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
www.TylerEaton.com

8

FLEET NATIONAL BANK, ET AL.
O'HANLON, ET AL.

** CONTIANS CONFIDENTIAL PORTIONS **
** FOR ATTORNEYS' EYES ONLY **

RICHARD E. MILLER
January 15, 2008

(Pages 113 to 116)

### Page 113

1  the locations for OnCure were failing
2  because they just didn't have enough
3  business to sustain them?
4         MS. HAMILL: Objection to the
5  form.
6      A.  If you give me specific
7  centers.
8      Q.  The Oklahoma centers? Let's
9  switch from — my colleague is suggesting
10 that I refer to them as Dolphin Arkansas,
11 Dolphin Oklahoma.
12     A.  Okay.
13     Q.  Was it — do you recall there
14 was a conclusion that those sites didn't
15 have the business to sustain — to sustain
16 the centers?
17        MS. HAMILL: Objection to the
18 form.
19        MR. DAILEY: Objection to
20 form.
21     A.  I believe that was a
22 conclusion that Mark Cherney came to, yes.
23     Q.  And in that circumstance, in

### Page 114

1  order to come up with a worst case
2  scenario, would it in your view be
3  necessary then to determine the cost of
4  repossession?
5         MS. HAMILL: Objection to the
6  form.
7         MR. DAILEY: Are you asking
8  what accounting guidance requires, is that
9  what you are asking?
10        MR. BERRINGER: I take that as
11 an objection, and I stand on the question.
12        MS. HAMILL: Objection to the
13 form.
14     A.  Could you repeat — I'm sorry,
15 could you repeat the question for me,
16 please?
17     Q.  Sure. In the circumstance of
18 those two centers where it was concluded
19 that they didn't have the business to
20 sustain them, in terms of the worst case
21 scenario, would it have been in your view
22 appropriate in those circumstances to
23 determine what the costs of repossession

### Page 115

1  would be?
2         MS. HAMILL: Objection to the
3  form.
4         MR. DAILEY: Objection to
5  form, lack of foundation.
6      A.  I would assume if those have
7  to be — that equipment has to be taken
8  out and resold, that you need to review
9  what those costs are. I'm talking from —
10 not from an accounting perspective, I
11 don't know what the accounting rules are
12 with respect to that. But from a logical
13 perspective, it would be something that
14 would be — you would want to know.
15     Q.  Okay. And you would need to
16 know, then, whether they are on the fourth
17 floor of an existing building or on the
18 first floor and whether they are — they
19 have concrete bunkers and steel
20 protections and all of those other things
21 you talked about?
22     A.  Yes.
23        MR. DAILEY: Objection to the

### Page 116

1  form.
2      Q.  The final entry on the second
3  document attached as Exhibit 1 is other
4  statistics, and it talks of whether the
5  accrual of income has been suspended.
6         Just reading that, does that
7  refresh your recollection at all as to
8  whether there was a —
9         MR. DAILEY: Where are you
10 looking?
11        MR. BERRINGER: Page two of
12 the second portion. It's the third page
13 of the exhibit.
14     Q.  Other statistics, and it talks
15 about accrual of income and whether or not
16 it has been suspended.
17        Does that jog any memories as
18 to whether there were benchmarks for when
19 income accrual would be suspended for
20 delinquent contracts?
21        MS. HAMILL: Objection to the
22 form.
23        MR. DAILEY: Objection to

29

FLEET NATIONAL BANK, ET AL.    ** CONTIANS CONFIDENTIAL PORTIONS **    RICHARD E. MILLER
O'HANLON, ET AL.    ** FOR ATTORNEYS' EYES ONLY **    January 15, 2008

(Pages 137 to 140)

Page 137

1  where Mr. Neas was in attendance?
2    MS. HAMILL: You mean board
3  meetings?
4    MR. BERRINGER: Board
5  meetings, yeah.
6    A.  It's so difficult to recollect
7  that long ago --
8    Q.  Uh-huh.
9    A.  -- how many meetings I
10 attended and how many meetings he was
11 there. I know from -- I would say it's
12 probably at least a couple.
13   Q.  Okay.
14   A.  If not three. I don't know.
15 I know he was not in attendance at all the
16 board meetings --
17   Q.  Right.
18   A.  -- but from time to time he
19 would attend.
20   Q.  Was he -- do you have an
21 understanding as to whether or not he was
22 in attendance at least on an annual basis
23 to discuss the results of the annual

Page 138

1  audits?
2    A.  I don't know that.
3    Q.  Do you recall any discussions
4  at any of the meetings where Mr. Neas knew
5  you were both there on internal controls?
6    MS. HAMILL: Objection to the
7  form.
8    A.  I can't recollect any exact
9  discussions of what Harold Neas talked
10 about at the board meetings.
11   Q.  Okay. Do you recall Mr. Neas
12 ever suggesting that the company had what
13 you would characterize -- what he
14 characterized in words and substance as
15 serious problems or issues with respect to
16 internal controls?
17   MS. HAMILL: Objection to the
18 form.
19   A.  I don't recollect anything
20 directly from Harold Neas with respect to
21 that.
22   Q.  Okay. What do you recollect?
23   A.  I recollect in reviewing memos

Page 139

1  and things, I know that there was some --
2  there was issues with Matt Colasanti in
3  his reporting --
4    Q.  Okay.
5    A.  -- to Deloitte.
6    MS. HAMILL: Is this because
7  of reviewing postlitigation?
8    A.  This is because of reviewing a
9  lot of postlitigation that there was a lot
10 of --
11   Q.  Let me ask the question.
12   Did the review of the
13 postlitigation -- post commencement of the
14 litigation, because the litigation is not
15 over yet -- postcomplaint your review of
16 documents jog any memories, refresh your
17 recollection about events or would you be
18 testifying about what documents said?
19   A.  My recollection is in hearing
20 from individuals like John Boyle and Steve
21 Garfinkel that the auditors were not happy
22 with the reporting that was coming from
23 Matt Colasanti's group.

Page 140

1    Q.  Okay. What else do you recall
2  about that?
3    A.  Just basically what I said,
4  that there was -- that they weren't happy
5  with it. I don't have anything firsthand
6  from Deloitte & Touche, I'm just speaking
7  from a standpoint of I had heard that from
8  them, that there was issues with Matt
9  Colasanti and the reporting.
10   Q.  Do you recall ever hearing
11 from Deloitte -- and not necessarily
12 directed to you -- were you ever at a
13 meeting, a board meeting, an audit
14 committee meeting, a meeting with whoever
15 at which Mr. Neas or someone else from
16 Deloitte in attendance that anyone from
17 Deloitte ever questioned the adequacy of
18 the company's reserves or charge-offs?
19   MR. DAILEY: Objection to
20 form.
21   A.  Not to my knowledge.
22   Q.  Were you ever at a meeting in
23 which Mr. Neas or anyone from Deloitte

IN RE DVI, INC. SECURITIES LITIGATION
800.458.6031
Tyler Eaton Morgan Nichols & Pritchett, Inc.    http://www.TylerEaton.com

35

10

**A4**

FLEET NATIONAL BANK, ET AL.     ** CONTIANS CONFIDENTIAL PORTIONS **          RICHARD E. MILLER
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **               January 15, 2008

                                                                            (Pages 325 to 328)

---

Page 325

1      THE VIDEOGRAPHER: This
2  adjourns the deposition of Richard E.
3  Miller. The time is now 4:44. Going off
4  the record.
5
6          (Whereupon, the deposition of
7  Richard E. Miller was
8  adjourned at 4:44 p.m. on
9  January 15, 2008, to be
10  reconvened at 9:00 a.m. on
11  January 16, 2008.)
12
13
14
15
16
17
18
19
20
21
22
23

---

Page 327

                A P P E A R A N C E S

1
2
3   FOR THE PLAINTIFFS:
4      Mr. Michael R. Karnuth
5      Attorney at Law
6      Krislov & Associates, LTD
7      20 North Wacker Drive
8      Chicago, Illinois 60606
9      312.606.0500
10     mike@krislovlaw.com
11
12  FOR THE PLAINTIFF, DENNIS BUCKLEY, TRUSTEE
13  OF THE DVI LIQUIDATING TRUST:
14     Mr. John B. Berringer
15     Attorney at Law
16     Anderson Kill & Olick, P.C.
17     1251 Avenue of the Americas
18     New York, New York 10020
19     212.278.1000
20     jberringer@andersonkill.com
21
22
23

---

Page 326

1    IN THE UNITED STATES DISTRICT COURT FOR
2      THE EASTERN DISTRICT OF PENNSYLVANIA
3
4   CASE NO. 2:03-CV-5336
    IN RE DVI, INC. SECURITIES LITIGATION
5   CASE NO. 04-CV-1277
    FLEET NATIONAL BANK, et al.,
6        Plaintiffs,
7   vs.
    O'HANLON, et al.
8        Defendants.
9   CASE NO. 04-CV-3423
    (Coordinated With 04-CV-1277)
    WM HIGH YIELD, et al.,
10       Plaintiffs,
11  vs.
    O'HANLON, et al.,
12       Defendants.
    CASE NO. 2:06-CV-1003
13  DENNIS J. BUCKLEY, as trustee
    of the DVI Liquidating Trust,
14       Plaintiff,
15  vs.
    CLIFFORD CHANCE LLP and
    CLIFFORD CHANCE U.S. LLP
16       Defendants.
17
18         VOLUME II
19  VIDEO DEPOSITION OF RICHARD E. MILLER
20         January 16, 2008
21
22  REPORTED BY: Gail B. Pritchett
           Certified Realtime Reporter,
23         Registered Professional

---

Page 328

1   ALSO FOR THE DEFENDANTS, JOHN P. BOYLE and
2   RAYMOND FEAR:
3      Messrs. Robert E. Kelly
4        and Matthew M. Ryan
5      Attorneys at Law
6      Duane Morris, LLP
7      30 South 17th Street
8      Philadelphia, Pennsylvania 19103
9      215.979.1000
10     rkelly@duanemorris.com
11     mmryan@duanemorris.com
12
13  FOR THE DEFENDANT, RICHARD E. MILLER:
14     Ms. Patricia M. Hamill and
15       Mr. Vincent T. Cieslik
16     Attorneys at Law
17     Conrad, O'Brien,
18       Gellman & Rohn, P.C.
19     1515 Market Street, 16th Floor
20     Philadelphia, Pennsylvania 19102
21     215.864.9600
22     phamill@cogr.com
23     vcieslik@cogr.com

                                                 82

---

FLEET NATIONAL BANK, ET AL.     ** CONTIANS CONFIDENTIAL PORTIONS **     RICHARD E. MILLER
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **          January 15, 2008

(Pages 453 to 456)

Page 453

1  Deloitte might put pressure to reverse
2  some of the income recognized in our
3  second quarter under the policies
4  discussed in paragraph one. Do you know
5  whether Deloitte, in fact, brought that
6  issue to the board?
7     MR. DAILEY: Objection to
8  form.
9     A.  I can't recollect that.
10    Q.  When Mr. Neas suggested in his
11  discussion in front of the board that
12  there was a lack of consistency in income
13  recognition for accounts greater than one
14  hundred and eighty days past due, did Mr.
15  Neas in his remarks indicate that he had
16  any reservations as to whether or not any
17  of those accounts should have been
18  suspended?
19    MS. HAMILL: Objection to the
20  form. He has already indicated he doesn't
21  remember the meeting.
22    A.  I don't recollect that.
23    MR. BERRINGER: I'm trying to

Page 454

1  jog his memory on some of this.
2     A.  Yeah, I don't -- I don't
3  recollect that.
4     Q.  Do you recall Mr. Neas' tone
5  at any of the meetings?
6     MR. DAILEY: Tone, did you
7  say?
8     MR. BERRINGER: Tone. Tone,
9  yeah.
10    MR. DAILEY: Object to the
11  form.
12    A.  Tone of voice or tone of --
13    Q.  Tone and demeanor. Did Mr.
14  Neas ever seem concerned at any of the
15  meetings in terms of any of the issues he
16  was discussing?
17    MS. HAMILL: Objection to the
18  form.
19    A.  My perception was no.
20    Q.  Did he ever indicate that --
21  anything about how DVI was handling issues
22  such as reserves and the suspension of
23  income was different than any of his other

Page 455

1  clients?
2     MR. DAILEY: Objection to
3  form.
4     A.  I don't -- I can't recollect
5  that.
6     Q.  Did he ever suggest that
7  anything about the way in which DVI was
8  handling its decisions such as for loss
9  allowances and suspension of income
10  violated accounting rules?
11    A.  I never heard that.
12    Q.  Did Mr. Neas ever suggest that
13  the way DVI was handling its loss
14  allowance and suspension of income
15  violated any Exchange rules?
16    MR. DAILEY: Objection to
17  form.
18    A.  Not to my knowledge.
19    Q.  This meeting of the audit
20  committee apparently began at 9:45 a.m.
21  and ended at 10:30 a.m., according to the
22  Exhibit 35.
23    Would that have been fairly

Page 456

1  typical for the length of time that was
2  spent at audit committee meetings?
3     A.  Trying to see where it
4  started. You say it started at -- oh,
5  okay, started at 9:45. And ended when?
6  Okay, second page, sorry. 10:30?
7     Q.  Yes.
8     A.  I can't recollect how long the
9  audit committee meetings took. I don't
10  remember them taking a long time. But is
11  that in the range? Could be.
12    Q.  Okay. There is a reference to
13  SEC letters at the bottom of Exhibit 35,
14  the first page. Are you aware of the
15  letters that are being referred to there?
16    A.  I was aware of SEC letters.
17    Q.  At any board meeting -- what
18  was -- can you characterize how Mr. Neas
19  and any representative of Deloitte --
20  their tone -- the same we did earlier,
21  their tone with respect to description of
22  the SEC letters?
23    MR. DAILEY: Objection to

114

**A5**

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

CASE NO. 2:03-CV-5336
IN RE DVI, INC. SECURITIES LITIGATION
CASE NO. 04-CV-1277
FLEET NATIONAL BANK, et al.,
     Plaintiffs,
vs.
O'HANLON, et al.
     Defendants
CASE NO. 04-CV-3423
(Coordinated With 04-CV-1277)
WM HIGH YIELD, et al.,
     Plaintiffs,
vs.
O'HANLON, et al.,
     Defendants.
CASE NO. 2:06-CV-1003
DENNIS J. BUCKLEY, as trustee
of the DVI Liquidating Trust,
     Plaintiff,
vs.
CLIFFORD CHANCE LLP and
CLIFFORD CHANCE U.S. LLP
     Defendants.

## ANTHONY TUREK
## January 24, 2008



**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
——————— www.TylerEaton.com ———————

13

FLEET NATIONAL BANK, ET AL.          ** CONTIANS CONFIDENTIAL PORTIONS **          ANTHONY TUREK
O'HANLON, ET AL.                      ** FOR ATTORNEYS' EYES ONLY **               January 24, 2008

(Pages 141 to 144)

Page 141

1  obligations and still have the Florida
2  property free and clear.
3      Q.    Uh-huh.  That's it on that.
4          (Whereupon, Turek Exhibit 7 was
5          marked for identification.)
6      A.    (Reviewing document.)
7      Q.    For the record, while you are
8  looking at the document, Mr. Turek, it has
9  been Bates marked BUCKLEY 29835 through
10  29836, the first page has a heading DVI,
11  Inc. meeting of the audit committee of the
12  board of directors March 22, 2000.  Do you
13  recognize Exhibit 7, Mr. Turek?
14      A.    Not particularly, no.
15      Q.    Did you receive minutes of
16  board of directors meetings or audit
17  committee meetings that you attended?
18      A.    I believe board committee
19  minutes were circulated to those who
20  attended.  I don't recall seeing minutes
21  from an audit committee ever.
22      Q.    Okay.  Do you recall attending
23  audit committee meetings?

Page 142

1      A.    No.
2      Q.    How about board -- board of
3  directors meetings?
4      A.    Yes, I was generally invited
5  to attend.
6      Q.    Okay.  To the extent that --
7  to the extent that a board of directors
8  meeting would adjourn in order to
9  reconstitute as the audit committee, do
10  you recall attending meetings where that
11  occurred?
12      A.    Generally -- again, no, I
13  would not attend audit committee meetings.
14      Q.    Do you know why you attended
15  this audit committee meeting?
16      A.    No.
17      Q.    Do you know who Mr. Forrester
18  is?
19      A.    He was in our -- with Deloitte
20  on our audit team.
21      Q.    Do you recall the meeting --
22  do you recall anything about the
23  presentation by Mr. Forrester that's

Page 143

1  described in the first full paragraph on
2  page one of Exhibit 7?
3      A.    Only vague -- only vague
4  memories.
5          MR. COMERFORD:  Objection,
6  lack of foundation.
7          (Reporter interruption.)
8          MR. BERRINGER:  Only vague
9  memories.
10      Q.    What are those memories?
11      A.    I can remember being at a
12  board of directors meeting at the
13  Brazilian Court in Palm Springs.  And
14  that's about all.
15      Q.    Do you recall any of the
16  statements Mr. Forrester made at that
17  meeting?
18      A.    No.
19      Q.    Were you at other meetings
20  where Deloitte personnel were invited to
21  attend in terms of the board of directors?
22      A.    Board meetings.  They were
23  invited to attend sometimes, yes.

Page 144

1      Q.    Do you recall that they
2  occasionally would make a presentation to
3  the board?
4      A.    Occasionally.
5      Q.    Do you recall any of those
6  presentations?
7      A.    Nothing jumps out at me, no.
8      Q.    Do you recall that the --
9  anyone from Deloitte ever expressing any
10  concern with respect to the adequacy of
11  DVI's loss allowance?
12          MR. COMERFORD:  Objection to
13  the form.
14      A.    I don't -- I don't recall that
15  being a topic at any of the board meetings
16  by Deloitte.
17      Q.    Okay.  Do you recall anyone
18  from Deloitte ever expressing concern with
19  respect to the amount of charge-offs being
20  taken by the company?
21          MR. COMERFORD:  Objection to
22  the form.
23      A.    No.

36

FLEET NATIONAL BANK, ET AL.     ** CONTAINS CONFIDENTIAL PORTIONS **          ANTHONY TUREK
O'HANLON, ET AL.               ** FOR ATTORNEYS' EYES ONLY **                  January 24, 2008

(Pages 145 to 148)

Page 145

1    Q.   Do you recall anyone from
2  Deloitte ever expressing concern about the
3  accuracy or reliability of DVI's financial
4  statements?
5        MR. COMERFORD:  Objection to
6  the form.
7    A.   No.
8    Q.   Do you recall anyone from
9  Deloitte ever expressing concern about
10 anything?
11       MR. COMERFORD:  Objection to
12 the form.
13   A.   Deloitte would address our
14 directors occasionally, and they would
15 give them kind of a state of the union
16 appraisal of the company.
17   Q.   Did they ever express concern
18 about any segment of the company or any
19 aspect of the company's financial records
20 that they had -- they had a problem with?
21   A.   Well, the company --
22       MR. COMERFORD:  Objection to
23 form.

Page 146

1    A.   -- Deloitte would issue its
2  management letter after it had completed
3  its audit.  And its concerns were --
4  subjects were those management letters,
5  that was the purpose of it.
6    Q.   Okay.  Who got copies of the
7  management letters?
8    A.   Well, I think that the
9  management letter was delivered by
10 Deloitte to the chief accounting officer
11 of the company.  And in general those
12 would then be disseminated to the
13 executive officers.
14   Q.   To the executive officers?
15   A.   I believe so.
16   Q.   How about to the board?
17   A.   Oh, I would imagine to the
18 board too, but I don't know that.
19   Q.   Okay.  At the board meetings,
20 what do you recall about discussions of
21 the management letters by Deloitte?
22   A.   Well, the board was -- to the
23 extent that there was a weakness in our

Page 147

1  controls or something for which Deloitte,
2  you know, criticized us, they would be
3  very highly focused on.
4    Q.   Okay.  Do you recall any --
5  anything of what was said to the board by
6  the Deloitte people, not just the topic,
7  but --
8        MR. TAYLOR:  John, during what
9  period of time?  I think it's just too
10 vague.
11   Q.   Say from March 22, 2000,
12 onward.
13   A.   My recollection of Deloitte's
14 presentations were they were always
15 professional.  They were -- you know, they
16 explained to the board exactly what their
17 concerns were and why they had them and
18 suggestions that they would have for
19 changes within the company.
20   Q.   Okay.  And that's with respect
21 to the management letters?
22   A.   The topics that were listed in
23 management letters, yes, sir.

Page 148

1    Q.   Okay.  There is a sentence in
2  the minutes that reads, "Mr. Forrester
3  then identified four different areas of
4  DVI's business as key risks -- key audit
5  risks, criticized assets transactions
6  related to the company's securitization
7  activity, hedging activity and the
8  company's international operations."
9        Do you recall anything about
10 any discussion Mr. -- Mr. Forrester had
11 sort of amplifying that statement?
12       MR. COMERFORD:  Objection to
13 the form and lack of foundation for
14 reading the document in.
15   A.   I don't recall the specific
16 discussion that followed these -- these
17 four things.
18   Q.   Do you recall any comments
19 ever made by anyone at Deloitte about
20 criticized assets?
21       MR. COMERFORD:  Objection to
22 the form.
23   A.   At a board meeting?

**A6**

FLEET NATIONAL BANK, ET AL.     ** CONTAINS CONFIDENTIAL PORTIONS **     ANTHONY TUREK
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **              January 24, 2008

(Pages 281 to 284)

Page 281

1   the earlier exhibits. I can't remember
2   exactly what this issue was.
3       Q.   Did it involve a reduction in
4   recommended reserves by Mr. O'Hanlon?
5       A.   No, I don't think it did. I
6   think what I'm reading here is that the
7   first email from Matt to me talks about
8   that they had estimated South America
9   because information was not here by the
10  cutoff date. And it speaks to the 4.4
11  million allocated against certain names
12  not -- to me what I read here is that it's
13  an issue of allocating the 4.4 to specific
14  names, not an elimination of 4.4 or, you
15  know, a missing 4.4.
16      Q.   Where do you read that?
17      A.   I'm sorry, it says, "I must
18  take and allocate 4.4 million across other
19  domestic workouts. That's not hard to do.
20  And then ask you to allocate name by name
21  another million two in South America."
22      That's saying to me that we had
23  recognized that amount of money, but they

Page 282

1   didn't know specifically which contracts
2   it should be added to, you know, which
3   specific companies this should be added
4   to, isn't that right?
5       Q.   I'm not sure. But the 4.5
6   waited -- why was it not longer -- why was
7   it suddenly available to be allocated to
8   other companies?
9       MR. COMERFORD: Objection to
10  form.
11      A.   I don't know. Let me read
12  some more. (Reviewing document.)
13      Q.   No luck?
14      A.   I'm still working on it, I'm
15  sorry. I don't have the answer for you.
16      Q.   Okay. There's a -- in the
17  first page of the memo, of the exhibit,
18  it -- in the first page of the exhibit,
19  page one of the exhibit, yes, the last
20  paragraph, "The Deloitte auditors were
21  here and looking for a report that I
22  suspect you had not seen, a suspicion
23  based on what I had heard at the executive

Page 283

1   committee meeting." Do you know what
2   executive committee meeting Mr. Boyle is
3   referring to?
4       A.   We had an executive committee
5   meeting -- or executive committee. It
6   would occasionally meet the day before a
7   board meeting, because all the executive
8   VPs went to the board meetings, I suspect
9   that's what he is talking about.
10      MR. BERRINGER: I think I'm
11  done with this one. He needs to change
12  tapes. It is now 5:12, we might as well
13  break for the day. You wanted to break at
14  5:30. So we will adjourn for today.
15      THE VIDEOGRAPHER: This marks
16  the end of Videotape 4. Going off the
17  record, 5:15 p.m.
18
19      (Whereupon, the deposition of
20      Anthony Turek was adjourned at
21      5:15 p.m. on January 24, 2008,
22      to be reconvened at 9:00 a.m.
23      on January 25, 2008.)

