FLEET NATIONAL BANK, ET AL.  ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                     ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 445 to 448)

Page 445

1 leave it, we're going to mark both of them
2 because --
3      MR. FRIEDMAN: No.
4      MS. SCHWARTZMAN: Huh? It's
5 not marked.
6      MR. FRIEDMAN: I'm looking at
7 Number 2 which is dated August 14th, and
8 what I've just been handed, assuming
9 that's Number 5, is dated September 4th,
10 unless I'm missing something.
11      MS. SCHWARTZMAN: Okay. Well,
12 it doesn't take long for me. I messed up.
13 Wait. Okay, yeah, it was pulled out.
14 They pulled it out without telling me.
15      MS. MEERMANS: No, you told me
16 to pull it out.
17      Q.   (BY MS. SCHWARTZMAN:) Okay.
18 Now we have Cohn 5 dated September 4th,
19 1998.
20      A.   Right.
21      Q.   Okay. And do you recognize
22 this document?
23      A.   Yes.

Page 446

1      Q.   Okay. Let's turn to page
2 156264. Do you recognize that
3 handwriting?
4      A.   No, I don't. I can't not only
5 recognize it, I can't read it.
6      Q.   And let's try 156266. Do you
7 recognize any of that -- do you recognize
8 that handwriting?
9      A.   That seems to be the same kind
10 of -- we've had that before.
11      Q.   Okay. Do you see the note
12 with a star next to your initials, star
13 JC, do you see that?
14      A.   Yes.
15      Q.   And do you see where it says
16 not comfortable on complete management?
17      A.   That was accurate.
18      Q.   Do you recall this
19 loan?
20      A.   No. But it's -- this --
21 you're now seeing exactly what we've been
22 talking about --
23      Q.   Okay.

Page 447

1      A.   -- and the way that we have
2 this thing structured and the way the
3 process worked.
4      Q.   Okay. Which is?
5      A.   Which is that a lot of times
6 we sent deals back if we feel
7 uncomfortable about it. We then try to
8 get a lot more information, a lot more
9 data, as we did in this particular case.
10 I think it quotes me as saying, "JC hates
11 deals with reskips," which pertained to
12 the other deal we looked at.
13      Q.   Uh-huh?
14      A.   "Not his favorite deal. Guy
15 has great cash generate" -- whatever that
16 means. "Just get ahold of the actual tax
17 returns" --
18      (Reporter interruption.)
19      A.   "Just get ahold of the actual
20 tax returns," meaning that's got to be
21 gotten before we give it approval.
22      MR. FRIEDMAN: And just so we
23 don't have a misleading record, the

Page 448

1 sentence that Mr. Cohn read is got -- or
2 the fragment that Mr. Cohn read as, quote,
3 "guy has great cash," close quote,
4 actually says "guy has great cash flow."
5      Q.   (BY MS. SCHWARTZMAN:) And
6 that's on page 156266?
7      MR. FRIEDMAN: Right.
8      A.   Right.
9      Q.   Okay. If you'll go back to
10 156262?
11      MR. FRIEDMAN: First page.
12      Q.   Yes. It says subsequent --
13      MR. FRIEDMAN: Hang on for a
14 second. Do you want a chance to read it?
15      A.   No, but I'm enjoying the
16 reading of it.
17      Q.   (BY MS. SCHWARTZMAN:) Do you
18 see -- take your time. Do you see where
19 it says "subsequent approval 5-0," first
20 page?
21      A.   Yes.
22      Q.   What does subsequent there
23 mean to you?

112

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.          ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008
(Pages 529 to 532)

Page 529

1   in my opinion, the -- the worst part of
2   the whole DVI thing. I never felt we
3   really got the straight story.
4      Q.   Straight story from whom?
5      A.   Steve Garfinkel.
6      Q.   Just Steve Garfinkel?
7      A.   I don't know, but I never -- I
8   know -- I shouldn't say never, but it
9   was -- these were much easier because I
10  was confident that we knew what we were
11  doing. And if you look through all of
12  these, you realize this company had
13  problems, and when you're finished up the
14  end of the day, and I knew how the
15  whole -- it's like going to a movie and
16  you know how it's going to turn out. They
17  had GE fund them for $410 million, and I
18  was worried about 120 million.
19      So, it turned out to be a
20  blockbuster kind of a business, and
21  it's -- I think PELL is the same. But
22  you've got to start -- when you're
23  starting in a business, you've got to have

Page 531

1      A.   I did. I did rely on it.
2      Q.   You did rely on it?
3      A.   I did.
4      Q.   Did you at any board meeting
5   ever express any concern that the numbers
6   you were receiving were not accurate?
7      A.   I --
8         MR. FRIEDMAN:   Do you want to
9   put a time line on that question?
10        MS. SCHWARTZMAN:   At any time
11  while he was at DVI.
12        MR. FRIEDMAN:   Ever?   Okay.
13     A.   Okay. I absolutely did.
14     Q.   Now, tell me when.
15     A.   It was in 2003, and I went
16  back on the audit committee during the
17  crisis mode, and we had a meeting,
18  telephonic meeting discussing the OnCure
19  situation, and I wanted to take the
20  conversation farther -- make it more
21  broader, and I asked the question is there
22  anything that you see that is, to your
23  view, wrong, illegal or otherwise that we

Page 530

1   the right kind of numbers given to you so
2   you can make the right analysis and then
3   make the right -- right decisions.
4      Q.   As a board member of DVI --
5   I'm going to ask you the question as a
6   board member and not a member of the audit
7   committee first, just as a board member.
8   Did you rely on the auditors to give you a
9   comfort zone that the numbers you were
10  getting were accurate?
11        MR. DAILEY:   Object to the
12  form.
13     A.   We did.
14     Q.   As a member of the audit
15  committee of DVI the two different times
16  that you served on the audit committee --
17     A.   Uh-huh.
18     Q.   -- did you rely on the
19  auditors to give you a comfort zone that
20  the numbers you were getting were
21  accurate?
22        MR. DAILEY:   Object to the
form.

Page 532

1   should know about.
2      Q.   To whom did you ask that
3   question?
4      A.   The people on the other side
5   of the phone, and the other side was
6   Harold Neas and one of the Deloitte people
7   from Wilton, was it? It's Connecticut,
8   the national headquarters.
9      Q.   When in 2003 was that, can
10  you --
11     A.   It was at -- when we were
12  starting to hassle over the OnCure
13  situation.
14     Q.   But that was -- but this was
15  before Deloitte resigned, obviously, if
16  you had that conversation with Harold
17  Neas?
18     A.   Yes. It was before Deloitte
19  resigned.
20     Q.   What did Mr. Neas say?
21     A.   I don't -- I can't -- I can't
22  recall if it was Mr. Neas or the other
23  person or two. I don't know how many

133

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.        ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 533 to 536)

Page 533

others, but they are all Deloitte people.
2    Q.    Okay.
3    A.    They said absolutely nothing,
4  nothing besides this OnCure transaction,
5  and then one of them suggested that -- and
6  this is slightly off the question that you
7  asked because I think I answered that
8  question, but after that they -- somebody
9  suggested, said if we got some additional
10  data that they would help us out and
11  that -- and then at one point I think
12  Harold Neas said if you got an independent
13  counsel, we would certainly pay a lot of
14  attention to that, something of that
15  nature.
16    Q.    Had Mr. Neas at any time up
17  until that conversation ever shared with
18  the board of directors of DVI that there
19  might be the need for an independent
20  counsel at the company?
21    A.    No.
22    Q.    Had, to your knowledge, Mr.
23  Neas ever shared with the audit committee

Page 534

1    that there might be a need ever before
2  that conversation in 2003, that there
3  might be a need for an independent counsel
4  at DVI?
5    MR. DAILEY: Object to the
6  form.
7    MR. FRIEDMAN: I object. That
8  mischaracterizes his testimony.
9    MS. SCHWARTZMAN: I'm sorry.
10    MR. FRIEDMAN: You keep saying
11  independent counsel at DVI. I don't think
12  that's what he said, and I know it's not
13  what he's referring to.
14    A.    Yeah, I'm referring to the
15  independent counsel that could really get
16  through a thorough examination of the
17  OnCure transaction.
18    MS. SCHWARTZMAN: Okay.
19    MR. FRIEDMAN: That's why I
20  knew there was confusion.
21    MS. SCHWARTZMAN: Thank you.
22    A.    And, so we sort of jumped on
23  that, meaning we talked to the board. We

Page 535

1    had like a board meeting sort of an
2  unofficial conversation, and I said, well,
3  at least one thing is good, we -- we've
4  heard that we don't have any skull
5  drudgery here. I mean, there's no fraud
6  or anything like that from them.
7    And, secondly, I think we
8  should press the point of -- of hiring
9  independent counsel, so we instituted that
10  conversation with them, I think, the next
11  day. I'm talking them being Deloitte.
12  And they said, yes, they would be very
13  open and pleased for us to hire an
14  independent counsel.
15    Q.    Did you ever have a discussion
16  with Mr. Neas or anybody else at Deloitte
17  that there was a necessity for an
18  independent counsel to investigate any
19  issue at DVI other than OnCure?
20    A.    I didn't think that was
21  necessary, so I never thanked in my
22  mind -- the answer is no. And you --
23    MR. FRIEDMAN: Okay. You

Page 536

1    answered it.
2    A.    Okay. The answer is no.
3    Q.    Well, I guess we should look
4  at 26 just to close the loop, which is
5  15 -- on the second page we have another
6  entry for RadNet, and this is an
7  acquisition.
8    A.    Now, wait a minute.
9    Q.    Okay.
10    A.    Oh, yeah.
11    Q.    Okay. Do you have any
12  recollection of that particular
13  transaction?
14    A.    (Examining document.) Yeah, I
15  think I recall it.
16    Q.    Okay. What was the subject
17  matter?
18    A.    Okay. The background of it is
19  that Howard Berger, he had just received a
20  big capitation contract. Do you know what
21  that means?
22    Q.    Yes, sir, I do. But I would
23  ask you to explain it for everybody else.

134

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.          ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 569 to 572)

**Page 569**

A. I don't think he understood that, that he might not be.

Q. What's the basis for your thinking? Just clarify it for me.

A. He enjoyed the business a lot. He enjoyed his position a lot. He was in fact a powerful person when this company was -- was really humming, and he felt it was an ideal circumstance for him.

Q. I'm going to ask you a question that I've asked you several times over the past couple of days, and I do want to preface it by saying I'm not asking this to be argumentative. I'm asking you for you to clarify. You were a board member. Why did you go to meet with the investment bankers for the company?

MR. DAILEY: Objection to form, asked and answered.

A. I don't -- I didn't hear you really ask that before, but I'm happy to answer it because I had come to the conclusion if we were going to make a

**Page 570**

deal, I had to be there.

Q. Why did you come to that conclusion? What was the basis for your coming to that conclusion? What was your reasoning?

A. Do you know what intuition means?

Q. Yes.

A. I had an intuition that the deal was only going to get done if I was there doing it because I wanted to do it, and I think that maybe there wasn't a whole-hearted effort in the past.

Q. And when you say I think maybe there wasn't a whole-hearted effort in the past, would it be correct to say you mean management wasn't enthusiastic about a potential transaction?

A. Correct.

Q. Are you familiar with an accounting firm named Mackinac or Mackinaw Partners?

A. No.

**Page 571**

Q. So, if I were to ask you if you ever came to know that this accounting firm came to DVI to audit DVI's books, you never heard of that the whole time you were at DVI?

MR. DAILEY: Object to the form, lack of foundation.

A. I knew there were auditors there from time to time, but I didn't know -- I never heard -- knew the name.

Q. Did you ever hear of a circumstance where Merrill Lynch sent its own auditors down to audit its warehouse lines?

A. We talked about that yesterday, I believe. But, yes, I did hear it.

Q. Okay. And the audit that I'm talking about is not a regular periodic audit. It was a special audit, if you will, for want of a better term.

MR. DAILEY: Object to the form, lack of foundation.

**Page 572**

MR. FRIEDMAN: Go ahead, Jerry.

A. I said to you that I had asked Mike about it because I'd heard that. And he said look, it's the same. There's no difference. They have been the same auditors and the same people, and it's the same kind of thing.

Q. So, it's your testimony that Mr. O'Hanlon told you there was nothing unusual about this outfit coming down to take a look at DVI?

A. That's my --

MR. FRIEDMAN: I object only in the sense that I don't know who "this outfit" refers to.

Q. Mackinac.

A. Refers to Mackinac.

MR. FRIEDMAN: Yes. But he didn't use the name of the outfit?

A. No.

MR. FRIEDMAN: Okay. That's the confusion.

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.          ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 573 to 576)

Page 573

Q. Well, now we're all confused
and now we've got to clean up.
    MR. FRIEDMAN: Okay.
    Q. Okay. You did testify, did
you not, sir, that you came to learn that
Merrill Lynch had sent auditors down to
DVI --
    A. Yes.
    Q. -- to look at the warehouse
lines?
    A. Right.
    Q. And these auditors whose name
you do not know as you sit here today --
    A. Right.
    Q. -- were not the ordinary
periodic Merrill Lynch auditors. Did you
understand that?
    MR. DAILEY: Object to the
form, lack of foundation.
    A. I didn't understand it at that
time because I was told that they were the
normal auditors.
    Q. Okay. So, Mr. -- Mr. O'Hanlon

Page 574

told you that the auditors were the
regular -- and this would be in May
of '03 -- that they were the regular --
    A. Yes.
    Q. -- Merrill Lynch auditors?
    A. That's right.
    MR. DAILEY: Object to the
form.
    A. It would be May of '03.
    Q. Okay. March. I'm sorry. I
was just corrected.
    MR. DAILEY: Same objection.
    MR. FRIEDMAN: Do you remember
the date, Jerry?
    A. No. But I know it was '03.
    MR. FRIEDMAN: Okay.
    Q. (BY MS. SCHWARTZMAN:) Okay.
Let's talk about Op Co. Do you have any
understanding as you sit here today of the
time frame during which you were
discussing Op Co with UBS?
    A. I think at least a year.
    Q. A year before the crisis?

Page 575

    A. Yeah.
    Q. I'm going to have to ask you
if you can put -- this is a good
question -- if you could put a starting
date on the crisis period.
    MR. DAILEY: Object to the
form.
    A. I think the crisis period
started when we had the disagreement with
the auditors on the OnCure transaction.
    Q. I'm trying to get a date in
here. Does it refresh your recollection
if I were to represent to you that
Deloitte resigned its engagement with DVI
in June of 2003?
    A. No, but -- we looked at the
crisis as before they resigned. It was --
I remember it was the middle to the end of
May because that's when I started to work
every day.
    Q. Maybe it would help me out if
you would define "the crisis."
    A. Well, we knew we -- we had to

Page 576

solve the problem with the auditor. We
had to try -- the first order of business
was to get the independent counsel and
satisfy Deloitte somehow. That was our
first goal.
    In order to do it, it was clear
what their instructions were, and the
instructions were get completely
independent counsel who has the
capability. Someone from the company has
to be with them all the time, but not --
not interfere with his activity, and I was
elected to do that. And then we have to
have a report from him, and then we'll see
what information he digs up.
    Q. Did DVI in fact hire
independent counsel for the OnCure
problem?
    A. Yes.
    Q. Who was the independent
counsel?
    A. The lawyer that we hired, I
can't remember his firm name, but it was

144

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                        ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 577 to 580)

Page 577

Fred Richman.
2      Q.   Was Mr. Richman with Arnold &
3   Porter?
4      A.   No.  That was another
5   exercise.
6      Q.   Okay.
7         MR. FRIEDMAN:  Do you want the
8   name of the firm?
9      Q.   Yes.
10        MR. FRIEDMAN:  It's Richman,
11  Mann, M-A-N-N.  I believe there may be
12  some other names, but those are the --
13     A.   Chizever or something.
14        MR. FRIEDMAN:  Yeah.
15     A.   Would you mind if I looked at
16  my wallet and I --
17        MR. FRIEDMAN:  No, don't.  No,
18  no, no.
19     Q.   That's okay.  It's not that
20  important.  I just like to close the loop
21  when I can.
22     A.   So, I knew Fred Richman
23  because I have been on a board of a

Page 578

1   company that used him on the West Coast.
2   And I wanted to get somebody on the West
3   Coast because that's where most of our
4   examinations were going to take place.
5         And, so, I called Fred.  I gave
6   him a general idea of what we were trying
7   to accomplish.  I asked him if he had any
8   SEC experience.  He said he had.  The
9   woman was Alexandra Wertzman --
10        MR. FRIEDMAN:  Wertzman.
11     A.   Wertzman, who had just left
12  the SEC in the last six months.
13        MR. FRIEDMAN:  That's a person
14  in the firm.
15     Q.   Yes.
16     A.   She was exceptional.  So I
17  said would you take on this assignment?
18  He said absolutely.  And, so, we made
19  arrangements, and the first person -- do
20  you want me to go into detail over it or
21  just --
22     Q.   Answer the question to the
    point that you're comfortable.  I want you

Page 579

1   to be comfortable with your answer, so
2   answer with as much detail as you need.
3      A.   Okay.
4      Q.   As you feel you need to to
5   express yourself accurately.
6      A.   Okay.
7         MR. DAILEY:  Can you restate
8   the question or read back the question?
9         MS. SCHWARTZMAN:  Read back
10  the question, would you, please?
11        (Record read.)
12     A.   Okay.  So, we made -- we
13  developed a schedule.  Mr. Richman and me
14  developed a schedule.
15     Q.   Okay.
16     A.   And, so, Rich Miller was in
17  California at the time, and the first
18  interview we had was with Rich.  Of
19  course, Rich knew the transaction cold.
20  We're talking about the OnCure
21  transaction.  And then Fred Richman and
22  Alexandra came into Jamison and they
23  interviewed an awful lot of people.

Page 580

1         MR. FRIEDMAN:  Jerry, could I
2   suggest, I mean, if Denise wants the
3   specifics of who, she will ask you, but
4   otherwise we're never going to get done if
5   you --
6      Q.   I'll ask the specifics.
7         MR. KRISLOV:  Let him answer.
8         MR. FRIEDMAN:  Okay.
9         MS. SCHWARTZMAN:  I think we
10  need to agree that Mr. Cohn is here to
11  answer questions as fully as possible so
12  that Mr. Cohn is comfortable with the
13  accuracy of his answers.  And Mr. Cohn
14  strikes me as a person whose mind holds
15  detail better than some of the rest of us
16  do.  And, so, if he wants to give us more
17  detail, that's fine with me.
18        So please answer -- answer the
19  questions.  And if I -- if I don't think
20  you've answered my question, I'll ask it
21  again.  I'm not shy.
22     A.   Okay.  So, Richman and his
23  assistant came in, and we immediately

145

Tyler Eaton Morgan Nichols & Pritchett, Inc.

http://www.TylerEaton.com

Toll Free 800.458.6031

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 581 to 584)

Page 581

1  started to interview. We interviewed
2  Steve Garfinkel, Sheila Kalkunte, another
3  counsel that we had in the place,
4  Santangelo, Steve Jasiukiewicz -- just
5  mark down Steve Joe -- J, please -- and
6  Mike O'Hanlon. And I think that was all
7  that we interviewed.
8          And Fred Richman gave Sheila a
9  whole laundry list of documents that he
10 wanted to see and to send out to -- to his
11 office so he could -- when he got back
12 there, that he would be able to start
13 assembling something.
14         And every night the three of
15 us, Alexandra and Fred and I, had dinner
16 together and we talked about what he was
17 going to do the next day. He asked me
18 some things about, you know, the people
19 that we were going to meet. And we ended
20 up with developing a schedule of who we
21 were going to meet in California and how
22 we were going to access them.
23         And then we went back to

Page 582

1  California, and we had set up a meeting
2  with Jeff Goffman, who was the head of
3  OnCure. And he came in with three lawyers
4  into the office of DVI in Newport Beach,
5  and Fred fired away. And for the most
6  part, I was a listener. I didn't give any
7  opinion, which I was instructed that way,
8  and he just kept writing down facts.
9          And Alexandra had her computer
10 out the same way these people are, and she
11 took down everything. And I should say
12 that Jeff Goffman used to be the president
13 of USD, so I knew him pretty well. And he
14 was very willing to cooperate. And to add
15 a little flavor to it, at one point he
16 apparently had some problems with the SEC,
17 so he had a couple of SEC lawyers there
18 that complicated the thing.
19         And, then, we had out there in
20 the office, we had a telefanatic -- what
21 is it, the telephone --
22      Q.   Telephonic.
23      A.   Telephonic. So we then

Page 583

1  interviewed Mark Cherney. Mark Cherney
2  was president of Dolphin and Mark Cherney
3  had engaged in a transaction to buy this
4  one radiation treatment center from --
5  from Jeff Goffman. I had -- I knew Mark
6  Cherney, but I saw him in a different
7  light, light in that he was very well
8  organized, he was very enthusiastic, and
9  he had started to make a lot of progress
10 in this -- in this center that he had
11 bought from OnCure.
12         Because one of the underlying
13 reasons for concern was is this really a
14 real deal or isn't it? And it was a
15 broken down deal, if I describe it
16 that way. But with Cherney's, I guess,
17 good direction, the company had started to
18 do well.
19         Then we found, Richman found a
20 mystery witness, and it was a gentleman --
21 I think his name was McAfee -- who was a
22 managing director of an investment banking
23 firm by the name of Makefield who had

Page 584

1  written up the original document as to the
2  M&A, merger and acquisition, of this
3  particular company.
4          And, so, as it turned out, that
5  pretty much filled up all the -- you know,
6  the information that he needed between the
7  people we had seen in both Jamison and out
8  there. So then he said I want to talk to
9  Deloitte. So I called up Harold Neas, and
10 I said we're doing what you said. We have
11 an independent counsel. He's had several
12 interviews, and he -- he needs to talk to
13 you because you've got to have some input.
14 And Harold Neas said I'll let you know.
15         So, I waited in the State of
16 California. I was waiting there. A
17 couple of days later he called me and he
18 said I've talked to headquarters. And he
19 said I need to have a list of questions
20 that the independent counsel is going to
21 ask me before we agree to this exercise.
22         And, so, I related that to Fred
23 Richman, who is somewhat of a volatile

146

Tyler Eaton Morgan Nichols & Pritchett, Inc.

**A13**

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 593 to 596)

Page 593

was it? It was 13 something.
MR. FRIEDMAN: Million, I
think.
   A.   It was comparatively small.
   Q.   Whatever it was.
   A.   Whatever it was. But it
wasn't significant in that thing. And
Deloitte answered and said, look, we've
got to make sure it's right. If we're
writing off 13, doesn't mean that we're
right. It might -- it should mean -- it
could mean that we're writing off
something that we shouldn't, and we need
more data.
        And that's why -- and they
threw a bone out, Harold did. He said,
look, if you can come up with an
independent auditor or counsel, rather,
you could -- we'll help you out if we like
it.
   Q.   Okay.
MR. FRIEDMAN: Are you at a
logical ending point? Because I know

Page 594

Jerry well enough to know Jerry is getting
tired.
MS. SCHWARTZMAN: Okay. We
can stop for the day.
MR. FRIEDMAN: Okay. Off the
record.
THE VIDEOGRAPHER: This marks
the end of Videotape 5. Going off --
Volume II. Going off the record 4:25 p.m.
        (Said deposition was in recess
        at 4:25 p.m. on the 13th day
        of February, 2008 until 8:36
        a.m. on the 14th day of
        February, 2008. All
        continuing testimony of Mr.
        Cohn is contained in Volume
        III of his Deposition.)

Page 595

THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

CASE NO. 2:03-CV-5336
IN RE DVI, INC. SECURITIES LITIGATION
CASE NO. 04-CV-1277
FLEET NATIONAL BANK, et al.,
                        Plaintiffs,
vs.
O'HANLON, et al.,
                        Defendants.

CASE NO. 04-CV-3423
(Coordinated With 04-CV-1277)
WM HIGH YIELD, et al.,
                        Plaintiffs,
vs.
O'HANLON, et al.,
                        Defendants.

CASE NO. 2:06-CV-1003
DENNIS J. BUCKLEY, as trustee
of the DVI Liquidating Trust,
                        Plaintiff,
vs.
CLIFFORD CHANCE LLP and
CLIFFORD CHANCE U.S. LLP,
                        Defendants.

VOLUME III
VIDEO DEPOSITION OF GERALD COHN
14TH DAY OF FEBRUARY, 2008

REPORTED BY: Gary N. Morgan
              Registered Professional
              Reporter and Notary Public

Page 596

S T I P U L A T I O N
IT IS STIPULATED AND AGREED,
by and between the parties, through their
respective counsel, that the deposition of
GERALD COHN may be taken before Gary N.
Morgan, Registered Professional Reporter
and Notary Public;
        That any objection as to the
form of a question shall be deemed to have
been made on behalf of all other parties
and on all applicable grounds;
        That it shall not be necessary
for any objections to be made by counsel
to any questions, except as to form, and
that counsel for the parties may make
objections and assign grounds at the time
of trial, or at the time said deposition
is offered in evidence, or prior thereto.

