**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DENNIS J. BUCKLEY, AS TRUSTEE | : | |
| OF THE DVI LIQUIDATING TRUST | : | |
| | : | |
| Plaintiff, | : | Civ. No. 04-955-GMS |
| v. | : | |
| | : | |
| MICHAEL A. O'HANLON, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## AFFIDAVIT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

STATE OF PENNSYLVANIA )
                                       ss.:
COUNTY OF BUCKS          )

GERALD L. COHN, being duly sworn, deposes and says:

1.    I am a Defendant in this action, and submit this affidavit in support of my motion for summary judgment on each of Plaintiff's claims against me.

2.    More particularly, I submit this affidavit in order to set forth: my role at DVI, Inc. (the bankrupt corporate entity on behalf of whose creditors Plaintiff purports to sue); how that role changed over time; my personal and family investments in DVI; my understanding and knowledge of DVI's obligations to its lending banks; my attempts to convince DVI management to operate the Company more efficiently so that the interests of both shareholders and creditors would be served; the notice which I received in August 2003 that DVI's senior operating officers apparently were engaged in fraudulent conduct; and the actions that I took subsequent to such notice.

**The Lack of Support for Plaintiff's Claims**

3.    I believe that the claims made against me by the Plaintiff in this action were not based upon any investigation conducted by Plaintiff, his counsel, or the creditors whom they represent.    Rather, I believe that those claims were based entirely on irresponsible allegations about me made by an examiner appointed by the Bankruptcy Court after DVI filed its bankruptcy petition.

4.    That petition was filed on or about August 25, 2003.    Thereafter, the Bankruptcy Court appointed R. Todd Neilson to examine the events leading up to DVI's bankruptcy and to report on his findings.    Although I fully cooperated in the examiner's interview of me as part of his investigation, the report he issued (the "Examiner's Report") did not accurately reflect what I told him in that interview and -- even more importantly -- did not accurately reflect the true facts.    Those facts are discussed in the balance of this affidavit.

**The Relevant Facts**

5.    While many of the witnesses who have been deposed in this case have not been hesitant to blame each other for the failure of DVI -- and to accuse each other of improper conduct precipitating that failure -- there has been no such testimony blaming me.    On the contrary, the testimony of all witnesses with personal knowledge of how I fulfilled my responsibilities as a DVI Director leads to the same conclusion -- that there is no merit to any of the claims made against me.

**The April/May 2003 Memorandum From Mr. Garfinkel to Mr. O'Hanlon**

6.    I believe that any discussion of the facts of this case should begin with the key piece of documentary evidence -- an April or May 2003 Memorandum from Steven Garfinkel (DVI's former Chief Financial Officer) to Michael O'Hanlon (DVI's former Chief

2

Executive Officer).[1]  This Memorandum acknowledges management's deception of the DVI Board in general, and myself in particular.  A copy of that Memorandum is included as A1 in the Appendix being submitted with the Brief in support of my motion.

      7.    Mr. Garfinkel began his memo with a warning to Mr. O'Hanlon of potential legal liability on both of their parts (A1, p. 1):

> At our last dinner I tried to convey a growing sense of concern that we had reached an untenable cross roads [sic]for the company.  We are no longer talking about a small problem.  The size of the [collateral] hole has taken on an unimagined size and consequences [sic].  We are at a point where the viability of the company can be legitimately questioned.  The personal exposure to our Board, you and me is real, serious and large.

      8.    Mr. Garfinkel then makes clear that he and Mr. O'Hanlon hid their fraudulent behavior from the Board, and that the Board in general -- and me in particular -- had no knowledge of the fraud taking place (A1, pp. 1, 5) (emphasis added):

> It had [sic] been frustrating sitting in on Board decisions and conversations about raising capital or selling businesses and assets that I know would have had a different answer with a fuller discourse of the company's liquidity situation.  Unfortunately, these same kind of misguided conversations continue today only reinforcing what should be a great deal of discomfort for you, Rich [Miller] and myself.  **You and I both have to cringe when Jerry [Cohn] talks about using the cash from the overseas operations to retire the senior notes and dismisses having to raise capital.**
>
>           *     *     *
>
> I cannot even think through the prospects of letting the Board members proceed with the exchange and capital raising issues with **no awareness whatsoever of the risks they are exposed to.**

---

[1]    Mr. Garfinkel recalled having written this memorandum soon after a private meeting with Mr. O'Hanlon that occurred on "a Monday night ... shortly after Easter [in 2003]."  (Garfinkel Dep. 163:4 - 163:12, March 31, 2008 [A18, p. 126].)

9.    Mr. Garfinkel acknowledged in his memo that DVI had been pledging ineligible collateral and that it had suffered an erosion of its cash position, and then described his own and Mr. O'Hanlon's actions as follows (A1, p. 1.):

> Desperate people do desperate things when their backs are to the wall. I understand that -- but we do not have to create situations that put our people and us in harms way. We have moved close to both cash and moral bankruptcy.

10.    Mr. Garfinkel's memorandum establishes that I did not know of the fraudulent activities engaged in by DVI's senior management. And the deposition testimony cited in the remainder of this affidavit[2] -- including both that of Mr. Garfinkel and Mr. O'Hanlon themselves -- confirms both my lack of knowledge of wrongdoing, and my diligence as a director. Mr. Garfinkel and Mr. O'Hanlon knowingly deceived me by hiding their illegal activities from me and falsely assuring me that there was no cause for concern.

**DVI's Operating History**

11.    Diagnostic Ventures, the predecessor of DVI, was founded in the mid-1980s by David Higgins. The Company provided diagnostic medical equipment financing and receivables financing to health care providers. At Mr. Higgins's request, I became one of the original investors in the Company. However, I did not do so until I had satisfied myself of the viability of the Company's business plan.

12.    As a general matter, I examine potential investments on the basis of three essential components -- cash flow, collateral, and character. I initially declined Mr. Higgins's invitation to invest in DVI because I thought that the Company's loan portfolio did not meet

---

[2]    The excerpts from the deposition testimony cited in the remainder of this affidavit are reproduced in the Appendix to the Brief submitted in support of this motion. Each day of each witness' testimony comprises a separate exhibit included in the Appendix. Pursuant to Rule 7.1.3 of the Local Rules of this Court, the deposition citations which appear below reference both the original transcript pages on which the testimony appears, and the Appendix pages on which the relevant transcripts are reproduced.

these criteria. Later, however, Mr. Higgins showed me new transactions in which the borrowers had good cash flow, good collateral, and good Dun & Bradstreet reports. On this basis, I changed my mind and determined to invest.