Page 284

1   IN THE UNITED STATES DISTRICT COURT FOR
2   THE EASTERN DISTRICT OF PENNSYLVANIA
3
4   CASE NO. 2:03-CV-5336
    IN RE DVI, INC. SECURITIES LITIGATION
5   CASE NO. 04-CV-1277
    FLEET NATIONAL BANK, et al.,
6   Plaintiffs,
    vs.
7   O'HANLON, et al.
    Defendants.
8
    CASE NO. 04-CV-3423
9   (Coordinated With 04-CV-1277)
    WM HIGH YIELD, et al.,
10  Plaintiffs,
    vs.
11  O'HANLON, et al.,
    Defendants.
12
    CASE NO. 2:06-CV-1003
13  DENNIS J. BUCKLEY, as trustee
    of the DVI Liquidating Trust,
14  Plaintiff,
    vs.
15  CLIFFORD CHANCE LLP and
    CLIFFORD CHANCE U.S. LLP
16  Defendants.
17
18  VOLUME II
19  VIDEO DEPOSITION OF ANTHONY TUREK
20  January 25, 2008
21
22  REPORTED BY: Gail B. Pritchett
    Certified Realtime Reporter,
23  Registered Professional

71

IN RE DVI, INC. SECURITIES LITIGATION
Tyler Eaton Morgan Nichols & Pritchett, Inc.      800.458.6031            http://www.TylerEaton.com

FLEET NATIONAL BANK, ET AL.     ** CONTIANS CONFIDENTIAL PORTIONS **          ANTHONY TUREK
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **                January 24, 2008

(Pages 409 to 412)

Page 409

1    A.   I don't recall.
2    Q.   Do you recall anyone from
3  Deloitte indicating that the new policy --
4  that absent adoption of the new policy,
5  they would continue to question the
6  controls -- the internal controls of the
7  company?
8    A.   I don't think a statement like
9  that was made.
10   Q.   Do you recall -- do you ever
11 recall a meeting of the board at which
12 representatives from Deloitte expressed
13 any reservations with respect to any of
14 the financial statements being filed by
15 the company?
16       MR. COMERFORD:  Objection to .
17 form.
18   A.   The financial statements as a
19 whole?
20   Q.   Yeah.
21   A.   No, I don't think they ever --
22   Q.   Do you recall any meeting of
23 the board you attended where Deloitte or

Page 410

1  Clifford Chance personnel expressed any
2  reservations with respect to specific
3  items within the financials?
4        MR. SHEER:  Objection to the
5  form.
6    A.   Well, I would regard all the
7  items brought up in the management letter
8  pertained to the financial statements.
9    Q.   I guess the question is
10 whether you recall at board meetings
11 anyone from Deloitte expressing
12 reservations about the accuracy of any
13 items within the financial statements.
14       MR. COMERFORD:  Objection to
15 form.
16   Q.   Not the procedures for
17 deriving those, but the accuracy of the
18 numbers.
19       MR. SHEER:  Objection to form.
20   A.   It's hard to separate those
21 two, it seems to me.  I mean, they talked
22 about issues that they believed the
23 company needed to improve in order to be a

Page 411

1  better company.
2    Q.   But, for example, it's one
3  thing to say you need to document your
4  reasoning as opposed to we question your
5  reasoning.  To the extent that Deloitte
6  was requiring documentation of reasoning,
7  that would be one thing, but do you recall
8  ever being at a meeting where Deloitte
9  said we don't think your numbers are
10 right?
11   A.   No.
12       MR. COMERFORD:  Objection
13 to form and to the testimony by Mr.
14 Berringer.
15   Q.   Do you recall ever being at a
16 meeting in which anyone from Deloitte said
17 we question the accuracy of your
18 conclusions?
19       MR. COMERFORD:  Objection to
20 form.
21   A.   No.
22   Q.   Do you recall any meeting in
23 which anyone from Deloitte ever alerted

Page 412

1  the board to any aspect of the minutes
2  -- the accuracy of which was being
3  questioned -- I'm sorry.  Let me restate
4  it.
5        Do you recall any meeting of
6  the board in which anyone from Deloitte
7  ever questioned the accuracy of any of the
8  items -- of any items within the financial
9  statements?
10       MR. COMERFORD:  Objection to
11 form.
12   A.   No.
13   Q.   At the May -- at the
14 December 2 meeting, the minutes of which
15 we are looking at, how would you
16 characterize the tone of the presentation
17 by Deloitte?
18   A.   Professional, serious.
19   Q.   Anything that caused -- that
20 appeared to cause any member of the board
21 any concern?
22   A.   I can't speak for them.
23   Q.   Well, you could see them.  Did

A7

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

CASE NO. 2:03-CV-5336
IN RE DVI, INC. SECURITIES LITIGATION
CASE NO. 04-CV-1277
FLEET NATIONAL BANK, et al.,
  Plaintiffs,

vs.

O'HANLON, et al.
  Defendants
CASE NO. 04-CV-3423
(Coordinated With 04-CV-1277)
WM HIGH YIELD, et al.,
  Plaintiffs,

vs.

O'HANLON, et al.,
  Defendants.
CASE NO. 2:06-CV-1003
DENNIS J. BUCKLEY, as trustee
of the DVI Liquidating Trust,
  Plaintiff,

vs.

CLIFFORD CHANCE LLP and
CLIFFORD CHANCE U.S. LLP
  Defendants.

---

## MICHAEL A. O'HANLON
### January 28, 2008

---



# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
www.TylerEaton.com

FLEET NATIONAL BANK, ET AL.    ** CONTAINS CONFIDENTIAL PORTIONS **    MICHAEL A. O'HANLON
O'HANLON, ET AL.         ** FOR ATTORNEYS' EYES ONLY **         January 28, 2008

(Pages 173 to 176)

### Page 173

1    Q.   (BY MR. BERRINGER:)  Did the
2  European operations require DVI to devote
3  its own capital rather than warehouse
4  lines or -- or securitizations to the
5  funding of the European business?
6         MR. SCHEFF:  Objection to the
7  form.
8    A.   Well, there was warehouse
9  facilities in place in the various
10  countries.  The problem was how do you get
11  the warehouse facility liquidated and get
12  permanent financing.
13    Q.   (BY MR. BERRINGER:)  And the
14  securitization mechanism was not available
15  to you?
16    A.   Well, the securitization
17  mechanism wouldn't cover a Pan-European
18  market.  It was more designed to handle
19  individual countries and it was much more
20  expensive than what we were first told.
21    Q.   So in order to securitize
22  Italian, German and French contracts, you
23  would need to have three different

### Page 174

1  securitizations?
2    A.   In effect, yes.
3    Q.   Did the European business, as
4  of about 1999, create a drain on your
5  capital?
6         MR. SCHEFF:  Object to the
7  form.
8    A.   Did it create a drain on our
9  capital?  Well, it depends on how you
10  classify capital, I guess.  The answer to
11  that is really no, because we had a large
12  bond issue that was issued in the U.S.
13  that we, in effect, raised to help fund
14  these businesses.
15         And basically what happened was
16  that DVI, Inc. was the borrower.  They
17  downstreamed capital into the various
18  subs.  If that is your question -- we
19  didn't have capital per se in any of the
20  European companies or any of the companies
21  outside the United States.  It didn't come
22  from DVI, Inc.
23    Q.   (BY MR. BERRINGER:)  Did it

### Page 175

1  have an impact on your cash flow?
2         MR. SCHEFF:  Object to the
3  form.
4    A.   Did it have an impact on our
5  cash flow?  And how would you see that
6  happening?
7    Q.   (BY MR. BERRINGER:)  Well, in
8  your memo at one point you state that --
9  let me find it -- that you were bleeding
10  red ink all over the market.  What did you
11  mean by that?
12    A.   Well, the way that DVI
13  accounted for its European operations, it
14  was losing money.
15    Q.   Did the European operations
16  ever become profitable?
17    A.   Did it ever become profitable?
18  Not to my knowledge, no.
19    Q.   Did Mr. Garfinkel or anyone
20  else at DVI ever suggest terminating your
21  European operations?
22    A.   Well, I think everybody at DVI
23  decided -- made a recommendation that we

### Page 176

1  should get out of the entire international
2  operation.
3    Q.   When was the first of those
4  recommendations that you can recall,
5  ballpark?
6    A.   In early 2001 maybe.
7    Q.   And who was the first person
8  to make those recommendations?
9    A.   To me?
10    Q.   Yes.
11    A.   Jerry Cohn.
12    Q.   What did Mr. Cohn say about
13  the European operations?
14    A.   Again, you are going back to
15  distinguishing Europe from the rest of the
16  -- he was talking about the entire
17  international.
18    Q.   Internationally?  Okay.
19    A.   He was saying, "Look, we have
20  to figure out what we are going to do here
21  and we should try to exit the thing if we
22  are not going to make money on it."
23    Q.   As of the bankruptcy, had you

44

IN RE DVI, INC. SECURITIES LITIGATION
Tyler Eaton Morgan Nichols & Pritchett, Inc.    800.458.6031    http://www.TylerEaton.com

A8

FLEET NATIONAL BANK, ET AL.   ** CONTAINS CONFIDENTIAL PORTIONS **   MICHAEL A. O'HANLON
O'HANLON, ET AL.              ** FOR ATTORNEYS' EYES ONLY **          January 28, 2008

(Pages 309 to 312)

**Page 309**

1  A. Yes.
2  Q. Was it successful?
3  A. Absolutely.
4  Q. Who was going to handle -- on
5  the page two, you are designated as
6  president of DVI Europe.
7  A. I think that would have been a
8  great promotion for me, actually. But I
9  did that simply to take over that function
10 and to prepare it for St. John Brown to
11 come in and actually fill that position.
12 Q. At this point in time, who was
13 responsible for workouts in Europe?
14 A. It was overseen by Tony Turek
15 as head of international.
16 Q. Did that remain the case after
17 you sort of shook up the leadership role?
18 A. No. No. Workouts became a
19 responsibility of St. John Brown. And
20 that is what I was talking about, it is
21 time to take ownership of the whole thing
22 and have somebody out there that could
23 take control of the whole situation.

**Page 310**

1  Q. Okay.
2  MR. BERRINGER: That is it on
3  that. Why don't we break now and we will
4  resume tomorrow morning at 9:00.
5  THE VIDEOGRAPHER: Off the
6  record, 5:06 p.m.
7  (Whereupon, the deposition of
8  Michael A. O'Hanlon was
9  adjourned at 5:06 p.m. on
10 January 28, 2008, to be resumed
11 at 9:00 a.m. on January 29,
12 2008.)

**Page 311**

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

CASE NO. 2:03-CV-5336
IN RE DVI, INC. SECURITIES LITIGATION
CASE NO. 04-CV-1277
FLEET NATIONAL BANK, et al.,
Plaintiffs,
vs.
O'HANLON, et al.,
Defendants.

CASE NO. 04-CV-3423
(Coordinated With 04-CV-1277)
WM HIGH YIELD, et al.,
Plaintiffs,
vs.
O'HANLON, et al.,
Defendants.

CASE NO. 2:05-CV-1003
DENNIS J. BUCKLEY, as Trustee
of the DVI Liquidating Trust,
Plaintiff,
vs.
CLIFFORD CHANCE LLP and
CLIFFORD CHANCE U S LLP,
Defendants.
VOLUME II
VIDEO DEPOSITION OF MICHAEL A. O'HANLON
January 29, 2008

REPORTED BY: Laura H. Nichols
Certified Realtime Reporter,
Registered Professional
Reporter and Notary Public

**Page 312**

APPEARANCES
FOR THE PLAINTIFFS:
Messrs. Clinton A. Krislov,
Michael R. Karnuth and
Brian Joseph Stalets
Attorneys at Law
Krislov & Associates, LTD
20 North Wacker Drive
Chicago, Illinois 60606
312.606.0500
clint@krislovlaw.com
mike@krislovlaw.com
brian@krislovlaw.com

FOR THE PLAINTIFFS, FLEET NATIONAL BANK
and BANK OF AMERICA:
Mr. John J. Jacko, III
Attorney at Law
Buchanan Ingersoll & Rooney PC
1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985
215.665.8700
john.jacko@bipc.com

78

IN RE DVI, INC. SECURITIES LITIGATION
Tyler Eaton Morgan Nichols & Pritchett, Inc.    800.458.6031    http://www.TylerEaton.com

20

FLEET NATIONAL BANK, ET AL.     ** CONTAINS CONFIDENTIAL PORTIONS **     MICHAEL A. O'HANLON
O'HANLON, ET AL.     ** FOR ATTORNEYS' EYES ONLY **     January 28, 2008

(Pages 581 to 584)

Page 581

1 had been addressed.
2 Q. (BY MR. BERRINGER:) Did you
3 receive it after the meeting and just not
4 look at it?
5 A. No, they sent it to Singapore.
6 Q. How did you find out it got
7 sent to Singapore?
8 A. Someone asked me if I had
9 received the stuff. I said, "No." They
10 said, "We mailed it to you in Singapore."
11 I said, "When did you mail it?" They kind
12 of lost track of the time difference, and
13 it apparently got there after I left.
14 Q. And it didn't follow you back
15 the States somehow?
16 A. (Shaking head.)
17 Q. Never -- you didn't receive it
18 after the meeting either?
19 A. No.
20 Q. How do you know this is the
21 material that they were referring to?
22 A. Well, I just -- I don't to be
23 honest with you. I just assumed that it

Page 582

1 was attached to all of this that was
2 supposed to be part of the meeting, so --
3 Q. Did anyone -- strike that.
4 Did Mr. Garfinkel ever indicate to you at
5 this or any point in time that there were
6 occasions during a calendar -- a fiscal
7 quarter in which DVI was out of compliance
8 with covenants concerning the Fleet or
9 Merrill borrowings, the warehouse lines?
10 A. The only time anyone ever told
11 me that was Lisa Cruikshank and Steve
12 Garfinkel came to my office, I believe in
13 1999, to tell me that they had presented
14 Fleet a borrowing base report during a
15 noncertification period in which two or
16 three accounts were on there and were, in
17 fact, delinquent.
18 I asked them, I said, "Well,
19 when did that happen?" They told me two
20 months ago. I said, "What happened?"
21 They said, "We fixed the problem, we were
22 in compliance but it was just a situation
23 where the times got tough and it was an

Page 583

1 attempt on our part to perhaps suggest
2 that we borrow additional money," which I
3 found somewhat troublesome, that they were
4 the people responsible for borrowing the
5 additional money.
6 But that is the only time that
7 anyone ever told me that they were, in
8 fact, out of compliance -- I'm sorry. Let
9 me correct that. One other time, Tony
10 Turek -- on two different occasions, Tony
11 Turek called me when Jim Costello had
12 passed away, and we were both acting as
13 CFOs, if you will; Tony Turek called me to
14 tell me that we were out of compliance and
15 asked me to contact the bank. The bank at
16 that time was NatWest.
17 I called Merilee McLaughlin,
18 who was the account officer, and I
19 reported that situation to her. She asked
20 me what the extent was. I told her it was
21 two accounts -- I believe it was two
22 accounts at the time that had presented
23 nonsufficient fund checks, putting them

Page 584

1 over sixty days past due. We were out of
2 compliance.
3 She told me the procedure then
4 was to simply fix the problem, get back in
5 compliance, and make sure that the
6 compliance report at the end of the
7 quarter was, in fact, accurate and was in
8 compliance, which we did.
9 Q. Okay.
10 A. The only other time was Steve
11 Garfinkel telling me on July 17th of 2003
12 that he in fact had double pledged
13 collateral and the borrowing base was
14 incorrect, at which time I reported that
15 to the bank.
16 Q. Okay. Were you informed as to
17 the reason why Lisa Cruikshank resigned
18 from DVI?
19 A. Well, Lisa Cruikshank told me
20 that she resigned because her husband had
21 a heart attack and that he was unable to
22 take care of himself, and she had to spend
23 time with him. That is what she told me.

146

**A9**

FLEET NATIONAL BANK, ET AL.   ** CONTAINS CONFIDENTIAL PORTIONS **   MICHAEL A. O'HANLON
O'HANLON, ET AL.                        ** FOR ATTORNEYS' EYES ONLY **                    January 28, 2008

(Pages 973 to 976)

---

**Page 973**

```
1      IN THE UNITED STATES DISTRICT COURT FOR
2        THE EASTERN DISTRICT OF PENNSYLVANIA
3
4    CASE NO. 2:03-CV-5336
     IN RE DVI, INC. SECURITIES LITIGATION
5    CASE NO. 04-CV-1277
     FLEET NATIONAL BANK, et al.
6        Plaintiffs,
     vs.
7    O'HANLON, et al.
         Defendants
8
     CASE NO. 04-CV-3423
9    (Coordinated With 04-CV-1277)
     WM HIGH YIELD, et al.
10       Plaintiffs,
     vs.
11   O'HANLON, et al.
         Defendants
12   CASE NO. 2:06-CV-1003
     DENNIS J. BUCKLEY, as Trustee
13   of the DVI Liquidating Trust,
         Plaintiff,
14
     vs.
15   CLIFFORD CHANCE LLP and
     CLIFFORD CHANCE U.S. LLP,
16       Defendants.
                   VOLUME IV
17
     VIDEO DEPOSITION OF MICHAEL A. O'HANLON
18            January 31, 2008
19
20
21   REPORTED BY: Laura H. Nichols
              Certified Realtime Reporter,
22            Registered Professional
              Reporter and Notary Public
23
```

---

**Page 975**

```
1    A P P E A R A N C E S (Continuing)
2
3    FOR THE PLAINTIFF, DENNIS BUCKLEY, TRUSTEE
4    OF THE DVI LIQUIDATING TRUST:
5        Mr. Edward J. Stein
6        Attorney at Law
7        Anderson Kill & Olick, P.C.
8        1251 Avenue of the Americas
9        New York, New York 10020
10       estein@andersonkill.com
11
12   FOR THE DEFENDANT, MICHAEL A. O'HANLON:
13       Mr. Jeffrey S. Feldman
14       Attorney at Law
15       Montgomery, McCracken,
16         Walker & Rhoads, LLP
17       123 South Broad Street
18       Philadelphia, PA 19109-1029
19       215.772.1500
20       jfeldman@mmwr.com
21
22
23
```

---

**Page 974**

```
1    A P P E A R A N C E S
2
3    FOR THE PLAINTIFFS:
4        Messrs. Clinton A. Krislov and
5            Brian Joseph Stalets
6        Attorneys at Law
7        Krislov & Associates, LTD
8        20 North Wacker Drive
9        Chicago, Illinois 60606
10       312.606.0500
11       clint@krislovlaw.com
12       brian@krislovlaw.com
13
14   FOR THE PLAINTIFFS, FLEET NATIONAL BANK
15   and BANK OF AMERICA:
16       Mr. John J. Jacko, III
17       Attorney at Law
18       Buchanan Ingersoll & Rooney PC
19       1835 Market Street, 14th Floor
20       Philadelphia, PA 19103-2985
21       215.665.8700
22       john.jacko@bipc.com
23
```

---

**Page 976**

```
1    A P P E A R A N C E S (Continuing)
2
3    FOR THE DEFENDANT, GERALD COHN:
4        Ms. Nina Sudhakar (By Telephone)
5        Legal Assistant
6        Stillman, Friedman & Shechtman, P.C.
7        425 Park Avenue
8        New York, NY 10022
9        212.223.0200
10
11   FOR THE DEFENDANT, ANTHONY J. TUREK:
12       Mr. William J. Taylor
13       Attorney at Law
14       Cozen O'Connor, P.C.
15       The Atrium
16       1900 Market Street
17       Philadelphia, PA 19103
18       215.665.2000
19       wtaylor@cozen.com
20
21
22
23
```

---

IN RE DVI, INC. SECURITIES LITIGATION                                               244
Tyler Eaton Morgan Nichols & Pritchett, Inc.     800.458.6031          http://www.TylerEaton.com

22

FLEET NATIONAL BANK, ET AL.
O'HANLON, ET AL.

** CONTAINS CONFIDENTIAL PORTIONS **
** FOR ATTORNEYS' EYES ONLY **

MICHAEL A. O'HANLON
January 28, 2008

(Pages 1105 to 1108)

**Page 1105**

1  A. Corporate headquarters.
2  Q. Okay. Cohn was regularly in
3  Jamison?
4  MR. FELDMAN: Object to the
5  form.
6  A. He was there at times.
7  Q. (BY MR. KRISLOV:) And so how
8  did this conversation come about? Mike, I
9  would like to take a look at something?
10  Mike, I have a troubling? Mike, I have a
11  great thing? Can you set the scene?
12  MR. FELDMAN: Objection to the
13  form.
14  MR. ROSS: Objection.
15  A. No, I -- well, I had spoken to
16  the people at General Electric extensively
17  of course during this period, and I know
18  the people from General Electric pretty
19  well. And the discussion really was GE's
20  problem with Latin America. GE Credit had
21  recently written off a substantial amount
22  of their Latin American portfolio.
23  And when GE came back to us

**Page 1106**

1  after due diligence, they offered to buy
2  DVI Financial Services, with the exception
3  of Latin America, which they told us they
4  would have to write off entirely, a
5  hundred percent writeoff in order to
6  purchase that portion of the business.
7  So they came back and offered,
8  and I believe this is right, somewhere
9  between sixteen and eighteen. That was
10  the range they gave us per share to buy
11  DVI Financial Services, but they did not
12  want the international business, nor did
13  they want Strategic Partners.
14  And the board elected not to
15  accept the offer. But this hundred and
16  fifty million dollar chargeoff that they
17  are talking about here, the majority of
18  that was the writeoff of DVI's Latin
19  American portfolio. And, of course, you
20  know, we didn't think that it was
21  justified whatsoever.
22  So they were trying to, in the
23  typical Eric Hanson GE methodology of

**Page 1107**

1  doing acquisitions, make a big offer, come
2  in, due diligence, cut the price. They
3  wanted to buy it -- in reality, they
4  wanted to have the whole company for
5  sixteen to eighteen dollars a share rather
6  than the twenty-three, twenty-four dollars
7  a share that they had offered originally.
8  So this didn't surprise me in
9  the least.
10  Q. (BY MR. KRISLOV:) Okay. Now,
11  let me take this in some bites. The
12  people from GE -- Eric Hanson is an
13  investment banker with Lazard Freres?
14  A. Right.
15  Q. Is he connected with GE?
16  A. His principal client was GE.
17  Q. Rather --
18  A. GECC.
19  Q. Okay. That was his client?
20  A. Correct.
21  Q. It was not the Pritzkers's?
22  A. No.
23  Q. And so they did not want

**Page 1108**

1  Business Credit?
2  MR. FELDMAN: Objection to the
3  form.
4  A. No. You know, my belief, my
5  recollection -- I get confused sometimes
6  between GMAC and GECC and which GECC,
7  because GECC is comprised of a lot of
8  divisions. And we had offers from a
9  couple of different divisions over my
10  period of time.
11  But in this particular case, I
12  believe I am right in saying they didn't
13  want South America and they did not want
14  Strategic Partners, which was DVI's
15  smaller ticket group. They wanted
16  Business Credit and they wanted Financial
17  Services with the exception of the
18  international and Strategic Partners
19  groups.
20  Q. (BY MR. KRISLOV:) Where does
21  the Op Co concept fit into all this?
22  MR. FELDMAN: Objection to the
23  form. Lack of foundation.