149

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031          http://www.TylerEaton.com

84

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 601 to 604)

---

**Page 601**

OTHERS PRESENT:

    Mr. Brad Campbell, Videographer
    Tyler Eaton Morgan Nichols
       & Pritchett, Inc.
    1819 Fifth Avenue North
    One Federal Place
    Suite 1020
    Birmingham, Alabama 35203
    205.222.0712
    video@tylereaton.com

---

**Page 602**

FEBRUARY 14TH, 2008          8:36 A.M.

        THE VIDEOGRAPHER: This marks
the beginning of Videotape Number 1,
Volume III, in the deposition of Gerald
Cohn. Today's date is February the 14th
of the year 2008. We're going on the
record at 8:36 a.m.

EXAMINATION BY MS. SCHWARTZMAN -
CONTINUING:
    Q.   Good morning, Mr. Cohn.
    A.   Good morning.
    Q.   And it's good to see you
again.
    A.   Thank you.
    Q.   And we are going to try very
hard, and we are going to succeed, at
completing your deposition today. So, as
an initial instruction, I would like to
suggest to you that, to the extent that
you can keep your answers brief but
accurate, if you would try to do that,

---

**Page 603**

sir.
    A.   Great.
    Q.   We discussed in this
deposition previously, I believe on the
first day, your association with the
Pritzker interests. Do you recall that
testimony?
    A.   I do.
        MS. STRIKIS: Object to the
form.
    Q.   By association, I just -- you
knew the Pritzker family, is that correct?
    A.   Correct.
    Q.   You know what The Pritzker
Organization is, is that correct?
    A.   Yes.
    Q.   You invested in some entities
in which the Pritzker interests had
invested, is that correct?
    A.   Correct.
        MS. STRIKIS: Object to the
form.
    Q.   You suggested DVI as an

---

**Page 604**

investment to the Pritzkers, is that
correct?
    A.   Yes.
    Q.   The Pritzkers, your testimony
was, performed their own due diligence
before they invested in anything, is that
correct?
    A.   Correct.
    Q.   Did the Pritzker interests,
and by the Pritzker interests, I mean any
of the Pritzkers that we have described,
the organization which is a legal entity,
the family or any of the affiliated
entities, did the Pritzker interests ever
suggest investments to you?
    A.   Never.
    Q.   In the whole time you were
associated --
    A.   Oh, you mean to me or --
    Q.   To you.
    A.   To me personally.
    Q.   To you personally.
        MS. STRIKIS: Object to the

151

---

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008
(Pages 641 to 644)

**Page 641**

it. They are worse than that.
Q. How about high pressure sales
of worthless stock?
A. Well --
MS. STRIKIS: Object to the
form.
MR. FRIEDMAN: I object to the
form as well.
A. Well, in our particular case,
it wasn't worthless stock, but they --
they have a technique that is usually
designed so that the break -- the broker
and the brokerage company makes money and
the client doesn't.
Q. Okay. That's a good
definition. Thank you.
Did you ever advise the
Pritzker interests that DVI was having
problems in compliance reporting for its
Fleet loan?
MS. STRIKIS: Object to the
form.
A. No, absolutely no.

**Page 642**

Q. To your knowledge, did DVI
ever lend money to any companies owned or
controlled by the Pritzker interests?
A. Yes.
Q. What company was that?
A. MarCap.
Q. Could you explain to me,
please, the circumstances of that loan?
A. Well, MarCap, you mentioned
that name before in a different context,
but MarCap was a -- I don't know if it was
a division or a section or subsidiary or
whatever of Marmon, and they had a
long-standing company that started as
TransUnion Credit, and when Mar -- Marmon
bought TransUnion, this company came along
and they changed the name to MarCap. And
what they were doing was very similar to
what DVI was doing, and that is doing
leases for MRI centers and medical
equipment. And at some point they also
decided to be in the business of operating
those centers.

**Page 643**

And, so, we did some business
with them on the same terms that we were
doing business with anybody else. Meaning
we were financing them.
Q. Lend -- when MarCap was the
obligor of DVI --
A. Yes.
Q. -- did DVI lend MarCap money
for operating centers?
A. Yes. That's what I just said.
Q. Did DVI lend money to MarCap
only for its business of operating
centers?
MS. STRIKIS: Object to the
form.
A. As I recall, at some times the
MarCap loans were -- we bought some
existing loans that MarCap had in force so
that they were like -- almost like a
broker where they would sell us some of
the paper that they had generated prior.
Q. Prior to what, please?
A. Prior to that time, that is to

**Page 644**

say, let's suppose they financed ABC to
build a center, and the paper matured a
little bit, and they said, you know, we --
maybe what we should do is liquefy this,
and so they would sell it to us.
Q. Do you have any relationship
with MarCap now?
A. No.
Q. Did you ever have a
relationship with MarCap post the filing
of the bankruptcy by DVI?
A. No.
Q. Do you recall what loans of
MarCap DVI acquired?
A. No, I can't.
Q. Do you -- well -- did DVI
continue to lend MarCap capital to lend to
other borrowers?
MR. DAILEY: Object to the
form.
MS. STRIKIS: Object to the
form.
A. You say did they continue.

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.           ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 645 to 648)

Page 645

1  The whole amount of business that was with
2  MarCap was not a very significant amount,
3  so I -- I would say no. The answer was
4  no.
5      Q.   Did the business of MarCap
6  extend over a period of time?
7      A.   Yes, it did.
8      Q.   Do you have any recollection,
9  as you sit here today, as to the dollar
10 volume of the DVI interests in -- excuse
11 me, loans to MarCap?
12     A.   No. One of the reasons for
13 that is it never got on the watch list.
14     Q.   To your knowledge, was it --
15 did the Pritzker interests ever take a
16 look at DVI to purchase the company?
17     MS. STRIKIS: Object to the
18 form.
19     A.   Never.
20     Q.   Do you recall you testified
21 both yesterday and the day before that you
22 had purchased notes of DVI's?
23     A.   Yes.

Page 646

1      Q.   And do you recall that you
2  testified that those notes were to come
3  due in 2002?
4      A.   Right.
5      Q.   And do you recall that you
6  testified that you agreed to extend the
7  due date to 2004?
8      A.   We signed a new note that
9  renewed the original note with the same
10 terms and conditions.
11     Q.   At whose behest did you sign
12 the new note?
13     MS. STRIKIS: Object to the
14 form.
15     Q.   Who asked you? Who
16 specifically at DVI asked you, Jerry, sign
17 a new note, please?
18     MS. STRIKIS: Object to the
19 form.
20     MR. DAILEY: Object to the
21 form.
22     A.   Steve Garfinkel.
23     Q.   Did only Mr. Garfinkel ask

Page 647

1  you?
2      A.   I just can't remember.
3      Q.   Did you discuss the note with
4  Tony Turek?
5      A.   I don't recall that.
6      Q.   Did you discuss the notes with
7  Michael O'Hanlon?
8      A.   I probably did. Can I give
9  you a little context on this of how
10 because --
11     MR. FRIEDMAN: Okay. Go
12 ahead.
13     A.   I tell you what because it
14 might be important.
15     Q.   Okay.
16     A.   The notes were due in 2002,
17 June 2002, and it was already July, and
18 that brought the note into the current
19 liability category.
20     MR. FRIEDMAN: To be clear,
21 July of 2001, correct?
22     A.   July 2001.
23     MR. FRIEDMAN: Okay.

Page 648

1      A.   So, they said, you know, we've
2  got to get this done before the quarter.
3  I remember Steve saying we have to have
4  this done before the quarter so that we
5  can classify the notes as long-term, and
6  that's -- and according to my
7  recollection, we did it at the beginning
8  of August.
9      Q.   August of 2001?
10     A.   Right.
11     Q.   Did -- did other members of
12 the DVI also own the notes that we're
13 discussing here, the notes that originally
14 came due in June 2001?
15     MS. STRIKIS: Object to the
16 form.
17     MR. FRIEDMAN: Members of
18 management? You said members of DVI. Do
19 you mean the management?
20     Q.   I meant members of the board.
21     MR. FRIEDMAN: Members of the
22 board?
23     Q.   Members of the board of DVI.

162

Page 649

    A.  Not that I was aware of.
    Q.  Did other members of
management of DVI also own notes that were
to come due in June 2002?
    A.  No.
    Q.  Did any owners of the notes
that were due June 2002 besides you extend
the notes?
    A.  Yes.
    MS. STRIKIS:  Object to the
form.
    Q.  Who?
    A.  The charitable foundation that
our family has.  They extended $200,000
worth of notes.
    Q.  Did the Pritzker interests own
notes that were due June 2002?
    A.  They did.
    MS. STRIKIS:  Object to the
form.
    Q.  Did the Pritzker interests
extend the notes at that time?
    A.  Yes.  I'd like to say, to be

Page 650

more accurate, we would renew the notes --
    Q.  Okay.
    A.  -- because we made -- it was a
new document.
    Q.  Okay.  Who suggested to the
Pritzker interests that they renew the
notes?
    MS. STRIKIS:  Object to the
form.
    A.  I recall -- seem to recall
that Mike O'Hanlon did.
    Q.  Do you know to whom he spoke?
    A.  More than likely, Mark
Hoplamazian.
    Q.  In 2002, based on your
knowledge of the company as a member of
the credit committee and a member of the
board of directors --
    A.  Uh-huh.
    Q.  -- did you know if DVI had the
cash to pay the notes in 2002 to you and
the Pritzkers?
    MR. DAILEY:  Object to the

Page 651

form.
    A.  I certainly -- I -- I
certainly assumed it, based on everything
I knew in those positions you just
described, or I would have just said
forget it, just pay us off.  Why would I
want to renew it if I -- if I knew that
they were cooking the books, so to speak?
    Q.  Well, again, not to be
argumentative --
    A.  Okay.
    Q.  -- but one of the reasons --
    MR. DAILEY:  Usually when she
says that, that means she's about to get
argumentative.
    Q.  One of the reasons --
    A.  All right with me.
    Q.  One of the reasons to renew
the note could be, could it not, to keep
the company afloat?
    MS. STRIKIS:  Object to the
form.
    MR. FRIEDMAN:  Well, of --

Page 652

    A.  Give me a chance like this
again, and you'll see my answer.
    MR. FRIEDMAN:  Go ahead and
answer the question.
    A.  My answer is between just my
friends and I and our charitable
foundation, we blew about a million and a
half dollars.  I'd rather have that
million and a half dollars than keeping
the company afloat, especially under the
circumstances that we now know.
    Q.  So, I'm going to be very
specific with my question.
    A.  Okay.
    Q.  Is it correct, then, that your
testimony is that in July and August of
2001, in that time period, you did not
renew the note to keep the company afloat?
    A.  Absolutely not.
    Q.  Closed lips.  Do you know, as
you sit here today, if the Pritzker
interests renewed the notes to help keep
the company afloat?

163

**Page 797**

Exhibit 56?
2      MS. STRIKIS:  Object to the
3  form.
4      A.  No.
5      Q.  Did you receive it from Tom
6  Pritzker?
7      MS. STRIKIS:  Object to the
8  form.
9      A.  I don't recall that I did get
10 it from Pritzker.
11     Q.  Is it your understanding that
12 this was a letter from Eric Hanson --
13     A.  Yes.
14     Q.  -- to Mr. Pritzker?
15     A.  Yes, I -- I see that.
16     Q.  Who -- who was Eric Hanson?
17     A.  Eric Hanson was a manager --
18 managing director of Lazard.
19     Q.  And where -- where did Lazard
20 stand in terms of the -- the GE pro --
21 proposed transaction?
22     A.  Well, Lazard --
23     MS. STRIKIS:  Object to the

**Page 798**

1  form.
2      A.  -- was representing General
3  Electric.
4      Q.  Do you have an understanding
5  of what -- what was being communicated by
6  Mr. Hanson to Mr. Pritzker in this letter?
7      MS. STRIKIS:  Object to the
8  form.
9      A.  I saw it, yes.
10     (Off-the-record discussion.)
11     Q.  (BY MR. BERRINGER:)  What's
12 your understanding about the purpose of --
13 of this letter from Mr. Hanson to Mr.
14 Pritzker?
15     A.  Well, I think --
16     MS. STRIKIS:  Object to the
17 form.
18     MR. FRIEDMAN:  Okay.  Now, go.
19 Just let them object.  Then, you answer.
20     A.  I know.  I'll -- I'll have to
21 concentrate on it.  Tell me when.
22     MR. FRIEDMAN:  Now.
      A.  Now?

**Page 799**

1      MR. FRIEDMAN:  Now.
2      MS. STRIKIS:  Now.
3      A.  All right.  Okay.  It seems to
4  say that after they did their due
5  diligence, they were of the impression
6  that they had to -- that they no longer
7  could subscribe to a $23 a share offer,
8  and he -- he speculates that the new offer
9  would be between 17 and 18, and that was
10 brought about because they thought that
11 there -- there was a -- a potential
12 impairment of $150 million.
13     Q.  When you received a copy of
14 Exhibit 56, did you share it with any
15 other members of the board?
16     MS. STRIKIS:  Object to the
17 form.
18     A.  I might have easily gotten it
19 from somebody from the board, for all I
20 know, but -- there was some discussion --
21 I had some discussion about it, yes.
22     Q.  Who did you have discussion
23 with?

**Page 800**

1      A.  Well, I did talk for a little
2  bit about -- about it with Michael
3  O'Hanlon, and -- and, of course, his point
4  was contrary, and basically, he said
5  they're talking about a liquidation value
6  of $150 million.  They don't understand
7  that we have a good record of workout.
8      Q.  Did you discuss -- at -- at --
9  at this point in time, you were no longer
10 a member of the audit committee, correct?
11     A.  Yes, I was no longer.
12     Q.  Did you share this letter with
13 anyone on the audit committee?
14     A.  That would have been Mr.
15 Gold -- I probably showed it to Goldberg.
16     Q.  Well, let -- let's try to be
17 sure about that.
18     A.  Well, I know there was
19 conversations, and at the time --
20     Q.  The important thing is with
21 who and when.
22     A.  Yeah, well, I had
23 conversation.  I would have continuous

200

Page 805

```
 1   $150 million write-off have been a fairly
 2   substantial write-off of business?
 3       A.   Huge.
 4       Q.   Do you know whether anyone --
 5   whe -- whether the letter or the assertion
 6   of the need for that kind of write-off was
 7   ever the subject of a -- of a formal
 8   discussion by the board or by the audit
 9   committee?
10       MR. DAILEY:  Object to the
11   form.
12       A.   No.
13       Q.   If GE was correct that a
14   $150 million write-off might be necessary,
15   what, if anything, would you, as a board
16   member, have done?
17       MR. DAILEY:  Object to the
18   form.
19       MR. FRIEDMAN:  I --
20       A.   What I thought about it?  I
21   would have been scared green about it.
22       Q.   And what would you have done
23   about it?
```

Page 806

```
 1       A.   Well, first thing I would do
 2   is really find out exactly what it was,
 3   and then, after that, I would see why it
 4   happened or -- was it a breakdown of
 5   some -- some sort or another, and then, I
 6   would go about trying to repair it.
 7       Q.   Did you undertake any of
 8   those -- those steps when you received a
 9   copy of Exhibit 56?
10       A.   I never -- I never gave it
11   much credibility.
12       Q.   And why is that?
13       A.   It -- first of all, they were
14   a potential buyer.  We were a seller.
15   Their obligation was to buy this thing at
16   the lowest price, and our obligation was
17   to sell it at the highest price.
18       Q.   Okay.
19       A.   So, we started out from that
20   aspect.  I don't know what -- their basis
21   of 150 million.  I could have said -- I
22   could have heard them say something much
23   bigger than that, too, or less than that.
```

Page 807

```
 1   So, I'd have to really get into it with
 2   them to see what the basis was.
 3       Q.   Okay.  In terms of your
 4   thought process, what did -- did
 5   Deloitte's work, as your auditors, play
 6   into your -- your reasoning at -- at this
 7   point?
 8       MR. DAILEY:  Object to the
 9   form.
10       A.   I did know that the auditor
11   spent a lot of time with those kinds of
12   evaluations when they audited our books.
13   It was not -- it was not a slipshod kind
14   of exercise.
15       Q.   Had anyone from Deloitte ever
16   suggested, even on a preliminary basis, as
17   far as you can recall, a write-off even
18   approaching the magnitude of 150 million?
19       MR. DAILEY:  Object to the
20   form.
21       A.   Not to me.
22       Q.   And to your knowledge --
23       A.   I'm sorry.
```

Page 808

```
 1       Q.   -- had -- had that suggestion
 2   ever been made to anyone at man -- in --
 3   in management?
 4       A.   No.
 5       Q.   Or on the audit committee?
 6       A.   The audit committee, I'd have
 7   no way -- no way of knowing.
 8       Q.   Did anyone from the audit
 9   committee ever indicate to you that --
10   that Deloitte, even in a preliminary
11   fashion, was suggesting write-offs in the
12   magnitude -- approaching the magnitude of
13   150 million?
14       A.   No.
15       MR. DAILEY:  Object to the
16   form; lack of foundation.
17       Q.   That's it on that one.
18   Follow-up from yesterday.  We were talking
19   at one point about when you heard about
20   the -- the double pledging or the double
21   booking of -- of -- of contracts.  You
22   mentioned that you had a discussion about
23   that topic with Mr. Healy.  Do you recall
```

202

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008
(Pages 809 to 812)

Page 809

1  that?
2          MS. LERNER: Object to the
3  form.
4      A.  Yes, I do recall it.
5      Q.  Did -- what I wanted -- and
6  just briefly get an understanding of, is
7  who raised the issue of -- who -- who --
8  who initiated the discussion?
9      A.  Mr. Healy called me.
10     Q.  Okay.
11     A.  He said that he had gotten a
12 call from Steve Garfinkel just a few
13 minutes earlier to make the announcement
14 to him that there was a $50 million hole
15 in the collateral.
16     Q.  Did Mr. Healy go into any more
17 detail than that?
18     A.  That was about it.
19     Q.  Do you recall ever --
20     A.  No, he said it was a serious
21 situation. I said I know, and I had told
22 him, I said, I've already gotten a call.
23 Remember that was my testimony that I had

Page 810

1  already gotten a call from prior.
2      Q.  I -- I guess the question was:
3  Did Mr. Healy seem to convey to you his
4  understanding of what was meant by a
5  $50 million hole in the collateral?
6      A.  He wasn't any more specific
7  than that.
8      Q.  Did you ever have any
9  subsequent discussions with Mr. Healy in
10 which he indicated what his in --
11 understanding was of what the hole in the
12 collateral meant?
13     A.  No, I had no subsequent
14 conversation with him.
15     Q.  Incidentally, do you have an
16 understanding as to how Mr. Garfinkel went
17 about double pledging or -- or double
18 booking the same collateral?
19         MR. DAILEY: Objection to
20 form.
21     A.  I first learned about it upon
22 reading the Susan Gibson letter.
23     Q.  Okay.

Page 811

1      A.  Then, it became clear to me
2  what he was doing. It was not only double
3  pledging, but it was using ineligible
4  collateral.
5      Q.  Ineligible collateral. Do you
6  have an understanding as to why Mr.
7  Garfinkel was doing what he did?
8          MR. FRIEDMAN: I -- I object.
9          MR. DAILEY: Object to the
10 form.
11         MR. FRIEDMAN: Yeah.
12     Q.  Well, let me ask this
13 question, first. You -- has there ever --
14 have you ever had any information to
15 suggest that Mr. Garfinkel was personally
16 profiting from what he did?
17     A.  I never had that information,
18 no.
19     Q.  Do you have an understanding
20 as to -- to -- to the purpose behind the
21 double pledging and the use of ineligible
22 collateral?
23         MR. FRIEDMAN: Object. Go

Page 812

1  ahead. It's befuddling to me, to be
2  honest with you.
3      A.  Well, was he using the in --
4  ineligible collateral because he didn't
5  have eligible collateral to use to -- to
6  secure borrowing?
7          MR. DAILEY: Objection to
8  form.
9      A.  Oh, obviously.
10     Q.  And was that because there
11 were cash shortfalls and liquidity
12 problems at various times?
13         MR. DAILEY: Objection to
14 form.
15     A.  Well, he said, if you recall
16 my testimony, that they went in and out of
17 compliance.
18     Q.  Right.
19     A.  And I judged that to mean the
20 following: Part of it is what I said
21 yesterday, and I think, maybe, I might
22 have omitted something because of the

203

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 813 to 816)

Page 813

1  question you just asked me. It started me
2  to think a little bit. Maybe, I wasn't
3  complete enough.
4      Q.  Uh-huh.
5      A.  But when he said that they
6  went in and out of compliance and I asked
7  him what does that mean, he said, well,
8  you know how securitizations work. Now,
9  just to step back, two times before this
10 group here, I discussed how
11 securitizations work, meaning --
12     Q.  And we probably don't need to
13 go through it again.
14     A.  Okay. Okay.
15     Q.  Tell you what?
16        MR. FRIEDMAN: Wait a minute.
17 Let him --
18        MR. BERRINGER: Okay.
19     A.  The one thing that I missed
20 was --
21     Q.  (BY MR. BERRINGER:) Uh-huh.
22     A.  -- that sometimes there's a
23 delay on the part of the underwriter to

Page 814

1  execute the -- the sale of the
2  securitization, and it's in that delay
3  that causes an imbalance on the cash and
4  the collateral, and that's why, as he
5  said, it swung in and swung out.
6      Q.  Okay. Do you have an
7  understanding of one of the ways in
8  which -- well, strike that.
9         Do you have an understanding,
10 that in connection with the Fleet and
11 Merrill warehouse facilities, that there
12 were restrictions on what type of
13 collateral could be pledged?
14     A.  I had general understanding of
15 it. I -- I never looked at the document.
16     Q.  Did you have an understanding
17 that -- that whether or not a contract was
18 delinquent played a role in whether or not
19 it could be pledged?
20        MR. DAILEY: Objection to the
21 form.
22     A.  Yes, I had that understanding.
23     Q.  And was it your understanding

Page 815

1  that delinquent contracts could not be
2  used as part of the borrowing base?
3      A.  Yes.
4      Q.  When Mr. Garfinkel said that
5  they were in and out of compliance, did
6  you have an understanding that one of the
7  ways they were sometimes out of compliance
8  was by failing to immediately replace
9  delinquent collateral in the borrowing
10 base?
11     A.  No. That was not my
12 understanding.
13     Q.  I'll be bouncing around a
14 little bit. So, I need some indulgence.
15        You also discussed yesterday,
16 or maybe the day before, your awareness
17 that $44 million had been moved to -- to
18 Merrill?
19     A.  Right.
20     Q.  What did you learn about that?
21     A.  When?
22     Q.  What.
23     A.  What?

Page 816

1      Q.  What did you learn, yeah.
2      A.  Well, I was sitting in Michael
3  O'Hanlon's office. I think Harry Roberts
4  was there. Mike was there and Rich
5  Miller, and Matt Goldenberg was passing
6  by, and he came in the office, and he said
7  did we -- did we know that there was a
8  $44 million slug of collateral that was
9  taken out of our shop and sent to Merrill
10 Lynch. That's how I found out about it.
11     Q.  And who was that that told
12 that, Mr. Roberts?
13     A.  No, Matthew -- Matt
14 Goldenberg.
15     Q.  Goldenberg. Did he go into
16 any further detail about it?
17     A.  No.
18     Q.  A couple of questions, and
19 these are going to be very rudimentary.
20 Did you have an understanding of what Mr.
21 O'Hanlon's role was in connection with the
22 setting of loss reserves for the company?
23     A.  No. I didn't think he set the

204

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                http://www.TylerEaton.com

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 833 to 836)

**Page 833**

1  kind of level, if you had been informed,
2  as a member of the board, that the workout
3  group was rou -- routinely permitting
4  overadvances to be used to avoid
5  impairment of the loan, would that have
6  troubled you?
7        A.   Yes, it would.
8        MR. DAILEY:  Objection to
9  form; lack of foundation.
10       A.   I'm sorry.
11       Q.   And if that had been brought
12 to your attention, either as a board
13 member or when you were a member of the
14 audit committee, what would you have done
15 about it?
16       MR. DAILEY:  Object to the
17 form.
18       A.   I would have called a special
19 meeting of the board to take some action
20 about it.
21       Q.   Would that have caused you
22 to -- to -- to want to take a hard look at
23 reserves in general?