13.    I initially invested a total of $250,000 in Diagnostic Ventures -- $200,000 in preferred stock, and $50,000 in common stock. This investment was made in 1985. At that time, I became a Director of the Company.

14.    Diagnostic Ventures went public in or around 1986, and changed its name to DVI, Inc. Mr. Higgins served as president and CEO of DVI during the early years. In or around 1993, Michael O'Hanlon joined DVI, and the Board elected him as Executive Vice President. I did not recruit Mr. O'Hanlon for DVI -- Mr. Higgins did so. Like the other Directors, I supported Mr. O'Hanlon's employment because I thought that his experience in medical equipment leasing and financing would make him a valuable addition to the Company.

15.    After he had been in DVI's employ for approximately two years, Mr. O'Hanlon approached other Directors and myself and proposed that he become CEO. Although I was, and still am, a friend of Mr. Higgins, I believed it was in the Company's best interest for Mr. O'Hanlon to become the CEO, and I voted with the Board to replace Mr. Higgins with Mr. O'Hanlon. I did so because I thought Mr. O'Hanlon would strengthen the Company because of his experience, his plans for a structured marketing organization, and his skill in managing the team of capable people he had brought with him to DVI from his prior employer.

16.    Soon thereafter, DVI was split into two component parts -- DVI Financial Services ("DVI FS") and DVI Business Credit ("DVI BC"). DVI FS was the medical equipment finance arm of the Company, and DVI BC was a factoring business which provided receivables financing.

**The Losses Suffered in My Personal and Family Investments in DVI**

17.    In addition to my original investment of $250,000 in DVI, I also exercised 20,000 common stock options. I subsequently sold 10,000 of those shares, but never sold the other 10,000 shares (which I had purchased for an option exercise price of approximately $120,000). (Cohn Dep. 28:17 - 29:2, Feb. 12, 2008 [A11, pp. 33-34].)

18.    My daughter Cynthia Cohn purchased DVI stock by exercising stock options. She did so on my advice, paying an exercise price of $150,000. I gave my daughter this advice in March 2002 (Cohn Dep. 27:7 - 27:13, Feb. 12, 2008 [A11, p. 33]) -- more than a year after the departure from DVI of Lisa Cruikshank, an event which Plaintiff claims should have put me on notice of management's fraud. (*See* ¶¶ 49-51 below.)

19.    I also purchased approximately 320,000 additional shares of DVI common stock for an aggregate price of approximately $1 million. (Cohn Dep. 912:13 - 913:10, Feb. 14, 2008 [A13, pp. 97-98].) I acquired those shares by private purchase before the public offering, and by purchase in the open market after the offering -- both in my personal account, and in my IRA. The stock price reached the range of $25 to $27 per share after my purchases. However, I never sold a single one of these shares.

20.    In addition to my equity and preferred stock investments described above, I also invested $1 million in DVI subordinated notes. This investment was composed of $800,000 of my personal funds and $200,000 of the funds of my family's charitable foundation. The notes bore an interest rate of 9 1/8 %, and were due in June 2002. (Cohn Dep. 101:23 - 102:21, Feb. 12, 2008 [A11, p. 35].) However, I never received that payment. The reason is that in August 2001, DVI's Chief Financial Officer asked me to roll over the notes for an additional two-year term so that they would become due in 2004 instead of 2002. I did so because I

thought the Company was sound. (Cohn Dep. 189:18 - 191:8, Feb. 12, 2008 [A11, p. 47]; Cohn Dep. 645:20 - 648:8, 649:6 - 650:4, Feb. 14, 2008 [A13, pp. 87, 88].)

21.    With the exception of 10,000 of the 20,000 option shares I acquired, neither myself, my daughter nor any affiliate of mine ever sold any DVI common stock at any time. Thus, when DVI went bankrupt, I lost the $50,000 I had originally invested in DVI common stock, the $120,000 I paid for the option shares I did not sell, and the approximately $1 million I paid for the additional DVI common stock I had purchased. (Cohn Dep. 29:3 - 30:3, Feb. 12, 2008 [A11, p. 34]; Cohn Dep. 914:2 - 916:6, Feb. 14, 2008 [A13, p. 98].) In addition, my daughter lost the $150,000 she had paid in March 2002 when she exercised her options and purchased DVI stock on my recommendation. Thus, our total losses on our DVI common stock investments were over $1.3 million when stated in terms of cost basis, and many millions of dollars when stated in terms of the value of the stock on the open market when we could have sold but elected not to do so.

22.    In addition to these losses on our equity investments, the $1 million which our family foundation and I invested in DVI subordinated notes has also been a total loss, since Plaintiff, the DVI Bankruptcy Trustee, has disallowed our claims based on those debt obligations. These notes are particularly significant to the present motion, since if I had not rolled them over when requested to do so, the foundation and I would have received full payment in June 2002. I would never have agreed to the rollover if I had any reason to suspect the veracity of the Company's financial reports or the Company's compliance with its loan agreements, or to otherwise doubt the integrity of Company management. (Cohn Dep. 102:13 - 102:15, Feb. 12, 2008 [A11, p. 35]; Cohn Dep. 650:15 - 651:8, Feb. 14, 2008 [A13, p. 88].)

**The Pritzker Investment in DVI**

7

23.    I was a personal friend of Jay Pritzker and his family, including his son Tom Pritzker, and invested in several business deals with the Pritzkers.

24.    The Examiner's Report (p. 149) claims that I was "appointed to the [DVI] Board at the request or behest of the Pritzker family". This is false. The fact is that at no time was I a representative of the Pritzkers on the DVI Board or any of its committees.