**A10**

Shapiro Nathan 020608-020808.txt

1

1          IN THE UNITED STATES DISTRICT COURT FOR

2          THE EASTERN DISTRICT OF PENNSYLVANIA

3
       CASE NO. 2:03-CV-5336
4      IN RE DVI, INC. SECURITIES LITIGATION

5      CASE NO. 04-CV-1277
       FLEET NATIONAL BANK, et al.,
6           Plaintiffs,
       vs.
7      O'HANLON, et al.,
            Defendants.
8
       CASE NO. 04-CV-3423
9      (Coordinated with 04-CV-1277)
       WM HIGH YIELD, et al.,
10          Plaintiffs,
       vs.
11     O'HANLON, et al.,
            Defendants.
12
       CASE NO. 2:06-CV-1003
13     DENNIS J. BUCKLEY, as Trustee
       of the DVI Liquidating Trust,
14          Plaintiff,
       vs.
15     CLIFFORD CHANCE LLP and
       CLIFFORD CHANCE U.S. LLP,
16          Defendants.

17

18                    VOLUME I

19     VIDEO DEPOSITION OF NATHAN SHAPIRO

20              February 6, 2008

21
       REPORTED BY:  Laura H. Nichols
22                   Certified Realtime Reporter,
                     Registered Professional
23                   Reporter and Notary Public

2

Page 1

24

Shapiro Nathan 020608-020808.txt
104

1     Q.    (BY MR. KRISLOV:)  Or what
2  were they during this time?
3          MR. DAILEY:  Same objection.
4     A.    They were a listing of -- a
5  listing of loans that were not either
6  current or that were troubled.
7     Q.    (BY MR. KRISLOV:)  And were
8  they discussed during the board meetings?
9     A.    Yes.
10    Q.    At every board meeting?
11    A.    Virtually, yes.
12    Q.    Was it your belief that all
13 troubled or delinquent loans were
14 discussed?
15    A.    Not all.  The larger ones and
16 the ones that were of concern to
17 management or would have been the concern
18 of the board.
19    Q.    Okay.  Was the adequacy of
20 DVI's loan loss reserve discussed during
21 these meetings as well?
22    A.    Yes.
23    Q.    At every meeting?

105

Page 91

25

Shapiro Nathan 020608-020808.txt

11    where there wasn't someone from Deloitte

12    either present or on the telephone.

13         Q.    Okay.  Present, you are saying

14    meaning present in person or by telephone?

15         A.    Yes.

16         Q.    To your -- in your memory,

17    were there ever any disputes between

18    Deloitte and management over the issues

19    raised in the management letter?

20              MR. DAILEY:  Object to the

21    form.

22         A.    There were not.  And if an

23    issue was identified as a matter of

140

1     concern -- you know, there were a few of

2     them, management would speak to what steps

3     were being taken to comply, and Deloitte

4     would agree with management.  Deloitte

5     always -- let me not use the word

6     "always" -- in my -- I do not recall a

7     time when management ever said that the

8     management of the company was not

9     cooperating fully.

10         Q.    And there was no time when at

11    the completion of the -- sorry.  Let me --

12              MR. ROSS:  Excuse me.

13         Q.    (BY MR. KRISLOV:)  At the

14    completion of discussion, was there

Page 122

26

Shapiro Nathan 020608-020808.txt

15  anytime that Deloitte indicated they were

16  not satisfied with management's responses

17  to the issue that they had raised?

18      A.   I do not believe so.

19      Q.   Do you recall whether Deloitte

20  ever raised the adequacy of DVI loan loss

21  reserves as a problem requiring audit

22  committee attention?

23      A.   I do not.

                                        141

1       Q.   Did Deloitte ever raise

2   concerns about the competency of the audit

3   committee?

4       A.   Not to me, and not at a board

5   meeting because I would have heard it.

6       Q.   And did they --

7       A.   The only time I might not have

8   heard it would have been if I wasn't

9   there, and the only board meeting that I

10  recall -- there was two that I did not

11  participate in.  One was December 4th,

12  and --

13      Q.   December 4th of '02?

14      A.   Yes.  So possibly something

15  came up, but not to my knowledge.  I only

16  missed possibly two or three meetings in

17  the entire three -- entire period when I

18  served.                 Page 123

Shapiro Nathan 020608-020808.txt

159

1    can be some timing delays on income coming

2    in.  So it was, I think, accepted that you

3    couldn't have a hard, fast policy on

4    everything that would be applicable to

5    everything.  If an asset was being

6    transferred to somebody and they were

7    going to make the company whole in one way

8    or another, it was acceptable accounting

9    wise.  But as to income that was due on

10   interest on a loan that was a hundred and

11   eighty days in suspension, everyone agreed

12   on that.

13        Q.    Okay.  When you say a hundred

14   and eighty days in suspension, you mean a

15   hundred and eighty days --

16        A.    Past due.

17        Q.    Past due.

18        A.    Yes.

19        Q.    So this issue had been

20   resolved to Deloitte's satisfaction and

21   there wasn't anything else that the audit

22   committee believed needed to be done in

23   this respect?

160

Page 139

28

Shapiro Nathan 020608-020808.txt

```
 1        MR. DAILEY:  Object to the
 2  form.
 3        A.    I thought it was resolved to
 4  Deloitte's satisfaction and that, if
 5  something hadn't been quite -- hadn't been
 6  fixed yet, it was in the process of being
 7  addressed and fixed --
 8        Q.    (BY MR. KRISLOV:)  And
 9  Deloitte --
10        A.    -- which is what this says,
11  and that is what we understood.
12        Q.    And Deloitte -- if there were
13  further things, would Deloitte be in --
14  sorry.  Strike that.
15             So in general, if Deloitte
16  presented problems with any of the ways in
17  which the company was being operated by
18  these management letters, how did you
19  obtain comfort during the meeting that
20  these problems had been addressed?
21        A.    To the best of my
22  recollection, issues that were discussed
23  regarding loans or the treatment --
```

0                                                   161


```
 1  accounting treatment -- and I presume that
 2  there were, from time to time, discussions
 3  on that internally, but I don't recall
```

Page 140

29

Shapiro Nathan 020608-020808.txt

4    them taking place actually at the board

5    meeting in terms of accounting principles,

6    were identified as matters that might be

7    up for discussion but whereby Deloitte was

8    receiving the full cooperation of

9    Garfinkel, Boyle -- you know, or the

10   company, management with -- and/or

11   management.  And management, you know,

12   the -- was at a second -- or below Boyle

13   and Garfinkel and people in their

14   departments.

15        Q.    What was it that made you

16   comfortable that the problems had been

17   addressed?

18        A.    well, if they are not being

19   addressed, it is the responsibility of the

20   auditors to indicate that knowledge to the

21   audit committee -- to the full board but

22   especially to the audit committee.

23        Q.    If they are not being

162

1    addressed?

2        A.    Absolutely.

3        Q.    Okay.

4              MR. KRISLOV:  Let me show you

5    what purports to be minutes of the audit

6    committee, January 25th, 2002.

7              THE REPORTER:  Marking Exhibit

Page 141

30

Shapiro Nathan 020608-020808.txt

8    Number 12.

9                    (Whereupon, Shapiro Exhibit 12

10                   was marked for identification.

11                   This exhibit and any testimony

12                   thereto has been designated

13                   confidential.)

14        Q.   (BY MR. KRISLOV:)  I see down

15   at the bottom of this page, it talks about

16   Mr. Neas leading the discussion indicating

17   that Deloitte has completed the audit of

18   DVI for June 30, 2001.  And then later in

19   the paragraph it says, "Audit areas

20   designated as greater than normal risk had

21   been addressed and resolved to the firm's

22   satisfaction."  I presume that means

23   Deloitte.

0                                              163



1                    MR. DAILEY:  Could we try to

2    lay a little foundation for this document?

3         Q.   (BY MR. KRISLOV:)  Have you

4    ever seen this document?

5         A.   Have I?

6         Q.   Yes.

7         A.   I presume I have.  I mean --

8         Q.   There's a bunch --

9         A.   I mean, there's a ton of paper

10   so I don't want to tell anyone that I have

11   got a photographic memory.  But this is

                    Page 142

A11

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

CASE NO. 2:03-CV-5336
IN RE DVI, INC. SECURITIES LITIGATION
CASE NO. 04-CV-1277
FLEET NATIONAL BANK, et al.,
      Plaintiffs,

vs.

O'HANLON, et al.
      Defendants
CASE NO. 04-CV-3423
(Coordinated With 04-CV-1277)
WM HIGH YIELD, et al.,
      Plaintiffs,

vs.

O'HANLON, et al.,
      Defendants.
CASE NO. 2:06-CV-1003
DENNIS J. BUCKLEY, as trustee
of the DVI Liquidating Trust,
      Plaintiff,

vs.

CLIFFORD CHANCE LLP and
CLIFFORD CHANCE U.S. LLP
      Defendants.

---

**GERALD COHN**
**February 12, 2008**

---



**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
——————— www.TylerEaton.com ———————

32

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                           ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 25 to 28)

**Page 25**

1     Q.   Okay. And if you need a
2 break, will you tell me or tell your
3 counsel so that he could tell me?
4     A.   I will do it.
5     Q.   Okay. Thank you.
6       Did you meet with your attorney
7 to prepare for today's deposition?
8     A.   I did.
9     Q.   How long did you meet with him
10 for?
11     A.   Two days.
12     Q.   Was anybody else present at
13 any of these meetings?
14     A.   Yes.
15     Q.   Who?
16     A.   Carolyn.
17     Q.   Anybody else?
18     A.   Elizabeth Weinstein.
19     MR. FRIEDMAN: Denise, maybe
20 you should say was anyone else other than
21 someone from my firm present. Maybe that
22 would speed it along.
23     MS. SCHWARTZMAN: Okay. I'll

**Page 26**

1 take that suggestion, and it may be the
2 last suggestion I take, Julian.
3     MR. FRIEDMAN: Well, it won't
4 stop me from making them.
5     MS. SCHWARTZMAN: Okay. As
6 long as we understand each other.
7     Q.   (BY MS. SCHWARTZMAN:) Was
8 anybody present in the room who was not
9 from your counsel's law firm?
10     A.   No.
11     Q.   All right. Did you discuss
12 your deposition with anybody other than
13 your counsel or your wife?
14     A.   Yes.
15     Q.   With whom?
16     A.   My daughter, Cindy.
17     Q.   And when did you have that
18 discussion?
19     A.   I discussed it -- I had
20 discussion with her a few weeks ago.
21     Q.   What was the subject matter of
22 that discussion, sir?
23     A.   The subject matter was that I

**Page 27**

1 called her to put together some of -- of
2 the losses she took on exercising options
3 at DVI because of my recommendation for
4 her to exercise the options, and --
5     Q.   Did -- oh, I'm sorry. Go
6 ahead. I don't mean to interrupt you.
7     A.   And I did that because I -- I
8 was anxious to know how much money she
9 lost because someone had defrauded me to
10 think that the company was in good enough
11 shape for her to exercise those options.
12     Q.   How much did Cindy lose?
13     A.   She lost $150,000.
14     Q.   Did you exercise options while
15 you were at DVI?
16     A.   I did.
17     Q.   Did you gain or lose money on
18 those options?
19     MR. DAILEY: Objection to
20 form.
21     A.   I exercised 20,000 options in
22 the 1980s -- in the early 1990s, sorry.
23 In the early 1990s, and 10,000 of those

**Page 28**

1 options I sold at the time, and the other
2 10,000 I kept the stock along with the
3 other stock that I bought and continued to
4 buy.
5     Q.   Did you realize a profit on
6 the 10,000 you sold?
7     A.   I did.
8     Q.   What was that profit, if you
9 recall, please, sir, approximately?
10     A.   It was many years ago.
11     Q.   Okay. Do you recall what you
12 lost on the 10,000 you held?
13     A.   I lost a hundred percent of
14 it.
15     Q.   And, so, it was worth zero.
16 What did you pay for them?
17     A.   I believe that I paid
18 somewhere around 11, $12, so --
19     MR. FRIEDMAN: Per share.
20     A.   Per share. It was 10,000
21 shares, so I lost over a hundred thousand
22 dollars.
23     Q.   And that's just on the

7

33

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 29 to 32)

Page 29

options?
2    A.   That was on the options.
3    Q.   Did you lose any other money
4    on DVI stock?
5    A.   I did.
6    Q.   How much?
7    A.   Is the question did I lose any
8    money off my cost basis, or was it on what
9    the price was?
10   Q.   That's an interesting -- now
11   you have asked me a question I have
12   to think -- let's go on your cost basis.
13   A.   Okay.  My cost --
14   Q.   I know what that is.
15   A.   The cost basis, I had a cost
16   basis of 320,000 shares, which I held.
17   The cost basis was about a million
18   dollars.
19   Q.   Okay.  And when -- and, so,
20   you lost that full million dollars?
21   A.   I lost that full million
22   dollars.
23   Q.   You held that until the

Page 30

1    bankruptcy, is that what you're saying
2    here, sir?
3    A.   Yes, that's what I'm saying.
4    Q.   With the exception of the
5    lawsuit that was filed by Mr. Anic --
6    A.   Anic.
7    Q.   Anic?
8    A.   Yes.
9    Q.   -- Third Coast Capital, have
10   you ever been a party to a lawsuit before?
11   A.   No.  Not that I can remember.
12   Q.   What else did you do to
13   prepare for your deposition besides meet
14   with your counsel?
15   A.   I read through the Examiner's
16   Report.  I read through a lot of the
17   exhibits with some focus on the references
18   to me.
19   Q.   When you say exhibits here --
20   I'm talking --
21   Q.   -- do you mean the exhibits to
22   the Examiner's Report?
23   A.   Yes, that's what I mean, the

Page 31

1    exhibits.
2    Q.   Did your counsel show you any
3    other documents?
4    MR. FRIEDMAN:  I object to the
5    question in the sense that it could be
6    interpreted to call for privileged
7    information.
8    Q.   Okay.  I'm going to ask you
9    just to answer the question if your
10   counsel showed you other documents, not to
11   tell me what documents that he showed you.
12   A.   Yes.
13   Q.   He did show you other
14   documents?
15   A.   He did, yes.
16   Q.   Did you review those
17   documents?
18   A.   I did.
19   Q.   About how long did it take you
20   to review those documents?
21   A.   The ones he showed me, less
22   than an hour.
23   Q.   With the exception of your

Page 32

1    daughter, Cindy, did you speak with
2    anybody else who's been a witness in this
3    litigation about your deposition today?
4    A.   No.
5    Q.   Do you maintain a social
6    relationship with any of the other former
7    board members of DVI?
8    MR. FRIEDMAN:  Object to the
9    form, okay?
10   A.   No.  I don't.
11   Q.   Do you ever see any of the
12   other former board members of DVI?
13   A.   See them?  Yes, I've seen --
14   seen them, meaning just like I'm looking
15   at Mr. Tepper.
16   Q.   Uh-huh.  That's what the word
17   means.  That's what I mean.  I don't
18   ordinarily ask trick questions.
19   A.   Okay.
20   Q.   Okay.
21   MR. DAILEY:  I don't agree
22   with that.
23   (Laughter.)

8

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 101 to 104)

**Page 101**

```
 1        Q.   When I refer to DVI in my
 2  questions from now on, I will only be
 3  talking about the public company.
 4        A.   Okay.
 5        Q.   Okay.  Did the Pritzker
 6  interests have an interest -- an equity
 7  interest in DVI?
 8        MS. STRIKIS:  Object to the
 9  form.
10        A.   At some point.  At some point.
11        Q.   Okay.  Which Pritzker
12  interest?
13        MS. STRIKIS:  Object to the
14  form.
15        A.   I don't know -- I don't know.
16        Q.   Did any of the Pritzker
17  interests ever lend money to DVI?
18        MS. STRIKIS:  Object to the
19  form.
20        A.   If you mean by lending money
21  buying some of the bonds, subordinated
22  bonds, they did.
23        Q.   Did you ever buy any of the
```

**Page 102**

```
 1  subordinated bonds?
 2        A.   I did.
 3        Q.   Do you remember how much?
 4        A.   Yes.
 5        Q.   How much?
 6        A.   Eight hundred thousand
 7  dollars' worth.  And another two hundred
 8  thousand was invested by our family
 9  charitable foundation.
10        Q.   And when were those bonds due?
11        A.   Those bonds were due
12  June 2002.
13        Q.   Did you receive a return of
14  the capital for your bonds?
15        A.   No.
16        Q.   Were you paid interest on the
17  bonds during the holding period?
18        A.   Yes.
19        Q.   What was the interest?
20        A.   Nine and -- nine and an eighth
21  percent.
22        Q.   Was that an interest that
23  represented a high risk lending venture at
```

**Page 103**

```
 1  the time of the bonds?
 2        MR. FRIEDMAN:  Object to the
 3  form.
 4        A.   I didn't think so.
 5        Q.   Okay.  We were speaking a
 6  moment ago that David -- and correct me if
 7  I misquote you, that David Higgins had
 8  formed Diagnostic Ventures.
 9        When Diagnostic Ventures became
10  DVI and when it became a public company,
11  was David Higgins still associated with
12  the company?
13        A.   He was.
14        Q.   Were you associated with the
15  company?
16        A.   I was.
17        Q.   What was your position with
18  the company?
19        A.   Investor.
20        Q.   Were you a board member?
21        A.   I can't recall.
22        Q.   Were you -- did you at some
23  time become a board member of the public
```

**Page 104**

```
 1  company DVI?
 2        A.   Yes.
 3        Q.   Do you remember when that was?
 4        A.   No.
 5        Q.   Do you remember how far along
 6  into the corporate life of DVI that
 7  occurred?
 8        A.   I'm guessing it was earlier
 9  than later.
10        MR. FRIEDMAN:  DVI being the
11  public company as you defined it?
12        MS. SCHWARTZMAN:  Yes.  Yes.
13        MR. FRIEDMAN:  Okay.
14        MS. SCHWARTZMAN:  Yes.
15        Q.   (BY MS. SCHWARTZMAN:)  When
16  did the Pritzker interests invest in DVI?
17        MS. STRIKIS:  Object to the
18  form.
19        A.   After the underwriting.
20        Q.   Now I'm going to have to ask
21  you to clarify, because I -- I don't
22  understand what after the underwriting
23  means.
```

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 105 to 108)

Page 105

1     A. Well, the investment banker's
2 name was Providence Securities, and he had
3 difficulty selling all of the public
4 offering, and he -- he kept calling me
5 every night at dinner and saying can you
6 help me sell the rest of -- of the
7 offering. And he -- he held them himself.
8 So, I did ask some people if they wanted
9 to buy any. And then eventually I asked
10 Jay Pritzker if he would like to buy what
11 the Provident Securities people had in
12 their holdings. And they did.
13     Q. They did?
14     A. The Pritzkers did.
15     Q. The Pritzkers did?
16     A. The Pritzkers did.
17     Q. Do you know which Pritzker
18 entity bought the securities?
19     A. No.
20     Q. Do you know if Mr. Jay
21 Pritzker bought the securities personally?
22     A. No.
23     Q. Who else did you contact

Page 107

1 these kind of friends.
2     MS. SCHWARTZMAN: I assume you
3 are not taking this down? Oh, dear.
4     A. Who said that?
5     MR. FRIEDMAN: Dailey did.
6     MR. KRISLOV: That was Dailey,
7 obviously.-- --
8     Q. (BY MS. SCHWARTZMAN:) For how
9 long were you a board member at DVI?
10     A. Up until after the bankruptcy.
11     Q. When you first began to
12 serve -- all right. When you first -- let
13 me strike that and start over.
14     When you first invested in DVI,
15 did you have an office like president,
16 vice president, credit manager, an office
17 job, not a physical location, at DVI?
18     A. I had no physical location.
19     Q. Okay.
20     A. But I did stipulate that I
21 wanted to look at every credit before it
22 was approved.
23     Q. Why? Why did you make that

Page 106

1 besides Jay Pritzker about purchasing the
2 DVI securities?
3     A. Some friends.
4     Q. Did any of your friends buy?
5     A. No.
6     Q. They are still your friends,
7 though, huh?
8     MR. DAILEY: Object.
9     A. No, a couple of them are dead.
10 I'm eighty years old, so -- I don't have
11 too many friends left my age.
12     Q. I don't believe that for a
13 second.
14     MR. FRIEDMAN: You don't
15 believe he's eighty or you don't believe
16 he's --
17     MS. SCHWARTZMAN: Both.
18     Q. Both. Okay?
19     A. Thanks.
20     MR. BERRINGER: We'll all be
21 your friends.
22     A. I'm sure.
23     MR. DAILEY: You don't need

Page 108

1 stipulation?
2     A. Because when I told you before
3 that he sent me three or four documents, I
4 would have vetoed every one of them. So
5 we missed a question, and the question was
6 at that time I told him no. And then he
7 asked me why, and I told him because there
8 was no cash flow, there was no collateral,
9 and I didn't know the character. And
10 that's been the basis of my valuation and
11 judgment. And so he came back -- I mean
12 Higgins, David Higgins, came back months
13 later and he said I want to show you some
14 new kinds of transactions I have, and they
15 were much better. So, then I told him I
16 was interested.
17     Q. Okay. Let me just clarify
18 something that you just said.
19     When you said they had no cash
20 flow, no collateral and I didn't know the
21 character, are you referring to the
22 obligors on the loans that Mr. Higgins
23 sent you the credit reports for?

27

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 109 to 112)

Page 109

MR. DAILEY: Object to the
form.
A.   That's why --
(Reporter interruption.)
A.   That's why they were vetoed,
for that reason.
Q.   Okay.
A.   I mean, that was the obligor.
Q.   And when Mr. Higgins revisited
the issue with you, the new transactions
that he showed you, they -- is it correct
that they were credit applications that
DVI had approved?
A.   Yes.
Q.   And is it correct that your
testimony was after seeing these new
credit applications that were approved --
A.   Yes.
Q.   -- you decided to invest in
DVI?
A.   That's correct.
Q.   Okay. What had changed from
the old credit applications that you

Page 110

wouldn't invest on to the new credit
applications?
A.   Well, I recall that the --
first of all, the backup of an application
was a lot -- had a lot more depth to it,
but the quality of the credit was a lot
better, meaning that they -- the companies
had cash flow and they had good
collateral, and based upon the Dun &
Bradstreet reports and some of the other
reports that we had, it seemed like the
character was good.
So, it was, in my opinion, an
acceptable credit.
Q.   And were you named a member of
the loan committee for DVI at that time,
at the time of your investment?
MR. FRIEDMAN: Object to the
form.
A.   No.
Q.   My question is really very
specific. In what capacity were you
acting for DVI when credit applications

Page 111

were shown to you prior to becoming a
member of the loan committee?
A.   I was shown every credit
before it was approved, and I gave my
opinion on each one.
Q.   Was that a formal credit
policy at DVI at the time?
A.   I don't know that it was ever
in writing, if that's what formal means,
but I took it as -- as the way the
procedure should take place.
Q.   To the best of your knowledge,
was it understood at DVI at that time that
credit applications were to be shown to
you?
A.   We had a limit that I didn't
look at, and I can't remember what it was.
But everything over the limit was to come
to me.
Q.   Okay. Is it correct that
while you were doing this at DVI, you had
no formal title with the company?
MR. DAILEY: Object to the

Page 112

form.
A.   I might have been on the
board.
Q.   Were you drawing a salary?
A.   No.
Q.   Did you ever draw a salary
from DVI?
A.   I did.
Q.   When did you begin to draw a
salary from DVI?
A.   I can't tell you the exact
time. I can -- it was when I was spending
between forty and fifty hours a week at
it.
Q.   What was your salary, sir?
A.   It was first started at like
fifty thousand, and then it got up as high
as a hundred and ten thousand.
Q.   Did you receive bonuses while
you were a salaried employee of DVI?
A.   Once.
Q.   When?
A.   I can't remember the exact

28

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **     GERALD COHN
O'HANLON, ET AL.     ** FOR ATTORNEYS' EYES ONLY **     February 12, 2008

(Pages 113 to 116)

**Page 113**

date, but it was the same bonus that
everybody on the board got.
    Q.   Okay.  And what was that
bonus?
    A.   My -- my memory, it was
between sixteen and seventeen thousand
dollars.
    Q.   When did DVI form the loan
committee?
    MR. FRIEDMAN:  Object to the
form.  Can I just state the ground for my
objection?
    MS. SCHWARTZMAN:  Yes.
    MR. FRIEDMAN:  Is loan
committee the same as the credit
committee?  Because otherwise I think
there's a confusing record.
    MS. SCHWARTZMAN:  Okay.  Okay,
I'll -- I'll straighten that out.
    MR. FRIEDMAN:  Fine.
    Q.   (BY MS. SCHWARTZMAN:)  Okay.
I'm saying loan committee.  I've been
corrected by counsel that I mean the

**Page 114**

credit committee.
    MR. FRIEDMAN:  Okay.
    Q.   When did DVI form the credit
committee?
    A.   When Tony Turek came on board.
    Q.   When was that, please?
    A.   I can't recall the date.
    Q.   Who was on the credit
committee?
    A.   At what point?
    Q.   When it was formed.
    A.   Tony and me.  And that was
pretty much the case.  We had some help
from a gentleman by the name of Maurie
Latheowers.
    Q.   Would you say that name again,
please?
    A.   Latheowers.
    Q.   Anybody else that you can
recall that served on the credit committee
with you now across the whole time that
you served on the credit committee?
    A.   Oh, well, later when O'Hanlon

**Page 115**

and his crew came on board, the loan
committee was expanded a lot.  There was
Ray Fear and Joe Malott, and at one time
Jerry Hayes came on and Mark Gallagher.
    Q.   When did Mr. Higgins separate
from DVI?
    A.   He separated into -- when Mike
O'Hanlon came on board, he was elected by
the board as executive vice president.
Higgins was president and CEO.  And then
after a period of time, Michael O'Hanlon
came to me and he said it was somewhat of
an uncomfortable position.  I can't
remember the adjective, but he thought it
was best that he become CEO.  And the
board and I deliberated over it, and I
felt that that would be the growth.  And
although Higgins and I were really good
friends and still are, I just felt that it
was best for the shareholders that we made
that change.  And, so, I had to give him
the notice.
    Q.   Do you remember when that was?