**Page 834**

1        A.   Yes. I would have questioned
2  the system.
3        Q.   I got a -- I got a few more
4  questions, not much more.
5        You had talk -- talked a little
6  bit about Aegis Bio --
7        A.   Yeah.
8        Q.   -- this morning. Were you
9  aware of the fact that loans were being
10 authorized to Aegis Bio in order to permit
11 Aegis Bio to pay off earlier loans?
12       A.   No.
13       Q.   Would that have been a --
14 caused you concern?
15       A.   Yes, it would have been a
16 concern.
17       Q.   Were you aware of the fact
18 that -- that the only collateral for those
19 loans was -- or the only justification for
20 loans was the -- a pro forma based upon
21 contracts that had not been se -- not yet
22 been secured by Aegis Bio?
23       MR. DAILEY:  Objection to

**Page 835**

1  form.
2        A.   I was told this company had a
3  viable future based upon, as you would
4  look at a venture firm, which is something
5  that I do for a living, and I was told
6  that there were a lot -- there was a lot
7  of market for this particular product, and
8  they were starting to see some improvement
9  in their ability to market their
10 particular product.
11       Q.   Do you know whether -- well,
12 let me ask the question this way:  If you
13 were on the -- the credit committee and
14 had been asked to approve a loan, based
15 solely upon pro formas, which were, in
16 turn, based upon hoped for contracts,
17 would that be sufficient for -- for
18 purposes of loan committee approval?
19       A.   No, sir.
20       MR. DAILEY:  Object to the
21 form.
22       Q.   And -- and why is that?
23       A.   Because we usually -- we -- we

**Page 836**

1  always tried to get some firm collateral
2  other than projections.
3        Q.   Okay.
4        A.   And we would -- in the case of
5  that one, if, in fact, they didn't have
6  any collateral, meaning equipment,
7  receivables, patents, whatever, we would
8  look to the principals to guarantee the
9  loan if, in fact, their financial
10 statements were strong enough.
11       Q.   And what if they weren't?
12       A.   Then, I wouldn't have made a
13 loan.
14       MR. DAILEY:  Objection to
15 form.
16       Q.   What if they already owed you
17 some money and the only way that they
18 could stay in business was if you were to
19 loan them more money?  Would that justify
20 ignoring the -- the other credit
21 requirements you just mentioned?
22       MR. DAILEY:  Object to the
23 form.

209

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                              ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008
(Pages 849 to 852)

Page 849

your judgment as to --
A.  Absolutely.
Q.  And how would it have altered
your judgment as to the creditworthiness?
A.  It would have altered it lot.
Q.  And -- in what way?
A.  I'd become very negative on
it.
Q.  I think you said you would
have shut them off?
A.  Something like that, yeah.
Q.  Yeah.  What do you mean by
that?
A.  I would put the pressure on
somehow to -- to call the loan.
Q.  Would you have stopped making
additional loans?
A.  Absolutely.
Q.  Do you know whether DVI -- and
this is a fact question, not an assumption
question.
A.  Right.
Q.  Do you know whether DVI ever

Page 850

secured an enforceable second mortgage?
A.  No, I don't.  But that -- are
you finished?
Q.  Now -- now, remember --
remember what the ground rules are?
A.  What is it?
Q.  Who's the questioner?
A.  I know, but I wasn't going to
ask you a question.
Q.  Okay.  You wanted to amplify a
previous answer or just --
A.  My short --
Q.  -- volunteer an observation?
A.  My short-term memory just went
to hell.
Q.  Okay.  Do you know whether
any -- strike that.
One final area, and it'll take
just a couple of seconds.  Rewrites of
contracts and forbearance on loans, what
role did the credit committee play on
rewrites on contracts and forbearance
on -- on loans?

Page 851

MR. DAILEY:  Objection to
form.
A.  None.
Q.  None?
A.  None.
Q.  And that was all solely the
province of the workout people?
A.  It was not under the province
of the -- of the credit committee.
Q.  Were you aware of the fact
that loans were -- with respect to HIS,
that loans were rewritten in order to
avoid delinquency?
MR. DAILEY:  Object to the
form; lack of foundation.  Again, John,
you can't make representations to the
witness unless you have facts to back them
up.
A.  I was not aware of it.
Q.  If -- if -- if you had learned
that loans were being rewritten in order
to avoid delinquency, would that have
caused you, as a board member, some

Page 852

concern?
MR. DAILEY:  Object to the
form.
A.  Would have caused concern but
if you recall my testimony yesterday, I
was opposed to that loan.  I was opposed
to the HIS loan.  I went into detail why I
was opposed to it and so forth.  So, I
just want to add to that.
Q.  I take it you -- okay.  Why
was the loan made over your objections?
A.  Because I didn't have the veto
power.
Q.  Was this the loan yesterday
that had the -- if -- if -- if he went to
O'Hanlon, he'd just make us do it?
MR. DAILEY:  Object to the
form.
A.  No.  There were other
supporters on the committee on that loan.
Q.  Were you aware of the fact
that -- that operators would be replaced
by the workout, when -- when they were

213

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                    http://www.TylerEaton.com

94

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.            ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 873 to 876)

Page 873

A.    I can't -- I can't tell you.
Q.    Do you recall what year?
A.    It was 2001 or 2002, I'm
guessing, but it was not at the end of the
day. I mean, it was early.
Q.    This was a board meeting that
you would have been present for?
A.    I was there.
Q.    And do you recall if there
were any board minutes that reflect those
conversations or discussions?
A.    I -- I don't recall that. I
didn't keep the minutes.
Q.    Do you recall having any
discussions about Mr. Garfinkel's erratic
behavior in 2001 with anyone outside of
the DVI board?
A.    No.
Q.    With anyone outside of DVI?
A.    No.
MR. TEPPER:  I think that's
all I have, sir. Thank you for your time.
THE VIDEOGRAPHER:  Off the

Page 874

record 3:11 p.m.
(Said deposition was in recess
at 3:11 p.m. until 3:21 p.m.
after which the following
occurred:)
THE VIDEOGRAPHER:  Back on the
record, 3:21 p.m.

EXAMINATION BY MS. STRIKIS:
Q.    Mr. Cohn, my name is Sylvia
Strikis, and I represent Thomas J.
Pritzker and The Pritzker Organization.
Other than at this deposition, have you
met me before?
A.    No.
Q.    And have you spoken with me
before other than at this deposition?
A.    No.
Q.    In your prior testimony over
the past couple of days, you referenced
certain actions that you took because you
said you thought those actions might
benefit DVI shareholders. And my question

Page 875

to you is, in taking those actions that
you testified about, did you intend to
benefit all DVI shareholders?
A.    All of them.
Q.    And the work that you
testified that you did for DVI, did you
perform that work to benefit all DVI
shareholders?
A.    All the shareholders.
Q.    Have you ever been an employee
of The Pritzker Organization?
A.    No.
Q.    In relation to DVI, did you
ever consider yourself to be the agent of
Thomas Pritzker?
A.    No.
Q.    Did you ever consider yourself
to be the agent of The Pritzker
Organization in connection with DVI?
A.    No.
Q.    Did Thomas Pritzker ever
control any decision you made as a member
of the DVI board?

Page 876

A.    No.
Q.    Did anyone --
A.    I must add to it, if you don't
mind. Give me a little leeway here. He
never controlled any of my decisions,
period.
Q.    Period. Including with
respect to DVI?
A.    Including with respect to DVI.
Q.    And I would take it your
answer would be the same with decisions
that you made in your position on the DVI
audit committee, Thomas Pritzker did not
control any of those decisions?
A.    None.
Q.    And with respect to the DVI
loan or credit committee, whichever --
MR. KRISLOV:  Sylvia, I'm
going to object to your doing leading
questions because this is not an adverse
witness to you.
MS. STRIKIS:  I will rephrase
that question.

219

Toll Free 800.458.6031

http://www.TylerEaton.com

95

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 877 to 880)

Page 877

Q. Did Thomas Pritzker ever
control any decision you made as a member
of DVI's loan or credit committee?
A. No.
Q. Did anyone from The Pritzker
Organization ever control any decision you
made as a member of the DVI board?
A. No.
Q. Did anyone from The Pritzker
Organization ever control any decision you
made as a member of the DVI audit
committee?
A. No.
Q. Did anyone from The Pritzker
Organization control any decision you made
as a member of the DVI compensation
committee?
A. None.
Q. At any time that you were on
the DVI board or any related committee,
did you purport to speak on behalf of
Thomas Pritzker?
A. Never.

Page 879

to DVI?
A. No.
Q. Did anyone from The Pritzker
Organization ever pressure you to do
anything with respect to DVI?
A. No.
Q. Did you ever do anything as a
DVI director because you thought that it
was what Tom Pritzker wanted you to do?
A. No.
Q. Did you ever do anything as a
DVI director because you thought anyone
from The Pritzker Organization wanted you
to do them?
A. No.
Q. Are you aware of any time that
Thomas Pritzker sought any special
treatment in connection with DVI?
A. No.
Q. Are you aware of any time that
anyone from The Pritzker Organization
sought any special treatment in connection
with DVI?

Page 878

Q. At any time you were on the
DVI board or any committees, did you
purport to speak on behalf of The Pritzker
Organization?
A. No.
Q. To the best of your
recollection, was Thomas Pritzker ever
involved in directing or managing DVI?
A. No.
Q. To the best of your knowledge,
was anyone from The Pritzker Organization
ever involved in directing or managing
DVI?
A. No.
Q. Did Thomas Pritzker ever tell
you to do anything with respect to DVI?
A. No.
Q. Did anyone from The Pritzker
Organization ever ask you to do anything
with respect to DVI?
A. No.
Q. Did Thomas Pritzker ever
pressure you to do anything with respect

Page 880

A. No.
Q. To your knowledge, did Tom
Pritzker tell anyone at DVI what to do?
A. Never.
MR. KRISLOV: You're leading.
These are still leading questions.
MR. FRIEDMAN: I guess you're
objecting.
MR. KRISLOV: Objection,
leading questions.
Q. (BY MS. STRIKIS:) To your
knowledge, did anyone at The Pritzker
Organization tell anyone at DVI what to
do?
A. No.
Q. To your knowledge, did DVI do
or not do anything because Thomas Pritzker
instructed DVI to take any particular
action?
A. No.
MR. KRISLOV: Objection,
leading and compound.
MS. STRIKIS: I have no

220

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 909 to 912)

Page 909

A.    The trial lawyers.
Q.    What trial lawyers?
A.    Strike suit lawyers.
Q.    Is that because they were --
those people in that category are
potential employers or engagers of the
examiner?
A.    That's exactly what my
intention was when I made the remark.
Q.    The examiners -- when you made
the remark. You mean when you testified
to that under oath?
A.    Yes, when I testified.
Q.    The examiner said that you --
withdrawn.
       You described a few minutes ago
some respects in which you think the
examiner was incorrect in talking about
you, correct?
A.    Yes.
Q.    The examiner said that you
knew about the pledging of ineligible
collateral in 2001. Is that statement

Page 910

true or false?
A.    That is false.
Q.    Well, you testified in
response to a question earlier about a
meeting with Matthew Goldenberg and the
other people you identified in which you
learned that there was a collateral
transfer to Merrill Lynch, correct?
A.    Correct.
Q.    And in response to
Mr. Tepper's question, you said that that
meeting occurred in the last half of July,
correct?
A.    Correct.
Q.    Do you know whether Fleet was
informed of that fact?
A.    We -- I know this --
Q.    Okay.
A.    -- that we had a special board
meeting and we instructed O'Hanlon to call
Fleet. And at that time, the subject, I
think it was we had a collateral
shortfall. Okay. And they did call, and

Page 911

they made an appointment to go up there,
"they" being Mike O'Hanlon and the -- the
people from Fleet insisted that they take
a director along because they wanted
somebody to -- other than O'Hanlon to
participate.
Q.    And did that occur?
A.    And that did occur.
Q.    And who was that other
director?
A.    Harry Roberts.
Q.    And did Mr. Roberts and
Mr. O'Hanlon meet with Fleet?
A.    They went to Fleet, yes.
Q.    Did you ever get a report on
what occurred at that meeting?
A.    Well, sort of an unofficial
report, I'd say.
Q.    Could you tell us what you
learned?
A.    Well, I heard from O'Hanlon
that, as he said, the meeting was bloody.
Q.    Was I'm sorry?

Page 912

A.    Bloody.
Q.    Bloody.
A.    And then as he continued on
and I sort of -- I asked him, you know,
what specifically went on and so forth.
By the time the meeting -- the call with
him was over, he was taking a little bit
different position, said that he felt that
Fleet would in fact help us through
this -- this episode.
Q.    Let me shift topics. How much
stock -- withdrawn.
       How much common stock of DVI
did you own at the time of the bankruptcy
filing?
A.    320,000 shares.
Q.    And how did you acquire that
stock?
A.    I acquired it in three ways.
I acquired it in a private transaction
when the company Diagnostic Ventures was
started --
Q.    Was that your original stock

228

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 913 to 916)

Page 913

acquisition?
2      A.    That was my original stock
3   acquisition.
4      Q.    What was the second one?
5      A.    The second way is I bought the
6   stock in open market purchases.
7      Q.    And what was the third one?
8      A.    I bought stock in open market
9   purchases through my IRA. The second way
10  was in the name of my trust.
11     Q.    During the time you or your
12  IRA account held DVI common stock --
13     A.    Right.
14     Q.    -- what do you recall as the
15  high price that the stock reached in the
16  public marketplace?
17        MR. KRISLOV:  Objection, form.
18     Q.    You can answer.
19     A.    My recollection was it was in
20  the 25 to $27 range.
21     Q.    So, the stock was in the 25 or
22  $27 range at a time when you held over
23  300,000 shares?

Page 914

1      A.    Correct.
2      Q.    How much of your stock did you
3   sell?
4      A.    I sold none of that stock.
5   No, I'm sorry. I want to be more clear.
6      Q.    Okay.
7      A.    During the period of time, I
8   exercised an option for 20,000 shares so
9   that I had really bought in total 330,000
10  shares. I kept the stock in one option
11  exercise, and I sold the 10,000 shares in
12  the other exercise.
13     Q.    So, is it -- with that
14  correction, is it still the case that you
15  had more than 300,000 shares of stock?
16     A.    Correct.
17     Q.    And when I say you, I mean you
18  and your IRA account --
19     A.    Yes.
20     Q.    -- had more than 300,000
21  shares of stock at the time when the price
22  of the stock was 18 and 20 and 23 and
23  25 --

Page 915

        MR. KRISLOV:  Objection,
2   leading.
3      Q.    -- and maybe even 27?
4        MR. KRISLOV:  Objection,
5   leading.
6        MR. FRIEDMAN:  Well, why don't
7   you let me finish my -- excuse me, sir.
8   You can object after my question.
9        MR. KRISLOV:  Sorry. I
10  thought at each price.
11       MR. FRIEDMAN:  I don't know
12  how far my question went, but let me
13  repeat it just so we're all clear, and
14  then you can make whatever objections you
15  want.
16     Q.    (BY MR. FRIEDMAN:)  Is it the
17  case that you had over 300,000 shares of
18  stock --
19     A.    Correct.
20     Q.    -- When the stock price was 18
21  and 20 and 22 and 24 and 25?
22       MR. KRISLOV:  Objection,
23  leading.

Page 916

1      A.    Yes.
2      Q.    You can answer.
3      A.    Yes, yes.
4      Q.    And did you ever sell any of
5   that stock?
6      A.    No.
7      Q.    You talked before about notes,
8   again, 800,000 in your name, 200,000 in
9   the name of a family foundation which you
10  renewed at the request, I think you said,
11  of Mr. Garfinkel, although I'm not 100
12  percent sure of that. Do you remember
13  that testimony?
14     A.    Yes.
15     Q.    If you had not -- and you
16  renewed those notes in approximately July
17  of '01, correct?
18     A.    It was August -- I actually
19  signed the document in August.
20     Q.    Of 2001?
21     A.    In 2001.
22     Q.    Had that not occurred and had
23  you not renewed the notes --

229

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 917 to 920)

Page 917

A.   Uh-huh.
Q.   -- what rights would you have
had as a note holder?
A.   I would have had the rights of
receiving the cash on the date of
maturity.
Q.   And the date of maturity was
in '02?
A.   In June of '02.
Q.   Assuming that you had not
renewed the notes and you had received the
cash, do you know whether the payment of
that cash was an event that DVI would have
been obligated to report in any public
filing?
A.   I doubt it.
Q.   Ms. Schwartzman pointed out
that you were the -- an officer of a
bank or -- or excuse me, a director of a
bank for 25 years?
A.   Right.
Q.   And she took -- toward the end
of the first day, she seemed to take great

Page 918

delight in saying as a director of the
bank, you knew what compliance meant. Do
you remember her making that comment?
A.   Yes, I remember it.
Q.   Could you tell me your
understanding, based on all of your
experience at the bank and elsewhere, what
it means to say that someone or a borrower
is, quote, "in compliance," close quote,
with a loan agreement or any other
document?
A.   Well, in order to answer the
question, you have to first find out what
the terms of the contract is. This is all
a matter of contract between a borrower
and the bank. And those contact -- those
covenants that are in that document
dictate what -- what the compliance means.
Q.   And if a borrower violates a
covenant, would that mean they are not,
quote, "in compliance"?
MR. KRISLOV:  Object to
leading.

Page 919

A.   My experience as a member of
the bank I was -- board I was on was the
Hazelton National Bank. It wasn't
JPMorgan. And they were a country bank
with an impeccable reputation. Their
general policy was to -- if they were
notified that something wasn't in
compliance, they would really try to work
it out.
Q.   You testified on the first day
of your deposition that you made visits to
a number of DVI's large accounts, and I
believe you gave RadNet as an example. Do
you recall that testimony?
A.   I do recall it.
Q.   Can you tell me in what
capacity you made those visits?
A.   I went in the capacity as a
member of the -- of the credit committee.
Q.   And can you tell me the
purpose of the visits?
A.   I was really trying to do a
number of things. One of the things that

Page 920

was unspoken was to try to match up the
results of the customer with the earlier
valuations that were done by the credit
committee.
Q.   Is what you've just described
your purpose in making the visits?
A.   That was my purpose.
Q.   And why did you want to engage
in that matchup process?
A.   Because I felt it would show
us, you know, how effective we were. And
if I found a dislocation, it would
maybe -- it would -- it would probably
prompt me to change the system.
Q.   And did you on the basis of
those visits, make any findings that
prompted you to consider changing the
system?
A.   No, I -- I can say I was
pleased with the ones you mentioned,
RadNet. There was an awful lot of -- an
awful lot of workout that -- positive
workout that took place. And, as a matter

230

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                    ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 925 to 928)

Page 925

1  that center?
2      A.   That's how -- that's how the
3  law worked.
4      Q.   And the Stark laws prohibited
5  such affiliated referrals, is that
6  correct?
7      A.   That's exactly right.
8      MR. KRISLOV:  Objection.  It
9  calls for a legal conclusion that this
10  witness is not in a position to make.
11      Q.   When DVI considered whether a
12  new owner should be brought in --
13  withdrawn.
14      When DVI considered whether a
15  facility which was collateral for a
16  defaulted loan --
17      A.   Uh-huh.
18      Q.   -- should be sold to a new
19  owner --
20      A.   Uh-huh.
21      Q.   -- did DVI consider whether
22  that new owner owned other centers in the
23  area?

Page 926

1      A.   Absolutely.
2      Q.   You mentioned an individual
3  named Vic at Rogers & Wells, and I think
4  there was some confusion.  I want to adopt
5  Ms. Schwartzman's distinction that
6  Diagnostic Ventures, Inc., was the company
7  prior to the public offering; DVI was the
8  company after the public offering.
9      Do you remember in which of
10  those eras -- and if the answer is both,
11  tell me both -- in which of those eras Vic
12  was part of the Rogers & Wells
13  representation of the company?
14      A.   He was after.
15      Q.   So, that was -- mean it was
16  after the public offering?
17      A.   Yes.
18      Q.   To your knowledge, did Vic --
19      A.   We had two public offerings.
20  We had an IPO, and we had a secondary.
21      Q.   Does that help you --
22      A.   It was after both of them.
23      Q.   Okay.  Did Vic prepare minutes

Page 927

1  of DVI board meetings, by which I mean
2  either face-to-face meetings or telephonic
3  meetings?
4      MS. LERNER:  Object to the
5  form.
6      A.   They were all telephonic.  I
7  never met Vic.
8      Q.   Okay.  Did you review minutes
9  which you were given to understand had
10  been prepared by Vic?
11      A.   Yes.
12      Q.   Did you reach any conclusions
13  about inaccuracies in those minutes?
14      A.   Yes, I realized Vic probably
15  never met anybody on the board except
16  maybe O'Hanlon.  And he ascribed, let's
17  say, remarks that to me I didn't -- that I
18  didn't make.  And I called him on the
19  phone.  I said, "Hey, Vic, you and I have
20  never met, and you said that I said this
21  and this and this, and I didn't say that.
22  That was somebody else."  So, I worked to
23  have him redo the minutes.

Page 928

1      Q.   You testified about a meeting
2  on August 4th with Marsal & Alvarez I
3  think in response to Mr. Dailey's
4  questions, correct?  And I may have the
5  name wrong.  I think it's Marsal &
6  Alvarez.
7      A.   I think that's right.
8      Q.   And Mr. O'Hanlon and
9  Mr. Garfinkel were present?  Were
10  Mr. O'Hanlon and Mr. Garfinkel present?
11      A.   Yes, they were present.
12      Q.   Did you say anything at that
13  meeting about the suit -- withdrawn.
14      August 4th was the same day you
15  saw the Susan Gibson letter for the first
16  time, correct?
17      A.   That's right.  That's right.
18      Q.   And you saw that first thing
19  in the morning, correct?
20      A.   Yes.
21      Q.   And the meeting was in the
22  afternoon, correct?
23      A.   Yes.

FLEET NATIONAL BANK, ET AL. ** CONTAINS CONFIDENTIAL PORTIONS **
O'HANLON, ET AL.                          ** FOR ATTORNEYS' EYES ONLY **

GERALD COHN
February 12, 2008

(Pages 929 to 932)

**Page 929**

Q. Sorry, Gary. Did you say
anything at the meetings with Marsal &
Alvarez about the Susan Gibson letter?
A. No.
Q. Can you tell me why not?
A. Because I testified and it was
so that Ellis Levin, head of the
contingent of Ten Eyck, expressly told us
that we should keep all that information
among ourselves.
MR. FRIEDMAN: Let's go off
the record and change the tape.
THE VIDEOGRAPHER: This marks
the end of Videotape 4, Volume III. Going
off the record 4:18 p.m.
(Said deposition was in recess
at 4:18 p.m. until 4:27 p.m.,
after which the following
occurred:)
THE VIDEOGRAPHER: Back on the
record, 4:27 p.m. This marks the
beginning of Videotape 5, Volume III.
Q. (BY MR. FRIEDMAN:) Mr. Cohn,

**Page 930**

do you remember the call, telephone call
you received from Michael O'Hanlon and
what he told you that Steve Garfinkel had
just given him a note indicating there was
a $50 million hole in the collateral, do
you remember that?
A. Yes.
Q. What was your reaction when
Mr. O'Hanlon said that to you?
A. Well, I figured I better get
moving and try to investigate it. I did
recall that in the past there were times
where there was improper bookkeeping at
the banks. Meaning that I was there when
they were showing me at one point that
they had sent checks in, and they were not
recorded, that they were laying on
somebody's desk or something, but I was
going to go in and investigate since
that's the only way I know, and that's
consistent with my whole way I do things.
I just don't go jumping, but I would --
that's what I was going to do.