25.    In fact, I introduced Jay Pritzker to DVI, not vice versa. Around the time that DVI went public -- a year after I had become a shareholder and director of the Company -- I contacted Jay Pritzker to see if he had an interest in investing in the Company. After doing its own due diligence, The Pritzker Organization invested in DVI, purchasing the shares the underwriter was unable to sell in the public offering. (Cohn Dep. 104:15 - 105:16, Feb. 12, 2008 [A11, pp. 35-36]; Cohn Dep. 603:23 - 604:8, Feb. 14, 2008 [A13, p. 85].) In addition, like me, the Pritzkers also invested in the DVI subordinated bonds that were due in June 2002, and subsequently rolled over the notes to 2004 -- resulting in the loss of the full value of the notes.

26.    Although I initially introduced the Pritzkers to DVI, we each managed our own investments in the Company independently, and made all of our own decisions. I was not a representative or an agent of The Pritzker Organization or anyone else in my service on DVI's Board. Rather, I served on the Board solely in my personal capacity, and I exercised my good faith judgment in what I believed to be the best interests of DVI and all of its shareholders. (Cohn Dep. 241:10 - 241:14, 257:1 - 257:4, Feb. 12, 2008 [A11, p. 48, 49]; Cohn Dep. 368:8 - 368:19, Feb. 13, 2008 [A12, p. 69]; Cohn Dep. 641:17 - 641:23, 875:1 - 880:20, Feb. 14, 2008 [A13, pp. 86, 95-96].)

**My Roles at DVI**

### My Role as a Director

27.     As noted above, when I became a shareholder, I joined DVI's Board of Directors. I viewed it as my duty as a Director to act for the benefit of DVI's shareholders, and believed my responsibilities as a Board member included using my experience and judgment to help guide the Company. Among the experience and qualifications I believed I brought to the Board were my ability to evaluate creditworthiness based on my position as a former director of a bank, along with my general business experience. (Cohn Dep. 117:20 - 121:20, Feb. 12, 2008 [A11, pp. 39-40]; Cohn Dep. 874:19 - 875:9, Feb. 14, 2008 [A13, p. 95].)

28.     I was a Director on DVI and a member of its Credit Committee and Compensation Committee until the bankruptcy. I was also a member of DVI's Audit Committee for a limited time.

### My Role on DVI's Audit Committee

29.     I served on DVI's Audit Committee from in or around 1998 until December 31, 1999, and not at all between 2000 and 2002. (Cohn Dep. 877:9 - 877:13, Feb. 14, 2008 [A13, p. 96].) At that time, another director and I left the Audit Committee because we were advised that due to a change in the securities laws, directors receiving a salary could no longer serve in that capacity. At the time, I was receiving a salary from DVI to compensate me for the fact that I was spending approximately forty hours a week or more fulfilling my responsibilities on the DVI Credit Committee (discussed more fully below).

30.     Harold Neas of Deloitte & Touche ("Deloitte"), DVI's outside auditors, attended some Audit Committee meetings while I was on the Committee, and discussed certain loans with the Committee. However, at no time while I served on the Audit Committee did Mr.

Neas ever give the Committee any indication that the Company's financial statements were not reliable, or that there were any problems concerning loan compliance, financial reporting, management integrity, or any of the other matters which form the basis of Plaintiff's claims against me in this action.

31.    The Audit Committee also received management letters issued by Deloitte. These management letters relayed the auditors' comments regarding certain aspects of the company's operation, and how those functions could be improved. During the time I was on the Audit Committee, none of Deloitte's management letters ever raised any issues that I believed -- or that Deloitte ever indicated -- could compromise the integrity of DVI's financial reporting. Nor did Deloitte ever express any disagreement with the responses to those letters by DVI management. On the contrary, Deloitte issued an unqualified opinion on DVI's financial statements at the conclusion of each audit. This led me to conclude that the Company's financials were reliable and that it was being managed properly.

32.    It bears repeating that beginning in January 2000 and running through the end of 2002, I was not on the Audit Committee. Plaintiff's claims in this action are based in part on information that Plaintiff contends should have come to the attention of the Audit Committee during this period. However, those contentions do not apply to me. There is no allegation in the Complaint that any of the persons serving on the Audit Committee during that period conveyed any such information or concerns to me, and in fact, that never occurred.

**My Role on DVI's Credit Committee**

33.    Prior to the existence of a formal DVI Credit Committee, I reviewed every loan above a certain threshold before it was approved. (Cohn Dep. 107:14 - 107:22, 110:21 - 111:19, Feb. 12, 2008 [A11, pp. 36, 37].) In or about 1987, I introduced Tony Turek to DVI, and

the Company hired Mr. Turek as its Chief Credit Officer because of his excellent credit background and his experience as a banker. Once Mr. Turek joined DVI, he became the head of the Credit Committee (Cohn Dep. 114:3 - 114:15, 154:19 - 155:15, Feb. 12, 2008 [A11, pp. 38, 46] -- a position the Examiner's Report incorrectly states that I held. Later, when Mr. O'Hanlon joined DVI and brought with him employees with extensive financial experience reviewing medical equipment loans, they too were added to the Credit Committee. (Cohn Dep. 139:22 - 141:4, Feb. 12, 2008 [A11, pp. 42-43].) These additional Credit Committee members included Mark Gallagher, Ray Fear, Jerry Hayes, and Joe Malott.

34.     The DVI Credit Committee reviewed all domestic loans valued at $1 million or more. This threshold was lower in the early years, but increased as the credit process was improved under Mr. Turek and the volume of loans grew. (Cohn Dep. 138:12 - 139:16, Feb. 12, 2008 [A11, p. 42].) The Credit Committee was responsible for new loans, but not for workouts of troubled loans -- for which DVI had a separate department. However, it was my understanding that if loans to a single borrower reached the Credit Committee threshold, any credit extension exceeding that threshold had to be approved by the Committee (Cohn Dep. 431:23 - 432:8, Feb. 13, 2008 [A12, p. 76] -- even if the additional credit was part of an arrangement structured by the Workout Department (discussed more fully in ¶¶ 41-44 below). Only after the DVI bankruptcy did I learn that the Credit Committee was being bypassed with respect to many of these workout loans which it should have reviewed. (Garfinkel Dep. 51:9 - 54:11, Apr. 1, 2008 [A19, pp. 135-136].)