**Page 116**

    A.   I can't put a date on that.
    Q.   What was your personal -- what
was the basis for your personal
decision-making that Michael O'Hanlon
should be named as the CEO of DVI?
    MR. DAILEY:  Objection to the
form.
    MR. FRIEDMAN:  I object to the
form as well.
    A.   My personal?  I had -- I had
watched him for -- we had two offices at
the time.  Once was -- one was in Horsham,
the East Coast, and the other was in
California in Irvine, and -- and I know --
and I saw the quality of the people that
Michael O'Hanlon brought, the salespeople,
the marketing people.  And my opinion was
that for the benefit of the shareholders,
we were going to get some good, solid
profitable growth with Michael O'Hanlon in
the job.
    Q.   You stated that you, in your
opinion, for the benefit of the

29

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **          GERALD COHN
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **              February 12, 2008

(Pages 117 to 120)

Page 117

1  shareholders that Michael O'Hanlon would
2  bring significant growth to the company --
3      A.   Right.
4      Q.   -- is that correct?
5      A.   Correct.
6      Q.   What do you mean benefit of
7  the shareholders?
8      A.   Benefit of the shareholders
9  that -- we were sort of stagnant in the
10 first phase of our business and we weren't
11 developing the business that we should for
12 a finance company. And when O'Hanlon came
13 in, he put a structure behind the
14 marketing organization, plus the fact he
15 brought a lot of very capable people with
16 him. And I felt that if we had the
17 growth, the stock would go up. And that
18 was to the benefit of the -- of the
19 shareholders.
20     Q.   Did you view it as your duty
21 as a member of the board to act for the
22 benefit of the shareholders? Did you view
23 it as your duty as a board member --

Page 118

1      A.   It was --
2          MR. FRIEDMAN: Let her finish.
3      Q.   -- to act for the benefit of
4  the shareholders?
5          MS. STRIKIS: Object to the
6  form.
7      A.   Yes, it was my duty.
8      Q.   When you first became the
9  member of a board of directors of a public
10 company, did you ever do any personal
11 research into the nature of your duties as
12 a board member of a public company?
13     A.   I did.
14     Q.   Did you develop an
15 understanding of what your duties were as
16 a board member of a public company?
17     A.   I did.
18     Q.   What do you understand your
19 duties -- the duties to be for a board
20 member of a public company?
21         MR. DAILEY: Object to the
22 form.
23         MR. FRIEDMAN: Object to the

Page 119

1  form, because originally you asked him
2  about some event in the past and that last
3  question was in present tense. I'm just
4  not sure which you're asking.
5      Q.   Okay. While you were serving
6  on the board of DVI, let's confine
7  ourselves to that time period and ask you
8  what did you understand your duties as a
9  board member to be?
10     A.   My duties were to go to board
11 meetings, to listen to management, to use
12 my experience and judgment to help guide
13 the company.
14     Q.   What's -- I'm not trying to be
15 argumentative here. I'm asking you to
16 explain to me your point of view.
17         Using your experience and
18 judgment to help guide the company, what
19 aspects of your personal experience do you
20 consider -- did you consider while you
21 were on the board of DVI to be most useful
22 to the DVI board -- to the DVI
23 shareholders? Excuse me.

Page 120

1      A.   Well, first of all, my
2  experience. I was on the board of a bank
3  for twenty-five years.
4      Q.   Okay. What else?
5      A.   And I thought that was pretty
6  good experience.
7      Q.   I agree, but you've just
8  testified at length that you have a great
9  deal of experience in corporate affairs.
10     A.   Madam, I just told you that
11 somebody without anything but a high
12 school education and had no money helped
13 build some pretty good size companies.
14 Now, so that's got to count as something.
15     Q.   Agreed.
16     A.   All right. Thank you.
17     Q.   And in your building of -- all
18 right. In the experience that you just
19 described as just got to count for
20 something, did you develop from your own
21 point of view a particular expertise in
22 evaluating creditworthiness?
23         MR. DAILEY: Objection to the

30

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.            ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 121 to 124)

Page 121

1  form.
2      A.   Well, in the board, we used to
3  look at every credit, the board of the
4  bank. It became -- it was the Hazelton
5  National Bank.
6          (Reporter interruption.)
7      A.   The Hazelton National Bank
8  that ultimately became Bank of America, by
9  a few iterations.
10         (Laughter.)
11     Q.   So, is it correct to say that
12  your experience and judgment that you were
13  bringing to the DVI board --
14     A.   Right.
15     Q.   -- was at least part in the
16  area of evaluating creditworthiness?
17     A.   That's true.
18     Q.   And would another part of it
19  be in just general business acumen?
20     A.   I think so, yes.
21     Q.   I think so too.
22         (Off-the-record discussion.)
23     Q.   (BY MS. SCHWARTZMAN:)  Okay.

Page 122

1  With respect to -- let's go back to the
2  Hazelton Bank, which is the Hazelton
3  National Bank.
4      A.   Yes.
5      Q.   Okay. Let's go back to the
6  Hazelton National Bank where you were on
7  the board.
8      A.   Yes.
9      Q.   Do you have a time frame that
10  you can share with us?
11     A.   I could do it in a different
12  kind of way.
13     Q.   Okay.
14     A.   I retired the day the bank was
15  sold to the Fleet Bank. The bank had been
16  sold to First Valley Bank and then UGAB
17  and then Summit and then Fleet, and I
18  decided it was time for me to quit. And
19  that was twenty-five years to the day that
20  I had been on the board.
21     Q.   Did you have an office or
22  title at the Hazelton National Bank?
23     A.   I was on the board.

Page 123

1      Q.   Just on the board?
2      A.   And I was on the audit
3  committee.
4      Q.   And on the audit committee.
5  As a member of the board of the bank for
6  the whole twenty-five years --
7      A.   Yes.
8      Q.   -- did the board look at
9  applications for credit?
10     A.   They did.
11     Q.   For the whole twenty-five
12  years?
13     A.   Yes.
14     Q.   Was there a dollar range, a
15  dollar point at which the board would look
16  at loans --
17     A.   Yes.
18     Q.   -- in other words, would a
19  five thousand dollar loan for a car go to
20  the board?
21     A.   No, it would not go to the
22  board.
23     Q.   Would a five million dollar

Page 124

1  loan for a building go to the board?
2      A.   Yes.
3      Q.   Do you recall what the dollar
4  limit was?
5      A.   No, I don't recall.
6      Q.   Do you know if it -- okay.
7  And that continued for the twenty-five
8  years?
9      A.   Yes.
10     Q.   As the bank got larger through
11  the mergers, did the dollar limit up, the
12  amount of the dollar limit for the loan
13  before the board would look at it?
14         MR. DAILEY:  Object to the
15  form.
16     A.   Now, it caused me to change an
17  answer.
18     Q.   Sure.
19     A.   I left when the -- when the
20  company was sold to First Valley.
21     Q.   Oh, okay.
22     A.   And then I was off the board,
23  and it was twenty-five years.

31

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **    GERALD COHN
O'HANLON, ET AL.                  ** FOR ATTORNEYS' EYES ONLY **          February 12, 2008

(Pages 133 to 136)

Page 133

car paid for by DVI even after he was no
2 longer CEO?
3    A.   I did not know that.
4        MR. FRIEDMAN:  Can I just
5 clarify, just so we're all on the same
6 page.  In those last two questions, I
7 assume you -- it -- implicit in your
8 question is other than what he might have
9 learned from counsel in a privileged
10 communication --
11       MS. SCHWARTZMAN:  Always.
12       MR. FRIEDMAN:  -- in
13 preparation for this deposition.
14       MS. SCHWARTZMAN:  Always.
15       MR. FRIEDMAN:  Just so we're
16 clear.
17   Q.    Any question that I ask you is
18 anything other than anything you've
19 learned from your counsel in privileged
20 preparation for this deposition.
21       MS. SCHWARTZMAN:  And now
22 having made our speech it's 12:30, it
23 would be a good time to break.

Page 135

1    Q.    -- the credit committee the
2 whole time you were associated with DVI,
3 is that correct?
4    A.   That's correct.
5    Q.   Were you ever a member of any
6 other committees?
7    A.   I was -- I was a member of the
8 audit committee.
9    Q.   And is that the audit
10 committee of the board?
11   A.   Audit committee of the board,
12 yes.
13   Q.   And for how long were you a
14 member of the audit committee of the
15 board?
16   A.   I was -- I can't remember when
17 it started, but I can -- I know exactly
18 when it ended, my -- my relationship with
19 the audit committee, and that was --
20   Q.   When did it end, then, sir?
21   A.   It ended December 31st, 1999.
22   Q.   And --
23   A.   I think.  I think -- I think

Page 134

1        MR. FRIEDMAN:  Good, perfect.
2        THE VIDEOGRAPHER:  This marks
3 the end of Videotape Number 2.  Going off
4 the record, 12:29 p.m.
5        (Said deposition was in recess
6        at 12:29 p.m. until 1:37 p.m.,
7        after which the following
8        occurred:)
9        THE VIDEOGRAPHER:  This marks
10 beginning of Videotape 3, going back on
11 the record 1:37 p.m.
12   Q.   (BY MS. SCHWARTZMAN:)  Mr.
13 Cohn, thank you for coming back.
14       (Laughter.)
15   Q.   And I'm constrained to remind
16 you that you're still under oath.
17       Let's go back to your
18 association with DVI.  You testified, I
19 believe, sir, that you were a member of
20 the credit committee, is that the term
21 we're using --
22       MR. FRIEDMAN:  (Nodding head
~~ affirmatively.)

Page 136

1 that was it.
2    Q.   You re -- is it correct that
3 you remained on the board after December
4 31st, 1999?
5    A.   Till the end.
6    Q.   Why --
7    A.   On the board, but not on the
8 audit committee.
9    Q.   Thank you.  Why did you
10 separate from the audit committee?
11   A.   Because we were told that
12 because I was taking a salary from the
13 company that I was no longer eligible to
14 be on the audit committee.
15   Q.   Who told you that?
16   A.   I think it was -- I think it
17 was Mel Breaux.
18   Q.   And in the sentence "we were
19 told," who is the "we," please?
20   A.   Harry Roberts and myself.
21   Q.   Was Mr. Roberts also taking a
22 salary from DVI?
23   A.   Yes.

34

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008
(Pages 137 to 140)

**Page 137**

Q.   And what was Mr. Roberts' job at DVI?
A.   Well, he traveled to the global -- you know, global markets.
Q.   I'm going to ask you to try to keep your voice up if you can.
A.   I'm sorry.  I just have to sit in a certain way.
Q.   Sit however you want to, and just be as comfortable as you want to, but that end of the room --
A.   I will speak louder.
Q.   Thank you.
MR. DAILEY:  I can hear Mr. Cohn just fine.
A.   Thanks.  Mr. Roberts did have some responsibility as related to some of the global markets.  He was -- had a good background in banking, and he -- he delved into whatever Michael O'Hanlon asked him to do.
Q.   When you were at DVI, the whole time you were at DVI, your testimony

**Page 138**

was, as a member of the credit committee, you reviewed loan applications, and prior to the credit committee being formed you personally reviewed loan applications, is that a correct statement of your testimony?
MR. DAILEY:  Object to the form.
A.   I think I said originally sometimes Maurie Latheower also participated in that.
Q.   Do you have any recollection of the dollar amount for a loan before it would go to the credit committee once the credit committee was formed?
A.   I think it was at that time a hundred thousand dollars.
MR. FRIEDMAN:  What does "at that time" mean?
A.   At the time it was formed.
MR. FRIEDMAN:  Okay.
Q.   Did that amount change over time?

**Page 139**

A.   Yes.
Q.   Did it increase?
A.   It increased.
Q.   To what number?
A.   $1 million.
Q.   How many years later did it increase to $1 million?
A.   I don't remember.
Q.   Do you remember why it increased to $1 million?
A.   Yes, because of two reasons.  First of all, we had buttressed the credit process that was, let's say, call it underneath the credit committee, and, secondly, our volume had grown exponentially.
Q.   What do you mean buttressed the credit process?  Could you explain that?
A.   Yes, ma'am.  I'll be glad to.
Q.   Thank you.
A.   The credit process began with the people.  They were in the marketing

**Page 140**

department, meaning the people that were out in the field.  Most of those people had extensive financial experience.  They were people that had worked in finance, and they would really write the first proposal, and then -- God bless you.  And then it would come into our shop, and it would be taken over -- the process would be taken over.  The next step was by a group of analysts that we had that would help put a much more in-depth proposal in front of a group of people, let's call them gatekeepers, Mark Gallagher, Ray Fear, Jerry Hayes, Joe Malott, and, you know, I remember at the time that we brought Mark Gallagher in, that was a major step in buttressing.  I also remember when Jerry Hayes came in, he was in a high level bank position.
So, there were a lot of -- I can't tell you exactly how much, but they were scrutinized, and -- at that point, and some of those presentations were never

35

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 141 to 144)

**Page 141**

1  made to the board. But some of them were
2  and -- but the answer to your question was
3  we put more people underneath the credit
4  committee.
5      Q.   When you say some of these
6  presentations were never made to the board
7  of directors, do you mean some of these
8  presentations were never made to the
9  credit committee?
10     A.   To the credit committee.
11     Q.   If the credit committee
12  approved a loan, did that loan then get
13  further analysis from the board of
14  directors of DVI?
15     A.   No.
16     Q.   If the credit committee
17  approved a loan, did that loan then get
18  further analysis from any other department
19  at DVI?
20     A.   Not that I know of.
21     Q.   If the credit committee
22  approved a loan, did that loan get further
23  analysis from any of the officers at DVI?

**Page 142**

1      A.   I think that Michael O'Hanlon
2  had -- had -- had a desire to get all the
3  executive sections; meaning -- let me just
4  explain. The book was maybe this thick,
5  executive  section was this thick, and
6  then -- and that pretty much told the
7  story of the credit. And then the
8  appendixes were the rest, and that was all
9  the demographic information, the credit
10 history of the people and all the rest of
11 it. And I think O'Hanlon did have access
12 and did take the trouble of looking at all
13 those executive sections.
14     Q.   Did Mr. O'Hanlon have veto
15 power over the credit committee's approval
16 of a loan?
17     A.   I never -- I never understood
18 it that way.
19     Q.   Did Mr. O'Hanlon have the
20 authority to approve loans within the
21 dollar range that would go to the credit
22 committee without that loan going to the
    credit committee?

**Page 143**

1      A.   Not that I know of.
2      Q.   You talked a moment ago about
3  a book. Can we explore for a little bit?
4  I think they are playing buzz word bingo
5  over there.
6          MR. FRIEDMAN:  No.
7          MS. SCHWARTZMAN:  That's okay.
8      Q.   (BY MS. SCHWARTZMAN:)  I'd
9  like you to explain to me the book. Did
10 each loan application have a book?
11     A.   It did.
12     Q.   And what were the subject
13 matters covered in the book?
14         MR. DAILEY:  Object to the
15 form.
16     Q.   To the best of your
17 recollection.
18         MR. DAILEY:  Which book?
19     A.   The fore part of the book was
20 the executive summary which went into some
21 detail of what the project was and
22 encapsulated, let's say, report on what
23 the referral base was, the medical

**Page 144**

1  referral base was --
2      Q.   Okay.
3      A.   -- in that area. And some
4  cash flow analysis of what the project
5  would be. All the books were different.
6  You were smart to ask that question
7  because certain --
8      Q.   Thank you.
9      A.   You're welcome. -- because
10 they all had their own differences as it
11 relates to their pluses and minuses.
12     Q.   Uh-huh.
13     A.   And every modality that we
14 were looking at had its own peculiarities.
15 And, so, that was the fore part, and it
16 was more of a summary of what we had in
17 the back of the book.
18         In the back of the book, we had
19 reports showing how many, for example,
20 orthopedists there were in the area, how
21 often they used an MRI, if this was an MRI
22 situation. They -- we would see what the
23 local hospital had, what the competition

36

43

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 145 to 148)

Page 145

was, what the population was doing. So,
we went into a lot of the general kinds of
things and specific things that really
reflected itself later in the amount of
cash flow that we would have.

Then if it was a deal that had
to be guaranteed by someone, we had the
personal balance sheet and actually IRS
submission so that we could tell if there
was the ability for somebody to guarantee
it.

And if the company was in
existence, we would also have the same,
meaning full financial statements.

Q.  Is there anything else that
you can think of that would routinely go
into the book?

MR. DAILEY:  Object to the
form.

A.  Yeah, if there was a real
estate potential or parcel or something,
we would have an appraisal of the real
estate.

Page 146

Q.  Where would the description of
the collateral be?

MR. FRIEDMAN:  Object.  You
mean where in the book?

Q.  Yeah.

A.  Yeah, the collateral would be
what -- it would be described as the
component of the loan, meaning if it was,
let's say, an MRI center, we would have
the kind of MRI, meaning was it Toshiba,
was it GE, whatever it was, and we would
put the price, not me, but the price would
be put on there, all the attendant kind
of, let's say, how shall I say, pieces of
equipment that were necessary, the readers
and all this other stuff, and that would
be one of the main parts of the -- of the
book, meaning we had to know exactly what
the loan was for, and then we had to know
what comprised the components, what the
components were that made up the -- the
loan.

Q.  Were the proposed terms of the

Page 147

loan in the book also?

A.  Yes.

Q.  Would the book contain drafts
of paperwork to document the loan?

A.  No, because we had a separate
document -- a documetric -- document
department, which I would like to say was
excellent because I can never remember a
time when our documents were challenged.

Q.  Is it your testimony that the
whole time you were working at DVI your
auditors never challenged the
documentation of DVI?

A.  I said I never knew of one.

Q.  Okay.  I'm -- you testified
that if it was a situation that required a
guarantee or a proposed loan that required
a guarantee --

A.  Yes.

Q.  -- then the credit committee
would receive the personal balance sheet
for the guarantor as well as the tax
returns for the guarantor, is that

Page 148

correct?

A.  That's correct.

Q.  Okay.  What kinds of
circumstances, in your mind, triggered the
requirement for a guarantee?

A.  Generally if it was a
start-up.  If it was a start-up center and
we didn't have any history of it, we -- we
usually required it.

Q.  Who prepared the reports that
demonstrated the demographic that would be
the patient population support for this
center?

A.  It was the analyst.  Analysts
worked with the regional salesperson.

Q.  Were the analysts employees of
DVI?

A.  Yes.

Q.  Who were they, do you recall?

A.  I can only remember one name
or two.

Q.  How about -- I'll settle for
the -- what names can you remember?

37

Page 149

    A.    Bill Hughes. I can't
2  remember. I didn't have that much
3  dealings with them.
4       Q.    For an existing center --
5       A.    Yes.
6       Q.    -- the -- can we call it the
7  credit book?
8       A.    Yeah, that's what it was.
9       Q.    Okay. Good. The credit book
10 would include the full financial
11 statements for the company?
12      A.    The company borrowing.
13      Q.    The obligor, the obligor?
14      A.    Yes.
15      Q.    How far back would they
16 normally go, the full financial
17 statements?
18      A.    (Indicating.)
19      Q.    Three years?
20      A.    Three years.
21      Q.    And with respect to real
22 estate, who did the appraisal of the real
23 estate for DVI?