**Page 931**

Q. Did you know in 2001 that
ineligible collateral had been pledged to
any DVI lender?
A. Never.
Q. Did you know in 2001 that any
collateral had been double pledged to any
DVI lender?
A. No.
Q. Did you know in 2001 that any
officer or director of DVI -- withdrawn.
Did you know in 2001 that any
officer of DVI had committed fraud of any
kind?
A. No.
Q. When did you first learn any
of those facts, if they are facts?
A. I first really -- first
learned when I met on the -- on the
morning of August 4th with John Boyle and
started to read the Susan Gibson letter.
Q. And in the last series of
questions I just asked you, I asked you
whether you knew that any officer of DVI

**Page 932**

had committed fraud -- excuse me, whether
you knew in 2001 that any officer of DVI
had committed fraud?
A. Right.
Q. Did you know in 2001 that any
person at DVI had committed fraud?
A. No.
Q. You used the terms, and I
can't remember which day, performing and
nonperforming either assets or loans. I
can't recall which you said. Do you
remember that?
A. Yes.
Q. Could you just explain what
you meant by those terms?
A. Performing loans are loans
that the customer is not only making
payments on time but also complying with
all of the regulations of the contract or
covenants of the contract.
Q. And how about nonperforming
loans?
A. Nonperforming loans are the

233

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                          http://www.TylerEaton.com

A14

Goldberg William 022008-022208.txt

1

1    THE UNITED STATES DISTRICT COURT FOR

2    THE EASTERN DISTRICT OF PENNSYLVANIA

3

4    CASE NO. 2:03-CV-5336
    IN RE DVI, INC. SECURITIES LITIGATION

5    CASE NO. 04-CV-1277
    FLEET NATIONAL BANK, et al.,

6        Plaintiffs,
    vs.

7    O'HANLON, et al.,
        Defendants

8

9    CASE NO. 04-CV-3423
    (Coordinated With 04-CV-1277)
    WM HIGH YIELD, et al.,

10       Plaintiffs,
    vs.

11    O'HANLON, et al.,
       Defendants.

12

13    CASE NO. 2:06-CV-1003
    DENNIS J. BUCKLEY, as trustee
    of the DVI Liquidating Trust,

14       Plaintiff,
    vs.

15    CLIFFORD CHANCE LLP and
    CLIFFORD CHANCE U.S. LLP,

16       Defendants.

17         VOLUME I

18      VIDEO DEPOSITION OF

19      WILLIAM S. GOLDBERG

20      February 20, 2008

21

22    REPORTED BY: Sabrina Lewis
            Certified Court Reporter

23            Registered Diplomate Reporter
            Notary Public

2

102

Goldberg William 022008-022208.txt

1  confirm that DVI's loss reserves were not

2  materially misstated for each audit year?

3        MR. DAILEY:  Object to form.

4     A.   Yes.

5     Q.   (BY MR. DeWITTE:)  Up until

6  late spring of 2003, was Deloitte DVI's

7  auditor during your time as a board member

8  of DVI?

9     A.   Yes.

10     Q.   Did Deloitte -- in that

11  time -- let me rephrase it.

12        In that time, did Deloitte ever

13  tell you that the audit committee could

14  rely on Deloitte rather than hire its own

15  auditors?

16        MR. DAILEY:  Object to the

17  form.

18     A.   I don't recall that, no.

19     Q.   (BY MR. DeWITTE:)  Okay.  Did

20  Deloitte ever indicate to the board that

21  the board should have its own auditors?

22        MR. DAILEY:  Object to the

23  form.

153

1     A.   I'd certainly remember that,

2  and I don't remember that statement.

3        MR. DeWITTE:  Marking

4  Exhibit 5.

Page 133

Goldberg William 022008-022208.txt

5          (Whereupon, Goldberg Exhibit 5

6          was marked for identification.)

7     Q.    (BY MR. DeWITTE:)  Before you

8    review that, if I could ask you a

9    question.  Do you recall Nate Shapiro ever

10   asking Deloitte whether the board should

11   have its own auditors?

12     A.    I've heard Nate make that

13   statement, but I don't recall it being

14   made at the time it was said that he said

15   it.

16     Q.    What do you mean by that?

17     A.    Meaning I have -- I cannot

18   trace my knowledge of that statement to

19   the time at which it was made.  I don't

20   remember it being made at the time he said

21   it was being made.  I can't tell you

22   whether he made it or not.  I just don't

23   remember.

                                        154

1     Q.    Okay.  If you could take a

2    look at this document.  This document is

3    labeled, "Notes from DVI conference call,

4    September 24, 2002 at 3 p.m."  Do you

5    recall this conference call?

6          MR. DAILEY:  Objection to the

7    form, lack of foundation.

8     Q.    (BY MR. DeWITTE:)  Have you

Page 134

104

Goldberg William 022008-022208.txt

9    ever seen that document?

10        A.    I have seen this document.

11        Q.    Do you recall this conference

12   call?

13        A.    I do not recall this

14   conference call specifically.

15        Q.    In what context have you seen

16   this document?

17        A.    I was provided the exhibits

18   from Nate Shapiro's deposition, and I

19   believe that this was one of them.

20        Q.    Okay.

21        A.    That is the first time I saw

22   it.

23        Q.    Now, referring down to the

                                                    155


1    sixth paragraph, where it states, "Nate

2    Shapiro noted that the board relies on the

3    company to provide information.  The board

4    is supposed to be proactive, but it trusts

5    the company.  He asked whether this

6    requires the board to have its own

7    auditors."  Do you recall that?

8             MR. DAILEY:  Object to the

9    form.  Object to you reading from a

10   document for which you have not laid the

11   requisite foundation.

12        A.    Again, I don't have memory of
                        Page 135

105

Goldberg William 022008-022208.txt

17  familiar with a material error?

18      A.   I don't believe so, no.

19      Q.   Did Deloitte ever indicate

20  that there were any material errors of

21  DVI's financial statements?

22          MR. DAILEY:  Object to the

23  form.

165

1       A.   Not that I recall.

2       Q.   (BY MR. DeWITTE:)  Did

3   Deloitte ever indicate that there were any

4   material errors with regard to DVI's

5   internal controls?

6           MR. DAILEY:  Object to form.

7       A.   Can you repeat the question?

8           MR. DeWITTE:  Do you mind?

9           (Record read.)

10      A.   I can't recall an instance

11  where that occurred.

12      Q.   (BY MR. DeWITTE:)  Now, you

13  testified earlier that management letters

14  were reviewed at board meetings, correct?

15      A.   Correct.

16      Q.   Now, during that review, who

17  spoke for management?

18      A.   Very often, Garfinkel.

19  Sometimes Boyle.

20      Q.   Any others?

Page 144

106

Goldberg William 022008-022208.txt

21    A.    O'Hanlon may have made

22    commentary.

23        Q.    And who spoke for Deloitte?

166

1    A.    Oftentimes, Harold Neas.    And

2    I believe also, although my memory of this

3    is not crystal clear, he would rely on the

4    audit engagement manager who had --

5    working underneath him in that particular

6    audit.

7        Q.    Brian Schaller?

8        A.    I don't have 100 percent

9    memory of times in which he spoke for the

10    firm, but certainly no one.

11        Q.    So Harold Neas is the primary

12    voice for Deloitte in discussing

13    management matters with the board?

14        A.    That's the way I recalled it.

15        Q.    Do you recall an instance in

16    which Deloitte was not present at a board

17    meeting at which its letters were

18    discussed?

19        A.    I have a weak memory of that

20    occurring, but I couldn't pin down a time

21    and date.    So I'm speculating.

22        Q.    Okay.    Now, Deloitte never

23    raised the adequacy of DVI's loan loss

167

Page 145

Goldberg William 022008-022208.txt

1   reserves as a problem requiring audit

2   committee attention; is that correct?

3           MR. DAILEY:  Object to form.

4       A.   I certainly don't remember

5   that.

6       Q.   (BY MR. DeWITTE:)  Had they,

7   would you have taken action?

8           MR. DAILEY:  Objection to

9   form.

10      A.   I would -- you know, it's

11  speculation, but I can't -- I can't

12  envision that you wouldn't.

13      Q.   (BY MR. DeWITTE:)  Would you

14  have sat idle?

15      A.   I can't envision that I would.

16      Q.   Did Deloitte ever raise

17  concerns about the composition of the

18  audit committee in terms of the

19  individuals on it?

20      A.   Not that I'm aware of.

21      Q.   Did Deloitte ever raise

22  concerns about the competency of the audit

23  committee?

                                        168

1       A.   Not that I know of.
                        Page 146

Goldberg William 022008-022208.txt

2       Q.    Did Deloitte ever raise

3  concerns about the competency of any

4  individual member of the audit committee?

5       A.    I'm not aware of that as well.

6       Q.    Did Deloitte ever raise

7  concerns about the responsiveness of the

8  audit committee to issues raised during

9  board meetings?

10           MR. DAILEY:  Objection to

11  form.

12       A.    I do not remember an instance

13  of that, either.

14       Q.    (BY MR. DeWITTE:)  Did

15  Deloitte ever raise concerns about the

16  responsiveness of the audit committee to

17  issues raised during audit committee

18  meetings?

19           MR. DAILEY:  Object to form.

20       A.    Can you repeat that question?

21       Q.    (BY MR. DeWITTE:)  It's

22  essentially the same question, just asking

23  about audit committee meetings.  I mean,

0                                            169

1  is that sufficient --

2           MR. DAILEY:  I think you

3  should repeat it.  Do you want me to read

4  it back for you?

5           MR. DeWITTE:  It's all right.
                    Page 147

Goldberg William 022008-022208.txt

6    I can read it back.

7        Q.    (BY MR. DeWITTE:)  Did

8    Deloitte ever raise concerns about the

9    responsiveness of the audit committee to

10   issues raised during audit committee

11   meetings?

12           MR. DAILEY:  Object to the

13   form.

14        A.    Not that I know of.

15        Q.    (BY MR. DeWITTE:)  Did

16   Deloitte ever raise a concern with you

17   about the audit committee's compliance

18   with its charter?

19        A.    No.

20        Q.    Did you receive any written

21   materials directly from Deloitte?

22        A.    Yes.

23        Q.    And which materials were

                                        170

1    those?

2        A.    I spoke earlier of a report

3    provided to me by email in -- I think it

4    was May of 2002.

5        Q.    Okay.  Did you consider that

6    to be Deloitte bringing a problem

7    specifically to your attention?

8        A.    No.

9        Q.    How did you view that?
                        Page 148

**A15**

Goldberg William 022008-022208.txt

```
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

D                                                              297

```
1     THE UNITED STATES DISTRICT COURT FOR
2     THE EASTERN DISTRICT OF PENNSYLVANIA
3
      CASE NO. 2:03-CV-5336
4     IN RE DVI, INC. SECURITIES LITIGATION
5     CASE NO. 04-CV-1277
      FLEET NATIONAL BANK, et al.,
6           Plaintiffs,
      vs.
7     O'HANLON, et al.,
            Defendants
8
      CASE NO. 04-CV-3423
9     (Coordinated With 04-CV-1277)
      WM HIGH YIELD, et al.,
10          Plaintiffs,
      vs.
11    O'HANLON, et al.,
            Defendants.
12
      CASE NO. 2:06-CV-1003
13    DENNIS J. BUCKLEY, as trustee
                           Page 259
```

111

Goldberg william 022008-022208.txt

```
        of the DVI Liquidating Trust,
14           Plaintiff,
        vs.
15      CLIFFORD CHANCE LLP and
        CLIFFORD CHANCE U.S. LLP,
16           Defendants.

17                    VOLUME II

18            VIDEO DEPOSITION OF

19            WILLIAM S. GOLDBERG

20            February 21, 2008

21
        REPORTED BY: Sabrina Lewis
22                   Certified Court Reporter
                     Registered Diplomate Reporter
23                   Notary Public
```

                                                        298


```
1              A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS:

4         Mr. Clinton A. Krislov

5         Mr. Robert P. DeWitte

6         Attorneys at Law

7         Krislov & Associates, LTD

8         20 North Wacker Drive

9         Chicago, Illinois 60606

10        312.606.0500

11        clint@krislovlaw.com

12        robert@krislovlaw.com

13

14   FOR THE PLAINTIFF, DENNIS BUCKLEY, TRUSTEE

15   OF THE DVI LIQUIDATING TRUST:

16        Ms. Amy L. Francisco

17        Attorney at Law
```
                              Page 260

                                                        112

Goldberg William 022008-022208.txt

16          1:36 p.m.)

17                THE VIDEOGRAPHER:  We're back

18    on the video record.  It's 1:36 p.m.

19

20    EXAMINATION BY MS. FRANCISCO:

21          Q.    Good afternoon, Mr. Goldberg.

22    I believe I introduced myself to you

23    yesterday.  I'm Amy Francisco from

                                              456

1     Anderson Kill & Olick, P.C., on behalf of

2     the trustee.

3                I believe that you testified

4     yesterday that you relied on the advice of

5     Deloitte with respect to the adequacy of

6     DVI's loan loss reserves; is that correct?

7                MR. DAILEY:  Object to the

8     form.

9          A.    I relied on Deloitte's audit

10    opinion.

11         Q.    (BY MS. FRANCISCO:)  Audit?

12    Okay.  Did Deloitte at any time ever give

13    you reason to believe that DVI's loan loss

14    reserves were inadequate?

15                MR. DAILEY:  Object to the

16    form.

17         A.    Not that I recall.

18         Q.    (BY MS. FRANCISCO:)  Had

19    Deloitte done so, would you have
                    Page 398

113

Goldberg William 022008-022208.txt

20  investigated this issue and insured that

21  the proper loan loss reserves were

22  recorded?

23              MR. DAILEY:  Object to the

G                                                    457


1  form.

2       A.    It's a speculation, but I

3  can't foresee how I wouldn't have tried.

4       Q.    (BY MS. FRANCISCO:)  And I

5  believe that yesterday, you also testified

6  that Deloitte left you with the impression

7  that internal controls with respect to

8  income suspension were adequate during

9  your time on the audit committee; is that

10  correct?

11              MR. DAILEY:  Objection to the

12  form.

13       A.    That was my conclusion.

14       Q.    (BY MS. FRANCISCO:)  Did

15  Deloitte ever give you any reason to

16  believe that DVI was recognizing income on

17  loans which had little or no expectation

18  of being repaid?

19              MR. DAILEY:  Object to the

20  form.

21       A.    Can you repeat your question?

22       Q.    (BY MS. FRANCISCO:)  Did

23  Deloitte give you any reason at any time

Page 399

114

**A16**

Goldberg William 022008-022208.txt

4   break for the day, come back tomorrow

5   morning?

6               MR. KRISLOV:  4:15?

7               MR. DAILEY:  Yeah.  I've got a

8   raging headache, and I'll need to

9   streamline my stuff.

10              MR. QUINN:  He also said we

11  could save time if he breaks now.

12              MR. KRISLOV:  Okay.

13              MR. QUINN:  That's fine with

14  me.

15              THE VIDEOGRAPHER:  This ends

16  Tape 4 in today's deposition of Bill

17  Goldberg, Volume II.  We're off the video

18  record at 4:17 p.m.

19              (The proceedings were continued

20              to February 22, 2008 at

21              9:30 a.m.)

22

23

1        THE UNITED STATES DISTRICT COURT FOR

2        THE EASTERN DISTRICT OF PENNSYLVANIA

3
     CASE NO. 2:03-CV-5336
4    IN RE DVI, INC. SECURITIES LITIGATION

5    CASE NO. 04-CV-1277
     FLEET NATIONAL BANK, et al.,
6          Plaintiffs,
     vs.
7    O'HANLON, et al.,         Page 505

セ

Goldberg William 022008-022208.txt

Defendants

8

CASE NO. 04-CV-3423
9   (Coordinated With 04-CV-1277)
WM HIGH YIELD, et al.,
10       Plaintiffs,
vs.
11  O'HANLON, et al.,
Defendants.

12

CASE NO. 2:06-CV-1003
13  DENNIS J. BUCKLEY, as trustee
of the DVI Liquidating Trust,
14       Plaintiff,
vs.
15  CLIFFORD CHANCE LLP and
CLIFFORD CHANCE U.S. LLP,
16       Defendants.

17                    VOLUME III

18              VIDEO DEPOSITION OF

19              WILLIAM S. GOLDBERG

20               February 22, 2008

21

REPORTED BY: Sabrina Lewis
22               Certified Court Reporter
Registered Diplomate Reporter
23               Notary Public

580

1          A P P E A R A N C E S

2

3   FOR THE PLAINTIFFS:

4        Mr. Clinton A. Krislov

5        Mr. Robert P. DeWitte

6        Attorneys at Law

7        Krislov & Associates, LTD

8        20 North Wacker Drive

9        Chicago, Illinois 60606

10       312.606.0500

11       clint@krislovlaw.com

Page 506

116

Goldberg William 022008-022208.txt

21  ineligible collateral.  And do you recall

22  that?

23          MR. QUINN:  I'm sorry; do you

                                              607


1   recall that he said that or do you recall

2   whether that happened?

3       Q.   (BY MR. DAILEY:)  Well, first,

4   did that happen?

5       A.    I have no memory of that

6   whatsoever.

7          MR. DeWITTE:  Objection to

8   form.

9       Q.   (BY MR. DAILEY:)  If

10  Mr. Garfinkel had made that statement, is

11  it fair to say you would remember that?

12         MR. DeWITTE:  Objection to

13  form.

14      A.    You're asking me to speculate,

15  but I cannot foresee a possibility that I

16  would not remember that.

17      Q.   (BY MR. DAILEY:)  And just so

18  we're clear, and I think that maybe it is

19  from yesterday, but prior to August 1st,

20  2003, no one ever told you that anyone at

21  DVI had either pledged ineligible

22  collateral or double pledged collateral to

23  its lenders, correct?

                                              608

                    Page 530


                                              117

Goldberg William 022008-022208.txt

1          MR. DeWITTE:  Could you read
2    that back, please?
3          MR. DAILEY:  I'll -- I'll try
4    to clean it up a little bit.
5          Q.    (BY MR. DAILEY:)  Prior to
6    August 1st, 2003, no one ever told you
7    that DVI had either pledged ineligible
8    collateral or double pledged collateral to
9    its lenders, correct?
10         MR. DeWITTE:  Objection to
11   form.
12         A.    My first understanding that
13   that was possible, I firmly believe came
14   from the Susan Gibson memo, which I
15   believe was -- which I believe I received
16   right about August 1st.
17         Q.    (BY MR. DAILEY:)  After
18   June 17, 2003, did the board of directors
19   take -- after -- let me rephrase the
20   question.
21         After June 17, 2003, did the
22   board of directors initiate an
23   investigation into whether DVI had in fact

D                                              609

1    taken steps to address the material
                    Page 531

118

**A17**

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

CASE NO. 2:03-CV-5336
IN RE DVI, INC. SECURITIES LITIGATION
CASE NO. 04-CV-1277
FLEET NATIONAL BANK, et al.,
    Plaintiffs,

vs.

O'HANLON, et al.
    Defendants

CASE NO. 04-CV-3423
(Coordinated With 04-CV-1277)
WM HIGH YIELD, et al.,
    Plaintiffs,

vs.

O'HANLON, et al.,
    Defendants.

CASE NO. 2:06-CV-1003
DENNIS J. BUCKLEY, as trustee
of the DVI Liquidating Trust,
    Plaintiff,

vs.

CLIFFORD CHANCE LLP and
CLIFFORD CHANCE U.S. LLP
    Defendants.

## Steven Garfinkel
## March 27, 2008



**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
www.TylerEaton.com

119

**Page 30**

```
09:33:10 1   in the company. I have gotten no personal
09:33:15 2   gain. All my savings are gone. I have
09:33:17 3   got nothing but heartache, aggravation and
09:33:20 4   the pleasure of being in prison out of
09:33:23 5   this.
09:33:23 6       Q. And when you did that, did you
09:33:28 7   do it to try to eventually resolve this
09:33:30 8   problem at the company?
09:33:31 9       MR. FRIEDMAN: I didn't hear
09:33:32 10  what you said.
09:33:33 11      MR. KARNUTH: When you -- I
09:33:35 12  will rephrase it.
09:33:37 13      Q. (BY MR. KARNUTH:) When you
09:33:37 14  decided to provide a borrowing base report
09:33:43 15  that listed collateral that was -- that
09:33:46 16  had insufficient eligible collateral, was
09:33:52 17  it your intention to do that with the
09:33:56 18  expectation that others would help solve
09:34:00 19  the problem going forward?
09:34:02 20      A. My expectation was that I was
09:34:04 21  buying the company time, that I would -- I
09:34:08 22  would accept that it got blind-sided.
09:34:13 23  Whether right or wrong, people in Business'
```

**Page 31**

```
09:34:15 1   Credit had to have understood that Medcap
09:34:18 2   Oregon was a growing problem. But I --
09:34:20 3   but we got blind-sided.
09:34:22 4       The company got blind-sided,
09:34:24 5   and I accepted the fact that the company
09:34:29 6   could solve that problem because we had
09:34:31 7   been solving liquidity needs from 1996 on.
09:34:34 8   We had raised lots of money lots of
09:34:36 9   different ways, and I thought the
09:34:41 10  financial function did a miraculous job --
09:34:45 11  wrong word -- did a very good job in
09:34:47 12  finding ways to raise money and continuing
09:34:52 13  to meet the liquidity needs.
09:34:53 14      And I knew that there were ways
09:34:54 15  to capital and equity and that we had to
09:34:56 16  pledge that O'Hanlon would go to the
09:34:58 17  Pritzkers or bring the issue up another
09:35:00 18  way. So I thought it wrong decision,
09:35:03 19  pressured, but I -- but I am the one that
09:35:06 20  had the weakness and gave in. But it
09:35:08 21  seemed reasonable to give the company time
09:35:10 22  to solve this problem.
09:35:11 23      Q. Okay. In your affidavit, on
```

**Page 32**

```
09:35:19 1   Page 22, Paragraph 65 --
09:35:21 2       A. Yeah.
09:35:21 3       Q. -- you indicate that you
09:35:28 4   repeatedly updated Mr. O'Hanlon about the
09:35:34 5   liquidity issue; is that accurate?
09:35:36 6       A. Repeatedly updated him about
09:35:38 7   the collateral shortfall and the use of
09:35:40 8   ineligible collateral to -- on the
09:35:41 9   borrowing bases.
09:35:41 10      Rich Miller was part of some of
09:35:43 11  those meetings. But it was -- it would be
09:35:46 12  almost a monthly meeting. Then it wasn't
09:35:50 13  that -- we were generally in compliance
09:35:53 14  for a number of times, so it didn't happen
09:35:55 15  as frequently.
09:35:59 16      But there are any number of
09:36:00 17  reports that you have seen in what I have
09:36:03 18  turned over, and certainly -- I am drawing
09:36:07 19  a blank on her name, Andrea -- Andrea
09:36:11 20  Marshall prepared a lot of reports and
09:36:12 21  analyses, that I would tell her I am going
09:36:15 22  over to see Rich and Michael and talk
09:36:17 23  about -- yes, he was continually updated.
```

**Page 33**