35.     For each would-be borrower, the Credit Committee carefully reviewed credit books compiled by the DVI Credit Department. Those credit books contained historical financial statements and supporting documents, including purchase agreements, leases,

shareholder agreements, business plans, and financial projections. They also included reports of the due diligence work done by DVI's Credit Department, as well as a financial analysis of credit risks and a valuation of the equipment to be purchased. (Cohn Dep. 143:12 - 147:9, Feb. 12, 2008 [A11, pp. 43-44].) A personal guarantee was generally required if the borrower was a start-up company. (Cohn Dep. 148:3 - 148:9, 150:6 - 150:9, Feb. 12, 2008 [A11, pp. 44, 45].)

36.    The Credit Committee focused on a company's ability to repay a loan based on the information provided in the credit book. A majority of the Committee's vote was needed for a loan approval. However, if a single member raised serious concerns, the Committee would often table the vote while requesting that additional due diligence be done. (Cohn Dep. 446:5 - 447:9, Feb. 13, 2008 [A12, p. 77].)

37.    Mr. O'Hanlon did not have the authority to overrule the Credit Committee, and I was not aware of any instances when Mr. O'Hanlon made loan decisions on his own. (Cohn Dep. 141:21 - 143:1, Feb. 12, 2008 [A11, p. 43]; Cohn Dep. 427:12 - 427:22, Feb. 13, 2008 [A12, p. 75].) Until DVI's bankruptcy, I believed Mr. O'Hanlon and DVI's other managers regularly followed the procedures of the Credit Committee for loan approvals. In fact, with one exception, I did not have knowledge of any DVI loans in excess of $1 million made without the Credit Committee's approval.

38.    The single exception occurred in or around June or July 2003, when I learned that DVI had made a workout loan in excess of the Credit Committee threshold to a borrower named Intrepid U.S.A. Inc. without the approval of the Committee. I confronted Mr. O'Hanlon, who explained that this was an error, and that the loan should have come before the Credit Committee. Until the DVI bankruptcy, this was the only situation I was aware of in which DVI made a loan in excess of $1 million without Credit Committee approval. Deloitte

never informed the Board or the Credit Committee that the Workout Department or officers of DVI were making loans--either initially or in the aggregate -- over $1 million without Credit Committee approval.

### My Role on DVI's Compensation Committee

39.    I also served on the Compensation Committee of the DVI Board.  That Committee determined the compensation of DVI's senior management.

### The Limitations on My Role at DVI

40.    My role at DVI consisted of my service on the Board of Directors and on the Committees discussed above.  I was not an officer of the Company and had no management responsibilities.  I did not have an office or a secretary at DVI, no employees reported to me, and I did not have the power to hire, fire or discipline employees, to disburse DVI funds, to enter into contracts, or to take any other action on behalf of the Company.

## DVI Workouts and Restructurings

41.    When Michael O'Hanlon came to DVI, he created a separate Workout Department which had authority to deal with troubled loans.  The Workout Department functioned separately from the Credit Committee, and I had no direct involvement in its activities.

42.    The Workout Department had authority to change the terms of existing loans for workout customers, and to make new loans to new borrowers when an existing loan became a matter of concern.  One particularly successful workout strategy at DVI was to replace the operator of a medical facility -- installing a new operator with a new management style often had the effect of turning around a struggling business.  This approach became particularly significant because over time, the medical diagnostic industry evolved in such a way that it made

sense to operate "clusters" of centers that were able to draw from the same referral base, deal with the same third party payers (government agencies and insurance companies), and profit from efficient centralized management. Assembling such "clusters" of diagnostic centers had the advantage of spreading general and administrative expenses over several centers, and enabling owners to enter into capitation contracts with insurance carriers. DVI's Workout Department was very successful in bringing in new managers to operate existing diagnostic centers on this basis.

43.     The separation of function between the Credit Committee and the Workout Department is particularly significant because of the nature of the allegations made against me in this action. Four of the allegations that I breached my fiduciary duty are premised on conduct of the Workout Department -- repurchasing delinquent loans (D.I. 1, ¶ 190); swapping leases (D.I. 1, ¶ 195); advancing funds to allow delinquent loans to be brought current (D.I. 1, ¶ 201); and improperly restructuring delinquent loans (D.I. 1, ¶ 207). I had no knowledge of, or role in, any such activity -- if in fact it ever occurred -- because such decisions never came before the Credit Committee. (Cohn Dep. 380:19 - 385:15, Feb. 13, 2008 [A12, pp. 70-72]; Cohn Dep. 850:18 - 851:3, Feb. 14, 2008 [A13, p. 94].)

44.     Had I learned that the DVI Workout Department was engaged in such conduct, I certainly would have called a special meeting of the Board to take action and investigate the Company's business practices. (Cohn Dep. 396:16 - 397:23, Feb. 13, 2008 [A12, pp. 73-74]; Cohn Dep. 833:11 - 834:2, Feb. 14, 2008 [A13, p. 93].) It was only after the bankruptcy that I learned that the Workout Department not only had made loans without the Credit Committee's approval, but had also rewritten loans (with the same borrower) by changing

payment terms in order to avoid delinquency, permitted over-advances to be used to avoid impairment of loans, and engaged in the other conduct described in paragraph 43 above.

**Loan Covenant Compliance**

45.    DVI, as a specialty lender (*i.e.*, a lender specializing in medical equipment and medical receivables) obviously needed sources of capital to finance its own loans to its customers.   There were basically two sources from which DVI obtained such funding -- borrowing from a syndicate of lenders which was headed by Fleet Bank at the time relevant to this action; and sales to underwriters (and through underwriters to investors in the securities markets) of participations in packages of loans that were bundled together as "securitizations".

46.    When DVI borrowed from Fleet and the other banks in the lending syndicate, the loan agreements contained multiple covenants relating to various subjects.  Some of those covenants concerned DVI's own financial performance parameters (for example, the Company's cash flow) and others concerned the nature of the collateral (including the receivables) which DVI pledged to the lenders.  Because there were many different loan covenants, knowing that the Company was "out of compliance" in some respect with its loan agreement did not equate with knowledge that it had pledged ineligible collateral.  The reason is that the particular covenant with which the Company was "out of compliance" could have been one of the many other loan covenants that involved matters unrelated to the eligibility of collateral. (Cohn Dep. 917:22 - 918:18, Feb. 14, 2008 [A13, p. 99].)