Page 150

1       A.    Somebody in the locality.
2       Q.    So, is it correct, then, that
3  the real estate appraisal wasn't done
4  in-house?
5       A.    It was not done in-house, no.
6       Q.    Okay. Would the real estate
7  be appraised only if the real estate were
8  part of the collateral?
9       A.    Yes.
10      Q.    All right. What was the
11 source of the value for the collateral
12 that -- and I'm talking about non-real
13 estate collateral here.
14      MR. DAILEY:  Objection to the
15 form.
16      A.    We had a gentleman who lived
17 in Pittsburgh, and he opined on the
18 value -- the liquidateable value of all of
19 the equipment.
20      Q.    Do you recall his name?
21      A.    Boy, I wish I could. No, I
22 don't -- I can't. I knew -- I knew him
23 well, too, I dealt with him, but I just

Page 151

1  can't remember his name.
2       Q.    Does the name Tom Hammer
3  refresh your recollection?
4       A.    That was his name. See, she
5  knows.
6       MR. FRIEDMAN:  A random guess.
7       Q.    Who prepared the executive
8  summary for the credit book?
9       A.    It was the one person that was
10 the proponent of the deal. There had to
11 be a proponent of the deal, and it could
12 be Ray Fear, for example. It could be
13 Mark Gallagher, could be Jerry Hayes, and
14 a couple of times Joe Malott.
15      Q.    Why would any of these four
16 gentlemen be a proponent of the deal?
17 What's the dynamic that you're describing
18 there?
19      MR. DAILEY:  Object to the
20 form.
21      A.    The dynamic is they all had
22 very strong grounding in credit analysis.
23      Q.    What was Mr. Fear's grounding

Page 152

1  in credit analysis?
2       A.    Well, Mr. Fear was chief of
3  credit for U. S. Concord Healthcare.
4       Q.    And what was Mr. Gallagher's
5  grounding in credit analysis?
6       A.    I -- I can't tell you what the
7  finance -- he came out of a finance
8  company, but I can't remember it.
9       Q.    Same question for Mr. Hayes,
10 grounding in credit analysis, what was his
11 background?
12      A.    Well, he was a -- as I recall
13 it, he was a senior lending officer for --
14 for First Pennsylvania.
15      Q.    And same question for Mr.
16 Malott. What was his grounding in credit
17 analysis?
18      A.    He was the president of a
19 bank, of a local bank, as I was told.
20      Q.    After the loan was approved by
21 the credit committee, did you ever -- and
22 this is the whole time you were on the
23 credit committee -- track the performance

38

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 153 to 156)

Page 153

of that particular loan?
        MR. DAILEY: Object to the
form.
        A.   I got -- could I interrupt you
a little bit?
        Q.   Sure.
        A.   Because I don't want to give
you a shortchanged answer.  You missed the
fact that Tony Turek was head of that
committee.
        Q.   Okay.
        A.   And Tony Turek I knew for many
years in different corporations when he
was a top credit guy for Continental Bank
of Chicago.  And one of the first things I
did was bring in Tony Turek to work for
this company.  And he had -- he played a
very important role in what happened at
the credit committee.  So --
        Q.   Go ahead.
        A.   I just wanted to tell you
that.
        Q.   Okay.  What --

Page 154

        A.   As far as track -- when we --
the only thing we did is -- as far as
tracking, it's not tracking.  When we --
when we approved it, it went.  I mean, it
went through.  That was what happened.
So, we didn't really feel any
responsibility there because that was not
our job.
        Q.   Fair enough.
        MR. FRIEDMAN: And "we" is the
credit committee there, not DVI.
        MS. SCHWARTZMAN: Understood.
        MR. FRIEDMAN: Just because we
have pronouns flying around.
        A.   Yeah, I'm sorry, Allen.  I'll
try to be more specific.
        Q.   (BY MS. SCHWARTZMAN:)  Go back
to your testimony that you brought in Mr.
Turek to work at DVI.  Would you describe
the circumstances of your bringing Mr.
Turek in to work at DVI?
        A.   Yeah, I called him on the
phone, and I said what we were doing.  He

Page 155

knew Dave Higgins before, and I said this
is what we're trying to do.
        Q.   Go ahead.
        A.   And then he said -- he called
me back, and I said, you know, do you have
any interest.  And he called me back a
week or so later and said, look, I have a
high level of interest.  I'd like to --
I'd like to join you.  And that's what
happened.
        Q.   And when you telephoned Mr.
Turek and described the possible job
position to him, did you tell Mr. Turek
that you were a member of the board?
        A.   Yes, I did.
        Q.   Do you know of any other
instances where board members brought in
employees to DVI under the same kinds of
circumstances as you've just described
here?
        MR. DAILEY: Object to the
form.
        A.   First of all, at that time I

Page 156

was like the only board member.  This was
early on.
        Q.   Okay.  I'm talking about over
the whole time you were at DVI.
        A.   Did I ever know that?
        Q.   Yes.
        A.   No.
        Q.   No, that you don't know it or,
no, you don't recall any circumstances?
        A.   No, I don't recall any of
those.
        Q.   Okay.
        A.   But I want to make it clear I
was the only person that was on that
committee that could do it.  There was
nobody else.  There were other employees,
but none of them that looked at their
credit like I did.  That was early on.
        Q.   We're talking about the credit
committee now?
        A.   Yes, the credit committee.
        Q.   Okay.
        A.   There was really no credit

39

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **          GERALD COHN
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **              February 12, 2008

                                                                    (Pages 189 to 192)

Page 189

A. After my time.
Q. Was anybody else on the board,
to your knowledge, the whole time you were
at DVI, the public company, ever asked to
use your contacts to help secure access to
the capital markets for the company?
MR. DAILEY: Object to the
form.
MR. FRIEDMAN: Go ahead.
A. Not that I can remember, no.
Q. Same question, but instead of
access to the capital markets, to secure
infusions of capital, was anybody on the
board, to your knowledge, ever asked to
help DVI secure infusions of capital?
A. I can never re -- I can't
remember that ever happening.
Q. Were you personally ever asked
to assist DVI in securing infusions of
capital ever the whole time for the public
company?
A. Yes. There was a time in
June 1994 where the company wanted to sell

Page 190

some subordinated notes, and they asked me
to buy a million dollars total of those
notes. We went into that earlier today.
Q. Those are the notes that you
bought, is that correct?
A. Right. Subordinated
convertible notes. I've got to admit,
too, by the way, because it's sort of like
a chuckle to me, those -- those notes
matured in 2002. If you read the
Examiner's Report, you'll hear him say
that I said that those notes were insured.
He didn't have the benefit of what you
guys have, so he mistook his notes to say
insured instead of matured, and I would
have been in about a million bucks, okay,
if he was right.
Q. Okay. Did you lose the
million dollars that you invested in the
2002 maturity notes?
A. Right. You know why? You're
looking at a dope because what happened
was I was asked in August of 2001 that I

Page 191

should renew those notes to 2004. I
thought everything was hunky-dory, and I
said okay, and then they went to Pritzker
and asked them and they did too. So, we
lost a total of some pretty healthy money.
Q. Do you know how much the
Pritzker interests lost?
A. No.
Q. As you sit here today, can you
recall any other services that you
performed for DVI other than making
yourself available to use your contacts
for the benefit of the shareholders and
sitting on the credit committee and
obviously sitting on the board?
A. Yeah, I -- I did a number of
things, okay? Can I answer the general
question like that?
MR. FRIEDMAN: Yes.
Q. Sure. Absolutely, you can. I
don't care what your counsel says.
A. Okay.
MR. FRIEDMAN: Well, I -- you

Page 192

know as Brendan Sullivan once said, what
am I, a potted plant? For those of you
old enough to be familiar with Watergate,
you would know the significance of that
comment.
A. I made some field trips, let
me call it, at the request of management
and sometimes Tony Turek, and I -- I went
to visit some of our biggest accounts
to -- to follow up on the credit aspect of
it. One in particular was RadNet because
I had a -- I had a good feeling about Dr.
Berger, and as a matter of fact, I could
tell you that before O'Hanlon came into
the company, my daughter, who was in
sales, you remember, she tried to get
Howard Berger to be a customer of DVI
prior to O'Hanlon. And he told us that he
would love to give us the business, but he
had a loyalty to one of the people at U.
S. Concord.
Q. Uh-huh.
A. So, that's where I got to know

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 241 to 244)

**Page 241**

ratings agencies on behalf of DVI?
2    A.    Never.
3    Q.    Did you ever meet with the
4 Fleet Bank on behalf of DVI?
5    A.    Never.
6    Q.    Did you ever meet with any
7 lender, other than Merrill Lynch, on
8 behalf of DVI?
9    A.    Not that I can remember.
10    Q.    Did you ever meet with The
11 Pritzker Organization on behalf of DVI?
12    MS. STRIKIS:  Object to the
13 form.
14    A.    No.
15    Q.    When you attended meetings of
16 the board --
17    A.    Uh-huh.
18    Q.    -- okay, you previously
19 testified that Mr. Neas would be present
20 at the audit committee meetings, is that
21 correct?
22    A.    The audit committee meetings,
23 he was.

**Page 242**

1    Q.    Did Mr. Neas attend meetings
2 of the full board?
3    A.    I thought I answered that one,
4 too, but I'll do it again.
5    Q.    Please do.
6    A.    One or two times.
7    Q.    One or two times.
8    A.    That I remember.
9    Q.    Did any representatives of
10 Merrill Lynch ever attend a board meeting?
11    A.    Not that I remember, no.
12    Q.    Did any attorney from Clifford
13 Chance ever attend a board meeting?
14    A.    I remember a group of board
15 meetings that were telephonically -- they
16 were on the phone, and this guy, Vic, oh,
17 was sort of -- well, he was on the -- on
18 the phone as well.
19    Q.    Do you remember the subject
20 matter of those meeting -- of those --
21 yes, of those meetings?
22    MS. LERNER:  Object to the
form.

**Page 243**

1    A.    Some of the discussions were
2 that we -- what was our course of action
3 as it relates to Deloitte not signing off
4 on the opinion on the 10, whatever -- 10-Q
5 or 10-K, I guess it was.  That -- that --
6 that was one meeting that sort of stands
7 out.
8    Q.    Any other meetings?
9    MR. FRIEDMAN:  Any other
10 subjects of those meetings where this
11 fellow --
12    Q.    Any other meetings that you
13 recall where there was a representative of
14 Clifford Chance at a full board meeting?
15    A.    The only ones I remember are
16 the telephonic meetings, and one had to do
17 with the hiring of an investment banker.
18 One had to do with the hiring of a
19 recapitalization bank -- banker.  And
20 that's the -- that's what my recollection
21 is.
22    Q.    Were all of those three
23 telephonic meetings that we just

**Page 244**

1 discuss -- discussed at or about the time
2 that Deloitte refused to sign off on the
3 10-Q?
4    A.    Yeah.
5    MR. DAILEY:  Object to the
6 form.
7    Q.    Do you recall anybody on the
8 phone besides Vic?  In other words, was
9 Mr. Healy on the phone?
10    A.    No.  I mean, whether --
11    Q.    Now, you don't recall --
12    A.    Now, wait a minute.  Now, if
13 you mean was anybody on the phone besides
14 Vic, there were the board.
15    Q.    Oh, I mean -- excuse me --
16    A.    Uh-huh.  But Mr. Vic --
17    Q.    -- I should have been more
18 clear.
19    MR. FRIEDMAN:  Let -- let
20 her -- let her restate the question.
21    Q.    I mean, was anybody else from
22 Clifford Chance on the phone?
23    A.    Nobody else.

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031    http://www.TylerEaton.com

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.      ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008
(Pages 257 to 260)

Page 257

1    Q.   Did you ever share inside
2  information with respect to DVI with The
3  Pritzker Organization?
4    A.   Never.
5    Q.   Did you ever share inside
6  information with respect to DVI with Bay
7  City Capital?
8    A.   No.
9    Q.   Same question, Mark
10 Hoplamazian?
11   A.   Yes.
12   Q.   Did you ever share inside
13 information with respect to DVI with Mark
14 Hoplamazian?
15   A.   No.
16   Q.   Did you ever share inside
17 information with respect to DVI with any
18 Pritzker interest?
19      MS. STRIKIS: Object to the
20 form.
21   A.   No.
22   Q.   Did you ever share inside
23 information with respect to DVI with —

Page 258

1  with Mr. Jay Pritzker?
2    A.   No.
3    Q.   With Mr. Tom Pritzker?
4    A.   No.
5    Q.   With respect to the function
6  of DVI as a company —
7    A.   Yes.
8    Q.   — and this — I'm not making
9  a distinction here between your being a
10 board member or your being a member of the
11 credit committee, just with respect to you
12 personally and the company.  Did you
13 interface with the DVI accounting
14 department at all?
15   A.   Never.
16   Q.   Did you — did you ever work
17 with Mr. John Boyle?
18   A.   I know who he was, yes.  And
19 it — in time beginning in the end of July
20 and the beginning of August 2003, I did,
21 in fact, spend time with him.
22   Q.   To what purpose?
23   A.   To try to get an understanding

Page 259

1  of where we were on certain matters.
2    Q.   What matters?
3    A.   On August 1st, it was a Friday
4  night, afternoon.  I got a call from Nate
5  Shapiro, who was on the audit committee,
6  and he said to me, Jerry, I'd like you to
7  go downstairs and talk to John Boyle and
8  see if you can get further information on
9  the collateral shortfall that we just
10 heard about in that prior few days.  And I
11 did.
12     I went downstairs, met with
13 him, and basically he — I asked him what
14 was going on.  He told me that the bank
15 auditors were in there.  I asked him what
16 are they doing.  He said, well, they are
17 trying to reconcile the collateral, and I
18 finished that part of the conversation
19 with him by saying whatever they are
20 looking for, give it to them, and whatever
21 other access they need, give them to them,
22 and if there's anything unusual, give me a
23 call.

Page 260

1    Q.   Did he call you?
2    A.   On Sunday night there was a
3  call from Nate Shapiro, this time with
4  John Boyle on the phone telling me that
5  John Boyle received a whistle-blower
6  letter from Susan Gibson, who was chief of
7  operations at DVI, and that they wanted to
8  have a meeting first thing Monday morning.
9  And, so, we set up that I would go in an
10 hour early, be there at 7:00 and we could
11 meet.
12     So, I get Nate on the phone,
13 and John Boyle and I talk to Nate, and
14 the — in the meeting came a gentleman by
15 the name of Ellis Lavette who was the
16 managing director of Ten Eyck.
17     Now, let me just step back for
18 a moment.  You mentioned before about the
19 letters from the SEC.  The board was
20 extremely frustrated about it because we
21 had ad infinitum meetings and discussions
22 and interaction, and we just felt we
23 weren't getting anywhere, and so someone,

65

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                              ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 261 to 264)

Page 261

1  not me, made the suggestion that we hire
2  an independent forensic accounting firm
3  that had a lot of experience in dealing
4  with the SEC and with these SEC letters.
5  And, so, there was an interview held. I
6  had nothing to do with it, but they did --
7  we ended up approving, that is, the board
8  did, approved Ten Eyck as our -- our -- to
9  be our consultant in that area, so Nate
10 Shapiro said, look, you've got Ten Eyck
11 there. Why don't we give them the
12 authority to extend their engagement and
13 see what they can do in investigating the
14 Susan Gibson letter.
15       We read the Susan Gibson
16 letter, and it was the first time I knew
17 sure shot that some -- somebody was
18 cooking the books because it was obvious
19 from that letter that that's what
20 happened.
21       In the meantime, the afternoon
22 of the 4th, I couldn't make a meeting with
23 Jay Alix because -- Jay Alix was the firm

Page 262

1  that we had hired -- or we were going to
2  hire to be our crisis manager because the
3  bank Summit -- not Summit, Bank, sorry,
4  Fleet Bank sending a bunch of people in,
5  including their forensic people, Marcel
6  and Alvarez, so I met with them and
7  O'Hanlon was there as was the other --
8  Steve, and they made a point meeting,
9  O'Hanlon, that they were confused by the
10 collateral and maybe the bank made a
11 mistake and so forth and so on. And I --
12 I felt that at some point it would play
13 out.
14       In the meantime, during the
15 very next day, I called up Nancy Cascioli
16 who was in the human resources department
17 at DVI.
18    Q.   Uh-huh.
19    A.   And I said to her what I'd
20 like from you is to supply to me a chart
21 that shows me every em -- employee, the
22 date they were hired and the amount of
23 severance they would get if we downsized

Page 263

1  the company because my thinking -- you
2  asked a couple of times what was your
3  thinking. What are you thinking now. My
4  thinking then was to go to work and start
5  to trim down this company. I felt in the
6  months that I was there that it was
7  bloated and that we had a good shot
8  because of a number of things, mainly the
9  franchise value, that we could probably
10 save this company. And, so, that was the
11 purpose, to find out what the total of the
12 severance was.
13       Getting back to the -- some of
14 the advice that was given us by Ten Eyck,
15 they said let's keep this between
16 ourselves. Let's just keep it between Ten
17 Eyck, Cohn, Shapiro and -- and Boyle.
18 And, so, we all -- at least I know I
19 abided by that rule.
20       When Nancy Cascioli came back
21 and she showed me the -- the chart, I
22 immediately saw that there were two holes,
23 no numbers, no financial numbers next to

Page 264

1  two names, and they were Matt Goldenberg
2  and Phil Jackson, and I asked her why
3  there was no numbers there, and she said I
4  think they were paid. Well, I knew -- I
5  saw those people there that week. I knew
6  they were there, so they couldn't have
7  left, and I became very suspicious.
8        So, after talking to everybody,
9  I decided that I would go and confront
10 Mike O'Hanlon, and I told him that we got
11 a whistle-blower letter, and I told him
12 about the inconsistencies in the severance
13 chart, and I suggested that we go in and
14 talk to Steve Garfinkel and see what's
15 really going on here. So, we did that.
16       Now, earlier in the day I had
17 been in to see Garfinkel because we just
18 heard some days earlier that there was an
19 improper movement of $44 million worth of
20 collateral that went to Merrill Lynch.
21 And when I went to see O'Hanlon -- I mean,
22 to see Garfinkel, I said to him, Steve,
23 have we made any kind of a large transfer

66

**Page 265**

of -- of collateral in the last couple of
weeks. And he said, yeah, we did with J.
D. Matthews. Well, I understood J. D.
Matthews because that was one of the
people that we had borrowed money from and
it was approved by the board and I
recalled it. I said is there anybody
else. And he said no. So, I knew he was
lying.

So, then, I also said to him
have you made any large checks out during
this period that we never presented to the
board or out of the ordinary? He said no.
And I didn't say anything to him, and I
knew he was lying there too.

So, by the time I took O'Hanlon
in, I started the conversation with
Garfinkel, and I said the two checks that
were given to Goldenberg and Jackson were
the two checks that I'm thinking about,
and I said you do know that, something
like that, and he said, yes. I said,
well, why did you do it. He said, well, I

**Page 266**

went to a consultant who told me I had the
right to do it because it probably
represents constructive termination, which
I have no idea what that means, but that's
what he said.

So, then, I asked him about --
I told him about the Jeep -- I told him
about the Merrill Lynch movement, that we
knew about that. And I said did you ask
the board permission, did you ask
O'Hanlon's permission, not that I think
that he had it, and he said, no, I didn't
ask O'Hanlon.

Then the subject came up on
Susan Gibson's letter, and he said Andrea
Marshall is a dim bulb. He was talking to
Mike, and he said Andrea Marshall is a dim
bulb, and she pressed some of these keys
the wrong way, and as you probably all
know, I'm computer illiterate. I really
didn't have any understanding what they
were talking about. And it turned out, I
mean, somebody was -- was cooking the

**Page 267**

books and defrauding both the bank and the
company.

I said to him you remember in
December when you -- when I asked you
during one of the board meetings if we
were in compliance, you said, yes, we are.
I said how can you equate that now to what
we're finding out with Susan Gibson, and
he said we were in compliance at that
particular time. That was his answer.

I then asked him if O'Hanlon
knew what was going on, and he said no.
Then I said -- I asked him if he had any
documentation on the Goldenberg and the
Jackson transactions. He had he did. I
said could he get it to me. He said I
will.

And the next morning I said to
myself why do I need him to get me the
documentation. I'll go down to the human
resources, and I'll dig it out. So, they
showed me the files, and I got the file.
In the file it said -- it says from Steve

**Page 268**

handwritten. It says please don't show
anybody this -- this file or whatever it
is. Some -- I can't remember the word.

So, what I did, I took all the
information I gathered, and I went
upstairs to speak to Sheila Kalkunte. I
said, look, I want you to write an opinion
of what happened here and -- and send a
copy to everybody on the board. And
that's what happened. I hope that answers
some of your questions.

Q. It does. It definitely does,
and I have a few things that I would like
to clarify for myself with respect to it.
Let's start --

MR. FRIEDMAN: Do we have a
tape issue?

THE VIDEOGRAPHER: Five
minutes left.

MS. SCHWARTZMAN: All right.
This is a good time to change.

THE VIDEOGRAPHER: Marks the
end of Videotape Number 4, going off the

67

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 269 to 272)

**Page 269**

```
 1   record 4:27 p.m.
 2           (Said deposition was in recess
 3       at 4:27 p.m. until 4:42 p.m.,
 4       after which the following
 5       occurred:)
 6       THE VIDEOGRAPHER:  This marks
 7   beginning of Videotape 5.  Back on the
 8   record 4:42 p.m.
 9       Q.   (BY MS. SCHWARTZMAN:)  Okay.
10   Before we took a break, we were speaking
11   about the advance at TFI beginning on
12   August 1st of 2003, and you spoke at
13   length about the events in chronological
14   order.  And I want to go back through some
15   of those things to clarify.
16       A.   Good.
17       Q.   At this time, August 1st,
18   2003, did you have an office at DVI?
19       A.   No.
20       Q.   Okay.  But you had said, "I
21   went downstairs to John Boyle."
22       A.   I was sitting upstairs with
23   the secretary there.
```

**Page 270**

```
 1       Q.   Okay.  Okay.
 2       A.   But he had an office.
 3       Q.   You said that the bank
 4   auditors were there to reconcile the
 5   collateral.  Do you know which bank that
 6   was?
 7       A.   It would have to be the Fleet
 8   Bank, if it was that bank, or it could be
 9   Merrill Lynch.  I didn't really ask him.
10       Q.   Okay.  You also testified, "We
11   just heard about" that Nate Shapiro called
12   you to talk about -- to talk to John Boyle
13   about the collateral shortfall, quote, "we
14   just heard about."
15       A.   Right.
16       Q.   Who is we?
17       A.   Well, earlier that week, and I
18   can't remember the date, but earlier, I
19   had already gone home, Doylestown.  And I
20   got a call from Mike O'Hanlon, and he said
21   that Steve Garfinkel had handed him a note
22   saying that there was a $50 million hole
23   in our collateral.  And I said, "How did
```

**Page 271**

```
 1   that happen?"  And he said, "Well, we're
 2   still trying to figure it out," and on and
 3   on and on.
 4       Then I -- and he also said that
 5   Steve had asked him, meaning Mike, for
 6   permission to reveal this to Kevin
 7   Badrick -- Padrick, who was representing
 8   Goldman Sachs.  Now, then about half hour
 9   later I get a call from Kevin Padrick.
10   Again, I was at my house.  And he said, "I
11   want to tell you what happened."
12       He tells me that Steve came in
13   and told him -- he had said to Steve -- he
14   claims he said to Steve, "Is there
15   anything else I should know about before I
16   wrap up my report," or whatever terms he
17   used.  And I said, "Kevin, I already heard
18   about it."  He said, "How did you hear
19   about it?"  I said, "Well, Mike called me
20   about it."
21       And -- and he said, "What did
22   he say?"  I've got to be very careful.  I
23   want to get it exactly right, but I
```

**Page 272**

```
 1   said -- I repeated that Mike had said that
 2   Steve had asked him permission to give
 3   this information to Padrick.
 4       And Padrick said in sort of sly
 5   way -- I don't want to act
 6   disrespectfully.  I just don't know how to
 7   use words when it's 5:00.  But he said it
 8   in a sort of a different way.  He said,
 9   "Well, that's the way -- that's not
10   exactly the way it happened," something to
11   that effect.
12       So, he said, "Could you come
13   over?"  So I said, "Yeah, I'll come over."
14   So I got in my car and went over there.
15   And I spent a lot of time trying to figure
16   out with them what has happened, and they
17   agreed that they were going to reconcile
18   this whole issue to see if the -- you
19   know, what the story with the collateral
20   was.
21       They then agreed -- then I was
22   told, rather, that -- that Fleet and their
23   auditors were going to appear on the --
```

68

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 273 to 276)

Page 273

1  the 4th, the afternoon of the 4th. As I
2  said before, I was supposed to be
3  interviewing Jay Alix, but I stayed around
4  just to hear what they were saying.
5        Then, also, within a few
6  minutes after I hung up and before I went
7  over there, I got a call from John Healy.
8  And he said, "I just got a call from Steve
9  Garfinkel. You've got" -- he said, "This
10 is bank fraud," and yelled at me. I said
11 I know about it. I just heard about it.
12 And so he said, "What are you going to do
13 about it?"
14       I said, "I'm going to try to
15 see first what's going on because I'm
16 getting sort of different opinions." And
17 that was that conversation.
18       Q.  So, the "we" and "we just
19 heard about the collateral shortfall" --
20       A.  Right.
21       Q.  -- can you, after identifying
22 for me all the players -- and it's getting
23 to be like strollers in a Shakespearean

Page 274

1  play, and I think I'm losing some of them.
2  Could you identify for me when you said
3  "we just heard about the collateral"?
4        A.  Well, "we" mean -- see, what
5  had happened, this was before the Susan
6  Gibson letter. That was the week before.
7  Remember that.
8        Q.  Okay. Just the "we."
9        A.  Okay, the we -- so I
10 immediately said to Mike, "You've got to
11 have a board meeting and you've got to let
12 the rest of the board hear what's going on
13 here." So he had a board meeting, and I
14 was there when he was talking. And he
15 made a presentation, and I could tell by
16 the response of the people on that board
17 that they didn't really hear what I heard.
18       And Michael O'Hanlon is a
19 marvelous salesperson and he has a
20 wonderful way to talk, much better than
21 mine. And so I called each one of them
22 independently, and I said, "I don't think
   you understood what Mike was telling you.