```
09:36:20 1       Q. Okay. In your affidavit, you
09:36:22 2   state in Paragraph 66 that "In June of
09:36:28 3   2000, I told Miller and Turek about the
09:36:29 4   pledging of ineligible collateral to the
09:36:31 5   Fleet lenders"; is that accurate?
09:36:38 6       A. I'm sorry. Where is this
09:36:40 7   again?
09:36:40 8       Q. I'm sorry. It's the second
09:36:41 9   sentence of Paragraph 66.
09:36:43 10      A. Yes.
09:36:43 11      Q. And you go on to state, "As
09:36:46 12  discussed below, in March of 2001, I told
09:36:49 13  Cohn that DVI was out of compliance due to
09:36:51 14  the pledging of ineligible collateral to
09:36:53 15  the Fleet lenders." Is that accurate?
09:37:36 16      A. I can't be sure if I used the
09:37:37 17  word "ineligible collateral." I can be
09:37:40 18  sure that I told him that we were out of
09:37:42 19  compliance and that Lisa was resigning
09:37:46 20  because -- for ethical reasons that
09:37:47 21  involved the collateral we were using for
09:37:51 22  Fleet and that I had those same ethical
09:37:53 23  issues. I can't be sure -- I have said it
```

9 (Pages 30 to 33)

** ROUGH DRAFT **  IN RE DVI, INC. SECURITIES LITIGATION  ** ROUGH DRAFT **
Tyler Eaton Morgan Nichols & Pritchett, Inc.                www.TylerEaton.com

8812e451-cdc5-4c0e-a9f7-4da96c60e3de

120

** UNCERTIFIED ROUGH DRAFT **  Steven Garfinkel
March 27, 2008

### Page 34

09:38:00 1  here, but I can't be sure that -- I can be
09:38:02 2  sure that I said that she was resigning
09:38:04 3  because of ethical reasons over the
09:38:05 4  collateral we were using for Fleet.
09:38:07 5        And I had the same issues. But
09:38:13 6  I can't be sure today that I used the word
09:38:16 7  "ineligible collateral."
09:38:17 8        Q.   Okay.  In Paragraph 68 of your
09:38:19 9  affidavit, actually on the next page,
09:38:21 10 Page 23, you make reference to the
09:38:25 11 conversation you have just described with
09:38:27 12 Mr. Cohn.  And you go on to state, "When
09:38:33 13 Cohn asked why, I told him it was because
09:38:36 14 we were out of compliance, which I meant,
09:38:39 15 and I believe that Cohn understood that at
09:38:42 16 least part of the collateral we had
09:38:44 17 pledged to support our borrowing base with
09:38:45 18 Fleet was ineligible."  Is that an
09:38:48 19 accurate statement?
09:38:50 20        MR. FRIEDMAN:  Object to the
09:38:50 21 form.
09:38:50 22        A.   Yeah, that goes to belief.
09:38:54 23        Q.   (BY MR. KARNUTH:)  And did

### Page 35

09:38:54 1  Mr. Cohn promise you that he would raise
09:38:57 2  this issue with Mr. O'Hanlon?
09:39:03 3        A.   He didn't promise.  He said,
09:39:06 4  "We can't be doing that.  We can't -- we
09:39:09 5  can't be out of compliance."  And I took
09:39:16 6  that to mean he would talk to O'Hanlon.
09:39:19 7        Q.   Did he ever get back to you as
09:39:24 8  to the conversations he had with
09:39:26 9  Mr. O'Hanlon about this issue?
09:39:33 10       MR. SCHWARTZ:  Objection to
09:39:34 11 the form.
09:39:34 12       A.   A whole series of events
09:39:37 13 happened after that that led me to believe
09:39:43 14 that -- that he had spoken to O'Hanlon.
09:39:51 15       Q.   (BY MR. KARNUTH:)  What are
09:39:52 16 those events that you are referring to?
09:39:59 17       A.   In late March --
09:40:00 18       Q.   Is this March of '01?
09:40:02 19       A.   Yeah, March of '01.  I was on
09:40:05 20 spring break -- by the way, this
09:40:06 21 deposition was scheduled on spring break,
09:40:09 22 so I don't get to see my kids, but this is
09:40:12 23 another problem.

### Page 36

09:40:13 1        But I was on spring break in
09:40:18 2  the condominium in New York.  And I got a
09:40:22 3  call from Jerry Cohn.  Jerry said the
09:40:31 4  Pritzkers had lost confidence in O'Hanlon
09:40:38 5  and wanted to sell the company.  I have no
09:40:40 6  idea whether -- and I have said this many
09:40:42 7  times, I know of no direct conversations
09:40:46 8  or anything.  I can't tell when -- when
09:40:49 9  Jerry was just using his -- his words.  He
09:40:57 10 said he was tired, tired of trying to
09:40:59 11 fight O'Hanlon by himself and he needed
09:41:01 12 help.
09:41:02 13       He asked me to go talk to some
09:41:04 14 investment bankers to tell them about the
09:41:09 15 situation at DVI to enlist their support
09:41:15 16 to address selling the company.  The one
09:41:22 17 specifically that he asked me to go see
09:41:24 18 was JPMorgan.  He had a personal banker
09:41:26 19 that he was close with.  I happened to
09:41:29 20 have already known two of the investment
09:41:31 21 bankers at JPMorgan.  So I said that would
09:41:36 22 be no problem, I have a person I can go
09:41:38 23 through.

### Page 37

09:41:40 1        I then told him I will also
09:41:43 2  meet with UBS and Credit Suisse.  I then
09:41:51 3  conducted three meetings as a result of
09:41:53 4  that, one with UBS with Ben Lorello, who
09:41:59 5  was at that point not named the -- had not
09:42:02 6  gotten the exclusive investment banking
09:42:07 7  agreement, and a team of about seven
09:42:07 8  people.
09:42:07 9        I met at JPMorgan with John
09:42:10 10 Chrin, the top M&A guy in the finance
09:42:17 11 sector, John -- I can't remember John's
09:42:20 12 name, an Irish guy.  And they had brought
09:42:25 13 the personal banker who knew Jerry Cohn.
09:42:28 14       I met with them, and I met with
09:42:31 15 the Credit Suisse people, a guy named --
09:42:35 16 he has been a long-timer on Wall Street.
09:42:38 17 O'Hanlon really knew him well, great
09:42:41 18 golfer out of Stamford, Bob something.  I
09:42:45 19 can't -- his name will come to me two
09:42:47 20 weeks from now.  And I met with a team of
09:42:50 21 Credit Suisse.
09:42:51 22       I told them that Jerry Cohn had
09:42:53 23 asked me to meet with them and that he

10 (Pages 34 to 37)

** ROUGH DRAFT **   IN RE DVI, INC. SECURITIES LITIGATION   ** ROUGH DRAFT **
Tyler Eaton Morgan Nichols & Pritchett, Inc.                   www.TylerEaton.com
                                                          8812a451-cdc5-4c0e-a9f7-4da96c60e3de

121

** UNCERTIFIED ROUGH DRAFT **    Steven Garfinkel
March 27, 2008

### Page 42

09:47:02 1  in front of The Breakers, which is where,
09:47:04 2  when you get called down, that is where
09:47:08 3  you would have your staff meeting. So I
09:47:10 4  complained that he is never around. And
09:47:12 5  Mark said, "Thank you for the
09:47:14 6  information." I left. I reported back to
09:47:16 7  Mr. Cohn that I'd had that meeting.
09:47:23 8      In between then -- and I have
09:47:25 9  trouble with some of these dates. I do
09:47:26 10 know that I was on spring break when I got
09:47:28 11 the call. I do know that I met with the
09:47:30 12 investment bankers between then and in
09:47:32 13 April. And Mr. Hoplamazian meeting came
09:47:40 14 after the meeting with the three
09:47:43 15 investment bankers.
09:47:44 16     In between then, we then had
09:47:46 17 the April 10th board meeting. And in the
09:47:51 18 April 10th board meeting is where -- and
09:47:54 19 to my belief, Mr. Cohn understood that
09:47:56 20 there was an issue with the -- let me take
09:48:02 21 that back. He understood we were out of
09:48:05 22 compliance.
09:48:12 23     So that is the series of

### Page 43

09:48:14 1  events. Out of that series of events, I
09:48:17 2  would have to -- the question that
09:48:18 3  triggered this is, did Mr. Cohn tell
09:48:20 4  O'Hanlon? It would be hard for me to -- I
09:48:25 5  don't know specifically. It is just hard
09:48:26 6  for me to believe that he didn't tell
09:48:28 7  Mr. O'Hanlon, especially since on the
09:48:29 8  April 10th board meeting, it was a regular
09:48:33 9  board meeting around 10:00 or something
09:48:38 10 like that.
09:48:38 11     It was only into it -- Mr. Cohn
09:48:41 12 asked all the outsiders to leave except
09:48:45 13 me. So it is the board of directors and
09:48:47 14 me. I can tell you where everyone was
09:48:51 15 sitting, because Nate Shapiro was to my
09:48:55 16 left, Jerry Cohn was at the head of the
09:48:58 17 table, and O'Hanlon was to his left.
09:48:59 18     And Jerry surprised me, and he
09:49:02 19 came out and said, "I asked everyone to
09:49:05 20 leave because I want to have a private
09:49:07 21 conversation. Steve, are we in or out of
09:49:10 22 compliance?" I was taken back by that
09:49:14 23 question. That was not a question that I

### Page 44

09:49:15 1  thought the board should blatantly want to
09:49:18 2  ask that way because I thought that would
09:49:21 3  make the board culpable.
09:49:23 4      And I think that once the board
09:49:24 5  understood that you are out of compliance,
09:49:26 6  then their obligations would be to report
09:49:27 7  that to the Fleet Bank. I thought it was
09:49:30 8  always sufficient that the board
09:49:32 9  understand that we were very short on cash
09:49:34 10 and did not necessarily know that we had
09:49:36 11 to go to negative cash for them to have
09:49:39 12 been required to take lots of action
09:49:41 13 before that.
09:49:41 14     I thought they had all the
09:49:43 15 knowledge and information they needed up
09:49:45 16 to that point to have raised capital and
09:49:52 17 understood what the liquidity -- liquidity
09:49:56 18 needs of the company were.
09:49:57 19     I was surprised by the answer.
09:49:59 20 But at that point, I said look, he has
09:50:01 21 asked me, so I told him. I said -- I said
09:50:04 22 we might be in compliance at the end of
09:50:06 23 this quarter, but we are definitely not in

### Page 45

09:50:11 1  compliance in between. And I said, "We
09:50:17 2  drift in and out of compliance," which
09:50:19 3  actually characterized what the situation
09:50:24 4  was.
09:50:24 5      You get it -- you go out of
09:50:26 6  compliance; you would raise some money;
09:50:28 7  you would go back into compliance. It
09:50:31 8  meant you were on the edge. And by
09:50:33 9  quarter end, when you moved a number of
09:50:35 10 loans over into the warehouse, you would
09:50:37 11 get a little surge of cash in. And Rich
09:50:43 12 Miller's customers -- Rich Miller would
09:50:46 13 have payables with his customers and would
09:50:48 14 get us into compliance.
09:50:49 15     At that point, O'Hanlon didn't
09:50:52 16 jump up and down when the question was
09:50:54 17 answered. But when I said we drift in and
09:50:57 18 out of compliance, O'Hanlon jumped in and
09:50:59 19 said, "I will answer this question.
09:51:01 20 Steve, I will answer the question."
09:51:03 21     O'Hanlon's answer was, "We are
09:51:09 22 not in compliance. It is a problem. Just
09:51:11 23 about every big company is not in

12 (Pages 42 to 45)

** ROUGH DRAFT **   IN RE DVI, INC. SECURITIES LITIGATION   ** ROUGH DRAFT **
Tyler Eaton Morgan Nichols & Pritchett, Inc.                    www.TylerEaton.com

8812a461-cdc5-4c0e-a9f7-4da96c60e3de

122

** UNCERTIFIED ROUGH DRAFT **  Steven Garfinkel
March 27, 2008

---

### Page 46

09:51:14 1 compliance. This is not a big deal. It
09:51:17 2 is a problem. I'll -- he said, "I'll --
09:51:22 3 he said, "Every big company is not in
09:51:24 4 compliance."
09:51:27 5       Nate Shapiro was the only one
09:51:29 6 who spoke up. Nate said, "Isn't this a
09:51:35 7 problem?" And O'Hanlon said, "I am tired
09:51:37 8 of talking about it, Nate. I said I'll
09:51:39 9 address it. I said I will get it fixed.
09:51:43 10 Let's just stop talking about this." And
09:51:46 11 O'Hanlon had a way of flaring up.
09:51:47 12       And Nate is one of the most
09:51:49 13 professional guys. And Nate was the only
09:51:52 14 one who said, and exact words -- and I
09:51:54 15 thought at that point I should duck under
09:51:56 16 the table, but no one else said anything.
09:51:59 17 No one called O'Hanlon on it. He just
09:52:01 18 brushed them all off. That was the end of
09:52:04 19 the conversation.
09:52:09 20       We then went on to a second
09:52:11 21 conversation, which was about
09:52:12 22 international.
09:52:13 23       Q.    At the same board meeting?

### Page 47

09:52:15 1       A.    At the same private board
09:52:16 2 meeting. Because at that board meeting
09:52:17 3 was the introduction of St. John Brown.
09:52:21 4 St. John Brown had been hired out of
09:52:28 5 Phillips. He was a long-time acquaintance
09:52:31 6 of Michael's. And he had a very high
09:52:34 7 marketing position; Oxford graduate, very
09:52:36 8 articulate, probably one of the most
09:52:38 9 arrogant people you could come across but
09:52:41 10 an accomplished marketing guy.
09:52:42 11       And he was being introduced to
09:52:44 12 the board at that meeting as the new head
09:52:46 13 of the European operations. Jerry said,
09:52:49 14 "Look, the other reason I wanted people to
09:52:51 15 leave is we want to talk about
09:52:53 16 international, and we didn't want to talk
09:52:55 17 about it in front of St. John because he
09:53:03 18 is the new guy here."
09:53:03 19       And then they talked about
09:53:05 20 why -- why are we -- what is going on with
09:53:06 21 this international? We don't seem to be
09:53:08 22 making money? What are we doing? How are
09:53:12 23 we going to get profitable? Why are we

### Page 48

09:53:14 1 there?
09:53:15 2       Previously, at the beginning of
09:53:17 3 the board meeting, O'Hanlon was on a
09:53:19 4 rampage about how John Boyle was
09:53:21 5 accounting for operating leases, for the
09:53:23 6 leases in the U. K. that we were treating
09:53:27 7 as operating leases.
09:53:32 8       And an operating lease, you
09:53:32 9 lose money on the front end and you make
09:53:34 10 money on the back end. On a finance
09:53:35 11 lease, you make money evenly over it. You
09:53:38 12 add up the total life of both of these; it
09:53:40 13 is the same amount of money, but the
09:53:41 14 operating leases are back-loaded and you
09:53:46 15 lose money on the front end because of all
09:53:48 16 the depreciation because you own the
09:53:48 17 equipment and you are renting it out.
09:53:53 18       And he got into a fight with
09:53:56 19 John, and he started attacking John about
09:53:58 20 that John was all wrong and John didn't
09:54:00 21 know what he was talking about. Now, John
09:54:02 22 Boyle was the controller of a leasing
09:54:04 23 company. And if there was anyone who

### Page 49

09:54:07 1 understood leases, it was John.
09:54:08 2       And John seldom lost his cool,
09:54:11 3 and he took it, and he just said, "You are
09:54:14 4 wrong." And O'Hanlon said, "Look, I have
09:54:17 5 talked to my friends at GE. I have talked
09:54:19 6 to other people. They say you are all
09:54:22 7 wrong." Boyle said, "Give me the name of
09:54:25 8 your friends. I will call them and
09:54:26 9 compare notes."
09:54:27 10       He said, "No, I am not going to
09:54:29 11 give you the name of my friends. This is
09:54:31 12 the reason we are losing money in Europe,
09:54:33 13 because accounting is doing it all wrong.
09:54:36 14 And I want these things changed to finance
09:54:39 15 leases."
09:54:39 16       So then we get into -- the only
09:54:42 17 reason I mention this is we loop back
09:54:44 18 quite a while later when we are having
09:54:46 19 this conversation about international and
09:54:48 20 O'Hanlon then says, "I told you all
09:54:50 21 before, it is all accounting's fault. The
09:54:52 22 reason we are losing money is because of
09:54:55 23 how he is making us account for these

13 (Pages 46 to 49)

** ROUGH DRAFT **  IN RE DVI, INC. SECURITIES LITIGATION
Tyler Eaton Morgan Nichols & Pritchett, Inc.

** ROUGH DRAFT **
www.TylerEaton.com

8812a451-cdc5-4c0e-a9f7-4da96c60e3de

123

** UNCERTIFIED ROUGH DRAFT **     Steven Garfinkel
March 27, 2008

Page 50

```
09:54:57  1   operating leases. We are going to
09:54:59  2   straighten out the UK.. And now that
09:55:02  3   St. John is here, we are going to grow
09:55:03  4   business." It was the usual story.
09:55:05  5        And the board said we will give
09:55:06  6   you a year, if you can make this
09:55:08  7   profitable and turn it around in a year.
09:55:10  8   But at the end of a year, you get out of
09:55:12  9   international.
09:55:20 10        Bill Goldberg said look, I
09:55:23 11   agree with that, but, Michael, I
09:55:25 12   honestly -- I don't see how this holds
09:55:27 13   together, words to this effect. I need to
09:55:30 14   see the numbers. I don't understand how
09:55:32 15   we are going to make this thing
09:55:34 16   profitable. Can you show me something?
09:55:36 17   Can you show us something? And O'Hanlon
09:55:39 18   said, "Fine, we will put something
09:55:41 19   together for you."
09:55:44 20        Later, after the board meeting
09:55:46 21   later, I told O'Hanlon, "I can't come up
09:55:49 22   with anything. I will give it my best
09:55:55 23   shot, but I don't know how to make this
```

Page 51

```
09:55:56  1   profitable." So I came up with some
09:55:58  2   indexes and some other things. O'Hanlon
09:56:01  3   refused to entertain it, and we never
09:56:03  4   submitted anything to the board, and Bill
09:56:05  5   Goldberg never asked to see it.
09:56:07  6        So all of this is triggered by
09:56:09  7   do I think that Jerry Cohn addressed it
09:56:14  8   with Michael? Yeah, I think Jerry was
09:56:17  9   pretty pissed off at the meeting and was
09:56:20 10   raising it. And at that point in time,
09:56:25 11   the board clearly understood.
09:56:27 12        And I think in the testimony to
09:56:29 13   the FBI, these board members have
09:56:34 14   acknowledged that they were told that we
09:56:36 15   were out of compliance. And I was told by
09:56:38 16   the FBI that they understood it but that
09:56:41 17   they said they didn't understand what out
09:56:43 18   of compliance meant. They certainly
09:56:47 19   didn't understand that I was using
09:56:50 20   ineligible collateral. But I didn't think
09:56:52 21   that was necessary.
09:56:56 22        Q.  If we can go back and just
09:56:58 23   take a few of the statements you made. I
```

Page 52

```
09:57:08  1   want to go back to an earlier part of your
09:57:10  2   testimony where you said that Mr. Cohn
09:57:11  3   asked you to meet with investment bankers
09:57:15  4   at JPMorgan, UBS and Credit Suisse.
09:57:17  5        A.  Uh-huh.
09:57:18  6        Q.  And you stated that --
09:57:20  7        A.  No, he said investment
09:57:22  8   bankers. The only one he wanted was
09:57:23  9   JPMorgan, meet with JPMorgan. And I said,
09:57:27 10   "How about if I meet" -- because we were
09:57:29 11   already dealing with UBS. "How about I
09:57:33 12   meet with them and I will meet with" --
09:57:35 13   and I gave him his name from Credit Suisse
09:57:37 14   because he is a well known name. And he
09:57:39 15   said, "Yeah, that is fine."
09:57:40 16        Q.  So you met with three
09:57:42 17   investment bankers?
09:57:42 18        A.  Three firms and their
09:57:44 19   investment bankers.
09:57:45 20        Q.  Okay. And you conveyed some
09:57:47 21   of the problems that DVI and the
09:57:50 22   challenges that DVI faced?
09:57:52 23        A.  Needed capital, needed
```

Page 53