47.    I had no notice until August 2003 that DVI was pledging ineligible collateral to lenders and "double-pledging" the same collateral to different lenders.  In fact, Mr. Garfinkel has admitted that while he prepared schedules showing loan covenant compliance, he never furnished those schedules to me. (Garfinkel Dep. 130:6 - 132:10, Apr. 1, 2008 [A19,

p. 147].)  The only knowledge I ever had about DVI's loan covenant compliance was related to covenants dealing with subjects other than pledged collateral.  Moreover, I was regularly assured by management that DVI was in compliance with all applicable loan covenants.

### 1999 Compliance Issue

48.     The first time I ever learned of any loan covenant compliance issue at DVI was in or about 1999.  At that time, Mr. O'Hanlon told me that DVI was out of compliance with a loan covenant because two customers (*i.e.*, two borrowers from DVI) had bounced checks in repayment of their loans.  Mr. O'Hanlon told me that he had called National Westminster Bank, DVI's main lender at the time, and reported this compliance failure.  He went on to say that the bank officer with whom he spoke said that DVI should bring itself back in compliance by having the customers make good on the checks, and that there would be no other consequences of this loan covenant violation.  (O'Hanlon Dep. 582:3 - 584:8, Jan. 29, 2008 [A8, p. 21].)

### 2001 Compliance Issue and Lisa Cruikshank Resignation

49.     The second time I learned that DVI had any loan compliance issues -- and one of the events that is central to Plaintiff's claims against me in this action -- occurred in or around April 2001.  I learned at that time that DVI was about to lose an important employee from the treasury department, Lisa Cruikshank.  I called Steve Garfinkel, DVI's Chief Financial Officer, and inquired why Ms. Cruikshank was leaving.  Mr. Garfinkel told me that she felt uncomfortable signing compliance reports because DVI had not always been in compliance with the Fleet loan agreement in the past -- that DVI "went in and out of compliance".  This was the first I learned that DVI had been out of compliance with any loan agreement in any respect since the isolated 1999 event described in paragraph 48 above.  I asked Mr. Garfinkel if DVI had brought itself back into compliance with the Fleet agreement by the time of our conversation,

16

and he assured me that the Company was back in compliance. Mr. Garfinkel had admitted that I

made it clear to him that DVI had to remain in compliance (Garfinkel Dep. 34:23 - 35:6, Mar.

27, 2008 [A17, p. 121]; Garfinkel Dep. 83:16 - 84:16, Apr. 1, 2008 [A19, p. 138]), and that I

asked him to have Ms. Cruikshank call me. I followed up on this request twice more, but Ms.

Cruikshank did not call me. Eventually, Mr. Garfinkel informed me that Ms. Cruikshank had

already left DVI without contacting me. Only at the time of Ms. Cruikshank's own deposition

testimony in this case did I learn that she had not done so because Mr. Garfinkel specifically

instructed her not to call me. (Garfinkel Dep. 86:5 - 86:11, 225:18 - 226:4, Apr. 1, 2008 [A19,

pp. 139, 149-150]; Cruikshank Dep. 239:4 - 240:2, Aug. 21, 2007 [A2, p. 7].)

50.    After my initial conversation with Mr. Garfinkel about Ms. Cruikshank, I

went to Mr. O'Hanlon and repeated Mr. Garfinkel's statement about DVI being out of

compliance in some unspecified way at some point or points in the past. Mr. O'Hanlon sought to

minimize my concern, comparing the compliance issue to overdrawing a checking account.

However, I told Mr. O'Hanlon that I viewed this as a serious matter, that DVI had to stay in

compliance, and that I would check with him every quarter to confirm DVI was in fact in

compliance. I did this, and each quarter, I received an assurance from Mr. O'Hanlon that DVI

was in compliance.

51.    During our discussions prompted by Ms. Cruikshank's resignation, neither

Mr. Garfinkel nor Mr. O'Hanlon ever told me that the compliance issue that prompted her

decision concerned ineligible collateral, double pledging of collateral, or any other improper

acts. (Cohn Dep. 303:1 - 307:23, Feb. 12, 2008 [A11, pp. 57-58]; Cohn Dep. 815:4 - 815:12,

Feb. 14, 2008 [A13, p. 92].) As discussed below, I had no knowledge of these matters until

August 2003. Instead, I believed in 2001 that the compliance issue about which Ms. Cruikshank

was concerned -- which both Mr. Garfinkel and Mr. O'Hanlon told me had occurred in the past but was no longer a problem -- involved DVI drawing down more on its credit lines than it was entitled to do. It was my understanding from what I was told that the reason DVI was making excessive draw-downs was due to a temporary imbalance between the new credits it was granting to borrowers and the permitted limit on the DVI total indebtedness to the Company's lenders. Mr. Garfinkel told me that the cause of this covenant violation was reduced cash flow -- and therefore a reduction in DVI's debt repayments to its lending banks -- due to a delay in selling DVI's securitizations in the public market place. He explained the issue as solely one of timing, and made no mention of any violation of the covenants relating to what collateral could be pledged. (Cohn Dep. 813:5 - 814:5, Feb. 14, 2008 [A13, p. 92].)

### Board Meetings Regarding Compliance Issues

52. I also remember the compliance issue being raised at several Board meetings prior to August 2003. At the April 2001 Board meeting, the question was raised whether DVI was in compliance with its loan covenants. Mr. O'Hanlon acknowledged a compliance issue, but reassured the Board that he would fix it. (Garfinkel Dep. 42:16 - 46:19, Mar. 27, 2008 [A17, pp. 122-123].) Although Mr. Garfinkel and Mr. O'Hanlon told the Board that DVI had been out of compliance, Mr. Garfinkel has admitted that they did not disclose that DVI was pledging ineligible collateral, or double-listing collateral. (Garfinkel Dep. 33:11 - 34:7, Mar. 27, 2008 [A17, pp. 120-121]; Garfinkel Dep. 82:12 - 83:10, 97:2 - 100:3, Apr. 1, 2008 [A19, pp. 138, 140-141].) And they assured the Board that all compliance issues related exclusively to the Company's past operations, and were in the process of being cured -- rather than ongoing conditions. (Cohn Dep. 337:4 - 338:11, 343:12 - 344:3, Feb. 13, 2008 [A12,

pp. 64, 65]; Cohn Dep. 810:15 - 810:22, 909:21 - 910:2, 931:1 - 931:8, Feb. 14, 2008 [A13, pp. 91, 97, 101].)