Page 275

1  We've got a $50 million hole in our
2  collateral." And they first had some
3  disbelief, then, of course, understood
4  what I was saying was correct.
5        Q.  Okay. Thank you for
6  clarifying that for me. Now, another
7  thing that you testified to was that you
8  spoke to Kevin Padrick at Goldman Sachs?
9        A.  I said he was representing
10 Goldman Sachs.
11       Q.  Representing Goldman Sachs.
12 Why -- why was Goldman Sachs involved?
13       A.  That was a funny thing.
14 Goldman Sachs originally went in there
15 to -- and there was independent
16 conversations between Goldman Sachs and
17 Mike O'Hanlon and Goldman Sachs and me.
18 And there was -- the head of the
19 department was a gentleman by the name of
20 Lance West, and then there was a fellow by
21 the name of Marticelli. And he and
22 Padrick started work with O'Hanlon.
23       And the idea was to take all

Page 276

1  the collateral we had that would -- that
2  collateral which was nonperforming as well
3  as the collateral that was performing and
4  borrow enough money to pay off the bank
5  completely and help us reposition
6  ourselves.
7        Q.  Reposition ourselves. Bury
8  the collateral shortfall, in other words?
9  And help the company reposition
10 themselves, which would bury the
11 collateral shortfall?
12       MR. FRIEDMAN:  Oh, come on.
13 Are we have playing games or --
14       A.  Now, wait a minute. Now, wait
15 a minute. We were trying to pay off the
16 bank. That's what we were -- we're not
17 burying anything. We took -- we were
18 going to get that extra money because some
19 people have different standards on how --
20 what they think is performing loans and
21 some that aren't performing loans plus the
22 fact we had a lot of good operating
23 companies in this company.

69

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **     GERALD COHN
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **      February 12, 2008

                                                                        (Pages 281 to 284)

Page 281

conversation at the board level among the
2  board members about the length of time it
3  was taking to respond to the SEC letters?
4      A.   Every board meeting we had
5  that conversation. Every one.
6      Q.   Was there a representative of
7  Deloitte present at the time that you were
8  having these conversations at the board
9  level?
10         MR. DAILEY:  Object to the
11 form.
12     A.   I don't recall that, that
13 anybody from Deloitte was there.
14     Q.   Do you recall if Mr. Healy was
15 present at any of the board meetings where
16 you were discussing the SEC letters?
17     A.   No, but I do recall a call
18 that I got from John Healy telling me that
19 we better get this matter straightened
20 out, that he said, you know, you're never
21 going to be able to do any more public
22 offerings until you get it done. So I did
23 put a lot of pressure on. But I wasn't

Page 282

1  the only one. Everybody put the pressure
2  on.
3          And as I said before when I
4  introduced the subject of the Ten Eyck, it
5  was because of the board's frustration
6  that we just had to hire somebody that
7  could do it.
8      Q.   When John Healy said you've
9  got to get this matter straightened out --
10     A.   Yeah.
11     Q.   -- was this before -- was this
12 before August 1st of 2003?
13     A.   Yes.
14     Q.   Do you recall when it was?
15     A.   No.
16     Q.   Did John Healy ever counsel
17 you that there was no necessity for DVI to
18 disclose the SEC comment letter?
19         MS. LERNER:  Object to the
20 form.
21     A.   I remember something like that
22 happening, yes.
23     Q.   Could you --

Page 283

1      A.   Not me personally. To our
2  board I think he did.
3      Q.   Okay.
4      A.   I don't know if he -- he never
5  called me to say that. That I can tell
6  you, but I think --
7      Q.   Does that refresh your
8  recollection as to whether or not
9  Mr. Healy was ever present at a board
10 meeting?
11         MR. DAILEY:  Object to the
12 form.
13     A.   No, it doesn't refresh my
14 memory, but I know the advice that we got
15 was that we didn't have to make it a -- a
16 disclosure of it.
17     Q.   Did -- did you explore or did
18 the board -- better said did the board
19 explore that advice with Mr. Healy to any
20 extent?
21         MS. LERNER:  Object to the
22 form.
23         MR. FRIEDMAN:  Object.

Page 284

1      A.   No, we didn't feel we needed
2  to.
3      Q.   Let's talk about this Susan
4  Gibson whistle-blower letter, okay?
5      A.   Yes.
6      Q.   It was your testimony that the
7  representative of Ten Eyck advised you to
8  keep it confidential?
9      A.   For the time being, yes.
10     Q.   For the time being. And who
11 was that representative of Ten Eyck?
12     A.   Ellis Levin, L-E-V-I-N.
13     Q.   What was the impetus for your
14 inquiring of the human resources
15 department of a chart regarding severance
16 agreements?
17     A.   That weekend before, I took
18 home one of the employee manuals. My
19 thinking was to pare this company down,
20 make it lean and mean and do a lot of
21 different things and -- but I had to start
22 by finding out what kind of an obligation
23 the company had to their employees.

71

54

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 285 to 288)

**Page 285**

1  And, so -- and I read it, and I
2  want to tell you something. It was so
3  complicated I can't believe it. I would
4  love to know who negotiated that thing.
5  But it was impossible for a layman to
6  really figure it out. I needed somebody
7  that really was up to it and was
8  computer -- not only literate, but they
9  must have had some kind of a software
10  package and it would come up much more
11  easily. So that's the reason. My
12  motivation was to pare the company down
13  and start making money.
14      Q.   When you found out that
15  Mr. Goldenberg and Mr. Jackson had already
16  been paid their severances --
17      A.   Uh-huh.
18      Q.   -- what was it about that
19  circumstance, that fact, rather, that made
20  you suspicious?
21      A.   Because I saw them there the
22  week before. I saw them there. I said,
23  "How can they be paid off if they are

**Page 286**

1  still there?" So, I figured somebody paid
2  them off.
3      Q.   And you figured -- is -- is it
4  correct to say that you figured somebody
5  paid them off with respect to the
6  information that was in the Susan Gibson
7  whistle-blower letter?
8      A.   Well, that's an opinion.
9      Q.   Okay. Fair enough. When you
10  talked to Steven Garfinkel about the
11  checks to Mr. Goldenberg and Mr. Jackson,
12  who else was in the room, if anybody?
13      A.   Michael O'Hanlon.
14      Q.   Was there anybody else
15  present?
16      A.   No.
17      Q.   Did Sheila Kalkunte, in fact,
18  send the board an opinion letter with
19  respect to the severances?
20      A.   Yes.
21      Q.   Do you recall what that letter
22  said?
23      A.   Well, just briefly. One thing

**Page 287**

1  she said, it was obvious that this request
2  never came before the compensation
3  committee. And I forgot to tell you I was
4  on the compensation committee too.
5      Q.   Well, then we'll have to start
6  the whole day over.
7          (Laughter.)
8      A.   And, you know, then I think
9  she -- she made it kind of formal.
10      Q.   When you asked in
11  December 2002 --
12      A.   Yes.
13      Q.   -- are you in compliance, did
14  you ask that question of Steven Garfinkel
15  when it was just you and Mr. Garfinkel?
16      A.   No, it was in a board meeting.
17      Q.   Who else heard the question?
18      A.   Everybody in the board heard
19  it. If they remember it or not, I don't
20  know.
21      Q.   When you testified that
22  Mr. Garfinkel said Mr. O'Hanlon didn't
23  know about it -- and the "it" there, if

**Page 288**

1  you recall correctly, refers to being out
2  of compliance.
3      A.   He testified -- he told me
4  twice on two different subjects, he said,
5  first of all, O'Hanlon didn't know
6  anything about the payments to these two
7  fellows. Secondly, he -- he also told me
8  that he never told O'Hanlon what was, in
9  fact, going on that Susan Gibson
10  described.
11      Q.   Was there anybody else that
12  you know of who heard Mr. Garfinkel say
13  that?
14      A.   No.
15      Q.   Did Mr. Garfinkel ever say in
16  your presence that we, meaning DVI, go in
17  and out of compliance?
18      A.   He did that.
19      Q.   When did he first say that to
20  you?
21      A.   He said that to me when I
22  called him in -- I don't remember. At the
23  time Lisa Cruikshank was going to leave to

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 293 to 296)

Page 293

Mr. O'Hanlon didn't know about the
2  compliance problem?
3      A.   That's –
4          MR. FRIEDMAN:  I object to the
5  question.
6      A.   That's what happened.  That's
7  what I told you.
8      Q.   Yeah.  I'm just trying to make
9  sure we've got it straight because it's
10  crazy.  You're right, it is crazy.
11          MR. DAILEY:  I object to that
12  statement.  You can't make statements like
13  that.
14          MS. SCHWARTZMAN:  Okay.
15          MR. DAILEY:  You have to ask
16  questions.  You don't make statements –
17      A.   If I may say something –
18      Q.   Surely.
19      A.   -- I read Garfinkel's
20  affidavit.
21      Q.   Yes.
22      A.   And it got me boiling because
23  he says that he knows that I knew because

Page 294

1  he felt I did, even that he never told me,
2  and also that nobody ever asked him about
3  it.  And I asked him two times in a board
4  meeting and again that particular day in
5  August the 5th or August the 6th, one of
6  those days.
7      Q.   And, so, on August the 5th or
8  6th of 2003, even after all of this had
9  transpired, he said to you that Michael
10  O'Hanlon didn't know about it; is that
11  correct?
12      A.   That's what he said.  He said
13  one other thing too.  I'll tell you it
14  just came to my mind.  Mike said to him,
15  "Do you remember the two or three months
16  ago," I think he said, "that you came in
17  and asked me if I could change the codes
18  in the computers?"  Now, I know the buzz
19  words, but I don't know what it means,
20  okay?  And he said, "I told you you
21  couldn't do that.  You -- you shouldn't
22  have done that.  You shouldn't have done
23  that," meaning -- there was a system, this

Page 295

1  lease system.
2      Q.   Yes.
3      A.   And apparently Garfinkel came
4  in and asked O'Hanlon if he could change
5  the codes in that system and -- and -- and
6  O'Hanlon told him, no, he couldn't.
7  Whether that had any impact on the Susan
8  Gibson letter or anything else, I have no
9  idea.  I'm just reporting it.
10          MR. FRIEDMAN:  Counsel --
11      Q.   Thank you.  When did that
12  occur?
13      A.   August 5th or 6th.  He told --
14  that's what he said.  I was witnessing
15  this conversation.
16          MR. FRIEDMAN:  Denise, so that
17  everybody doesn't go home tonight with a
18  confused understanding, could I suggest a
19  question for you to ask the witness?  It's
20  obviously your choice.
21          MS. SCHWARTZMAN:  Everybody
22  else does.  Go ahead.
23          MR. FRIEDMAN:  Could you ask

Page 296

1  him two questions, what he understood
2  compliance to mean at the time of his
3  conversation with Steve Garfinkel in March
4  or April of '01 about Lisa Cruikshank and
5  then what he understood compliance to mean
6  in the first week of August '03 when he
7  was having the conversations he was
8  relating?
9          MS. SCHWARTZMAN:  I think I'm
10  going to pass, Julian.
11          MR. FRIEDMAN:  Okay.
12          MS. SCHWARTZMAN:  Mr. Cohn
13  just testified he was on the board of a
14  bank for 25 years.  He knows what
15  compliance means.
16          MR. FRIEDMAN:  No, that's
17  totally -- I mean if you want to have the
18  debate on the record, I'm happy to have
19  that debate, but I think you're absolutely
20  incorrect.
21          MR. KRISLOV:  Well, you're
22  going to rehab him on your redirect or
23  whatever so --

74

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 301 to 304)

Page 301

1  think the overseas operation could have
2  been sold at a profit?
3      A.   Yes.
4      Q.   In terms of there being too
5  much in the way of personnel, does that
6  include overseas personnel?
7      A.   The plan that we had for
8  overseas didn't necessarily mean cutting
9  back.
10     Q.   I'm sorry. I'm not sure I
11  understood your answer. Let me ask the
12  question a different way so that we'll
13  both be talking about the same thing.
14          You testified you wanted to
15  cut —
16     A.   Yeah.
17     Q.   One of the things you were
18  exploring was the opportunity to cut
19  expenses because there was too much in the
20  way of personnel.
21     A.   Uh-huh.
22     Q.   When you were looking at
23  personnel vis-a-vis that particular

Page 302

1  personnel issue, was that just onshore
2  personnel?
3      A.   Onshore.
4      Q.   Where did you see the
5  bloating, if you recall?
6      A.   There were too many
7  administrative people. I felt that some
8  of the sales offices or say territories
9  were not paying their own way. And
10  separate and apart from cutting people, I
11  thought the overseas could be redirected
12  in a different way.
13     Q.   What do you mean redirected in
14  a different way? Could you elaborate on
15  that?
16     A.   Could I go into a little
17  longer dissertation like I did in the
18  other thing? Do you have the time?
19     Q.   Well, we could hold that until
20  tomorrow because that is a whole new
21  topic.
22     A.   Yes, it is.
23     Q.   The overseas operations are a

Page 303

1  whole new topic matter, and the question I
2  have is the events that were brought to
3  light in August of 2003 —
4      A.   Uh-huh.
5      Q.   — were the result of a
6  liquidation — a liquidity crisis at the
7  company; is that correct?
8          MR. DAILEY: Objection to the
9  form.
10     A.   I didn't believe so at the
11  time.
12     Q.   Do you believe so now?
13     A.   I don't know so.
14     Q.   Did the company have adequate
15  capital to the cover its operations,
16  expenses, obligations of all kinds in
17  August 2003 —
18          MR. DAILEY: Object.
19     Q.   — in your opinion?
20          MR. DAILEY: Object to the
21  form.
22          MR. FRIEDMAN: His opinion
23  then or his opinion now or something else?

Page 304

1      Q.   Your opinion now.
2          MR. DAILEY: Same objection.
3      Q.   When these events — when you
4  were being appraised of these events.
5          MR. DAILEY: Same objection.
6      A.   I obviously was thinking that
7  way because why would I want to pare down?
8  Because — I'd pare down because I wanted
9  to cut costs.
10     Q.   If you had been told by
11  Deloitte & Touche in 2001 or 2002 that DVI
12  had serious liquidity problems, what would
13  you have done?
14          MR. DAILEY: Object to the
15  form, lack of foundation.
16     A.   I would have done — I would
17  have taken a — I would have done a lot
18  about it.
19     Q.   For example?
20     A.   Well, I would have gotten into
21  the company a heck of a lot sooner, and I
22  would have — remember, I came in there in
23  another, let's say, hat on —

76

Toll Free 800.458.6031                http://www.TylerEaton.com

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 305 to 308)

Page 305

1    Q.   Uh-huh.
2    A.   -- besides the credit
3  committee to really -- one of the things I
4  did was find and -- and engage in the
5  independent auditor caper, so to speak.
6  And, so, I was trying to find out what
7  that was all about; and never once did
8  Steve Garfinkel ever say to me that --
9  that he's out of money and he -- and he's
10  cooking the books. Never once.
11    Q.   Well, let's take those apart.
12  Let's just stick with out of money. Did
13  Michael O'Hanlon ever say to you that the
14  company was out of money?
15    A.   Never.
16    Q.   Did anybody from senior
17  management that we identified earlier
18  today ever say to you that we're out of
19  money?
20    A.   I didn't hear it from anyone.
21    Q.   Did Deloitte & Touche ever say
22  to you as a member of the board of
23  directors this company is out of money?

Page 306

1    A.   Never.
2    MR. DAILEY:  Objection to
3  form.
4    Q.   If you had been told by
5  Deloitte & Touche in 2001 or 2002 that DVI
6  had inadequate reserves, that the reserves
7  were seriously understated, what would you
8  have done?
9    MR. DAILEY:  Object to the
10  form, lack of foundation.
11    A.   I would have first
12  investigated.
13    Q.   Whom would you have engaged to
14  investigate it?
15    A.   I would have investigated it
16  with Tony Turek.
17    Q.   Why Mr. Turek?
18    A.   Because he knew the values of
19  the -- of the assets.
20    Q.   Did Mr. Garfinkel ever tell
21  you that DVI's reserves were understated?
22    A.   No.
23    Q.   Did Mr. O'Hanlon ever tell you

Page 307

1  that DVI's reserves were understated?
2    A.   Never.
3    Q.   Did anybody from Deloitte &
4  Touche ever tell you that DVI's reserves
5  were understated?
6    MR. DAILEY:  Object to the
7  form.
8    A.   Not that I can remember, no.
9    Q.   Did anyone from Deloitte &
10  Touche ever say at a board meeting that
11  DVI's reserves were understated?
12    A.   Not that I can recall.
13    Q.   Did any -- Deloitte & Touche
14  ever say at a board meeting that you can
15  recall that there was a liquidity problem
16  at DVI?
17    MR. DAILEY:  Object to the
18  form, vague.
19    A.   I didn't hear it.
20    MS. SCHWARTZMAN:  I'm going to
21  ask you to clarify that answer. You
22  didn't hear it or --
23    A.   I can't remember hearing that.

Page 308

1    Q.   Okay. You clarified it for
2  me.
3    MR. FRIEDMAN:  Okay. We've
4  gone on about to two new topics.
5    MS. SCHWARTZMAN:  I think we
6  can stop for today.
7    THE VIDEOGRAPHER:  This marks
8  the end of Videotape Number 5. Off the
9  record 5:23 p.m.
10    (Said deposition was in recess
11  at 5:23 p.m. on the 12th day
12  of February, 2008 until 9:10
13  a.m., on the 13th day of
14  February, 2008. Continuing
15  testimony of Mr. Cohn can be
16  found in Volume III of his
17  Deposition.)

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                    http://www.TylerEaton.com

**A12**

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.          ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 309 to 312)

---

Page 309

THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

CASE NO. 2:03-CV-5336
IN RE DVI INC. SECURITIES LITIGATION
CASE NO. 04-CV-1277
FLEET NATIONAL BANK, et al.,
        Plaintiffs,
vs.
O'HANLON, et al.,
        Defendants.

CASE NO. 04-CV-3423
(Coordinated With 04-CV-1277)
WM HIGH YIELD, et al.,
        Plaintiffs,
vs.
O'HANLON, et al.,
        Defendants.

CASE NO. 2:06-CV-1003
DENNIS J. BUCKLEY, as trustee
of the DVI Liquidating Trust,
        Plaintiff,
vs.
CLIFFORD CHANCE LLP and
CLIFFORD CHANCE U.S. LLP,
        Defendants.

VOLUME II
VIDEO DEPOSITION OF GERALD COHN
13TH DAY OF FEBRUARY, 2008

REPORTED BY: Gary N. Morgan
        Registered Professional
        Reporter and Notary Public

---

Page 310

S T I P U L A T I O N
    IT IS STIPULATED AND AGREED,
by and between the parties, through their
respective counsel, that the deposition of
GERALD COHN may be taken before Gary N.
Morgan, Registered Professional Reporter
and Notary Public;
    That any objection as to the
form of a question shall be deemed to have
been made on behalf of all other parties
and on all applicable grounds;
    That it shall not be necessary
for any objections to be made by counsel
to any questions, except as to form, and
that counsel for the parties may make
objections and assign grounds at the time
of trial, or at the time said deposition
is offered in evidence, or prior thereto.

---

Page 311

A P P E A R A N C E S

FOR THE PLAINTIFFS:
    Mr. Clinton A. Krislov
    Attorney at Law
    Krislov & Associates, LTD
    20 North Wacker Drive
    Chicago, Illinois 60606
    312.606.0500
    clint@krisloviaw.com

    Ms. Denise Davis Schwartzman
    Ms. Kathy Meermans (Mary Katherine)
    Attorneys at Law
    Chimicles & Tikellis LLP
    361 West Lancaster Avenue
    One Haverford Centre
    Haverford, PA 19041
    610.642.8500
    deniseschwartzman@chimicles.com
    kathymeermans@chimicles.com

---

Page 312

FOR THE PLAINTIFF, FLEET NATIONAL BANK and
BANK OF AMERICA:
    Mr. H. Marc Tepper
    Attorney at Law
    Buchanan Ingersoll & Rooney PC
    1835 Market Street, 14th Floor
    Philadelphia, PA 19103-2985
    215.685.8700
    marc.tepper@bipc.com

FOR THE PLAINTIFF, DENNIS BUCKLEY, TRUSTEE
OF THE DVI LIQUIDATING TRUST:
    Mr. John B. Berringer
    Attorney at Law
    Anderson Kill & Olick, P.C.
    1251 Avenue of the Americas
    New York, New York 10020
    212.278.1000
    jberringer@andersonkill.com

78

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **    GERALD COHN
O'HANLON, ET AL.              ** FOR ATTORNEYS' EYES ONLY **          February 12, 2008

(Pages 321 to 324)

Page 321

1   my silence. I need to figure out
2   schedule, so we'll talk about it later in
3   the dep.
4         MS. SCHWARTZMAN: Okay. Okay.
5       Q.  (BY MS. SCHWARTZMAN:) Sorry
6   about that. Mr. Cohn, I'm constrained to
7   remind you that you're still under oath.
8   Last night after your deposition, did you
9   meet with your counsel?
10      A.  We had dinner.
11      Q.  Did you review any documents
12  last night?
13      A.  No.
14      Q.  When we broke yesterday, we
15  were talking about conversations and
16  events of August 2003, and the events we
17  were discussing — among the events we
18  were discussing was your personal kind of
19  investigation into ways to pare down the
20  company, exploring personally, not as an
21  emissary of the company but personally,
22  ways to pare down DVI. Do you remember
23  that?

Page 322

1         MR. FRIEDMAN: I object.
2   Object. I don't know what the distinction
3   is between personally and an emissary of
4   the company. That confuses me.
5       Q.  (BY MS. SCHWARTZMAN:) Well,
6   did DVI ask you to explore possibilities
7   or opportunities to pare down the company?
8   Did management of DVI ask you to do that?
9       A.  No.
10      Q.  Did you — was the impetus to
11  do that personal, from you yourself?
12      A.  No.
13      Q.  What was the impetus?
14      A.  The impetus was my
15  conversation with the board members. But
16  I want to also criticize — criticize in a
17  nice way that that was only part of what I
18  was doing.
19      Q.  Understood.
20      A.  I was basically trying to get
21  information and find out what was really
22  going on.
23      Q.  Understood. And so testified

Page 323

1   yesterday.
2       A.  Okay.
3       Q.  What I'm saying here is I want
4   to redirect your attention to that
5   testimony.
6       A.  Okay.
7       Q.  Okay. One of — one of the
8   issues that you brought up was the
9   overseas operations of DVI. Do you recall
10  that testimony? That was one of the
11  aspects of DVI that you were looking into.
12      A.  Yes.
13      Q.  Was looking into the overseas
14  operations of DVI something that you were
15  doing on behalf of the board?
16      A.  Yes.
17      Q.  One of the things that you
18  said yesterday was that you would have
19  liked to have seen overseas redirected was
20  the word that you used. Do you remember
21  that testimony?
22      A.  Yes.
23      Q.  I want — that's a long way to

Page 324

1   get to my question, but my question is
2   what do you mean by redirected?
3       A.  Well, let me give you just a
4   little bit of background —
5       Q.  Sure.
6       A.  — first. I'd say at
7   somewhere the year 2001 I went up to Palm
8   Beach to see Mike O'Hanlon with a mission
9   of convincing him that we have to somehow
10  jettison the global business, and he
11  promised he would do so. And then the
12  next year I came back, and I said I need a
13  time line of when we're going to do this.
14  And then another six months later I came
15  back, and I said now is the time, and he
16  said okay, let me set up an appointment,
17  and you and I will go to Europe. And
18  that's what we did.
19      Q.  You went to Europe with Mr.
20  O'Hanlon?
21      A.  Uh-huh.
22      Q.  When was that, please?
23      A.  I can't remember that.