```
09:57:53  1   liquidity, needed a partner, couldn't
09:57:56  2   execute the business strategy, and the
09:57:58  3   business strategy was driving the core
09:58:01  4   earnings down lower and lower and lower,
09:58:03  5   and we were relying on gain on sale more
09:58:05  6   and more.
09:58:07  7        Q.  Okay. And of the three, did
09:58:09  8   you have an opinion as to which one DVI
09:58:13  9   would have been better off choosing?
09:58:15 10        MR. FRIEDMAN: Object to the
09:58:16 11   form.
09:58:17 12        MS. STRIKIS: Object to the
09:58:18 13   form.
09:58:18 14        Q.  (BY MR. KARNUTH:) Of the
09:58:19 15   three firms that you met with?
09:58:21 16        A.  Any one of the three. Well,
09:58:22 17   hold off on UBS. JPMorgan, Credit Suisse,
09:58:27 18   you can't go wrong. They are top flight,
09:58:31 19   world class firms. We only dealt with top
09:58:34 20   class, world class major firms, Merrill,
09:58:38 21   Prudential, Lehman, Credit Suisse. These
09:58:41 22   are the -- Piper Jaffray. these are the
09:58:44 23   people that understood the finance -- they
```

14 (Pages 50 to 53)

** ROUGH DRAFT **    IN RE DVI, INC. SECURITIES LITIGATION    ** ROUGH DRAFT **
Tyler Eaton Morgan Nichols & Pritchett, Inc.                                www.TylerEaton.com

8812a451-cdc5-4c0e-a9f7-4da96c60e3de

124

**A18**

# UNCERTIFIED ROUGH DRAFT

### In The Matter Of:

**Fleet National Bank, et al.,**
**v.**
**O'HANLON, et al.,**

### 2:03-CV-5336

**Steven Garfinkel**
**March 31, 2008**



## TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

### THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
——— www.TylerEaton.com ———

127

Fleet National Bank, et al.,    ** UNCERTIFIED ROUGH DRAFT
O'HANLON, et al.,

Steven Garfinkel
March 31, 2008

**Page 162**

1  sign it, but if you feel that that is
2  something you -- that someone has to do,
3  then, hypothetically, you should go to the
4  board and tell the board that you bought
5  them some time, you have done something
6  that is against your better judgment, you
7  shouldn't do, and make it the board's
8  problem at that point.
9      Q. How long was your meeting with
10 Mr. Healy on this date?
11     A. Seemed an eternity. Probably
12 an hour, hour and a half.
13     Q. And did you -- after the
14 meeting, did you --
15     A. I think I visited the
16 bathroom, but, anyway.
17     Q. Am I correct that after the
18 meeting, you prepared a letter to deliver
19 to Mr. O'Hanlon on this issue?
20     A. I thought about what -- I
21 thought about the meeting, kind of where
22 events had taken me. I then tried to --
23 tried to meet with O'Hanlon, but I

**Page 163**

1  realized trying to have a conversation
2  with him about this would be awkward. A
3  lot of the things I would want to say
4  wouldn't get out. So I thought I would
5  give him a letter, but first I asked for a
6  one-on-one private meeting with O'Hanlon,
7  because whether I flat out resigned, went
8  to the board, signed a certification was
9  going to be dependent on his reaction.
10     So it was a Monday night I
11 think shortly after Easter, I'm not sure,
12 we went to a restaurant, his favorite
13 restaurant, Bocci, which is one of the few
14 that was opened on a Monday night, we were
15 literally the only people in it. I
16 brought with me updates on the sheets we
17 had gone over before. I told him where we
18 were again and that this was -- you know,
19 way beyond where we were, and what was he
20 going to do about this? I was waiting to
21 see his reaction. And once again he
22 professed I have to find a way to deal
23 with it, this isn't right. And he seemed

**Page 164**

1  to be sincere and once again being
2  taken -- being -- realizing that the
3  ineligible collateral continued to rise to
4  a larger level, that this wasn't an easy
5  solution. And he said I'll find a
6  solution. I'll work at it. I'll never
7  forget this part, as we were walking out,
8  I was still going along, what are you
9  going to do? I understand it. He turned
10 around and angrily said will you stop
11 getting so worked up. No one is going to
12 go to jail over this.
13     Well, he was half right. So
14 then I decided that a letter was about the
15 only thing to do. Clearly that's a letter
16 no lawyer would have ever -- if I had ever
17 reviewed it with anyone would have said I
18 should write or say or do. But if I think
19 if you go through all of the sections of
20 the letter, it's consistent with a lot of
21 my memos before, both greatly troubled by
22 what I had been doing and trying to hit --
23 oversell on some points but trying to hit

**Page 165**

1  every hot button issue I could with
2  O'Hanlon to get him to just do it.
3         (Whereupon, Garfinkel Exhibit
4         112 was marked for
5         identification.)
6      Q. If I can hand you what has
7  been marked as Exhibit 112, and if you
8  will let me know if this is the letter
9  that you are referring to?
10     A. Yep, that's it. At our last
11 dinner is the Bocci dinner.
12     Q. That's referring to the Bocci
13 dinner?
14     A. That's referring to the Bocci
15 dinner. You can probably find that on the
16 American Express cards.
17     MR. DAILEY: Will you please
18 wait until we get the documents before you
19 go on with your questions. Thank you.
20     Q. Mr. Garfinkel, Exhibit 112 is
21 also referred to in paragraph one
22 twenty-six of your affidavit, is that
23 correct?

42 (Pages 162 to 165)

A19

# UNCERTIFIED ROUGH DRAFT

### In The Matter Of:

### Fleet National Bank, et al.,
### v.
### O'HANLON, et al.,

## 2:03-CV-5336

### Steve Garfinkel
### April 1, 2008



## TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

### THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
www.TylerEaton.com

129

** UNCERTIFIED ROUGH DRAFT **

Steve Garfinkel
April 1, 2008

Fleet National Bank, et al.,
O'HANLON, et al.,

---

**Page 6**

1  ALSO FOR THE DEFENDANTS, THOMAS J.
2  PRITZKER and THE PRITZKER ORGANIZATION
3  LLC:
4      Mr. Andrew Shen
5      Attorney at Law
6      Kellogg, Huber, Hansen, Todd
7          Evans & Figel PLLC
8      1615 M Street, NW, Suite 400
9      Washington, DC 20036-3209
10     202.326.7900
11     ashen@khhte.com
12
13 OTHERS PRESENT:
14     Mr. Brad Campbell, Videographer
15     Tyler Eaton Morgan Nichols
16         & Pritchett, Inc.
17     1819 Fifth Avenue North
18     One Federal Place
19     Suite 1020
20     Birmingham, Alabama 35203
21     205.222.0712
22     video@tylereaton.com
23

---

**Page 7**

1      I, Gail B. Pritchett, a
2  Certified Realtime Reporter and Registered
3  Professional Reporter of Birmingham,
4  Alabama, and a Notary Public for the State
5  of Alabama at Large, acting as
6  Commissioner, certify that on this date,
7  as provided by the Federal Rules of Civil
8  Procedure of the United States District
9  Court, and the foregoing stipulation of
10 counsel, there came before me at the
11 Federal Courthouse in Allentown,
12 Pennsylvania on the 1st day of April,
13 2008, commencing at 9:10 a.m., STEVEN
14 GARFINKEL, witness in the above cause, for
15 oral examination, whereupon the following
16 proceedings were had:
17          *    *    *
18
19          THE VIDEOGRAPHER: This marks
20 the beginning of Videotape Number 1,
21 Volume VI in the deposition of Steven
22 Garfinkel. Today's date is April 1st of
23 the year 2008. We are going on the record

---

**Page 8**

1  at 9:10 a.m.
2
3  EXAMINATION BY MR. FRIEDMAN (continuing):
4      Q.  Good morning Mr. Garfinkel.
5      A.  Good morning.
6          MR. FRIEDMAN:  Let me just say
7  before we started the questioning that the
8  court reporter told me before we started
9  today that Marc Tepper called her, said
10 that he was hung up in traffic in the
11 Philadelphia area.  Gail asked whether
12 whether we could start without him, Marc
13 said wait a decent interval and then go
14 ahead and start without him because he
15 didn't want to hang everyone one.  So it's
16 hard to remember my college days, it goes
17 a long ways back, but I remember that we
18 used to have to wait for a professor for
19 ten minutes; and then if the professor
20 didn't show up, we could all leave.  And I
21 think we owe Marc the same respect that we
22 owed our college professors, so we've
23 waited for ten minutes, so let's go ahead.

---

**Page 9**

1      A.  You're not going to suggest
2  that lawyers get more than professors?
3      Q.  (BY MR. FRIEDMAN:)  Mr.
4  Garfinkel, do you remember yesterday that
5  we were talking about certain loan
6  covenants, the violation of which does not
7  automatically constitute a default?
8      A.  Correct.
9      Q.  Could you give me examples of
10 -- based on your knowledge of DVI's loan
11 agreements, could you give me examples of
12 loan covenants that fall in that category?
13         MR. DEWITTE:  Objection to the
14 form, asked and answered.
15     A.  I thought all of the financial
16 covenants fell under that category.  After
17 that I'm not sure.
18     Q.  In the other category
19 consisting of defaults -- withdrawn --
20 consisting of violations which constitute
21 events of default merely by their
22 occurrence, am I right in my belief, and I
23 think you testified to this yesterday,

3  (Pages 6 to 9)

**Page 10**

1  that even in those circumstances the
2  lender could waive in the event of
3  default?
4       A.  That is correct.
5       Q.  And --
6       A.  That is my understanding.
7       Q.  Okay.  Did you in your role as
8  CFO of the company ever seek a waiver from
9  a lender of a default in either category?
10          MR. DEWITTE:  Objection to
11  form.
12      A.  Yes.
13      Q.  Can you give me your memory of
14  the specifics?
15      A.  The --
16      Q.  Excuse me, was it once or more
17  than once that you can recall?  Let me ask
18  you that first.
19      A.  Probably about six or seven
20  times.
21      Q.  Okay.  Can you give me a
22  general --
23      A.  Ballpark.

**Page 11**

1       Q.  Can you give me a general
2  description of the -- the events leading
3  to those requests?
4       A.  Sure.  June -- the June 30,
5  2002, once -- once the loss was -- that it
6  was understood we were having the loss,
7  and that understanding did not come until
8  late into the following quarter, so
9  sometime in August or September, we
10  realized that we would breach one of the
11  financial covenants on the Fleet facility,
12  and the booking of the loss was that.
13          So we -- we had to go to Fleet,
14  and Phil Jackson and I went around and
15  visited just about every bank.  Some we
16  just -- some we talked to on the phone,
17  but I think we contacted every bank
18  asking -- asking that they not declare an
19  event of default on -- on that covenant
20  and explaining -- and then we had to
21  explain all of the adjustments that took
22  place in the fourth quarter, all of the
23  losses, which was a combination of the

**Page 12**

1  loss in the first -- in the March 31st
2  quarter '02 and June.
3          So we met with all the -- all
4  the banks and said this is the situation.
5  And they wanted to know -- you know, you
6  have that kind of discussion, they want to
7  know what the company is going to do about
8  capital, what is it going to do about this
9  or that.  And usually it's painful.
10      Q.  Were the -- although painful,
11  were the discussions successful?
12          MR. ARTESE:  Objection to
13  form.
14      A.  That -- it had a -- it had a
15  good end in the three of the -- I think we
16  had five, maybe six banks.  And it took a
17  majority of the loan dollar amount
18  outstanding, as I recall.  So three of the
19  banks approved it.  It was not successful
20  with CDC or BankOne, I think they
21  abstained from voting.  CDC said it wanted
22  to get out of the credit and was
23  attempting to get out of the credit.

**Page 13**

1  BankOne advised that they would -- that
2  they would not join the facility again.  I
3  think Sovereign advised the same thing.
4       Q.  Did the three banks that
5  approved have the requisite majority --
6       A.  Yes.
7       Q.  -- of the total outstanding
8  loans?
9       A.  Yes, they did.
10      Q.  So is it the case that the
11  default was not declared, as you had
12  requested?
13      A.  That is correct.
14      Q.  Now, this was in June '02, as
15  best you recall?
16      A.  It was in September, as of
17  June '02.
18      Q.  Did this have -- if I say the
19  words Argentine currency crisis, do you
20  know what I'm referring to?
21      A.  Absolutely.
22      Q.  Did that event have any
23  connection to the meeting with the banks

4 (Pages 10 to 13)

Fleet National Bank, et al.,     ** UNCERTIFIED ROUGH DRAFT      Steve Garfinkel
O'HANLON, et al.,                                                April 1, 2008

---

Page 22

1  profit as a result of that loan?
2      A.  Yes.
3      Q.  Was DVI's loan to Reliant
4  repaid?
5      A.  Yes.
6      Q.  Did DVI suffer any loss?
7      A.  No.
8      Q.  Did they make a profit?
9      A.  Yes.
10     Q.  Is it your contention that the
11 loans to Westbury and Reliant were not
12 approved by the credit committee or that
13 they were approved by the credit
14 committee?
15         MR. DEWITTE:  Objection to
16 form.
17     A.  Boy, I never thought of that.
18 I don't know one way or the other --
19     Q.  Okay.
20     A.  -- if -- if they were.
21     Q.  Okay.  If you don't know, you
22 don't know.
23     A.  I don't know one way or the

---

Page 23

1  other if they were approved by the credit
2  committee.
3      Q.  Paragraph thirty-five of your
4  affidavit --
5      A.  Yes.
6      Q.  -- thirty-five, referring to
7  these two loans says they "were made at a
8  time when DVI was itself short of cash and
9  lacked the cash to meet these
10 commitments."
11         Do you see that language?
12     A.  Yes.
13     Q.  Did you ever tell Jerry Cohn
14 that DVI lacked the cash to make -- to
15 meet these commitments?
16     A.  I did not tell him that we
17 were out of cash.
18     Q.  Did you tell any other member
19 of the credit committee?
20     A.  The credit committee?
21     Q.  Yeah.  That's my first
22 question.  My next one will be the board.
23     A.  Miller -- Miller is not on the

---

Page 24

1  credit committee.
2      Q.  Right.
3      A.  No.  O'Hanlon and Miller would
4  have been the only two, but mostly
5  O'Hanlon would have been the one and --
6  and Terry -- and Terry Cady.
7      Q.  So the people that knew that
8  you lacked the cash to meet the
9  commitments were O'Hanlon, Miller, Terry
10 Cady and yourself and no one else, is that
11 accurate?
12     A.  That is accurate.
13     Q.  Okay.  Do you want to expand?
14         MR. DEWITTE:  Objection to
15 form of the previous question.
16     A.  Yeah, Phil Jackson would have
17 not known that I was in negative cash, but
18 he would have understood that we didn't
19 have the cash to do that.  He would not
20 have known that I went negative cash, but
21 he would have understood.  Reliant was a
22 little different.  Minerals -- Minerals
23 sat by itself as a five million dollar

---

Page 25

1  line, you had to advance cash for it.
2  Reliant was a little trickier.  Reliant
3  was a receivables line, but it was against
4  pharmaceutical -- generic pharmaceuticals
5  shipped, it really didn't fit medical
6  services, and it was a twenty million
7  dollar facility?  And what -- what was
8  understood by everyone in Business Credit
9  that I talked to and O'Hanlon was that --
10 and I can't say about Mr. Cohn, we only
11 had an ability to do a ten million dollar
12 facility.
13         So whenever Reliant -- and --
14 we did get the Reliant specially approved,
15 and we had U.S. Bank look at it, and so
16 that was funded in a special facility by
17 U.S. Bank and they looked at it, but they
18 could still only do ten million.  So the
19 issue was when Reliant would exceed and
20 want to draw the full twenty million
21 dollars, we didn't have the capacity.  And
22 at many times over the life of that loan
23 there were very contentious meetings.

---

7 (Pages 22 to 25)

** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **
Tyler Eaton Morgan Nichols & Pritchett, Inc.    (800) 458-6031    www.TylerEaton.com
6d4f42e9-0fe7-4280-9c90-6646b48b0b44

132

Fleet National Bank, et al.,         ** UNCERTIFIED ROUGH DRAFT        Steve Garfinkel

O'HANLON, et al.,                                                    April 1, 2008

Page 30

1    A. Yes.
2    Q. O'Hanlon tried to manipulate
3 you at various times by saying things to
4 you, is that a fair statement?
5         MR. DEWITTE: Objection to
6 form.
7         MR. ARTESE: Objection to
8 form.
9    A. Who didn't he try to
10 manipulate?
11    Q. Do I take that as a yes?
12    A. You can take that as a yes.
13         MR. SCHWARTZ: Could I have
14 that last answer read back, please?
15         (Record read.)
16    Q. Third Coast Capital is dealt
17 with, among other places, in paragraph
18 thirty-eight of your affidavit?
19    A. Correct.
20    Q. You can look at it, but my
21 question is not really about the language.
22    A. Okay.
23    Q. Do you know how DVI --

Page 31

1 withdrawn.
2         Who initially approached whom?
3 Did DVI approach Third Coast or did Third
4 Coast approach DVI?
5    A. I don't know.
6    Q. Okay. Do you know what
7 individuals were involved in that approach
8 regardless of in which direction it went?
9    A. All I know was Mik Anic and
10 Kathleen on that side. And I don't know
11 on the DVI side how it got -- how it got
12 to the point they were in our company.
13    Q. Do you know whether the board
14 approved the agreement with Third Coast?
15    A. The purchase of Third Coast?
16    Q. Yes, I'm sorry, the purchase
17 of Third Coast.
18    A. I don't know.
19    Q. Do you have any reason to
20 doubt that the board approved?
21    A. No reason to doubt at all.
22    Q. Kathleen -- I can't remember
23 her last name --

Page 32

1    A. Wilkinson.
2    Q. Wilkinson. She is the person
3 that told you there was trouble in the
4 Third Coast Capital, which I think you
5 quantified as twelve to thirteen million
6 dollars?
7    A. She said around ten to -- ten
8 to twelve range.
9    Q. Did you pass that information
10 on to anybody else at DVI?
11    A. I passed it on to Tony Turek
12 and Mike O'Hanlon.
13    Q. Do you know what Mr. --
14 withdrawn.
15         Do you know whether Mr. Turek
16 took any action based on the information
17 you passed on?
18    A. No. His only action was to
19 tell me that she was overreacting and they
20 weren't -- that the portfolio -- there
21 weren't problems in the portfolio.
22    Q. Do you know the basis for that
23 statement, do you know whether Mr. Turek

Page 33

1 had reviewed the portfolio?
2    A. Yes, he approved -- yeah, he
3 was on the credit committee and he -- he
4 dealt with almost every loan I thought
5 that was created by then.
6    Q. Do you know whether O'Hanlon
7 took any action based on your passing on
8 to him what Kathleen told you?
9    A. He was more emphatic about
10 Kathleen and being a little unstable and
11 just purposefully trying to cheapen the
12 portfolio. Mik Anic had already left the
13 company -- well, he hadn't left -- yeah,
14 he did leave, but it was all kinds of
15 lawsuits and he at that point was a severe
16 antagonist of Third Coast and Kathleen.
17 We almost had to get a restraining order,
18 I think we almost had to call the police
19 to get Mik removed out of the offices. So
20 Kathleen wanted nothing to do with Mik and
21 was deathly scared of Mik. So at the time
22 she was out there by herself, best of my
23 recollection. So she was trying to deal

9 (Pages 30 to 33)

Fleet National Bank, et al.,    ** UNCERTIFIED ROUGH DRAFT
O'HANLON, et al.,

Steve Garfinkel
April 1, 2008

## Page 34

1  with that.
2      Q.  In paragraph fourteen of your
3  affidavit, you say that Cohn recruited
4  Michael -- Michael O'Hanlon to DVI. If
5  you want to take a look, I will pause.
6      A.  No, no. Go ahead.
7      Q.  Is that your belief today?
8      A.  Yeah, that -- that is my
9  belief.
10     Q.  What's the basis for that
11 belief?
12     A.  Myth or fact?
13     Q.  That's really my question, is
14 it myth or fact? Like truth or
15 consequences.
16     A.  Right. O'Hanlon had the
17 company and he set it up at a little
18 office in -- something like Hatborough,
19 something where -- where coincidentally
20 was near Doylestown. I'm under the
21 impression from O'Hanlon that he said Cohn
22 approached him. But I can't -- I can't be
23 sure. But I sit with the firm impression

## Page 35

1  that O'Hanlon -- that O'Hanlon did not
2  approach the company, he was approached.
3      Q.  Is there -- well, let me break
4  that down into a couple --
5      A.  Sure.
6      Q.  -- of steps. One, is your
7  impression that O'Hanlon did not approach
8  the company, he was approached, based on
9  any information you got other than from
10 O'Hanlon himself?
11     A.  That is correct.
12     Q.  So it's only what O'Hanlon
13 told you?
14     A.  That is correct.
15     Q.  Did O'Hanlon tell you that
16 Jerry Cohn approached him or that DVI
17 approached him?
18     A.  I can't be sure.
19     Q.  How about David Higgins, did
20 he tell you that David Higgins approached
21 him?
22     A.  You know, I can't be sure now.
23     Q.  So is your affidavit in

## Page 36

1  paragraph fourteen saying that Cohn
2  recruited Michael O'Hanlon, is that one of
3  the respects in which you think your
4  affidavit is not really accurate?
5      MR. TEPPER: Objection to
6  form.
7      MR. ARTESE: Join that
8  objection.
9      A.  At best -- as best I would be
10 able to say it was my impression that it
11 was Cohn, but I don't have firsthand -- I
12 don't have firsthand knowledge and I'm
13 not -- I can't say now -- knowing it came
14 from O'Hanlon, I can't be sure who
15 approached him. But it could have been
16 Higgins, it could have been DVI, it could
17 have been Cohn.
18     Q.  Do you know if Jerry Cohn held
19 any debt issued by DVI, bonds or debt?
20     A.  No, he only owned the -- well,
21 he owned the common stock. I don't think
22 he owned the convertible. I don't think
23 he was in the nine and an eighth

## Page 37

1  convertible.
2      Q.  You don't think he was in the
3  nine and a eighth convertible?
4      A.  I don't. I could be wrong --
5  let's put it I don't know if he was in
6  nine and an eighth convertible.
7      Q.  When were the nine and
8  one-eighth convertible notes originally
9  due to mature?
10     A.  June of 2003, I believe.
11     Q.  Okay. And if a person held
12 such notes and took no further action,
13 would they be paid on the --
14     A.  No, wait, I'm sorry.
15     Q.  I think it's '02 --
16     A.  Yeah I was about to say '02.
17     Q.  I was going to get back to
18 that --
19     A.  It's June of '02.
20     Q.  If a person -- if a holder of
21 the notes took no action and June of '02
22 came, what would happen, would they be
23 paid?

10 (Pages 34 to 37)

Fleet National Bank, et al.,    ** UNCERTIFIED ROUGH DRAFT    Steve Garfinkel
O'HANLON, et al.,    April 1, 2008

---

**Page 50**

1     Q.  Is it your contention that for
2 those loans that you have just identified,
3 Jerry Cohn knew that they exceeded the
4 company's ability to fund?
5     A.  No.
6     MR. DEWITTE:  Objection to
7 form of the question --
8     Q.  No?
9     A.  No.
10     MR. DEWITTE: -- Mr. Garfinkel
11 be permitted to finish his answers.
12     Q.  I'm sorry, I didn't mean --
13 did I interrupt you? If I did, I
14 apologize?
15     A.  No, only -- only O'Hanlon
16 and Miller understood that we were going
17 into negative cash.
18     Q.  So in the second sentence of
19 paragraph sixty, you are not saying that
20 Mr. Cohn knowingly engaged in transactions
21 that exceeded DVI's ability, correct?
22     MR. DEWITTE:  Objection to
23 form.

**Page 51**

1     A.  That is correct.
2     Q.  You mentioned at some point a
3 loan called Intrepid, it was mentioned,
4 and Todd Garamella. Do those names ring a
5 bell to you?
6     A.  Yes, they do.
7     Q.  That was a borrower from DVI?
8     A.  Yes, it was.
9     Q.  Did you ever learn that
10 additional credit was extended to Intrepid
11 in a workout situation without credit
12 committee approval?
13     A.  No, I never -- I never knew
14 that, but I'm not shocked.
15     Q.  Okay. Why are you not
16 shocked?
17     A.  He was a significant helper
18 and friend. And O'Hanlon had substantial
19 dealings and was enamored with that and
20 kept -- and kept exchanging and doing
21 things of getting increased ownership in
22 the company. And there was a major --
23 there was a major -- some battles over if

**Page 52**

1 Todd would take on some of the problem
2 loans -- through Terry Cady I understand
3 this. O'Hanlon was very involved and
4 would be pushing for an increased
5 ownership in Intrepid, and Intrepid would
6 be pushing for the opposite. So O'Hanlon
7 was very -- very involved and moving and
8 pressuring Terry Cady to have Todd
9 Garamella and Intrepid move. He was -- he
10 was almost -- not as close as Gary Wright,
11 but for a while he and O'Hanlon were very
12 close.
13     Q.  Did it ever come to your
14 attention or did you ever hear that when
15 Jerry Cohn learned that credit had been
16 extended to Intrepid without credit
17 committee approval, he hit the roof?
18     MR. DEWITTE:  Objection to
19 form.
20     A.  I heard that. I heard that
21 when the -- when the management letters
22 went in, I remember at the board Jerry was
23 very upset.

**Page 53**

1     Q.  Did he vent that at a board
2 meeting?
3     A.  Yes.
4     Q.  What do you remember him
5 saying? Excuse me, were you present?
6     A.  Yes.
7     Q.  What do you remember him
8 saying?
9     A.  Saying that's not allowed and
10 this has to stop.
11     Q.  And to whom did he say that?
12     A.  I thought it was O'Hanlon.
13     Q.  And what did O'Hanlon respond,
14 if anything?
15     A.  He said we are not going to do
16 it anymore. But that was also in the
17 response in the management letter.
18     Q.  Do you think --
19     A.  I thought that was -- I
20 understood that Jerry was upset at
21 anything -- Mr. Cohn was upset that things
22 wouldn't go through the credit committee.
23     Q.  And did you form any opinion

14 (Pages 50 to 53)

** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **
www.TylerEaton.com
Tyler Eaton Morgan Nichols & Pritchett, Inc.    (800) 458-6031
6d4f42e9-0fe7-4280-8c90-5646b48b0b44

135

Fleet National Bank, et al.,    ** UNCERTIFIED ROUGH DRAFT

O'HANLON, et al.,

Steve Garfinkel
April 1, 2008

---

**Page 54**

1  about whether prior to learning about
2  Intrepid he knew there were things not
3  going through the credit committee?
4      MR. DEWITTE: Objection to
5  form.
6      Q.  Or was this his first
7  knowledge?
8      A.  I -- I don't know.  All I know
9  is he seemed to be surprised and very
10  annoyed that anything would happen that
11  wouldn't go through the credit commitee.
12      Q.  Is it a fair characterization
13  that when Jerry Cohn was upset at
14  something, he verbalized it?
15      MR. ARTESE: Objection to
16  form.
17      A.  Mr. Cohn?
18      Q.  Yes.
19      A.  Oh, yes.  But he -- yes.  That
20  was always -- most of his verbalization
21  and most of his contact was always
22  O'Hanlon, and then sometimes Miller --
23  Miller developed a relationship.  You only

**Page 55**

1  have to check the number of phone calls
2  every day between he and -- but he -- yes,