53.    I again raised the question of DVI's compliance status at a Board meeting in 2002 at which Mr. Garfinkel explained the Argentinian currency crisis. Mr. O'Hanlon said that DVI had gone out of compliance because of the precipitous drop in the value of the Argentine currency, but that Fleet Bank would likely grant DVI an exemption. (Garfinkel Dep. 9:18 - 13:21, Apr. 1, 2008 [A19, pp. 130-131].) I then asked which covenant DVI had broken, and Mr. Garfinkel explained it was the cash flow covenant -- DVI was not receiving sufficient repayments on its Argentine loans to satisfy the cash flow to debt ratio required under the agreement with the Company's lenders. I also asked Mr. Garfinkel at the meeting if DVI was out of compliance with any other covenants in the Fleet borrowing agreement, and Mr. Garfinkel said that DVI had no other compliance problems. Based on Mr. Garfinkel's responses to my questions at this meeting, I had no notice that DVI had pledged ineligible collateral or double-listed collateral.

54.    I also raised the question of DVI's compliance status at the December 2002 Board meeting, once again asking Mr. Garfinkel whether DVI was in full compliance with its loan covenants. In front of the entire Board, Mr. Garfinkel affirmed that DVI was in full compliance.

**Loan Loss Reserves**

55.    Just as I was not told about the pledging of ineligible collateral or double pledging, I was never told by Mr. Garfinkel, Mr. O'Hanlon, or Deloitte that DVI's loan loss reserves were intentionally understated by management.

56. Moreover, the existence of cash flow, liquidity and loan loss reserve issues in no way led me to believe that any fraudulent activity had occurred at DVI. These are issues that frequently arise in business operations, and I was not surprised they arose at DVI because I thought I knew the cause. It was my belief that DVI's shortage of liquidity was caused by the Company's expansion into the international arena -- a subject that I had regularly raised with Mr. O'Hanlon. This was an issue on which I disagreed with Mr. O'Hanlon's management decisions, but it was not one which gave me any reason to question his integrity.

**International Operations**

57. At Mr. O'Hanlon's direction, DVI had expanded its operations into the international arena with joint venture companies in Latin America and Asia, and a wholly-owned subsidiary in Europe. As early as 2001, I began to believe that the international component of DVI's operations was an unprofitable drain on the Company's operating capital, and I urged Mr. O'Hanlon to discontinue the international operations. (Cohn Dep. 354:14 - 358:21, Feb. 13, 2008 [A12, pp. 67-68]; O'Hanlon Dep. 175:22 - 176:11, Jan. 28, 2008 [A7, p. 19].) While the international operations began with a favorable acquisition of a portfolio of overseas loans that had no delinquencies, the devaluation of the Brazilian currency, followed by the Argentina currency crisis, changed the situation entirely and undercut the health of the Company's international loan portfolio.

58. For these reasons, I repeatedly and forcefully urged Mr. O'Hanlon to divest DVI's foreign investments. (Garfinkel Dep. 57:7 - 59:12, Apr. 1, 2008 [A19, pp. 136-137].) He agreed, although it took longer for him to actually act than I thought it should. However, I was instrumental in getting Mr. O'Hanlon to agree to the sales, I personally participated in the selling effort, and I believe that effort would have been successful had it been

allowed to run its course. (Cohn Dep. 323:7 - 329:13, 334:21 - 335:6, Feb. 13, 2008 [A12 pp. 60-62, 63].)

59.    Moreover, in order to insure that Mr. O'Hanlon lived up to his commitment, I took an active role in the effort. I did this by accompanying Mr. O'Hanlon on a trip to meet with prospective purchasers of DVI's international business. However, once Deloitte resigned its position as DVI's auditor (*see* ¶ 66 below), those discussions were brought to a halt. (Cohn Dep. 329:14 - 329:19, Feb. 13, 2008 [A12, p. 62].)

**Efforts to Sell DVI**

60.    Plaintiff apparently claims that efforts to sell DVI -- in which I was personally involved -- should have put me on notice of the existence of serious problems at the Company. This assertion focuses on the fact that when General Electric Credit Corporation ("GECC") entered into negotiations with DVI, GECC made a purchase offer of $21 (subsequently raised to $23), but then lowered its offer to between $17 and $18 per share because it claimed to have found a potential impairment in DVI capital in the amount of $150 million. (Cohn Dep. 799:3 - 799:12, Feb. 14, 2008 [A13, p. 89].)

61.    However, I did not give GECC's assertion about the potential impairment of capital much credibility because GECC was a potential buyer trying to drive down the price, and was well known as a tough negotiator. (Cohn Dep. 806:7 - 806:17, Feb. 14, 2008 [A13, p. 90]; O'Hanlon Dep. 1106:22 - 1107:7, Jan. 31, 2008 [A9, p. 23].) Moreover, Mr. O'Hanlon claimed that the $150 million figure which GECC used to refer to the potential impairment was based on liquidation value, and that GECC did not understand DVI's good record of workouts. (Cohn Dep. 799:9 - 800:7, Feb. 14, 2008 [A13, p. 89].) I found his comments persuasive -- especially when coupled with my own knowledge of GECC's tough negotiating tactics.

Moreover, I did not take seriously GECC's claim of such a large impairment in DVI's capital because I believed that if that claim was at all true, the Board would have learned of this condition from Deloitte well before we heard the claim from GECC.

## DVI's Relationship with Deloitte & Touche

62.    It was DVI's policy to allow Deloitte to review any information the auditors requested. In fact, until the end of 1999, while I was on the Audit Committee, I do not recall Deloitte ever asking for any information that was not promptly supplied.