81

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                          ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 325 to 328)

Page 325

Q.   Was it in -- still in 2002, to
the best of your recollection?
A.   Yes.
Q.   Where did you go?
A.   Well, we went to London first,
and we met with our manager there, St.
John Brown, and spent some time with him
with the idea to see where they were, what
kind of shape they were in, and pretty
much talk about their source of business
and what they saw in that particular
marketplace.
      The next stop we had, we went
to CDC. CDC is, I think, a
quasi-government agency that's mission is
to make investments in other countries. I
think healthcare had a priority. I was
very -- we met with two of the top
officials there. This was also in London.
And they were very supportive of DVI.
They liked the organization. They liked
what DVI was doing. They felt good about
their investment. They had invested -- I

Page 327

then the two of them wanted to pow-wow,
and so they left the room, and they came
back extremely positive about the idea and
said, you know, one of our problems is
that we deal with a lot of OEM
manufacturers -- do you know what that is,
original equipment manufacturers.
Q.   Okay.
A.   And if we can't be, in many
people's eyes, the finance arm of, let's
say, Siemens and at the same time be the
finance arm of Phillips. And they said,
you know, I think you come up with an
intriguing idea. And they said maybe we
could use the DVI name to be our private
label name, and we would continue on the
leasing of Societe Generale. They got so
excited, they went to the cupboard. They
gave me a watch. I did not disclose it,
but I never used it either, and they gave
O'Hanlon a watch too.
      And by the time we got back to
the hotel, there was a fax from them that

Page 326

can't recall the amounts, but it was in
the millions and -- to fund some of the
overseas ventures. I felt pretty good
about that.
      We then went to Paris, and we
had pretty much an all-day meeting with
Societe Generale. Then again, it's
noteworthy to say that Michael O'Hanlon
got a very warm welcome, and the
redirection -- part of the redirection
that I was telling you about had already
been thought through, and so the plan
was -- and O'Hanlon did all the speaking,
and I sat and listened to two of the top
officials of the leasing side of Societe
Generale.
      Basically the program was that
he wanted to have Societe Generale take
out all our European loans so that we
could repatriate those loans back into the
United States, and -- and to use the DVI
name in the process, and they were, I
remember, very cold to that approach. And

Page 328

they wanted to proceed with some kind of
activity for us.
      The next day we had a little
bit of an unfortunate circumstance. We
were going to go to the Netherlands to see
Rabo Bank, and we had some discussions
that I was aware of with Rabo well before
we planned our trip, and they were the
most enthusiastic about making an
investment or buying the -- the portfolio.
And the idea was to buy the portfolio, we
would keep our operating people there
because we had a good access to the
customers. We would free up our capital,
and away we would go. And that was the
general concept, and that's what I meant
by redirect, that is, take our capital out
and still participate.
      As a matter of fact, we did --
when we were set with Societe Generale,
Michael did lay out, you know, what he
thought was the program, and, again, they
were enthusiastic about it.

82

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.            ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 329 to 332)

**Page 329**

The unfortunate part was we got
to the airport. He didn't have his
ticket. I had my ticket, but I didn't
have my passport, so I couldn't go. He
bought a new ticket, and he went.
    Q.    To the Netherlands?
    A.    He went to the Netherlands.
    Q.    Okay.
    A.    And he said that they were
very enthusiastic about the program, and
he -- he showed me the letter that he had
gotten and that we should, you know,
continue the program.
    I think when it was announced
that we lost our auditor, that took an
awful lot of steam out of it, but we did
continue conversations with at that time
Societe Generale and with Rabo. Rabo
being the hot button.
    Q.    Did you have similar
conversations with any financing entities
in Asia?
    MR. FRIEDMAN: You meaning Mr.

**Page 330**

Cohn personally?
    MS. SCHWARTZMAN: Yes.
    MR. FRIEDMAN: Okay.
    A.    No, I did go to Asia.
    Q.    (BY MS. SCHWARTZMAN:) When
did you go to Asia?
    A.    I went to Asia right after we
got into the global originally.
    Q.    Oh, okay.
    A.    Not at the end. I just
want -- I didn't want to skirt your
question. I just wanted to tell you I had
an interest in Asia. I went to the Asia
office. It was in Singapore, and -- but
I -- no, I didn't have any --
    Q.    Do you recall --
    A.    -- conversation.
    Q.    Oh, excuse me. I didn't mean
to interrupt you.
    Do you recall a time frame for
going to Asia? Was that -- that was prior
to 2001?
    A.    I just don't remember.

**Page 331**

    Q.    I'm -- I'm not trying to be
argumentative. I'm just trying to get a
focus for myself. You testified that in
2001 you told Michael O'Hanlon to jettison
global. Does that refresh your
recollection --
    A.    Yes.
    Q.    -- that that trip to Asia
would have been before 2001?
    A.    Before that, yes.
    Q.    Do you have any idea how long
before?
    A.    Well, it was right after we
opened shop globally.
    Q.    What did you do on the Asia
trip?
    A.    I spent a lot of time with a
gentleman that was running the office who
used to work for Phillips, and, as you
know, the Phyllis -- the Phillips
portfolio is what we bought to get the
business going. We bought it. There was
a $200 million portfolio. There was not

**Page 332**

one delinquency there. We're talking
about a Brazilian portfolio with some,
also, activity in Argentina, and that was
owned by -- by Phillips. And we secunded
their employees there and took one of the
Phillips management and moved to
Singapore. So, I met some of the
potential customers. I evaluated him, and
it was, you know, just sort of an
introductory thing to see what -- what
that area looked like. That was certainly
before the boom in Asia.
    Q.    On that trip to Singapore, did
you transact any other business?
    A.    Me personally?
    Q.    Yes.
    A.    No.
    Q.    Did you transact any other
business for any of the companies that we
talked about yesterday with which you were
associated on that trip to Asia?
    A.    I didn't tract -- I didn't
transact any business of any kind for me

83

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                 ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 333 to 336)

Page 333

1  or anyone else.
2       Q.   Let me ask you about DVI's
3  Latin American interest. In the 2002 time
4  frame, the time frame during which you
5  went to Europe to evaluate -- to assist
6  with the evaluation of the European
7  assets --
8       A.   Not only to evaluate but to
9  begin a process to relieve ourselves of
10 those -- of those assets.
11      Q.   Did you ever conduct a similar
12 trip to Latin America?
13      A.   No.
14      Q.   Do you know if anybody from
15 DVI ever conducted a similar trip to Latin
16 America?
17      A.   Tony Turek was there. I think
18 on a somewhat regular basis.
19      Q.   Was Mr. Turek, to your
20 knowledge, charged with the duty of
21 attempting to redirect the Latin American
22 business?
23      A.   No.

Page 334

1       MR. DAILEY: Object to the
2  form.
3       A.   No.
4       Q.   What were, to your knowledge,
5  Mr. Turek's duties when he was in Latin
6  America?
7       A.   I think basically he spent a
8  lot of time on the credit side, and he
9  sort of was the interaction between DVI
10 USA and -- and South America. Also, Harry
11 Roberts went to South America on a number
12 of occasions as well.
13      Q.   Did Mr. Roberts, to your
14 knowledge, ever go to South America to
15 explore the opportunities for selling
16 South American -- the DVI South American
17 interest?
18      A.   Not to my knowledge.
19      Q.   Excuse me. I didn't hear you.
20      A.   I said not to my knowledge.
21      Q.   In 2001, when you -- was
22 that -- you testified that you told
23 Michael O'Hanlon it's time to jettison

Page 335

1  global?
2       A.   Yes.
3       Q.   Was that the first time you
4  had had a conversation like that with Mr.
5  O'Hanlon?
6       A.   One-on-one it was.
7       Q.   Okay. When had you had
8  conversations with Mr. O'Hanlon of that
9  nature when other people were in the room?
10      A.   I know I had it when other
11 people were in the room because, as I told
12 you when I first walked in here, I read
13 the Examiner's Report and a number of the
14 exhibits. And one of the exhibits said
15 one of the people that was in this group
16 or this meeting said we have to hold back
17 from laughing every time Jerry Cohn talks
18 about the amount of money that we are
19 going to repatriate from the sale of the
20 business. So, I must have said it in
21 front of those people, meaning Garfinkel,
22 O'Hanlon and whoever else was on that --
23 that e-mail.

Page 336

1       Q.   They had to hold back from
2  laughing?
3       A.   Yeah, meaning that they were
4  misleading me.
5       Q.   I see. In 2001, do you recall
6  any discussions at the board level about
7  getting rid of global?
8       A.   In 2001, I don't believe we
9  had come to the decision that we were
10 getting rid of it. I think there were
11 discussions on the part of the board
12 questioning, a lot of questioning of
13 viability, especially at one point the --
14 the ascendancy of Lula in Brazil who is
15 the elected president or whatever.
16      Q.   Oh, okay.
17      MR. FRIEDMAN: Oh, that Lula.
18 (Laughter.)
19      A.   So, we were concerned about
20 that because he was purported to be a
21 Socialist and so forth. So, there was
22 conversation about that.
23      Q.   You missed the boat. You

84

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                    http://www.TylerEaton.com

63

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.           ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 337 to 340)

Page 337

1  should have invested in Venezuela as well.
2      A.  I missed a lot of boats,
3  especially this one right here.
4          And, so, there was conversation
5  there. And then there were other
6  conversations dealing with Argentina. And
7  we had a special meeting, and Steve
8  Garfinkel was at the meeting. He sort of
9  was the main participant because he was
10 there to report that, because of the
11 Argentina currency dropping so
12 precipitously, dropping down, that we had
13 gotten out of compliance with our -- with
14 our debt with -- with Fleet Bank. So,
15 there was a lot of questions on that.
16         He felt that he could get Fleet
17 to give us an exemption there, but it
18 was -- I asked him specifically what was
19 the -- the covenant that they broke
20 through, and he said it was the cash flow
21 covenant because of the currency.
22     Q.  Did the Fleet Bank grant the
23 company an exception for that aspect of

Page 338

1  the compliant -- of the covenants --
2      A.  Yes, they did.
3      Q.  -- and lending agreement?
4      A.  Yes. And then I asked Mr.
5  O'Hanlon -- I mean, Mr. Garfinkel at that
6  meeting how many covenants do we have in
7  our agreement, and he told me, and I
8  cannot remember how many he told me. And
9  then I said are we out of compliance with
10 any other covenant in the Fleet borrowing
11 agreement, and he said no.
12     Q.  Was that the only time you
13 asked Mr. Garfinkel that specific
14 question?
15     A.  No. That was not the only
16 time.
17     Q.  Was that the first time you
18 asked him, are we out of compliance with
19 any covenant?
20     A.  In front of the board?
21     Q.  At any time. At any time at
22 all.
        MR. FRIEDMAN: I object

Page 339

1  because -- I object. Go ahead. You can
2  answer.
3      A.  Okay.
4      Q.  Well, let me --
5      A.  I'm going to answer it.
6      Q.  Okay. Sure.
7      A.  I mean, I'm told me. I -- he told
8  it. I asked Mr. O'Hanlon --
9          MR. FRIEDMAN: Garfinkel or --
10     A.  Geez, Garfinkel.
11         MR. FRIEDMAN: Everybody is
12 making the same mistake.
13     A.  Yeah, we are. I better mark
14 his name down so I don't forget. I asked
15 him why Lisa Cruikshank was leaving, and
16 he said because she was uncomfortable
17 about signing the Fleet documents. I said
18 what documents. He told me. I -- he said
19 we -- we've moved in and out of
20 compliance, and I said is that a function
21 of the -- of the securitization. And he
22 said, well, you know how securitizations
23 work. I said are we in compliance now.

Page 340

1  He said we were. I said do you think
2  you're going to be able to keep Lisa on.
3  He said yes, I'll talk to her. I said
4  will you have her call me. He said he
5  would. I asked him again a week later or
6  two, and she had left. Before she left,
7  and I want to continue on it so I get it
8  clear for you.
9      Q.  Okay.
10     A.  I called O'Hanlon, and I said
11 I understand Lisa is thinking of leaving.
12 This was after the first conversation. He
13 said --
14     Q.  I -- you called Mr. O'Hanlon
15 or Mr. Garfinkel?
16     A.  Mr. O'Hanlon after that.
17     Q.  Okay.
18     A.  And I said to him, I hate to
19 see Lisa leave. He said no loss. He said
20 she's not up to the job. So, I said --
21 but Steve says that we're out of
22 compliance, and he says let me tell you
23 about compliance there. He said it's like

85

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 341 to 344)

Page 341

1   being overdrawn in your checking account.
2   I said I don't -- I don't overdraw my
3   checking account.
4       (Laughter.)
5       A.   He said, well --
6       MR. BERRINGER:  Nobody here is
7   surprised.
8       A.   My wife does, though.
9       MR. FRIEDMAN:  Oh.
10      MR. KRISLOV:  You want to seal
11  that part of the record?
12      (Laughter.)
13      A.   You've got to have a laugh
14  every once in a while, right?
15      So, at any at any rate, he
16  reminded me at the time that we were out
17  of compliance.  I think he said 1998, '99
18  twice, and I said refresh my memory.  And
19  he told me of one, and I couldn't remember
20  it, so -- but the second one I remembered
21  well.  It was Nat West because I happen to
22  know the Nat West people.  Turek
23  introduced me.  He brought them into the

Page 342

1   company.  He said you remember what
2   happened.  I said yeah, I remember it was
3   cured, and just tell me again, and so he
4   did tell me that two people had sent
5   checks into the securitization that
6   bounced, and they called the bank and told
7   them.  And the bank said, well, just make
8   them good.  And in the meantime they
9   either made them good or the people
10  paid -- you know, paid for the bounced
11  check.
12      So, I said at that point, look
13  at -- I take this as a serious thing, and
14  I'm going to be calling you on a regular
15  basis and inquiring whether we are in
16  compliance or not.  So, that was another
17  conversation I've had.
18      Q.   I -- Mr. --
19      A.   On compliance.
20      Q.   Ms. Cruikshank --
21      A.   Yes.
22      Q.   -- resigned in March of 2001?
23      A.   Yes.

Page 343

1       Q.   Does that refresh your
2   recollection of the time frame for this
3   conversation that we were just talking
4   about right here?
5       A.   It was right at that time.
6       Q.   Okay.
7       A.   It was right at that time.
8       Q.   Okay.
9       A.   So, then, we already went over
10  the Argentinean thing, and I asked a
11  question and you asked if there were any
12  others.  There was.  And the other one was
13  I put it about a meeting that was -- I'm
14  talking about a board meeting.
15      Q.   Okay.
16      A.   December 2002.  And I
17  specifically asked them are we in full
18  compliance with all the bank covenants,
19  and he said yes.
20      Q.   And the "him" that you asked
21  was Mr. --
22      A.   Garfinkel.
23      Q.   Okay.  And were the other

Page 344

1   board members present when you asked that
2   question?
3       A.   They were.  They were there.
4       Q.   When you --
5       A.   And there was one other time.
6       Q.   Oh, excuse me.
7       A.   You asked me all the times.
8       Q.   I want to know.  That's why I
9   asked the question.
10      A.   And the other time was when I
11  was on my mission after we got the Susan
12  Gibson letter, and, as I said to you, that
13  was the first time that I knew that there
14  was any double pledging, and at a matter
15  of fact, the first time I talked to Steve
16  Garfinkel, he never said anything about
17  double pledging.  He never said anything
18  about not eligible collateral.  It was, I
19  thought, the -- you know -- remember the
20  other day, seems like last week, I said I
21  tried to explain how I looked at
22  securitizations, what it meant.
23      Well, you see, securitizations

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 345 to 348)

**Page 345**

1 there's something you have to know about
2 the cash flow, and that is if you're
3 putting together a warehouse, say, with
4 Fleet Bank, and let's suppose you have a
5 hundred million dollars' worth of leases,
6 you're only going to get paid advance
7 from -- from Fleet of 90 million. They
8 take a ten percent haircut right off the
9 top, okay? If you recall my very crude,
10 let's say, explanation of the
11 securitization process, you would remember
12 there was a AAA at the top and then BBB
13 and then the tranches went down.
14       But the pricing of -- of those
15 particular sections of debt included our
16 profit, so the -- let's say the A -- the
17 AAA would have 200 basis points over our
18 costs, maybe BBB would be 250, maybe BB
19 would be 350. So, that was our profit.
20 And then finally we had our -- our equity
21 piece that was the Z piece. We called it
22 the Z piece. And that was cash. We put
23 cash into that. It wasn't some, how shall

**Page 346**

1 I say, made up asset that people are now
2 doing, but it was cash. No, I'm trying to
3 tell you about this. So, anyway --
4       Q.   Okay. Skipping my colleagues
5 here, a real comfort level from her
6 understanding of the financial markets,
7 she thinks a lot of it is made up.
8       A.   As it turns out, you see it's
9 on the front page of every paper. But at
10 that time I remember asking whether --
11 what we had in the Z piece, and I'll tell
12 you why I was asking, okay? The Pritzkers
13 had suffered a tremendous embarrassment
14 with Superior Bank, and they were doing
15 securitizations at that bank, and while I
16 had nothing to do with it, and it was just
17 like it was my recreation for the weekend
18 to really try to delve into it on my own
19 just to see, you know, what was -- what it
20 was. And I found out that they had a Z
21 piece composed of other kinds of as assets
22 supposedly. And I immediately went back
23 Monday, and I said, okay, what do we have

**Page 347**

1 in the Z piece, and I was told cash.
2 Okay?
3       Q.   Okay.
4       A.   So, to get back to the story
5 here, when the securitization was done,
6 was finished, we got back our ten percent,
7 you know; because we fleshed that out. We
8 got the profit on the -- on all the
9 tranches, on all the assets that were in
10 there, and we got our portion of the -- of
11 the equity, okay?
12       Now, the question then
13 became -- now, that was cash, so that was
14 all cash, and that's what creates this in
15 and out kind of a thing. There are other
16 things, too, but this is one of the basic
17 things. That's how I thought of it
18 anyway.
19       But the question they -- they
20 had and developed with Deloitte was
21 revenue recognition, which I had nothing
22 to do with, but I was just, I'll say, a by
23 -- an interested bystander. So, at some

**Page 348**

1 times, we would be allowed and desired to
2 have gain on sale, which was a technique
3 that we would recognize more income than
4 if we did it the other way to just let it
5 go through the way it did. I'm sorry, I'm
6 a little bit winded, but I sort of
7 expected as we get moving into some of the
8 other stuff here that you should really
9 have some kind of understanding of the
10 inner workings of what was going on.
11       Q.   Thank you.
12       A.   You're welcome.
13       Q.   The Susan Gibson letter --
14       A.   Uh-huh.
15       Q.   -- was that the time period we
16 were discussing yesterday that was
17 approximately August of '03?
18       A.   That was the date that I was
19 told about it.
20       Q.   Okay.
21       A.   The later -- the letter was
22 dated ten days earlier.
23       Q.   Okay. And the time that you

87

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 353 to 356)

Page 353

A.   Because as I told you
2  yesterday, he -- any time I asked him
3  about a credit, just for some other color
4  on that particular credit, because I
5  didn't need him to tell me what that -- I
6  was trying to get some background on it.
7      Q.   Uh-huh.
8      A.   He knew that credit cold.
9      Q.   And, to your --
10     A.   And I sort of suspect that he
11  saw copies of -- of the credit book.
12     Q.   Did you ever have a discussion
13  with Mr. O'Hanlon regarding the quality of
14  the credit for the overseas operations of
15  DVI?
16     A.   The only time I had a
17  substantive conversation with him was at
18  the very beginning when he bought that
19  $200 million package from Phillips. That
20  was the only time.
21     Q.   Did you ever have a
22  conversation that you recall with anybody
23  else at DVI regarding the quality of the

Page 355

that correct?
2      A.   Yes, in my recollection of it.
3      Q.   Do you have any understanding,
4  as you sit here today, with respect to
5  what the nature of the problem was with
6  DVI's overseas operations, why they were
7  losing money?
8      A.   Yeah. I have some.
9      Q.   Would you share it with us,
10  please?
11     A.   Yeah, sure. I think we
12  suffered badly because of what happened in
13  Brazil, because Brazil was our bulwark,
14  and not too long after we bought it, you
15  know, the thing with the peso started to
16  come apart a little bit. There was a lot
17  of apprehension.
18         If you'll remember, Fleet Bank,
19  as a matter of fact, had one of the top
20  guys in Brazil as their top guy, and they,
21  Fleet, took it out of there. They took
22  their assets out.
23         So, I think it was that kind of

Page 354

credit of the overseas --
2      A.   Yes.
3      Q.   -- operation?
4      A.   I --
5         MR. FRIEDMAN:  Just let her
6  finish before you start answering.
7      A.   Okay. Okay. You're right.
8  Yes. I had a conversation with Turek a
9  number of times.
10     Q.   A number of times. Do you
11  recall a time frame for those
12  conversations?
13     A.   No.
14     Q.   What made you decide in 2001
15  to tell Mike O'Hanlon that it's time to
16  jettison the overseas operations?
17     A.   Because they were losing
18  money.
19     Q.   And by 2001, for how long had
20  they been losing money, to your knowledge?
21     A.   I -- I can't remember.
22     Q.   And 2001 was prior to the
23  devaluation of the Argentinean peso, is

Page 356

a thing that started it. I think if I had
2  a overall criticism, I think that they
3  were -- they were stretched, that is, they
4  put an outpost in South Africa, and I just
5  couldn't see it, and I argued against it
6  at one of the meetings, and it was done
7  anyway, and it just didn't make sense to
8  me just because of the -- the distance
9  between South Africa and, you know, the
10  headquarters, let's say, in London, so
11  that was one of the things as well.
12     Q.   What meeting did you argue
13  against it at?  Was that a board meeting?
14     A.   It was at a board meeting.
15     Q.   And what do you mean when you
16  say they were stretched?  Do you mean
17  geographically stretched?
18     A.   Geographically stretched, yes.
19     Q.   Was there any liquidity
20  stretching involved in the overseas
21  operations of DVI?
22     A.   I never heard of it because
23  that, as I said in my earlier testimony,

89

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 357 to 360)

Page 357

1  much of the -- of the funding was done by
2  local banks, and that's, again, what I
3  think Harry made a big contribution with,
4  Harry Roberts.
5     Q.  Uh-huh.  So, is it your
6  testimony that it is your understanding
7  that DVI's overseas operations were
8  adequately funded?
9     A.  Yes, that was my impression.
10    Q.  And if the overseas operations
11 were adequately funded but losing money,
12 did that drain capital from DVI?
13    MR. DAILEY:  Object to the
14 form.
15    A.  I was told that it did.
16    Q.  By whom?
17    A.  Rich Miller.
18    Q.  Were you ever concerned -- oh,
19 let me start over.
20    Was one of your concerns in
21 2001 that the overseas operations of DVI
22 were draining too much capital from the
23 company?

Page 358

1     MR. DAILEY:  Object to the
2  form.
3     A.  If we could eliminate two
4  words there, "too much," I was concerned
5  about it, and that's why I got myself some
6  heck of a sunburn up in West Palm Beach.
7  I drove all the way up there, sat in the
8  sun with O'Hanlon to get him to promise me
9  that he was going to do something about
10 it, because I -- I had much concern.
11    Q.  I want to rephrase my question
12 to be consistent with --
13    A.  Yes.
14    Q.  -- your testimony and so that
15 I can get you to respond.
16    Is it your testimony, then,
17 that you were concerned in 2001 that DVI's
18 overseas operations were draining capital
19 from the country?
20    A.  That's what my understanding
21 was.
22    MR. FRIEDMAN:  You said
23 country, and you obviously meant company.