3  he -- he verbalized it to O'Hanlon, lots
4  of his feelings.
5      Q.  He was not shy about
6  expressing his opinions about DVI?
7      A.  In all of the time I know him,
8  no.
9      Q.  Would you call him an active
10  director?
11      A.  Very active.
12      Q.  You gave some testimony about
13  the General Electric negotiations, I will
14  call them, correct?  Do you know whether
15  Mr. Cohn participated in those
16  negotiations?
17      A.  No.
18      Q.  No, you don't know or no, he
19  did not?
20      A.  He did not participate in the
21  first set.  The second set is kind of a
22  mystery, because I was not even involved
23  in the second until the GE proposal came

**Page 56**

1  in and no one could figure it out, no one
2  being UBS or anyone, and they had to come
3  to me and ask me to try and figure out
4  what this proposal was.  I can't say one
5  way or the other whether Mr. Cohn was
6  involved in that -- in that second series.
7      Q.  Did you ever hear that the
8  board gave Mike O'Hanlon a direction
9  between the first and second series that
10  if he was going to continue to have
11  discussions with General Electric, Jerry
12  Cohn had to be involved?
13      MR. DEWITTE: Objection to
14  form.
15      A.  I -- I don't remember that.
16  What I -- the closest I can come is -- our
17  largest shareholder is Ron Barron.  And
18  Mr. Barron was very, very sensitive about
19  being an insider.  And sometime before GE
20  came in the second time, Barron called me,
21  he had lost some of his analysts and was
22  just asking for an update, and he
23  mentioned something to me about GE.  And I

**Page 57**

1  told him that -- not -- something like
2  there was a final pressure number.  And I
3  got into a short conversation with him
4  about my understanding of GE, and said
5  that -- this is what I understand
6  happened.
7      Mr. Barron was very agitated.
8  He -- and this I heard from Mr. Cohn, but
9  also from -- also from -- more from
10  O'Hanlon.  He -- Mr. Barron called Mr.
11  Cohn -- I guess I heard most of this from
12  O'Hanlon.  And Mr. Cohn did say at the
13  board that he -- that he would be in
14  constant contact with Mr. Barron.  Mr.
15  Barron directed that he wanted to be kept
16  up to date and have access to Mr. Cohn.
17  And -- so Mr. Cohn then kept a -- would
18  report that he -- he is having biweekly or
19  so conversations.  But that's really also
20  was part of we are going to sell the
21  International operations and Mr. Cohn
22  would not leave Mr. O'Hanlon's side.  I
23  don't --

15 (Pages 54 to 57)

** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **
Tyler Eaton Morgan Nichols & Pritchett, Inc.    (800) 458-6031

www.TylerEaton.com
5d4f42e9-0fe7-4280-9c90-8646b48b0b44

136

**Page 58**

1        So there -- so there was a --
2    the fact that Mr. Cohn was not supposed to
3    leave Mr. O'Hanlon alone seemed to deal
4    with a number of things. But I don't know
5    specifically that -- that Mr. Barron ever
6    said anything about GE. And I don't know
7    how that the board said anything.
8        Q.   Who is it -- based on your
9    knowledge, who is it that -- that
10   established the protocol by which Mr. Cohn
11   would never leave Mr. O'Hanlon alone?
12   Whose idea was that?
13       A.   Probably Mr. Cohn's
14   interpretation of what Mr. Barron was
15   looking for. But I thought it was
16   more we've told the world and Mr. Barron
17   we are getting out of International and we
18   are moving Business Credit and those
19   things have to happen. I don't know --
20   and I thought there was something in there
21   that Mr. Barron wanted to have a better
22   understanding of how things were
23   progressing in the company.

**Page 59**

1        Q.   Do you know whether Mr. Cohn
2    stated to Mr. O'Hanlon his own view, Mr.
3    Cohn's own view, that the company should
4    get out of International?
5        MR. DEWITTE:  Objection to
6    form.
7        A.   Oh, that was -- that was an
8    emphatic -- was in a press release and
9    then discussed at the board. And Mr.
10   O'Hanlon was obligated to update the board
11   on the progress he was making, or the lack
12   thereof, in getting out of International.
13       Q.   Is it a fair statement that
14   Mr. Cohn was one of the prime pressure
15   points on Mr. O'Hanlon to get out of
16   International?
17       A.   That is correct.
18       MR. DEWITTE:  Objection to
19   form.
20       Q.   Just to go back to GE for a
21   second, in the last sentence of paragraph
22   seventy-four of your affidavit, that's on
23   page twenty-five --

**Page 60**

1        A.   Sure.
2        Q.   -- you say, "O'Hanlon rejected
3    this offer." Do you see that?
4        A.   The -- for the -- for the
5    first transaction?
6        Q.   Yeah. Well, first of all, do
7    you see that language?
8        A.   Yes, I do.
9        Q.   Okay. What's your basis for
10   that statement in your affidavit?
11       A.   When I updated O'Hanlon about
12   the visit I had from the two GE people
13   saying they didn't want to do a deal and
14   why, I went and told O'Hanlon. And
15   O'Hanlon's reaction was good, now I don't
16   have to do a deal with those son of a
17   bitches, I never liked Rick Wolfert, that
18   problem solved. But I don't know how that
19   got reported to the board and whether --
20   who -- who was authorized to just let it
21   die or what happened. My understanding
22   was there was nothing to approve or say
23   no; GE never made an offer.

**Page 61**

1        Q.   Okay. Paragraph seventy-six
2    of your affidavit talks about the Op Co
3    plan, and you have testified --
4        A.   Yeah.
5        Q.   -- earlier, and I'm a little
6    confused and I just want to understand
7    what it was. You may be a little confused
8    also maybe. We could help each other --
9        A.   Many years later I'm still
10   trying to figure out, as are -- as just
11   about everyone who touched it.
12       Q.   Are you capable of giving me a
13   general structure of what you understood
14   the Op Co plan to be?
15       A.   I'm not sure that anyone is,
16   because it was -- it was -- I will take a
17   shot at it.
18       Q.   Okay. All -- that's all that
19   anybody could ask.
20       A.   Okay. We had -- because we
21   weren't a bank, we were a private company,
22   we could own and operate centers. And
23   invariably with a problem loan in a

16 (Pages 58 to 61)

### Page 82

1  paragraph and the next one describes how
2  you and Ms. Cruikshank came up with the
3  cash, correct?
4      A.  Correct.
5      Q.  Did you ever discuss with Mr.
6  Cohn what Mr. O'Hanlon said to you or what
7  you did on the basis of what Mr. O'Hanlon
8  said to you?
9          MR. DEWITTE:  Objection to
10 form.
11     A.  I did not.
12     Q.  Paragraph sixty-six says, "As
13 discussed below" -- and I'm reading the
14 third sentence. "As discussed below, in
15 March of 2001, I told Cohn that DVI was
16 out of compliance due to the pledging of
17 ineligible collateral to the Fleet
18 lenders."
19         Did you say that to Jerry Cohn
20 in March 2001?
21     A.  That was what I intended, but
22 I think my exact -- I think that
23 conversation was around the resignation of

### Page 83

1  Lisa Cruikshank.
2      Q.  Right.
3      A.  No, I did say we were out of
4  compliance. And Jerry said we can't be,
5  that's a situation that can't exist. But
6  I didn't use the word ineligible
7  collateral. I said Lisa has an issue with
8  the -- an ethical issue with the -- with
9  the Fleet facility and the collateral we
10 are pledging and I have the same issue.
11     Q.  Did you -- were you --
12 withdrawn.
13         Were you any more specific
14 about that ethical issue?
15     A.  No.
16     Q.  And Mr. Cohn said to you in
17 that same conversation that the company
18 should not be out of compliance or could
19 not be?
20         MR. TEPPER:  Objection to
21 form.
22     A.  Yes, he did.
23     Q.  When he said that, did you

### Page 84

1  respond?
2      A.  I think I said I know -- I
3  can't remember the response. There was
4  some response, but it wasn't -- it would
5  have -- was something like I know that,
6  but here we are, something along those
7  lines. It was not a strong rebuttal or a
8  -- it was an acknowledgment, yeah, I know
9  we can't, but -- but.
10     Q.  What came after the but?
11     A.  I don't know if anything did,
12 but what was unsaid was but we are.
13     Q.  It was unsaid but we are?
14     A.  Yeah.
15     Q.  Correct?
16     A.  Yeah.
17     Q.  Did you tell the lawyers who
18 prepared the affidavit about the
19 conversation you've just described to me?
20         MR. TEPPER:  Objection to
21 form.
22         MR. DEWITTE:  Objection to
23 form.

### Page 85

1      A.  I -- I did, and I may have
2  said ineligible -- and I said it was
3  ineligible collateral. As I'm looking at
4  it today, I thought I had said -- I
5  thought I was clear that what I had said
6  in the Lisa conversation is what I've said
7  all along, that I said there were -- she
8  had ethical consider -- ethical problems
9  with the collateral and so did I.
10     Q.  You think that's what you said
11 to the lawyers?
12     A.  That's what I -- yeah, that's
13 -- yeah, that's what I think I said.
14     Q.  Do you know how the words I
15 told Cohn ineligible collateral got into
16 this affidavit?
17     A.  Maybe -- no, I don't -- maybe
18 I said it and didn't pick it up and missed
19 it in the -- in the other one, but what
20 I'm -- I'm sure -- I'm clear in my mind
21 that I said that we are out -- that we are
22 out of the compliance and there is an
23 ethical -- there is an ethical issue with

22 (Pages 82 to 85)

Fleet National Bank, et al.,        ** UNCERTIFIED ROUGH DRAFT        Steve Garfinkel
O'HANLON, et al.,                                                   April 1, 2008

**Page 86**

1  the collateral.
2     Q.  Did you tell them what the
3  ethical issue was?
4     A.  No.
5     Q.  Did he ask you to have Lisa
6  Cruikshank call him?
7     A.  No.  He asked if he should
8  talk to Lisa.
9     Q.  And did you respond?
10    A.  I told him Lisa didn't want to
11 talk to anybody.
12    Q.  And what was your basis for
13 that statement?
14    A.  Lisa said that.  And then I
15 told Lisa about the conversation and she
16 said no, I -- I don't want to get in any
17 more phone conversations, I just -- I just
18 want to leave.
19    Q.  Did Mr. Cohn ask you more than
20 once -- withdrawn.
21        Did Mr. Cohn state more than
22 once his desire to talk to Lisa?
23    A.  No, I only thought it was that

**Page 87**

1  one time.
2     Q.  Did you express to Lisa an
3  opinion about whether she should talk?
4  You have just -- withdrawn.
5        You have just said what Lisa
6  said to you about talking to people.  My
7  next question is did you speak to Lisa
8  giving your opinion about whether she
9  should talk to Jerry?
10    MR. DEWITTE:  Objection to
11 form.
12    A.  No, I didn't give it either
13 way.  She said she had talked to
14 O'Hanlon -- either talked to him or would
15 be talking and that was all she was going
16 to do.
17    Q.  Let me represent to you that
18 at page two hundred thirty-nine, line
19 twenty-one, to page two hundred forty,
20 line two, of her deposition --
21    A.  Okay.
22    Q.  -- in this case -- which I
23 assume you have never read, right?

**Page 88**

1     A.  Correct.
2     Q.  On August 21, 2007, here's
3  what Ms. Cruikshank said.  "I just
4  remember Mr. Garfinkel saying that Mr.
5  Cohn asked why I was leaving, that he did
6  want to talk to me, and Mr. Garfinkel
7  asked me not to speak to him."
8        Is that consistent with your
9  own memory?
10    A.  Absolutely not.
11    Q.  Okay.  Do you know whether Mr.
12 Cohn ever spoke to Mr. O'Hanlon about Ms.
13 Cruikshank's departure?
14    A.  I don't know.  The only person
15 I remember that Sara Lee talked to and
16 wanted to talk to --
17    Q.  You said Sara Lee?  Lisa?
18    A.  Oh, Lisa.
19    Q.  Okay.
20    A.  Was Sara Lee Keller-Smith.
21    Q.  Okay.  Did Ms. Cruikshank
22 write a resignation letter?
23    A.  We had a severance agreement,

**Page 89**

1  but I don't remember a resignation letter.
2     Q.  And, therefore, you don't
3  remember if she wrote more than one
4  resignation letter, would that be correct?
5     A.  That is correct.
6     Q.  Let me ask -- let me mark as
7  Exhibit 138 a document which purports to
8  be a letter signed by Lisa Cruikshank
9  dated March 13, 2001.  And I'm going to
10 show you both, so let me mark as Exhibit
11 139 a document that purports to be another
12 letter from Lisa Cruikshank dated March
13 13, 2001.  And let me ask you to look at
14 those while I pass out copies.
15        (Whereupon, Garfinkel Exhibits
16        138 and 139 were marked for
17        identification.)
18    MR. FRIEDMAN:  I don't know if
19 I have the right number, but if not we
20 will get some more.
21    A.  (Reviewing documents.)
22    MR. DEWITTE:  Which one is
23 which?

23 (Pages 86 to 89)

139

Page 94

1  in need. In fact, the final liquidation,
2  as evidenced by the -- by the Anderson and
3  Kill letter on my behalf, essentially
4  recovered almost five times the amount it
5  would have taken.
6        But at that point in time, Lisa
7  was absolutely against double listing, as
8  was -- as was I, but there was no reason.
9  And those -- those numbers sit in trended
10 history of being such an insignificant
11 number that there was no reason for any of
12 that to take place. So I -- I am at a
13 loss, because it didn't -- and let's use
14 the phrase double -- double listing.
15     Q.  Okay.
16     A.  Because this is just kind of a
17 euphemism that got picked up and -- and
18 there really was no -- no literal
19 pledging. I don't recall that that ever
20 happened on Lisa's watch, and it was
21 something she was adamantly against.
22     Q.  The double listing never
23 happened on her watch?

Page 95

1      A.  As far as I know, and she was
2  adamantly against it.
3      Q.  Okay. Referring to the
4  earlier part of the sentence, how about
5  "funding transactions without enough
6  collateral"?
7      A.  Absolutely.
8      Q.  You have already testified --
9      A.  Absolutely.
10     Q.  -- that that happened in 1999
11 in connection with Medcap Oregon.
12     A.  Correct.
13     Q.  Did it happen at any other
14 times between '99 and the date of this
15 letter?
16     A.  Yes. It happened -- it
17 happened on occasions in 2000, not a lot,
18 generally worked our way back. And then
19 it began to get tighter in 2001. And
20 around the forecast for what you would be
21 working with was beginning to forecast
22 a -- an out of compliance again. And I
23 think later on in 2001, we began to go to

Page 96

1  more -- more out of compliance when she
2  left.
3      Q.  More out of compliance?
4      A.  Correct, more out of -- more
5  consistently out of compliance and more
6  out of compliance.
7      Q.  Did -- I'm sorry, had you
8  finished?
9      A.  Yes.
10     Q.  Did you tell Jerry Cohn in
11 1999 that the company was out of
12 compliance?
13     A.  No.
14     Q.  Did you tell him in 2000?
15     A.  No.
16     Q.  Did you tell him in 2001?
17     A.  2001.
18     Q.  And that was the conversation
19 about Lisa's resignation, correct?
20     A.  That's correct.
21     Q.  That was the conversation that
22 did not include the words ineligible
23 collateral, correct?

Page 97

1      A.  I believe so, yes.
2      Q.  There was a board meeting in
3  April of 2001, correct?
4      A.  Yes, April 10th.
5      Q.  And you testified on your
6  direct testimony that there came a point
7  when Jerry Cohn asked everyone except
8  yourself to leave the room, correct?
9      A.  Correct, and -- and the board.
10     Q.  I'm sorry. Everyone except
11 the board members and yourself?
12     A.  Right, correct.
13     Q.  And you stated in response to
14 his question after everyone else had left
15 the room that the company "drifts in and
16 out of compliance and struggles to stay in
17 compliance." That's in paragraph
18 sixty-nine of your affidavit?
19     A.  Yes, that's correct.
20     Q.  Do you remember making that
21 statement?
22     A.  I do.
23     Q.  Do you also remember O'Hanlon

25 (Pages 94 to 97)

140

Fleet National Bank, et al.,          ** UNCERTIFIED ROUGH DRAFT          Steve Garfinkel
O'HANLON, et al.,                                                        April 1, 2008

Page 98

1   saying at that meeting that "many
2   companies are out of compliance and that
3   he was going to fix DVI's situation"?
4       A.  Yes, I do.
5       Q.  And that's in paragraph
6   seventy of your affidavit?
7       A.  Yes, I do.
8       Q.  What is your best recollection
9   of exactly what O'Hanlon said about fixing
10  the situation?
11      A.  The -- Jerry asked me the
12  question, I was surprised at the question,
13  I was fumbling with the answer and said
14  that we drift in and out of compliance.
15  O'Hanlon said I will -- I will handle the
16  answer to that. Now I look -- now I will
17  admit to a little confusion of which came
18  first.
19      Q.  Okay.
20      A.  O'Hanlon said we have -- we
21  are out of the compliance but it's a
22  problem we are addressing. Nate Shapiro
23  -- Nate Shapiro said isn't this a problem.

Page 99

1   Now, I can't remember whether Nate Shapiro
2   said -- I think he had to say it before,
3   because that's when O'Hanlon blew up, and
4   he said it in an angry way directed --
5       Q.  Nate or O'Hanlon?
6       A.  O'Hanlon did.
7       Q.  Okay, okay.
8       A.  -- in an angry way directed at
9   Nate and Jerry, saying lots of companies
10  are out of compliance, this is not a big
11  issue, lot of companies deal with it, it's
12  a problem I've said that I will fix. And
13  he didn't elaborate on how he was going to
14  fix it, when it was going to get fixed,
15  what he was going to do, no questions
16  about how big, how small. He ended the
17  conversation.
18      Q.  Did you tell the board at that
19  meeting that in the past, ineligible
20  collateral had been included in borrowing
21  base reports?
22      A.  No.
23      Q.  Did O'Hanlon?

Page 100

1       A.  No.
2       Q.  Did you say anything at that
3   meeting about double listing of
4   collateral?
5       A.  No.
6       Q.  Did O'Hanlon?
7       A.  No. There would have been no
8   reason. I did not come to -- my
9   understanding of double listing began in
10  November -- the potential for it began --
11  and I have been consistent in this in
12  every -- everywhere I have spoken, was --
13  did not begin until around November of
14  2002 when Andrea Marshall came in -- after
15  we had all of the liquidity processes and
16  Andrea Marshall came into my office and
17  asked permission to do double -- to list
18  collateral that was in other facilities,
19  mainly because she was just having to list
20  too many ineligible loans of delinquent
21  and it was becoming cumbersome. And I
22  said I don't like it but you -- but I want
23  I want it limited to twenty-five million.

Page 101

1       I never had another
2   conversation. I never looked at any
3   individual loans. I never participated in
4   loans. I never heard the comment double
5   pledging. I never saw the extent -- I
6   never -- I saw -- the examiner did not
7   review that with me. He put one report in
8   front of me that was totally confusing.
9   Not until I read the report and saw the
10  assertions of the double listing did I
11  come to understand anything of that
12  magnitude. And only about six or seven
13  months later did I ever really believe or
14  have reason to think that maybe that
15  really did happen and went back and looked
16  at that exhibit to try and understand it.
17      Q.  And you said it, but I didn't
18  focus on it. When did Ms. Marshall come
19  to you and have the conversation you just
20  described?
21      A.  Around November, December,
22  2002.
23      Q.  And what was Ms. Marshall's

26 (Pages 98 to 101)

**  UNCERTIFIED ROUGH DRAFT  **  UNCERTIFIED ROUGH DRAFT  **
Tyler Eaton Morgan Nichols & Pritchett, Inc.     (800) 458-6931          www.TylerEaton.com
                                                                        6d4f42e9-0fe7-4280-9c90-6648b48b0b44

141

Page 106

1  sure now that John and I were on the
2  conversation.
3      Q.   You testified earlier about I
4  believe on July 14th a conversation you
5  had with Kevin Padrick?
6      A.   Yes.
7      Q.   And on the same day you had a
8  conversation with O'Hanlon on the same
9  subject?
10     A.   I had the conversation in the
11 morning with O'Hanlon as a result of a
12 question from Padrick and then a brief one
13 later in the day.
14     Q.   What did you tell O'Hanlon in
15 the morning conversation?
16     A.   In the morning I told him that
17 I was going to tell Goldman about the
18 collateral shortfall problem.
19     Q.   Did you define the collateral
20 shortfall problem?
21     A.   I didn't have to.  He has
22 understood it for years.
23     Q.   What did you then tell

Page 107

1  Mr. Padrick?
2      A.   I told Mr. Padrick that there
3  was a collateral shortfall problem with
4  the Fleet facility that did not know about
5  it and that was something his firm should
6  know on the engagement.  He asked me how
7  much, I said fifty million dollars.
8      Q.   Did you have a conversation
9  with Jerry Cohn on that day?
10     A.   No, not that I know of, no.
11     Q.   Did you give any consideration
12 to telling Mr. Cohn what you had told
13 Mr. Padrick after telling Mr. O'Hanlon you
14 were going to tell Mr. Padrick?
15          MR. DEWITTE:  Objection to
16 form.
17     A.   Did not.
18     Q.   Did you learn at some point
19 that Susan Gibson wrote a memo about
20 certain activities at the company?  People
21 have referred to it as a whistle-blower
22 letter.
23     A.   I learned about that only in

Page 108

1  the examiner's report.  But I had
2  counseled Ms. Gibson and Ms. Snyder to
3  cooperate fully with Fleet.  I had
4  counseled them that there was a problem
5  with the Fleet facility, they were being
6  told about it and that they should
7  cooperate fully and give Fleet all of the
8  support that it wants and needs.
9      Q.   Do you remember having a
10 conversation with Jerry Cohn in August
11 2003 in which he asked you whether DVI had
12 made any large transfers?
13     A.   He asked me about the
14 severance payments to Matthew Goldenberg
15 and Phil Jackson.
16     Q.   And what did you say to him?
17 Withdrawn.  What did he say?  What did he
18 ask?
19     A.   He came in with O'Hanlon.  He
20 had a piece of paper in his hand.  He was
21 highly agitated.  And he asked me if I
22 knew about the severance payments made to
23 Jackson and Matthew Goldenberg, and I said

Page 109

1  I did.
2      Q.   And was there any further
3  conversation?
4      A.   Yes.
5      Q.   What was it?
6      A.   He asked me did I -- did I
7  approve those.  And I said yes, I created
8  the severance agreements, I approved it.
9  He turned to O'Hanlon, who seemed to have
10 aged a lot, and he barked at O'Hanlon --
11     Q.   Did he age on that very day in
12 that very conversation?
13     A.   I don't know when he aged
14 because I hadn't seen him for a long time.
15     Q.   Okay.
16     A.   But he was in there.  And
17 O'Hanlon barked at him, "Do you know
18 anything about this?"
19     Q.   Barked at Jerry?
20     A.   No, Jerry barked at O'Hanlon.
21     Q.   I'm sorry, okay.  Okay.
22     A.   "Do you know anything about
23 this?"  And O'Hanlon said no.  So Jerry

28 (Pages 106 to 109)

142

Fleet National Bank, et al.,      ** UNCERTIFIED ROUGH DRAFT        Steve Garfinkel
O'HANLON, et al.,                                                   April 1, 2008

**Page 110**

1  said, "Why did you do that?"
2      Q.  Said that to you?
3      A.  Yeah, and I said, "I've worked
4  on everyone's severance agreement in here.
5  I've done just about everyone's severance
6  agreement and worked it out, and no one
7  has ever asked me why I did anyone. But
8  on those, I did it because I thought the
9  people -- I thought they -- I thought they
10  deserved it, needed it and it was the
11  right thing to do. I believed that the
12  company put them in harm's way." And I
13  said, "I put this into the category of
14  constructive dismissal, and I thought that
15  they were entitled to that."
16          Jerry then got agitated and
17  said, "Well, what about the board?" And I
18  said, "Jerry" -- at this point voices may
19  have gotten raised. I said, "Jerry, I
20  have given the board every opportunity in
21  the world to address and correct this
22  situation, and the board has done nothing.
23  So I -- so I thought those employees

**Page 111**

1  needed that protection."
2          Then he said something, and I
3  blurted out and said, "Why do you think I
4  went to see Mr. Goldberg? What do you
5  think that was all about?" That ended the
6  conversation. Jerry got -- stormed out.
7  O'Hanlon followed him like a little puppy
8  dog at that point. That was the extent of
9  the conversation.
10      Q.  What is your best memory of
11  the time of this conversation?
12      A.  I can't remember if that was a
13  two -- it had to -- I can't remember if it
14  was August 10th, 11th. I don't know, but
15  the auditors or someone had gone to him
16  and given them the sheet. So I don't
17  know -- it was either late the week before
18  or Monday or Tuesday the 10th or 11th. I
19  can't remember.
20      Q.  And when you said the auditors
21  had given them this sheet, are you
22  referring to a document?
23      A.  Well, he had a sheet in his

**Page 112**

1  hand, so it sounded like something that
2  someone was looking at -- they were going
3  through looking at all of the severance
4  payments, because that was something for
5  bankruptcy. They were going to go to the
6  Court to say we want to stop all of these
7  payments. That's what came later. So he
8  was referring to a sheet that was in his
9  hands and earlier made a comment that
10  someone had given it to him and he was
11  seeing this for the first time.
12      Q.  Do you know whether that sheet
13  had been prepared at his direction?
14      A.  No idea.
15      Q.  Do you know whether that sheet
16  showed -- withdrawn. At the time of the
17  conversation, were Mr. Jackson and
18  Mr. Goldenberg still in the employ of DVI?
19          MR. DEWITTE: Objection to
20  form.
21      A.  Phil had already resigned but
22  was continuing to work through and do
23  whatever the company wanted. And Matthew

**Page 113**

1  was -- had resigned previously, but was on
2  a month-to-month employment relationship,
3  and he was continuing to be -- to stay
4  there to do whatever the company wanted.
5      Q.  So both of them were still
6  physically present in the offices,
7  correct?
8      A.  Absolutely. And Goldenberg
9  stayed through till around November,
10  December 2003. Jackson offered to stay
11  and offered to be of a lot of help to Alix
12  and Goldman. And Phil said that certain
13  people from DVI went to Goldman and said
14  that was unacceptable and asked that Phil
15  be -- be let go, which was really a
16  horrible thing that greatly -- I happen to
17  believe that letting Phil -- letting me go
18  was detrimental enough to what they could
19  have gotten with the proceeds and the
20  knowledge of the company.
21          But then letting Phil go was