63.    Once I was no longer on the Audit Committee, I had no discussions with Deloitte regarding specific loans. However, I continued to rely on Deloitte for assurance that DVI's financial and accounting data were accurate, and that DVI's internal controls were proper. For example, at a Board meeting in 2003, when I asked whether Deloitte saw anything other than one particular transaction (discussed at ¶ 64 below) that was "wrong, illegal, or otherwise that [the Board] should know about," Deloitte responded that there was "absolutely nothing, nothing besides this OnCure transaction." (Cohn Dep. 531:15 - 533:15, Feb. 13, 2008 [A12, pp. 78-79].) Most importantly, Deloitte never raised concerns about management integrity, DVI's loan covenant compliance status, or any out of the ordinary matter. (Turek Dep. 412:5 - 412:12, Jan. 25, 2008 [A6, p. 17]; Miller Dep. 140:10 - 140:21, Jan. 15, 2008 [A3, p. 10]; Goldberg Dep. 165:2 - 165:11, 166:15 - 169:19, Feb. 20, 2008 [A14, pp. 106, 107-110]; Shapiro Dep. 140:19 - 141:5, Feb. 6, 2008 [A10, pp. 26-27].) Even with regard to comment letters received from the SEC, Deloitte indicated that it was responding in the ordinary course of business, and it never suggested -- with the sole exception of the OnCure transaction -- that there was a need for DVI to conduct a special inquiry or hire independent counsel.

**The OnCure Transaction and the Deloitte Resignation**

64.    In or around January 2003, the SEC questioned a transaction in which DVI had invested $5.9 million in a company called OnCure. After the SEC raised this issue, Deloitte refused to sign DVI's 10-Q for the quarter ended March 31, 2003. Harold Neas of Deloitte suggested to the Board that if DVI hired independent counsel to examine the OnCure transaction, Deloitte would consider the independent counsel's findings and might change its view. The Board followed Deloitte's suggestion about hiring independent counsel. When we did so, the Board asked Deloitte whether it had any other concerns about DVI besides the OnCure transaction, and Deloitte said it did not. I took comfort in this statement because I knew that if Deloitte had discovered evidence of fraud, this would have been reported to us promptly.

65.    At my suggestion, DVI hired the firm of Richman, Mann, Chizever, Phillips & Duboff ("Richman, Mann") as our independent counsel to investigate the OnCure transaction. (Cohn Dep. 534:14 - 535:14, 576:20 - 578:4, Feb. 13, 2008 [A12, pp. 79, 81-82].) I served as DVI's representative in Richman Mann's investigation process, attending all of the interviews that firm conducted -- interviews with numerous DVI employees and third parties. (Cohn Dep. 580:22 - 583:11, Feb. 13, 2008 [A12, pp. 82-83].) As part of its investigation, Richman Mann requested an interview with Mr. Neas. However, this never occurred because Deloitte insisted that Richman Mann provide Mr. Neas in advance with a list of the questions to be asked, and Richman Mann rejected this approach.

66.    Ultimately, in or around June 2003, Richman Mann issued a report on its investigation. The report found that the OnCure transaction was a legitimate exercise of the business judgment of the DVI Board. Deloitte did not respond to the report, and still was not willing to sign off on the March 31 10-Q. Instead, in or around June 2003, Deloitte resigned as

DVI's auditor. However, even at that time, Deloitte never indicated that there were any problems at DVI other than the OnCure transaction.

67.    At the time of Deloitte's resignation, the Board asked me to take the responsibility of monitoring the performance of management until the Company obtained a new auditor. I agreed, and I was instrumental in securing both a new auditor and in bringing in a crisis manager to guide the Company through this transition period.

**The Events of July 2003**

68.    In mid-July 2003, Mr. O'Hanlon contacted me to report that Mr. Garfinkel had just informed him that there was a $50 million "hole" in DVI's collateral. I asked how this happened, and Mr. O'Hanlon indicated he was investigating the issue. (Cohn Dep. 270:17 - 271:3, Feb. 12, 2008 [A11, p. 52].) A few minutes later, I also received a phone call from John Healy of Clifford Chance -- DVI's outside counsel -- saying that Mr. Garfinkel had made a similar statement to him as well. (Cohn Dep. 808:22 - 809:15, Feb. 14, 2008 [A13, pp. 90-91].) I insisted that we call a Board meeting because I wanted to be sure that the seriousness of this problem was understood by the Directors.

69.    At its meeting, the Board decided that an investigation was required to determine whether Mr. Garfinkel's claim indicated a real discrepancy or a record-keeping error. I did not immediately assume that the "hole" in the collateral that Mr. Garfinkel had revealed was due to a collateral shortfall -- but I realized that this was a real possibility, and I wanted to have the true facts brought out into the open as soon as possible. (Cohn Dep. 930:10 - 930:23, Feb. 14, 2008 [A13, p. 101].)

70.    At the Board meeting, Mr. O'Hanlon was instructed to meet with Fleet immediately and inform the Bank of the issue Mr. Garfinkel had raised (and to have another

director accompany him to this meeting).  (Cohn Dep. 910:15 - 911:8, Feb. 14, 2008 [A13, p. 97].)  The meeting occurred on July 17, and as a result, Fleet sent an auditing team into DVI to conduct a thorough review of DVI's records and of the collateral situation.  (Cohn Dep. 262:4 - 262:6, 272:21 - 273:1, Feb. 12, 2008 [A11, pp. 50, 52-53].)

71.    I was glad that this investigation was being conducted, because if there was in fact a collateral shortfall, I was intent on learning its magnitude and how it had come about.  I believed that the best way to learn all the facts was for Fleet to send its auditors in to DVI to work with our own people to review the entire collateral picture.

**The Events of August 2003**

72.    On or around August 1, 2003 -- as the review of the collateral was being conducted -- I learned for the first time (in a telephone call with Nate Shapiro, Chairman of the Audit Committee) that the Company had received a "whistle-blower" letter from a DVI Treasury Department employee named Susan Gibson a week earlier.  I then saw the letter on August 4, 2003.  This was the first time I understood that one or more employees of DVI may have committed fraud.