Page 359

1     Q.  And --
2     A.  Okay.  They were all in the
3  same boat.
4     Q.  Yesterday we talked a little
5  bit about your interface with -- well, the
6  extent of -- I don't want to overstate
7  what you said to me because I recall what
8  you said to me -- your interface with the
9  accounting department at DVI.  Did you
10 have -- similarly did you have any
11 interface with the documentation
12 department at DVI?
13    A.  No.
14    Q.  Do you have any familiarity
15 with the InfoLease system?
16    A.  That's the system I was trying
17 to describe to you yesterday, and I forgot
18 the name, but it was InfoLease.
19    Q.  Do you know what InfoLease is?
20    A.  I have a general idea what it
21 is.
22    Q.  What is it, what's your
23 general idea?

Page 360

1     A.  Well, it keeps track.  It's a
2  software package that keeps track of all
3  the leases and the payments that come in,
4  and I, you know, have talked to some
5  people about it.  I remember talking to
6  Jim Costello about it because he was the
7  one that installed it, and he said that it
8  was the state of the art kind of product
9  for a company like DVI.
10    Q.  Did you have access to
11 InfoLease?
12    A.  No.
13    Q.  Did --
14    A.  I don't have e-mail, so how
15 can I have access?
16    Q.  Well, even I know that
17 InfoLease would not load up on your
18 e-mail, even I know that.
19    Did you ever in the company of
20 somebody else, even for just plain
21 curiosity, access InfoLease?
22    A.  Never.
23    Q.  Did you ever see reports that

90

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 365 to 368)

Page 365

1   their -- their warning.
2           And, so, we decided to go back
3   again, and we went back two weeks later,
4   and it was like a completely different
5   atmosphere -- atmosphere. I mean, they
6   were brutal totally, and they said, look,
7   we have a program for you here. It's
8   called the flow program, and you've got to
9   sign it today. If you want to do business
10  with us, you've got to sign it today.
11          And they went on to say -- I
12  realized after a while, after they were
13  talking, that they really had conned us in
14  the first meeting because, if you recall
15  my testimony before that there was
16  $44 million worth of -- of collateral that
17  was moved, and I had been very suspicious
18  of them, of that transaction.
19          And, so, then later we had sort
20  of like a little private meeting of the
21  people who were there, and it's not clear
22  to me who was in that meeting. The first
23  meeting I was absent, I'm 99 percent sure,

Page 366

1   I can't remember, but it was -- it was --
2   not me. I mean, I have no reason not to
3   go there by myself, so -- but the DVI
4   folks at the meeting, they said do you
5   realize that every piece of collateral
6   we're sending in there for their warehouse
7   loan, they are taking big, big discounts.
8   They have throttled our liquidity. And
9   that's when I knew that the end was here.
10  And that's when I pushed to put the
11  company into the bankruptcy because I felt
12  an obligation then to the creditors.
13          Q.  Let me ask you a question, and
14  I don't mean this to be rude.
15          A.  I know. You're not a rude
16  person.
17          Q.  Thank you. That's a real
18  compliment for a lawyer, isn't it?
19          The -- you were a board member?
20          A.  Yes.
21          Q.  Why were you taken to the
22  meetings with Merrill Lynch?
        A.  I had the most interest.

Page 367

1           Q.  How so?
2           A.  How so?  I had a lot of money
3   at stake, number one.
4           Q.  Uh-huh.
5           A.  Number two, I had what I
6   thought was a lot better reputation than
7   you gave me the credit for yesterday, but,
8   you know, I've been known for it as a guy
9   that could go into tough situations and
10  work them through. And I took it
11  personally. I mean, I was in -- I was,
12  since the middle of May, I was -- to
13  August, whatever date it was, I was in
14  there, boy, 8:00, latest in the morning
15  until almost that at night. So, I was --
16  I felt that it was my -- my strong desire
17  to see what I could do.
18          Q.  Did any of your relatives or
19  your wife's relatives invest in DVI?
20          A.  Yes, my wife's brother did.
21  My wife's sister.
22          Q.  Did --
23          A.  My wife's brother and my

Page 368

1   wife's sister.
2           Q.  Did your wife's brother and
3   sister lose money on their investments?
4           A.  Yes.
5           Q.  Did any of your friends invest
6   in DVI?
7           A.  I think so, yes.
8           Q.  And did the Pritzker interests
9   invest in DVI at -- at your suggestion?
10          MR. DAILEY:  Object to the
11  form.
12          MS. STRIKIS:  Object to the
13  form.
14          A.  To my knowledge, the only time
15  the Pritzkers invested at my suggestion
16  was when I brought to them the proposition
17  of buying from Provident Securities those
18  shares that were remaining in his box, but
19  at no other time did I ever suggest it.
20          Q.  One more question and we'll
21  take a break.
22          MR. FRIEDMAN:  Okay.
23          Q.  With respect to the Pritzker

92

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 377 to 380)

**Page 377**

circumstances of your seeing a consolidated delinquency report?

A. Well, the one -- every time I looked at one, I -- and -- and I want to make it clear. This was not my job. This was not my job, but I had an interest in this company.

Q. Understood.

A. And that -- that should permeate this room --

Q. Sure.

A. -- and people should know that. So, I would look at some of the names that I had opined on originally, and it would sort of get me a little bit more interested in finding more out about it, and I would call, in most cases, Ray Fear, some cases to Tony Turek and a couple of cases Joe Malott, and I would ask them various credits about those particular -- I would ask them about the circumstances in those particular credits and what they thought and -- and so forth.

**Page 378**

Q. And --

A. Because I think they wrote -- wrote that report. Whoever wrote the report. But I remember speaking to Fear a number of times.

Q. And the answer that you just gave me was with respect to the consolidated delinquency report, is that correct?

A. And the watch list. Was the watch list the one that had the -- the intended result?

Q. I -- I don't know these facts by myself.

A. What we mean by intended result; that is, we would look at this body, and we would say, okay. The worst that we could do is this particular number, and then, the compilation of that -- those numbers should be the loss reserve.

Q. Okay.

A. That -- that's -- that's what

**Page 379**

I was looking for.

Q. Did you ever check the 10-Ks to make sure that the loss reserve matched that number, whether it came from the CER or the watch list?

A. No.

MR. DAILEY: Object to the form.

Q. What credits -- what companies were you interested in following in looking at these reports, whether it was the CDR or the watch list?

MR. FRIEDMAN: You're asking if he can remember specific companies?

MS. SCHWARTZMAN: Yeah, yeah, yeah.

A. No, I -- there wasn't any specific. It -- it was usually one that I had familiarity with that was over a million dollars that -- that there was familiarity on my part when the credit was made, and it -- what the problem was because it wouldn't be on the watch list

**Page 380**

unless there was a problem.

Q. Uh-huh.

A. So, what problem developed that maybe we didn't properly understand when we made the credit, or maybe, we could add something to it, you know.

Q. Do you recall the names of any of those --

A. I don't.

Q. -- companies --

A. I just --

Q. -- of which you had familiarity?

A. No.

Q. Okay. Did you have any interface with anybody at work at -- in workout at DVI?

A. None.

Q. Did DVI have a workout department when you first were associated with the company?

A. No.

Q. When was the workout

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.             ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 381 to 384)

Page 381

department formed?
2      A.   Well, I remember a board
3  meeting where Mike made a pre -- Mike
4  O'Hanlon made a presentation, and he said,
5  look at -- our volume is -- has moved up
6  to a point that I think we have to spend
7  more money in putting together a -- a
8  really first-class professional workout
9  group, and he did bring that before the
10  board.
11      Q.   What --
12      A.   He --
13      Q.   Go ahead. I'm sorry. I
14  didn't mean to interrupt.
15      A.   No. I -- I was finished.
16      Q.   To your knowledge, was anybody
17  specifically hired to head up that workout
18  group?
19      A.   I was told that Colasanti was.
20      Q.   Do you know Mr. Colasanti?
21      A.   I know him, yes.
22      Q.   Did you ever meet with him?
23      A.   Never. I was with him one

Page 382

1  day. Do you want to hear where it was?
2      Q.   Sure.
3      A.   DVI always had this dinner at
4  Chicago at the RSNA, and we usually had a
5  sports figure to be the speaker. This
6  particular time, we had Pete Rose. You
7  know Pete Rose?
8      Q.   Yes, I know who Pete Rose is.
9      A.   So, at any rate -- so,
10  Colasanti, as it turned out, was a big
11  Philly fan, and so am I. So, they asked
12  him to sit at the head table. Now, I
13  never would sit with the customers, usually when
14  I went, but this time, I sat at the head
15  table, and I sat next to Harry Roberts.
16  And he said, Colasanti is at this table
17  because Mike wants to give him some
18  recognition that he's done such a good
19  job. That was the only interaction I had
20  with him. We talked a little bit about
21  the Phillies.
22      Q.   During your time at DVI, was

Page 383

1  it your impression that Mr. Colasanti was
2  doing a good job?
3      MR. DAILEY:  Objection to the
4  form.
5      A.   I was impressed with the job
6  that was done by DVI in working out
7  difficult loans. Whether Mr. Colasanti
8  was key to that, I have no idea because I
9  had nothing to do with the workout side.
10      Q.   Could you give me some
11  examples of difficult loans that were
12  worked out that formed the basis of your
13  being impressed?
14      A.   I know some names, and some
15  names I don't know, but I'll try with the
16  ones I know, okay? But I -- I did know,
17  you know, when I was there. Allegheny was
18  a workout.
19      Q.   Any others?
20      A.   USD was a big workout.
21      Q.   Any others?
22      A.   Medical Resources was a
23  workout.

Page 384

1      Q.   Any more?
2      A.   Yeah, there were -- there were
3  a number of them that I don't have the
4  name, and I -- I think I just came up with
5  a name. Now, I'll give you another one.
6  02 Science was the product of a workout.
7      Q.   What do you mean "product of a
8  workout"?
9      A.   Well, it was -- there was a
10  loan that was put on the books. I think
11  it was called Valley, and I think General
12  Electric was our partner with that, and
13  Mike O'Hanlon said, look, I can make this
14  a heck of a company, and we did pay
15  General Electric off, and the company
16  became a terrific oxygen provider for
17  homes, you know --
18      Q.   Okay.
19      A.   -- for home delivery. I went
20  to Arizona -- I went to Arizona to see it
21  just because I couldn't really believe the
22  numbers that they were coming in with, and
23  it was -- it was really dirt when we

96

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 385 to 388)

Page 385

1    started it. It was -- it was a good
2    workout. There were a couple of workouts.
3    There was a workout of an eye -- optician
4    that had bit off more than he could chew
5    up in New England somewhere, and I
6    remember the credit. And I put a lot of
7    the value of that particular credit on the
8    real estate and they got in trouble, and
9    as it turned out, the real estate did, in
10   fact, bail -- bail us out.
11       Q.    Was that optician in Bangor,
12   Maine?
13       A.    I think so, yeah. Oh, yeah,
14   at least I knew -- I knew of the -- I knew
15   the modality, so to speak. But there were
16   others. There were a lot of others.
17   There was one in particular that was
18   really something.
19           We had a request for a -- it
20   was a fairly large company that had four
21   MRI centers, and they didn't want to give
22   us the -- the asset of the cent -- the
23   center. They wanted to pledge the cash

Page 386

1    flow of the center, and ori -- originally,
2    I just said, I -- I -- I just don't feel
3    comfortable with it. And, so, we decided,
4    as we did sometimes, that we'd -- that we
5    ask Tony. He was somewhere on the West
6    Coast. Could he go out and do a field
7    trip and really make an evaluation? He
8    said the company is strong, the head
9    company is strong, and I think we'll get
10   our money. We should take a shot at it,
11   and the rate was good, and so we did.
12           Well, the company wasn't
13   eventually that strong, and they went
14   bankrupt. Well, these four centers had
15   been sold to this large company by Howard
16   Berger. So, I remember Rich got involved
17   with that, and he said call Howard.
18       MR. FRIEDMAN: Is Rich, Rich
19   Miller?
20       A.    Rich Miller.
21       MR. FRIEDMAN: Okay.
22       A.    And he said, Howard, how would
     you like to buy those four centers. He

Page 387

1    said, boy, I could use those four centers.
2    One was in Northridge, California, so
3    forth and so on. So, we went to the -- we
4    had somebody go to the bankruptcy court.
5    The -- the big company did go bankrupt,
6    and we helped Howard Berger buy those
7    centers back, and--and they became very,
8    very successful.
9        Q.    When Howard Berger bought the
10   centers back, is that the kind of a
11   transaction that you referred to as a
12   restructure?
13       A.    No, that was --
14       MR. DAILEY: Object to the
15   form.
16       A.    -- a purchase. That was a
17   pur -- purchase.
18       Q.    Okay.
19       A.    That went through the
20   committee.
21       Q.    And is it correct that your
22   testimony was -- or, maybe, I didn't ask
23   it. So, I'll just ask it again, and

Page 388

1    forgive me, if I did.
2        A.    Don't worry. I -- I don't
3    mind.
4        Q.    Thank you. If, as part of the
5    workout, DVI was going to lend money to
6    either the company that was having issues,
7    the existing obligor --
8        A.    Uh-huh.
9        Q.    -- or to a new obligor, who
10   was going to come in and take over the
11   debt --
12       A.    Uh-huh.
13       Q.    -- would that kind of a loan
14   go to the credit committee?
15       A.    It was my understanding that
16   that loan had to come to the committee.
17       Q.    To your knowledge, did those
18   loans come to the committee?
19       A.    I found out in the year 2003,
20   just by accident, that the loan that I was
21   familiar with -- it was a guy by the name
22   of Todd Garamella, and the loan was to
23   this company, which was called Intrepid.

97

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                     ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 393 to 396)

**Page 393**

1 -- and the next was a little Jeep. Out
2 stepped Bill Bradley. I said, this the
3 guy's not for us, and I had this serious
4 conversation with Tony Turek, and I said,
5 Tony, this guy doesn't have the character;
6 and, remember, we talked about collateral,
7 cash flow and character. He doesn't have
8 the character. I'm afraid of him.
9     So, the request came in, and
10 I -- I said I couldn't vote for it, and,
11 Tony said -- and this is part of what we
12 did.
13   Q.   Uh-huh.
14   A.   We'd say, what would you --
15 what can we do to make you feel more
16 comfortable about it? Well, I said, I
17 want to go on record that I don't feel
18 comfortable about it, but I could -- you
19 can improve it by doing the following.
20 They had a -- God bless you.
21     They had a period at the
22 beginning that he didn't have to make any
23 payments. So, there was no amortization.

**Page 394**

1 I said no way could I approve that. If
2 you bring the eight months of payments
3 beginning immediately, so we at least have
4 some collateral in there, I said, I could
5 probably get it, but I'm -- I'm worried
6 about it. And unfortunately, we made --
7 we made the loan to him. And, then, the
8 workout group got into it. And the
9 workout group sold off his Rittenhouse --
10 he had a -- he had a place up here,
11 Rittenhouse MRI.
12   Q.   Oh, okay.
13   A.   Okay.
14   Q.   I thought you were going say
15 he had a house on Rittenhouse Square.
16   A.   No, he didn't have. He lived
17 in -- he lives in a mansion in New Jersey.
18 I've never been there. And, so, they sold
19 Rittenhouse, but we didn't see any of the
20 money because it was one of those things,
21 as you said before, that I sort of had my
22 interest on and my eye on, and it was --
23 it was bad.

**Page 395**

1     So, Rich found a terrific group
2 of radiologists in Philadelphia. I wish I
3 could remember their name. And they
4 agreed to go in there and be a partner,
5 and that's what they did. In the
6 meantime, he then went into bankruptcy,
7 and we felt we could still work it out.
8 And except he wanted a payoff, and we
9 wouldn't give him a payoff. He wanted
10 $300,000 as a payoff.
11     But, in the meantime, the word
12 was he was sending his wife in a chartered
13 helicopter to New York once a week to shop
14 at Bloomingdale's, which made me irate,
15 but there was nothing I could do about it,
16 and it was just one of those things. It
17 was a terrible thing.
18   Q.   Were there any personal
19 guarantees by Mr. Vernon on these loans
20 made by DVI?
21     MR. DAILEY: Object to the
22 form.
23   A.   I don't recall it.

**Page 396**

1   Q.   In terms of concentration,
2 was -- were -- was there -- let me take
3 that back one step.
4     Was there more than one loan
5 made by DVI to HIS?
6   A.   Yes, there was.
7   Q.   In terms of concentration,
8 were the loans to HIS a large
9 concentration for DVI?
10     MR. DAILEY: Object to the
11 form.
12   A.   I can't remember the size of
13 the loan, but I -- whatever it was, it was
14 too much, in my opinion. I mean, that was
15 my attitude toward it, and that was it.
16   Q.   Were you ever advised that
17 DVI's workout department rewrote HIS
18 loans, and by rewriting a loan, I'm
19 talking about changing the terms of the
20 loan but leaving the obligor and the
21 collateral intact. Were you ever advised
22 that DVI rewrote HIS loans in order to
23 avoid delinquency?

99

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 425 to 428)

Page 425

committee minutes.
2        MR. FRIEDMAN: Okay. Yeah.
3        MR. DAILEY: Object to the
4 form.
5        MS. SCHWARTZMAN: The loan
6 committee or credit committee means the
7 same thing.
8        MR. DAILEY: Is there a
9 question?
10        MR. FRIEDMAN: Do you want the
11 question read back?
12        A.   No, I heard it.
13        MR. FRIEDMAN: Okay.
14        A.   I'm just trying to think
15 about -- think about what the honest
16 answer is. I -- no, I can't -- I can't
17 remember anyone doing what you said,
18 taking it upon themselves to loan money
19 when the credit committee said no.
20        Q.   How about in the workout
21 context? A loan over a million dollars --
22        A.   Yeah.
23        Q.   -- may -- made in the workout

Page 427

A.   Because there were times that
2 Rich Miller, as I testified yesterday,
3 that Rich would come to the committee --
4        Q.   Yeah.
5        A.   -- and say, look at this.
6 This is a loan I think we should make, and
7 he'd give us a whole bunch of reasons why.
8 But the ultimate decision was made by the
9 credit committee. So, if he was going to
10 do it by himself, he wouldn't have
11 bothered to come.
12        Q.   Did Michael -- did Michael
13 O'Hanlon have the authority to overrule
14 the credit committee?
15        A.   No.
16        MR. DAILEY: Objection; form.
17        Q.   Did Richard Miller have the
18 authority --
19        A.   No, he -- no, he --
20        Q.   -- to overrule the credit
21 committee?
22        A.   No.
23        MR. DAILEY: Objection to

Page 426

context, would an -- do you have any
2 awareness of any individual at DVI doing
3 that?
4        A.   Well, I -- I told you of one,
5 and that was Garamella, and that's the
6 only one I knew.
7        Q.   Did Michael O'Hanlon have the
8 authority, the formal authority, at DVI to
9 make loans?
10        MR. FRIEDMAN: I object to the
11 question.
12        A.   I don't think Michael O'Hanlon
13 had that authority.
14        Q.   Did Richard Miller have the
15 authority at DVI to make loans?
16        MR. FRIEDMAN: Objection. Go
17 ahead.
18        A.   I don't think Rich Miller had
19 that authority either.
20        Q.   Did Tony --
21        A.   And -- and I -- I'll tell you
22 why.
        Q.   Sure.

Page 428

form.
2        Q.   Did Michael O'Hanlon ever
3 influence the credit committee?
4        MR. FRIEDMAN: Objection.
5        MR. DAILEY: Object to the
6 form.
7        A.   I can't say because I -- he
8 might have talked to somebody on the
9 committee and had some influence.
10        Q.   Did Rich Miller ever influence
11 the vote on the credit committee?
12        MR. FRIEDMAN: Object.
13        A.   Rich Miller talked to me about
14 credits from time to time, and we always
15 brought those credits before the credit
16 committee.
17        Q.   Is it correct, then, that it's
18 your testimony that you are not aware of
19 any instance in which Michael O'Hanlon
20 made loans on his own?
21        A.   That is my testimony.
22        Q.   Is it your testimony that you
23 are not aware of any instances where Rich

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                http://www.TylerEaton.com

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 429 to 432)

Page 429

Miller made loans on his own?
2    A.   That's my testimony.
3    Q.   With respect to loans within
4  Mr. Turek's authority, which would be
5  loans up to a certain cap --
6    A.   Uh-huh.
7    Q.   -- do you understand his
8  authority to mean loans?
9    A.   Yes.
10    Q.   Are you aware of any instance
11  where Mr. Turek made loans so that the
12  aggregate exceeded his cap without going
13  to the credit committee?
14    MR. DAILEY:  Object to the
15  form.
16    A.   The only loans that I'm aware
17  of that kind of thing, somewhat like that
18  kind of thing, is when we deliberated on a
19  loan, and there wasn't a final resolution
20  because there was an awful lot of credit
21  work that had to be done, and we would
22  suggest that Tony Turek went out and met
23  with the principals himself and went over

Page 430

1  the plan and the rest of it.  And then, we
2  would ask him to have a telephonic board
3  meeting with us and tell us what he found,
4  and they, ultimately, went through the
5  committee.
6    Q.   You said "telephonic board
7  meeting."  You meant committee meeting,
8  didn't you?
9    A.   I mean, the credit.  That's
10  all right.
11    Q.   Yes.  Okay.  I just want to
12  make sure --
13    A.   Yeah, I know.
14    Q.   -- I'm clear.
15    A.   I'm getting old.
16    Q.   I'm going to -- let's take a
17  look at Cohn 1.  Okay.  It's the one we
18  looked at yesterday.
19    A.   Cohn 1.
20    MR. FRIEDMAN:  This is the
21  credit policy that we looked at from
22  yesterday.
    A.   Yeah, we're wasting time.

Page 431

    Q.   And I'm going to direct your
2  attention to page -- ah, here we go.  To
3  page 0360 and page 036 --
4    MR. FRIEDMAN:  Wait.  I assume
5  you mean 0306.
6    MS. SCHWARTZMAN:  Yes, I do,
7  and 0307. - - - - - -
8    MR. FRIEDMAN:  And she's using
9  the bottom right numbers.  Here take this
10  one, and then we'll switch it.
11    A.   (Examining document.)
12    MR. FRIEDMAN:  This is what we
13  looked at yesterday.
14    A.   What's that?
15    MR. FRIEDMAN:  This is what we
16  used yesterday.
17    A.   Yesterday, yeah.
18    Q.   (BY MS. SCHWARTZMAN:)  And
19  what we have there, would you agree with
20  me, is a list of officers by title in the
21  company and their credit authority?
22    A.   Correct.
23    Q.   Did you understand the policy

Page 432

1  or the procedures at DVI to be if loans
2  aggregated in excess of the officer's
3  credit authority, then, the loan that
4  would cause the excess had to go to the
5  credit committee?
6    MR. DAILEY:  Objection to the
7  form.
8    A.   Yes.
9    MR. FRIEDMAN:  Objection.
10    A.   That was my understanding of
11  the policy.
12    Q.   Are you aware of any instances
13  while you were at DVI -- my husband calls
14  it death by a thousand cuts -- whereby
15  aggregation loans increased over the
16  credit officer's authority and were not
17  brought to the credit committee?
18    MR. DAILEY:  Object to the
19  form.
20    A.   I am not aware of that -- of
21  that happening.
22    Q.   Are you aware --
23    A.   Except one time.

108