22  just as ill-advised a move as they could
23  have made. I thought that greatly

                                    29 (Pages 110 to 113)

** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **
Tyler Eaton Morgan Nichols & Pritchett, Inc.     (800) 458-6031
www.TylerEaton.com
5d4f42e9-0fe7-4280-9c90-6646b48b0b44

143

Fleet National Bank, et al.,        ** UNCERTIFIED ROUGH DRAFT        Steve Garfinkel
O'HANLON, et al.,                                                     April 1, 2008

Page 114

1  affected the potential, the understanding
2  of what was recoverable, and people
3  knowledgeable to work with it. So Phil --
4  Phil then left the company.
5      Q.   In your conversation with
6  Mr. Cohn on this subject on the 10th or
7  11th of August --
8      A.   Yeah.
9      Q.   -- did he say anything in
10 substance like how could they have got
11 severance when their -- payments when they
12 are still working here?
13         MR. DEWITTE:  Objection to
14 form.
15     Q.   Did he raise that issue?
16     A.   No, it never got more than did
17 you authorize this and why? And when I
18 said the harm's way and he asked about the
19 board, he sure didn't like my answer that
20 I had given the board every opportunity,
21 and I assured him when I said, "Why do you
22 think I went to Mr. Goldberg?"
23     Q.   In that same conversation or

Page 115

1  in any conversation at this time, did the
2  subject of double listing come up?
3      A.   No.
4      Q.   Did there ever -- withdrawn.
5  Did you ever have a conversation with him
6  in which he asked you about the transfer
7  of collateral to Merrill Lynch from the
8  Fleet warehouse to the Merrill Lynch
9  warehouse?
10         MR. TEPPER:  Objection.
11         MR. ARTESE:  Objection to
12 form.
13     A.   I can't blanketly say yes. I
14 vaguely remember a conversation about --
15 about the transfer of the Fleet
16 collateral. But I can't -- I can't deny
17 that. I can't say yes or no. But I'm --
18 it registers as something that might have
19 happened.
20     Q.   I take it you don't remember
21 any specifics of the conversation?
22     A.   I don't remember any
23 specifics. But it might have happened.

Page 116

1      Q.   Let me ask you to look at
2  Exhibit 112. That is the same thing as
3  Exhibit 5 to your affidavit.
4      A.   Uh-huh.
5      Q.   So if you flip to Exhibit 5 --
6      A.   Okay.
7      Q.   -- that's the document that
8  was -- I marked, I believe, as Exhibit
9  112?
10     A.   Yeah.
11     Q.   And you gave some testimony
12 about this document over the last several
13 days, correct?
14     A.   Correct.
15     Q.   I want to ask you about some
16 specific language.
17     A.   Sure.
18     Q.   On the first page in the third
19 paragraph, it says, quote, "It had been
20 frustrating" -- and maybe it should be "It
21 has been frustrating sitting in on board
22 decisions and conversation about raising
23 capital or selling businesses and assets

Page 117

1  that I know would have had a different
2  answer with a fuller disclosure of the
3  company's liquidity situation," period,
4  close quote.
5          Was that state -- is that
6  statement an accurate portrayal of your
7  view when you wrote this memo to --
8      A.   Right. If it had been
9  explicitly said that we were negative
10 capital, it might have had a different
11 outcome. However, if it would have been
12 said that we were negative capital, the
13 company would have been required to make
14 the disclosure to the lenders, so the
15 option of raising capital would have never
16 been there.
17     Q.   And it never was explicitly
18 said that you were negative capital,
19 correct?
20     A.   Only in the December -- no,
21 not in those words. Only in the December
22 board meeting did it come -- did it
23 approach that.

30 (Pages 114 to 117)

** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **
Tyler Eaton Morgan Nichols & Pritchett, Inc.    (800) 458-6031
www.TylerEaton.com
6d4f42e9-0fe7-4280-9c90-6646b48b0b44

144

** UNCERTIFIED ROUGH DRAFT **  Steven Garfinkel
March 27, 2008

## Page 118

11:19:27 1  delinquent or ineligible loan collateral
11:19:30 2  with DVI's own cash, that was not included
11:19:33 3  in the statement of cash flows?
11:19:34 4  MR. DAILEY: Object to the
11:19:35 5  form.
11:19:35 6  MS. STRIKIS: Object to the
11:19:36 7  form.
11:19:36 8  A. It is in the -- you say "not
11:19:39 9  included." The SEC's approach and FASB's
11:19:43 10  approach to that statement does not --
11:19:44 11  does not provide for that.
11:19:46 12  Q. (BY MR. KARNUTH:) And it was
11:19:47 13  not included in the statement of cash
11:19:48 14  flows that DVI filed publicly, right?
11:19:50 15  A. If it -- if it -- if it was to
11:19:54 16  be provided, the filing would not be
11:19:56 17  effective.
11:19:56 18  Q. Okay.
11:19:57 19  A. When the -- filing
11:19:58 20  information -- it was -- we follow the --
11:19:58 21  we follow the rules on what is asked for.
11:20:23 22  (Whereupon, Garfinkel
11:20:23 23  Exhibit 38 was marked for

## Page 119

11:20:24 1  identification.)
11:20:24 2  Q. (BY MR. KARNUTH:)
11:20:24 3  Mr. Garfinkel, I am handing you what has
11:20:25 4  been marked Exhibit Number 38.
11:20:27 5  A. Yeah.
11:20:27 6  (Pause.)
11:21:16 7  Q. (BY MR. KARNUTH:)
11:21:17 8  Mr. Garfinkel, Exhibit 38 is an email from
11:21:19 9  Mr. Boyle to you, copying others, dated
11:21:23 10  April 23rd, 2002. Have you seen this
11:21:26 11  document before?
11:21:27 12  A. It is not familiar. I am
11:21:29 13  copied on it, but it is a -- it is not --
11:21:30 14  it is -- I am not familiar with it. So
11:21:32 15  give me a second -- if -- is there
11:21:35 16  something -- let me read it.
11:21:37 17  Q. Yeah, if you can read through
11:21:39 18  it.
11:22:18 19  (Pause.)
11:22:18 20  A. Okay.
11:22:18 21  Q. (BY MR. KARNUTH:) Having read
11:22:19 22  Exhibit 38, does that refresh your
11:22:21 23  recollection as to whether you -- you

## Page 120

11:22:22 1  received this?
11:22:23 2  A. It doesn't refresh my
11:22:25 3  recollection about whether I received it,
11:22:26 4  but it does refresh it about what it is
11:22:28 5  talking about.
11:22:29 6  Q. Okay. In the first paragraph
11:22:31 7  of the exhibit, Mr. Boyle states, "During
11:22:35 8  the course of answering questions
11:22:36 9  contained in their internal control
11:22:39 10  questionnaire, Deloitte makes two points
11:22:41 11  which will affect the scope of the
11:22:44 12  audit." Then he goes on to state, "They,
11:22:46 13  Deloitte, may insist on independent
11:22:48 14  appraisals on several operating companies
11:22:50 15  like Barth, OnCure, Valley, Dolphin. They
11:22:56 16  will, of course, initially perform desktop
11:22:58 17  analysis, including review of business
11:23:00 18  plans and financial statements for each
11:23:03 19  company."
11:23:05 20  Was it your understanding that,
11:23:07 21  prior to this time, Deloitte was not
11:23:09 22  insisting on independent appraisals of
11:23:13 23  operating companies?

## Page 121

11:23:13 1  MR. COMERFORD: Objection to
11:23:14 2  the form.
11:23:14 3  A. I don't have an understanding
11:23:16 4  of what happened before the -- or before
11:23:17 5  this.
11:23:20 6  Q. (BY MR. KARNUTH:) Was it your
11:23:21 7  understanding that Deloitte made site
11:23:24 8  visits to various DVI customers?
11:23:28 9  A. No, that is not my
11:23:29 10  understanding.
11:23:30 11  Q. In the second -- or, I'm
11:23:34 12  sorry, the third paragraph, Mr. Boyle
11:23:40 13  states, "The shield created by refraining
11:23:43 14  from exercising warrants on preferred
11:23:45 15  stock to avoid consolidation is now deemed
11:23:50 16  to no longer exist. And without waiting
11:23:53 17  for the EITF to establish a policy, the
11:23:56 18  criteria for the fiscal year 2002 audit is
11:24:01 19  to exercise control on an as-if-exercised
11:24:05 20  basis."
11:24:07 21  Was it your understanding that
11:24:08 22  Deloitte was requesting consolidation of
11:24:10 23  PELL and Valley into DVI's financial

31 (Pages 118 to 121)

** ROUGH DRAFT **  IN RE DVI, INC. SECURITIES LITIGATION  ** ROUGH DRAFT **
Tyler Eaton Morgan Nichols & Pritchett, Inc.                    www.TylerEaton.com

8812a451-cdc5-4c0e-a9f7-4da96c60e3de

145

** UNCERTIFIED ROUGH DRAFT **  Steven Garfinkel
March 27, 2008

Page 122

11:24:13 1 statements?
11:24:14 2      MR. COMERFORD: Objection to
11:24:14 3 the form.
11:24:15 4      A.   They were testing for
11:24:17 5 consolidation on a number of companies.
11:24:19 6 And ultimately we did consolidate Valley
11:24:21 7 at June 30.
11:24:23 8      Q.   (BY MR. KARNUTH:) Of '02?
11:24:24 9      A.   Of '02. I can't remember if
11:24:29 10 we consolidated PELL. But we were --
11:24:34 11 of -- and Maria Gansz was hired
11:24:36 12 specifically to help do work on all the
11:24:38 13 consolidation work because of the new --
11:24:44 14 the new accounting regulation. And EITF
11:24:46 15 is something about emerging things. So
11:24:50 16 when you see it coming, the accountants
11:24:53 17 essentially have to follow -- or should
11:24:55 18 be -- should be following a merging, and
11:24:57 19 there was a very definite change in the
11:24:59 20 consolidation rules.
11:25:01 21      So I know lots -- we were
11:25:05 22 having to put a full-time effort into
11:25:07 23 reviewing all of these companies, Barth,

Page 123

11:25:08 1 OnCure, Valley -- in fact, Barth was
11:25:11 2 consolidated, which is ORE, so ORE is
11:25:13 3 effectively a -- it is your company, and
11:25:16 4 it is consolidated by nature.
11:25:18 5      So any -- they were looking at
11:25:20 6 a number of companies. And we definitely
11:25:23 7 consolidated Valley at '02 on a -- on a
11:25:27 8 retroactive basis. So it was not just a
11:25:29 9 spot, it was retroactive. I can't
11:25:36 10 remember whether PELL was done or not.
11:25:38 11      Q.   The effective consolidation is
11:25:40 12 DVI having to recognize the accumulated
11:25:43 13 earnings or losses in the company?
11:25:44 14      A.   Correct.
11:25:44 15      Q.   And was DVI resisting
11:25:47 16 consolidation of -- of customers that --
11:25:51 17      A.   O'Hanlon was resisting.
11:25:53 18      MR. COMERFORD: Objection.
11:25:55 19      Q.   (BY MR. KARNUTH:) O'Hanlon
11:25:55 20 was resisting?
11:25:56 21      A.   O'Hanlon strongly resisted on
11:25:58 22 that, and -- and John -- John's position
11:26:02 23 was, we are going -- we are going to do

Page 124

11:26:03 1 whatever Deloitte wants. So there, I
11:26:08 2 think, Harold, I think -- let's just say
11:26:12 3 O'Hanlon strongly resisted, and he -- and
11:26:19 4 I think he did talk with Harold. Harold
11:26:22 5 had to tell him that, "This is how it is
11:26:24 6 going to be."
11:26:26 7      Q.   Did -- do you know the reason
11:26:28 8 why Mr. O'Hanlon resisted consolidation of
11:26:30 9 DVI customers?
11:26:33 10      A.   Because they had losses --
11:26:35 11      MR. COMERFORD: Objection to
11:26:35 12 the form.
11:26:35 13      A.   -- and they were going to
11:26:38 14 consolidate losses into the company. And
11:26:40 15 he had a -- he had an invention --
11:26:41 16 O'Hanlon could suddenly become an -- when
11:26:43 17 it was convenient for him, he would become
11:26:45 18 an accounting expert, like on operating
11:26:48 19 leases and actually when it was
11:26:51 20 convenient, he would become an expert in
11:26:53 21 many areas. But he was suddenly an expert
11:26:56 22 in this area and said -- and said, "If we
11:26:59 23 have a plan" -- and he argued

Page 125

11:27:02 1 strenuously with -- I thought it was -- I
11:27:03 2 thought it was Harold, and maybe he was
11:27:05 3 just telling Boyle, "You have got to go
11:27:07 4 say this, you have got to go say that."
11:27:09 5      You had one year, and if you --
11:27:11 6 if your plans were to sell it within a
11:27:14 7 year, then you wouldn't have to
11:27:17 8 consolidate it.
11:27:18 9      And John Boyle said -- there's
11:27:23 10 a polite way to say it, but I'm not
11:27:25 11 sure -- he said, "Bullshit, and that's
11:27:25 12 not."
11:27:28 13      Then O'Hanlon said, "Of course
11:27:29 14 it is."
11:27:30 15      And John said, "I have looked
11:27:31 16 in the literature," and handled it his
11:27:35 17 usual way.
11:27:36 18      And then Neas ultimately told
11:27:37 19 him, as I understood it from John, "That
11:27:40 20 that has never been. If you -- if you
11:27:43 21 have been under that impression, then you
11:27:45 22 have invented that. That has never
11:27:47 23 existed anywhere."

32 (Pages 122 to 125)

** ROUGH DRAFT **  IN RE DVI, INC. SECURITIES LITIGATION  ** ROUGH DRAFT **
Tyler Eaton Morgan Nichols & Pritchett, Inc.                              www.TylerEaton.com

8812a451-cdc5-4c0e-a9f7-4da98c60e3de

146

**Page 130**

1  returns. You just -- you should have
2  thrown up when you looked at the report.
3       (Whereupon, Garfinkel Exhibit
4       140 was marked for
5       identification.)
6       Q.   Let me show you what I marked
7  as Exhibit 140 --
8       A.   Sure.
9       Q.   -- which has Bates numbers
10 DVI'04 00000571 through 577.  Is that the
11 schedule that you put together that you
12 are talking about?
13      A.   No.
14      Q.   What is this document --
15 withdrawn.
16      MR. ARTESE:  Could you wait
17 until we get a copy, please?
18      MR. FRIEDMAN:  Sure.  I
19 wouldn't want to blunder ahead without you
20 having a copy.
21      MR. ARTESE:  I would imagine
22 you wouldn't.
23      MR. DEWITTE:   What exhibit

**Page 131**

1  is this?
2       MR. FRIEDMAN:  It's
3  Exhibit 140.  Everybody have copies?
4       MR. ROSS:  No.
5       Q.   Have you ever seen this
6  document before?
7       A.   Oh, sure.
8       Q.   What is it?
9       A.   I don't know this specific
10 one.  But I'm familiar with a whole series
11 of them.
12      Q.   What is this document?
13      A.   This represents a package of
14 information that, one, I would prepare for
15 myself for work, and then second, would
16 review mostly with O'Hanlon.  But then we
17 would call Miller in and would review it
18 with Miller.  There were other things in
19 there.
20      But this is basically showing
21 the trend and it shows beginning
22 compliance and it shows sources and uses.
23 It shows -- so you get a monthly trend of

**Page 132**

1  all of the categories that make it up and
2  then shows the clients. This is actually
3  the one that I reviewed with O'Hanlon at
4  Bocci.
5       Q.   Did you ever show either this
6  document or any similar document that you
7  prepared to Jerry Cohn?
8       A.   I did not.
9       Q.   To board members?
10      A.   I did not.
11      Q.   Is the handwriting at the
12 bottom of page one of Exhibit 140 yours?
13      A.   Yes.
14      Q.   Could you please read it into
15 the record?
16      A.   "Michael, this is getting to
17 extremely serious levels. I have had to
18 take steps to limit this information even
19 within."
20      Q.   Does within mean within the
21 company?
22      A.   Yes.
23      Q.   What steps did you take?

**Page 133**

1       A.   Only Andrea Marshall would
2  have it. There are parts that didn't show
3  the compliance. There are parts that in
4  order to get the forecast, I would have to
5  work with other people to just get the
6  forecast, but they wouldn't see the
7  compliance part.
8       Q.   When you wrote your memo to
9  O'Hanlon, you told him -- withdrawn. On
10 the last page, first full paragraph on the
11 last typed paragraph of your memo to
12 O'Hanlon Exhibit 112, you say, quote, "We
13 should not be putting ourselves or homes
14 and personal assets at this kind of
15 risk" --
16      A.   I'm sorry, the last page?
17      Q.   The last page in -- it is the
18 fourth line of the first full paragraph.
19      A.   Okay.
20      Q.   "We should not be putting
21 ourselves, our homes and personal assets
22 at this kind of risk as well as face the
23 very real prospects of going to jail,

34 (Pages 130 to 133)

**Page 134**

1  simply for fear of selectively disclosing
2  the problems and forcing painful but --
3  painful but necessary changes to solve the
4  liquidity issues." Do you see that
5  language?
6      A.  I do.
7      Q.  Prior to the time you wrote
8  this memo, to whom had those problems been
9  disclosed?
10     A.  O'Hanlon, Miller.
11     Q.  Okay.
12     A.  In any substantive detail
13  where they both understood the level of
14  it, steps I had to take to not disclose
15  it, the trend, all of these kinds of
16  reports that kind of really get right in
17  at it.
18     Q.  Right.
19     A.  And then attached to this
20  would be the cash-funded assets report
21  would come in to say what's happening on
22  all of those -- all of those assets.
23  O'Hanlon was familiar with -- intimately

**Page 135**

1  familiar with it. And Miller would be
2  brought in periodically. And mostly
3  O'Hanlon would bring him in. I would want
4  to talk to Miller more about the cash
5  funded assets.
6      I wasn't comfortable with
7  Miller, but we -- but he was involved in
8  the conversations, so I would say O'Hanlon
9  mostly and then somewhat Miller.
10     Q.  And in writing the sentence
11  that I just read out loud, were you
12  suggesting that disclosures should be made
13  to additional people within the company?
14     A.  The board.
15     Q.  Did O'Hanlon respond to your
16  suggestion?
17         MR. DEWITTE: Objection to
18  form.
19     A.  The only response I got from
20  O'Hanlon was this handwritten list that
21  says, "Steve, the following is a list of
22  cash deals that either have occurred or
23  will occur over the next thirty days.

**Page 136**

1  Hopefully this will give you some
2  comfort."
3      Q.  And what you just read is the
4  last page of Exhibit 12 -- 112, correct?
5      A.  Correct.
6         MR. TEPPER: Objection.
7      Q.  I just want to spend a very
8  short time going over some specific things
9  you said in your direct testimony.
10         Referring to O'Hanlon's time at
11  Concord, you said that you had learned or
12  you had reached the conclusion that he had
13  no concern for risk. Do you remember
14  giving that testimony?
15     A.  I do.
16     Q.  Was that your own conclusion?
17     A.  That was mine by observation,
18  but the person who phrased it in the way I
19  understood was a senior credit guy from
20  Ambac who had known O'Hanlon from Concord.
21  And he was the one who said something like
22  his total cavalier attitude towards risk
23  or total disregard for risk. And as a

**Page 137**

1  result, we can't -- we just can't have any
2  dealings with a company that he is part
3  of.
4      Q.  And was that statement
5  consistent with the view that you yourself
6  formed about O'Hanlon?
7      A.  You know, yeah, I thought it
8  captured it. I had never thought to think
9  of it that way, but when he said it, boy,
10  I thought that guy -- that guy had dealt
11  with O'Hanlon before.
12     Q.  Did you ever convey to Jerry
13  Cohn the substance of the statement made
14  to you by the person from Ambac?
15         MR. DEWITTE: Objection to
16  form.
17     A.  I thought -- and I could be
18  wrong -- I said -- I told the board that
19  Ambac had turned us down. I sure told
20  O'Hanlon why, and he knew -- he knew
21  exactly what the person was that would have
22  made that comment. I can't be sure what I
23  told the board. I want to think I told

35 (Pages 134 to 137)

Fleet National Bank, et al.,      ** UNCERTIFIED ROUGH DRAFT
O'HANLON, et al.,

Steve Garfinkel
April 1, 2008

**Page 222**

1  trustee.
2      Q.  Now, did they get these
3  borrowing base reports, do you know?
4      A.  No, they didn't get the
5  borrowing base reports. They got the
6  actual pledging reports and the
7  information and the release -- they would
8  get the signed releases of collateral from
9  Fleet and the -- and anything we were
10 pledging to Fleet. So they would get all
11 of the ins and outs. And I don't know
12 what else they got. I don't know if they
13 got a listing of collateral. I just don't
14 know.
15     Q.  You had mentioned that after
16 your disclosure to Mr. Padrick, that you,
17 Mr. Healy had spoken with Mr. O'Hanlon?
18     A.  Yes.
19     Q.  Do you have any notes from
20 that meeting?
21     A.  I thought I -- I thought it's
22 in my material or people presented to me.
23     Q.  So if you had any notes, they

**Page 223**

1  have been produced, to your knowledge?
2      A.  Yeah, correct, absolutely --
3  yeah, absolutely. There were some rough
4  drafts of ideas of what we might say. And
5  I thought John might have doctored one up
6  and that might have been something we used
7  as a discussion point. Some document more
8  or less says we can't get trampled by the
9  elephants, we really need -- we needed
10 them to work with us while we kind of --
11 while we kind of get a source of
12 repayment. But it was supposed to have
13 identified the problem, say what it was,
14 and ask for a waiver and get some
15 acknowledgment that we were working on a
16 source to repay them.
17     Q.  And you mentioned Mr. O'Hanlon
18 and Mr. Roberts went up to a meeting with
19 Fleet.
20     A.  Correct.
21     Q.  Are you aware of any notes
22 from that meeting?
23     A.  Can we take a break? Because

**Page 224**

1  this is going to get into more extensive
2  and I have to go to the bathroom badly.
3      Q.  You know what, it's 20 until
4  1. Why don't we take a break for lunch.
5      A.  Okay.
6          THE VIDEOGRAPHER: Off the
7  record, 12:36 p.m.
8          (Whereupon, the lunch recess
9          was taken at 12:36 p.m. until
10         1:48 p.m.)
11         THE VIDEOGRAPHER: Back on the
12 record, 1:48 p.m.
13     Q.  (BY MR. COMERFORD:) Mr.
14 Garfinkel, before the break, there was a
15 question pending, which I asked were
16 you -- are you aware of any notes from the
17 meeting that Mr. O'Hanlon and Roberts had
18 with Fleet.
19     A.  And I do want to answer that
20 question. And there are several things
21 that you are skipping that leads up to
22 that, and I want to answer it fully. This
23 is an important point for me to get into

**Page 225**

1  the record. I'm a little surprised five
2  years later there appears never to have
3  been a discussion of some of the things
4  that I'm going to allude to. I also want
5  to say I have not come here with the
6  exception of perhaps one person that's
7  obvious, I'm not here to accuse anyone of
8  anything, I'm here to just say what I
9  understand and know, but also question --
10 one of you, it was either Julian or here,
11 asked about Lisa's resignation letter, and
12 then also read something to me, a question
13 about Mr. Cohn. And I think the -- the
14 comment from Lisa was that I would not
15 give her permission to talk to Mr. Cohn.
16         MR. FRIEDMAN: Correct, I read
17 you an excerpt from her testimony.
18     A.  That's a comment that I
19 don't -- I really don't want to just leave
20 in the record without a more expansive
21 view. I have already commented before
22 that it's hard for me to remember a person
23 in the financial area that worked for me

57 (Pages 222 to 225)

** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **
Tyler Eaton Morgan Nichols & Pritchett, Inc.    (800) 458-6031
www.TylerEaton.com
6d4f42e9-0fe7-4280-9c90-6646b48b0b44

149

Fleet National Bank, et al.,          ** UNCERTIFIED ROUGH DRAFT          Steve Garfinkel
O'HANLON, et al.,                                                      April 1, 2008

Page 226

1  or I worked with that I had more respect
2  for than Lisa. And that continues to be
3  the case. I think that whatever she says,
4  she truly believes. I think that one
5  thing I want to say is that we were both
6  equally conflicted. And what we were
7  doing and thought that both of us, it was
8  for the good of the company, but also
9  always a solution. So both of us I
10 thought were -- shared the same conflict.
11 During the period of time that I have
12 known Lisa and that she worked there, it
13 should be clear I never once yelled at
14 Lisa, asked her to do anything, coerced
15 her. We were conflicted together. I
16 thought that it might have been more out
17 of loyalty to me and the company and the
18 conflicts of other employees, but nowhere
19 was there ever an ounce of bullying,
20 intimidation. All Lisa ever had to say
21 was no more. And even in the end, never
22 did I make a single comment.
23        For want of a better phrase,

Page 227

1  there may be a little posttraumatic
2  syndrome, I believe Lisa thinks everything
3  she believes on this. But in her
4  testimony and 302 with the FBI for some
5  reason she doesn't remember the Medcap
6  Texas and remembers another thing, and I'm
7  sure she firmly believes that. However,
8  if one were to look at the Business Credit
9  borrowing base reports for June, July,
10 August, September of '99, one would
11 certainly see the disappearance of a large
12 Medcap Texas loan out of there. If one
13 were to talk to Cindy Cohn and Mark
14 Idzerda about who they discussed it with,
15 that might -- might make a recollection a
16 little different.
17        The wire transfers there, the
18 comment that was brought to her by Andrea
19 Marshall, Andrea Marshall's testimony will
20 be that almost a year later before she got
21 involved. So I believe there is an honest
22 traumatic reaction of things that if I had
23 to -- three prosecutors staring me in the

Page 228

1  face, I might -- I might also have had
2  difficulty. But, again, Lisa is of the
3  highest character. I think she strongly
4  believes everything she said. And if
5  that's what she remembers, I'm not going
6  to sit here and say that she is wrong in
7  her thinking. But I believe the similar
8  testimony juxtaposed of Andrea Marshall
9  who did it twice tends to support a
10 different view of when she got involved.
11        But I just really want to
12 clarify that some evidence of some memory
13 impact, that is natural, and I understand
14 and I think that's what she really
15 believes. But I never would have ever
16 said to Lisa don't talk to Jerry Cohn.
17 She was at the end, had it, she didn't
18 want to talk to anyone, but she did talk
19 to O'Hanlon and she left the company. So
20 I don't want an insinuation left that I
21 was the person bullying or making
22 someone -- or other employees -- anything
23 that was ever done would have been at most

Page 229

1  of the employees with loyalty to me and
2  the company. I just want to clarify that
3  on the record.
4        Q.   And the pending question was
5  are you aware of any notes of the meeting
6  that O'Hanlon and Roberts had with Fleet,
7  are you aware of any notes?
8        A.   I'm going to get to that. But
9  you are transcending and skipping over --
10 over something else that that question
11 should be raised and that should be a much
12 broader question.
13        Q.   Well, first of all, can you
14 answer -- are you aware of any notes?
15       A.   No, there are not no notes.
16       Q.   There are no notes?
17       A.   That I am aware of.
18       Q.   You had mentioned in --
19       A.   Are you not going to let me
20 answer --
21       Q.   All right. Is there something
22 else you want to --
23       A.   Oh, absolutely.

58 (Pages 226 to 229)

** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **
Tyler Eaton Morgan Nichols & Pritchett, Inc.    (800) 458-6031          www.TylerEaton.com
                                                                      6d4f42e9-0fe7-4280-9c90-6646b48b0b44

150