73.    The letter explained that Ms. Gibson had learned on July 3, 2003 that Andrea Marshall, who worked for Steve Garfinkel, DVI's CFO, had gone into the DVI data processing system in order to re-characterize as pledged to Merrill Lynch certain receivables that were actually pledged to Fleet.  This was the first time I had heard anything about possible improper conduct in connection with pledged collateral.  (Cohn Dep. 261:15 - 262:13, Feb. 12, 2008 [A11, p. 50]; Cohn Dep. 344:10 - 344:22, Feb. 13, 2008 [A12, p. 65]; Cohn Dep. 931:15 - 931:20, Feb. 14, 2008 [A13, p. 101].)  Around this time, I also learned that there had been an unauthorized movement of $44 million of DVI collateral to Merrill Lynch.

74.    I discussed the Gibson letter with Mr. Shapiro, John Boyle, DVI's Chief Accounting Officer to whom it had been addressed, and Ellis Levin of Ten Eyck Associates ("Ten Eyck") -- a forensic accounting firm DVI had hired to assist in answering certain SEC inquiries. Mr. Shapiro and I decided to extend Ten Eyck's authority to include an investigation of the charges Ms. Gibson made in her letter. (Cohn Dep. 260:2 - 261:14, Feb. 12, 2008 [A11 pp. 49-50]; Cohn Dep. 348:21 - 348:22, Feb. 13, 2008 [A12, p. 66].) Mr. Levin of Ten Eyck suggested that Mr. Shapiro, Mr. Boyle and I say nothing about the letter to anyone else while Ten Eyck investigated. (Cohn Dep. 263:13 - 263:19, Feb. 12, 2008 [A11, p. 50].)

75.    During this time, I knew that DVI would have to reduce its expenses significantly if it was to be able to resume profitable operations. Therefore, I began to consider how expenses could be reduced -- a subject about which my business experience made me knowledgeable. With a view toward saving money by reducing staff, I approached the Human Resources Department on August 5, 2003 and asked for a list of employees who would be entitled to severance payments if they were let go. I got that list on August 6. Two employees' names on the list were not followed by any severance amount, and I asked why this was so. I was told that it was because these employees had already received severance payments -- something that made no sense, since I knew that both of these individuals were still employed at DVI. (Cohn Dep. 263:20 - 264:4, Feb. 12, 2008 [A11, p. 50].) Because the responsibilities of both of the employees in question involved reporting to DVI's lenders, I became suspicious that the so-called severance payments to them were really "hush money" to get them to conceal what they knew about how DVI's collateral had been dealt with by management. (Cohn Dep. 261:14 - 264:7, 284:13 - 284:23, Feb. 12, 2008 [A11, pp. 50, 54].)

76.     After getting the severance payment list on August 6, I met with Mr. Garfinkel to test his reaction to the information I had acquired. I asked Mr. Garfinkel if he had released any collateral without Board approval, and he said he had not. (Cohn Dep. 264:16 - 265:9, Feb. 12, 2008 [A11, pp. 50-51].) I also asked Mr. Garfinkel in this meeting whether he had prepared any large checks outside of the normal course of business. Mr. Garfinkel said that he had not done so, with the sole exception of the fee to Ten Eyck. Because Mr. Garfinkel's answers to my questions were not satisfactory, I then went to Mr. O'Hanlon, showed him the Susan Gibson letter, told him about the severance payments, and asked him to accompany me to Mr. Garfinkel's office. (Cohn Dep. 264:8 - 264:15, Feb. 12, 2008 [A11, p. 50].)

77.     This time, with Mr. O'Hanlon present, I confronted Mr. Garfinkel about the Susan Gibson letter, the collateral that had been transferred to Merrill Lynch, and the severance payments. With regard to the collateral, I asked if he had requested the permission of either Mr. O'Hanlon or the Board for the transfer to Merrill Lynch, and Mr. Garfinkel admitted that he had not. With regard to the severance payments, I asked Mr. Garfinkel why they had been made. He said that he had been advised by a consultant that the employees in question had been constructively terminated. (Garfinkel Dep. 108:9 - 110:15, Apr. 1, 2008 [A19, pp. 142-143].) I asked Mr. Garfinkel why the Board had not been notified, and he had no answer.

78.     Finally, with regard to Ms. Gibson's letter, Mr. Garfinkel initially attempted to provide an innocent explanation for the situation Ms. Gibson described by claiming that Ms. Marshall (who worked for him) simply made a mistake in listing the same collateral in two different places. (Cohn Dep. 266:6 - 267:2, Feb. 12, 2008 [A11, p. 51].) I asked why -- given the collateral shortfall -- Mr. Garfinkel had assured the Board of Directors at the December 2002 Board meeting that DVI was in compliance with its loan covenants. His response to me

was that DVI had in fact been in compliance at the time of the December meeting. (Cohn Dep. 267:3 - 267:10, Feb. 12, 2008 [A11, p. 51].)

79.    The next day I went to the Human Resources Department, got the records relating to the severance payments, and found a handwritten note from Mr. Garfinkel instructing that the records be kept confidential and shown to no one. (Cohn Dep. 267:18 - 268:3, Feb. 12, 2008 [A11, p. 51].) I immediately contacted the Legal Department and directed that the entire Board be informed of what I had discovered. (Cohn Dep. 268:4 - 268:11, 286:17 - 287:4, Feb. 12, 2008 [A11, pp. 51, 55].) The Legal Department subsequently sent the Board a report informing the Board Members of the supposed severance payments and stating that they had not been approved by the Compensation Committee.

80.    Once I learned from the Gibson letter and my two unsatisfactory conversations with Mr. Garfinkel that the collateral issues at DVI were the product of possible management fraud, I realized that a bankruptcy filing would be the best way to bring order to the situation by supplanting management's control and having someone on the scene whose only loyalty was to the Company's creditors.

81.    With the approval of the Board, I then undertook to obtain bankruptcy counsel for DVI. That process took a while because DVI's normal outside counsel in Philadelphia was conflicted. Therefore, I had to contact a number of other firms. However, I

was eventually able to secure Latham & Watkins to represent DVI in the bankruptcy, and the petition was filed on August 25, 2003.

_____

Gerald L. Cohn

Sworn to before me this
26th day of June, 2008

_____

Notary Public

NOTARIAL SEAL
LOIS OPDYKE, Notary Public
Doylestown, PA, Bucks County
My Commission Expires Feb. 28, 2011

29